Jon M. Sands
Federal Public Defender
Sarah Stone (AZ Bar No. 022713)
Charlotte G. Merrill (AZ Bar No. 029786)
Dale A. Baich (OH Bar No. 0025070)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
sarah_stone@fd.org
charlotte_merrill@fd.org
dale_baich@fd.org
602.382.2816
602.889.3960 facsimile

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Ray Newell, | No. CV-12-02038-PHX-DGC |
| Petitioner, | DEATH-PENALTY CASE |
| vs. | |
| Charles L. Ryan, et al., | |
| Respondents. | |

## PETITION FOR WRIT OF HABEAS CORPUS
### 28 U.S.C. § 2254

# Table of Contents

Introduction ...............................................................................................................1

I. Facts and Procedural History ...............................................................................1

   A.  Newell's Personal History ............................................................................1

   B.  Procedural History.......................................................................................28

II.  State Court Presumption of Correctness ............................................................48

III.  Exhaustion .........................................................................................................49

IV.  The AEDPA is unconstitutional .......................................................................50

   A.  The AEDPA suspends the writ of habeas corpus .....................................50

   B.  The AEDPA violates the separation-of-powers doctrine.........................51

   C.  Conclusion .................................................................................................52

V.  Federal Constitutional Claims ...........................................................................53

Claim One ...............................................................................................................53

   Newell was denied effective assistance of counsel when his trial counsel
   failed to present expert testimony on his mental health and drug addiction. .53

Claim Two ...............................................................................................................65

   Newell was denied effective assistance of counsel when his trial counsel
   failed to request an expert on addiction and/or polysubstance abuse. ...........65

Claim Three ............................................................................................................70

   Newell's trial counsel ineffectively failed to investigate, develop, and present
   a wealth of powerful mitigating evidence during his capital trial proceedings
   in violation of his rights under the Sixth, Eighth and Fourteenth Amendments
   to the United States Constitution.....................................................................70

     A.  Introduction ..........................................................................................71

     B. Newell's trial counsel ineffectively failed to investigate, develop, and
     present the mitigating evidence of Newell's upbringing amid a multi-
     generational history of violence. ................................................................. 73

     C. Newell's trial counsel ineffectively failed to investigate, develop, and
     present the mitigating evidence of Newell's severe, pervasive, and long-
     term drug addiction and the effects of his drug use at the time of the
     crime…...................................................................................................75

     D. Newell's trial counsel ineffectively failed to investigate, develop, and

present the mitigating evidence of Newell's family history of instability and neglect, and the serious physical, mental, emotional, and sexual abuse of Newell. ...................................................................................................77

E. Newell's trial counsel ineffectively failed to investigate, develop, and present the mitigating evidence of Mr. Newell's mental and cognitive impairments .........................................................................................79

F. Each instance of trial counsel's failure to investigate, develop, and present this readily-available and relevant mitigation evidence was constitutionally deficient performance that undermines confidence in the outcome of Newell's case...........................................................................79

Claim Four .......................................................................................................82

Newell was denied effective assistance of counsel and his due process rights when his trial counsel failed to subpoena certain witnesses and failed to adequately prepare others in the mitigation phase of his capital trial.............82

Claim Five .......................................................................................................90

The Arizona Courts violated Newell's Fifth, Sixth, and Fourteenth Amendment rights by permitting the State to play the statements that it obtained from him over the course of a thirteen-hour interrogation in violation of Miranda, Edwards, and the Constitution's voluntariness principles. ........................................................................................................90

A. The state courts permitted the State to admit statements that were obtained in violation of Miranda v. Arizona and Edwards v. Arizona. ......90

B. The state courts permitted the State of Arizona to admit statements obtained through force, threats, coercion, and promises............................98

Claim Six ......................................................................................................110

Newell's trial counsel, in violation of his Sixth, Eighth, and Fourteenth Amendment rights, failed to ensure crucial portions of the record were preserved and recorded.............................................................................110

Claim Seven ..................................................................................................116

Newell's was denied effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment Rights, when appellate counsel failed to raise the issue of the incomplete record..........................................116

Claim Eight ...................................................................................................118

The Arizona Courts violated Newell's rights under the United States Constitution and clearly-established federal law by permitting the State to introduce in rebuttal the improper testimony of a probation officer that was based on information that the officer did not author and that Newell had never seen. .............................................................................................................118

A. The Arizona Courts violated clearly-established federal law by allowing the state to present evidence in the penalty phase of Newell's trial that did not rebut any arguments he made................................................119

B. The Arizona Courts violated Newell's rights under the confrontation clause by permitting the state to present Edwards's testimony based on

information taken solely from reports he did not author or witness. ........121

C. The Arizona Courts violated Newell's constitutional rights to Due Process and a fair trial by permitting the state to elicit testimony about evidence it did not disclose to Newell's counsel........................................123

Claim Nine........................................................................................................125

Newell's trial counsel, in violation of his Sixth and Fourteenth Amendment rights, ineffectively failed to investigate or obtain the probation file upon which the State relied in the aggravation and penalty phase of his trial.......125

Claim Ten ........................................................................................................129

Newell's trial counsel, in violation of his Sixth, Eighth, and Fourteenth Amendment rights, ineffectively failed to properly investigate and obtain records essential to a complete mitigation presentation. ............................129

Claim Eleven ....................................................................................................132

Newell's Sixth and Fourteenth Amendment rights to confront witnesses against him were violated when a medical examiner who did not perform the autopsy testified at trial. ..................................................................................132

Claim Twelve....................................................................................................136

Trial counsel was ineffective for failing to object to the Medical Examiner's testimony that was in violation of Newell's rights under the Confrontation Clause. ..................................................................................................136

Claim Thirteen ................................................................................................138

Appellate counsel was ineffective, in violation of Newell's Sixth, Eighth, and Fourteenth Amendments rights, for failing to raise a confrontation clause issue with respect to the medical examiner's testimony...............................138

Claim Fourteen ................................................................................................139

The trial court erred when it precluded all expert testimony about Newell's mental health in violation of Newell's due process rights under the Fifth, Sixth, and Fourteenth Amendment of the United States Constitution..........139

Claim Fifteen ....................................................................................................142

The trial court erred when it forced counsel into trying a case post-Ring before the new rules were clear, in violation of Newell's right to due process of law and effective assistance of counsel. ..................................................142

Claim Sixteen....................................................................................................147

Appellate counsel was ineffective, in violation of Newell's Sixth, Eighth, and Fourteenth Amendments rights, for failing to raise the Due Process violation of forcing Newell to trial...........................................................................147

Claim Seventeen ..............................................................................................148

The trial court erred, violating Newell's Eighth and Fourteenth Amendment

rights, when it permitted the ligature to be admitted into evidence and then to go back to the jury room. ..................................................................148

Claim Eighteen .................................................................................152

Newell was denied effective assistance of appellate counsel, in violation of his Sixth, Eighth and Fourteenth Amendment rights, when counsel failed to raise the issue that the trial court erred by admitting the ligature into evidence. ............................................................................................152

Claim Nineteen ................................................................................153

Newell was deprived of the right to a fair trial because the State engaged in various instances of misconduct......................................................153

  A. Closing argument. ....................................................................155

  B. Use of actual ligature at trial..................................................157

  C. The State engaged in misconduct when it played an un-redacted tape of Newell's interrogation for the jury. ...........................................160

  D. The prosecutor engaged in misconduct in closing argument when they appealed to vengeance in their closing argument at penalty phase...........162

Claim Twenty ...................................................................................166

The trial court erred when it denied Newell's motion for mistrial due to prosecutorial misconduct, in violation of Newell's due process rights under the Fourteenth Amendment of the United States Constitution. ...................166

Claim Twenty-One ............................................................................174

Newell was denied the effective assistance of appellate counsel in violation of his Sixth, Eighth and Fourteenth Amendment rights where appellate counsel failed to challenge multiple instances of prosecutorial misconduct and the trial court's rulings. ....................................................................174

Claim Twenty-Two.............................................................................176

The trial court improperly denied Newell's Batson challenge in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution........................................................176

Claim Twenty-Three...........................................................................179

The trial court violated Newell's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by giving the sentencing jury an incomprehensible instruction that misled the jury about its sentencing alternatives and the jurors individual choices............................179

Claim Twenty-Four ...........................................................................183

Newell's trial and appellate counsel ineffectively failed to ensure the jury was properly instructed regarding their sentencing alternatives in violation of his Sixth, Eighth, and Fourteenth Amendment rights. ............................183

Claim Twenty-Five.............................................................................183

The trial court violated clearly-established federal law and Newell's constitutional rights to Due Process and a fair trial by instructing the jury that if it did not sentence Newell to death, he could be sentenced to life with the possibility of parole after 35 years when, in fact, the earliest possibility of parole would have been after 58 years. .........................................................183

Claim Twenty-Six ..................................................................................186

Newell's direct-appeal counsel ineffectively failed to raise to the Arizona Supreme Court the meritorious issue that the trial court unconstitutionally misled the jury about its sentencing options. .................................................186

Claim Twenty-Seven ..............................................................................187

The trial court improperly precluded Newell's family from presenting the relevant mitigation evidence of execution impact testimony in violation of the Eight and Fourteenth Amendments, and his counsel ineffectively failed to challenge this practice in violation of the Sixth and Fourteenth Amendments. ......................................................................................................187

Claim Twenty-Eight ...............................................................................191

Newell's trial and appellate counsel performed ineffectively by failing to ensure the sentencing jury heard crucial evidence related to an individualized sentencing in violation of the Eighth and Fourteenth Amendments.............191

Claim Twenty-Nine .................................................................................192

Newell was denied his right to a fair sentencing and due process of law when the Arizona Supreme Court affirmed his death sentence under independent review. .......................................................................................................192

Claim Thirty............................................................................................196

Newell was denied his right to effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to raise the flawed independent review in a Motion for Reconsideration. ..............................................................................196

Claim Thirty-One.....................................................................................197

The application of Arizona's newly enacted death penalty statute to Newell violated the ex post facto clause of the United States Constitution..............197

Claim Thirty-Two ....................................................................................199

Newell was denied his right to the effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to raise the Ex Post Facto issue. ............................199

Claim Thirty-Three ..................................................................................200

Newell was denied his right to the effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to challenge the (F)(6) aggravator.........................200

Claim Thirty-Four ................................................................................205

    Arizona's "heinous, cruel, or depraved" aggravating circumstance does not genuinely narrow the class of death-eligible offenders, thus violating Petitioner's due process rights and his protection against cruel and unusual punishment. ...............................................................................205

Claim Thirty-Five ................................................................................209

    The court's failure to require special verdict forms for mitigation violated Newell's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ...............................................................209

Claim Thirty-Six .................................................................................210

    Arizona's capital sentencing scheme violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because it does not require the prosecution to prove that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. ...................................210

Claim Thirty-Seven .............................................................................212

    Arizona's requirement that mitigating factors be proven by a preponderance of the evidence unconstitutionally prevents the jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. ...............................................................212

Claim Thirty-Eight ..............................................................................213

    Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a defendant to affirmatively prove that the sentencing body should spare his life. .........213

Claim Thirty-Nine ...............................................................................214

    The trial court improperly permitted the introduction of victim impact evidence in violation of Newell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. ........................214

Claim Forty ........................................................................................218

    The death penalty is categorically cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment to the United States Constitution. ..................................................................................................218

Claim Forty-One .................................................................................219

    The aggravating factors alleged by the State are not supported by findings of probable cause at the indictment stage because the State failed to allege the aggravating factors in the indictment in violation of Newell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. .........................................................................................219

Claim Forty-Two .................................................................................221

    Arizona's capital sentencing scheme violates the Eighth and Fourteenth

Amendments to the United States Constitution because it affords the prosecutor with unbridled discretion to seek the death penalty...................221

Claim Forty-Three ................................................................................222

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant...................222

Claim Forty-Four ................................................................................223

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances...................................223

Claim Forty-Five ................................................................................224

Arizona's capital sentencing scheme violates Newell's Constitutional protections against cruel and unusual punishment because it denies capital defendants the benefit of proportionality review of their sentences. ...........224

Claim Forty-Six ................................................................................225

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently channel the discretion of the sentencing authority. ..................225

Claim Forty-Seven................................................................................226

Arizona's capital sentencing scheme discriminates against poor, young, and male defendants in violation of the Fourteenth Amendment.......................226

Claim Forty-Eight................................................................................227

Newell will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. ................................................................227

Claim Forty-Nine................................................................................228

The State of Arizona's execution of Newell after over nine years on Arizona's death row constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. ......228

A. The Conditions of Newell's Confinement in the Maricopa County Madison Street Jail ................................................................228

B. The Conditions of Newell's Confinement on Arizona's Death Row..230

C. Legal Basis for Relief ................................................................233

Claim Fifty................................................................................238

Newell's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case. ................................................238

1

Prayer for Relief ...................................................................................................241

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Pursuant to 28 U.S.C. § 2254, Petitioner Steven Newell, through counsel, respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondent, pursuant to the judgments and sentences of an Arizona state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of his rights under the United States Constitution.

Petitioner is in the custody of the Arizona Department of Corrections (hereinafter "ADOC"), incarcerated on a sentence of death for his 2004 conviction for the first-degree murder of Elizabeth Byrd.

## I. Facts and Procedural History

### A. Newell's Personal History

By the time he was an adolescent; Newell had already experienced and lived constantly with some of the harshest realities of life:  abject poverty, homelessness, parental drug addiction, unthinkable neglect, physical abuse, and the devastating trauma of sexual abuse.  Born to a methamphetamine-addicted mother, Newell had only one stable, consistent figure in his life to count on, his maternal grandmother.  Living with his grandmother was the best period of Newell's life; however, it was during this time he was sexually abused by two men, witnessed his mother beaten, and dealt with his mother's drug addiction. (Tr. 3/4/11 at 33.)[1]  Shaken and lost after the death of his grandmother, Newell

---

[1]Trial proceedings for the Maricopa County Superior Court are docketed under CR2001-009124.  Reporter's transcripts are designated "Tr." followed by the relevant date and page number.  Indexed documents from the record on appeal are designated "ROA" or "Supp. ROA" followed by the docket number. Exhibits from the trial and sentencing proceedings are designated "Trial Ex." followed by the exhibit number.  Post-conviction proceedings and evidentiary hearing exhibits were Bates numbered by the State and used for citing documents in the Petition for Review and Opposition to Petition for Review.  These documents are designated "PCR ROA" followed by the relevant Bates number.  Post-conviction documents not part of the PCR ROA are referred to by the appropriate pleading name and date filed.  Transcripts from the evidentiary hearing will be cited as "Tr." followed by the relevant date and page number. Docket number CR-04-0074-AP identifies Newell's direct appeal to the Arizona Supreme Court. This docket will be referred to as "DA Doc."  The Arizona Supreme Court docket for Newell's petition for review from the Maricopa

turned to the only coping mechanism he learned as an impressionable child – drugs.   By the extremely young age of eleven, Newell was a full-blown methamphetamine addict neglected by everyone but the pipe.

> **1.    Both sides of Newell's biological family were plagued with histories of mental illness, drug addiction, and physical violence.**

Although rail-thin the rest of his life, Steven Ray Newell weighed twelve to thirteen pounds (Not. of Filing, 5/5/09, Wake Chronology ("Wake Chron.") at 3.), when he was born September 26, 1980, at Maricopa County General Hospital in Phoenix, Arizona to Kathy Joann Newell.   Born to a mother who smoked cigarettes daily and used cocaine and methamphetamine while pregnant with him, (Tr. 3/4/11 at 30), Newell was one of three pregnancies for Kathy.   His half-sister, Tracy Lynn Newell, was born December 29, 1978, in Phoenix. Kathy's third pregnancy was not carried out full term.

Kathy was one of eight children born to Eula and Morris Newell on August 29, 1956, in Phoenix.   (Tr. 2/23/04 p.m. at 4, 71; Not. of Filing, 5/15/09, Sherry Orsborn Affidavit ("Sherry Orsborn Aff.") at 1.)   Eula was from Utah and was a homemaker.   (Wake Chron. at 1.)   Morris was from California and worked as a mechanic. Morris, who was fifteen years older than Eula, died at age 63 of heart problems in 1966.   (Wake Chron. at 1; Sherry Orsborn Aff. at 1.) About three years later, Eula married Dean Elliott, who also worked as a mechanic and abused alcohol.   (Wake Chron. at 1.)   Dean passed away a few years after they married.   (Wake Chron. at 2.)

Kathy's family was tumultuous and fought often.   The family fights usually started after someone said something about another.   Kathy often fought with Eula, who was a strict woman, and her sister Connie, who drank alcohol

---

County Superior Court's denial of his petition for post-conviction relief is Docket number CR-12-0065-PC and will be referred to as "PR Doc."

heavily and was rough on Kathy.  Kathy's sister Sherry tried to stay away from the family to avoid the constant bickering.  (Tr. 2/23/04 p.m. at 71-72.)

Like Newell, Kathy was troubled at a young age.  Kathy and her family spent a few years in California (Sherry Orsborn Aff. at 2), but she was primarily raised in Phoenix, where she dropped out of school after the eighth grade. (Wake Chron. at 2; Tr. 2/23/04 a.m. at 42-43.)  When Kathy was only twelve years old, Eula found cocaine in the bathroom after Kathy and her boyfriend had been in there.  Kathy stole from her place of employment and her sisters and mother, presumably for drug money.  (Tr. 2/23/04 p.m. at 83.)  Despite all of the red flags, Eula was in denial that her youngest child had a drug problem.

Kathy moved out of Eula's home several times beginning at age eighteen but always returned after a couple of months.  (Wake Chron. at 2.)  At 21, Kathy married Richard Dallas Cope on December 9, 1977, in Phoenix.  (Wake Chron. at 2.)  While married to Kathy, Cope fathered a son with his former wife, Rhonda.  His son was born December 29, 1978 (Wake Chron. at 2), the same day Kathy gave birth to Tracy.  Kathy lived with Eula at the time Tracy was born and claimed Richard Maynard of Glendale, Arizona was her father.  (Wake Chron. at 2.)  Tracy's birth certificate, however, lists her father as "Rick Newell," a name Kathy made up so that Tracy would have her last name.  After years of dysfunction and separation, Kathy and Cope's marriage legally dissolved on January 21, 1983.  (Wake Chron. at 4.)

Kathy met Newell's father, Thomas Ray Smith ("Tom") (Tr. 2/23/04 a.m. at 42; Wake Chron. at 3), through her friend, who was also Tom's former wife. They started dating while Tom was on parole for assaulting a man with a machete, cutting his neck and severely wounding his arm.  Tom and Kathy dated on and off for three years and lived together in Eula's home about one year. Tom worked as a roofer and gave Kathy money to pay bills, but she spent the money partying with friends in the neighborhood and the telephone and

electricity were disconnected.  During the relationship, Kathy seemed depressed, was argumentative, and her moods often changed sharply.  She would go from stable to being in states in which Tom could not even talk to her.

Eula made a verbal agreement with Tom that if he made repairs to her home she would leave the house to him in her will.  After learning about the deal, Connie convinced Eula to cancel the deal despite the time and money Tom had invested into the home. Tired and upset, Tom said he was moving out, and it was at this moment Kathy told Tom she was pregnant with Newell.  Believing it was just an attempt to keep him from leaving, Tom moved out.

Tom was never a part of Newell's life.  (Tr. 2/23/04 a.m. at 43.)  He once saw Newell playing in the front yard of Eula's home as he drove by in his car; he believed Newell was about seven or eight years old.  Many years later, Tom ran into Connie at a bar and she told him Kathy was running the streets and not taking care of Newell.  She tried to persuade Tom to take Newell in, but he told her that he did not even know him.

Until recently, Newell knew nothing about his father other than he shares his middle name.  Tom was born September 19, 1949, in Casa Grande, Arizona, and spent most of his life in Arizona.  He and his seven siblings grew up in an unloving home with alcoholic parents, Dora and Alvin, who administered discipline with the use of a razor strap, and Alvin beat them.  Dora succumbed to cancer at forty-six.

Mental health issues were prevalent in Tom's family.  Tom's brother, Harmon, was incarcerated as a juvenile for stealing, and he accrued adult convictions, most as a result of his addiction to drugs or alcohol.  Harmon was admitted into a Veterans Affairs hospital following a suicide attempt and participated in mental health treatment.  In 1983, he was arrested after walking blind drunk to a convenience store intending to engage in a shootout with police

4

in hopes of ending his life. Harmon's troubles rose to the level that he was ordered to participate in a competency evaluation.

Tom did not spend much time with his family because he too spent most of his life institutionalized and incarcerated.   At nine, Tom was caught shoplifting and placed in the Arizona Boys Ranch, Sunshine Acres, where he spent the next three years.  A couple of years later, Tom was sent to Fort Grant for over four months and, shortly after his release, he was sent back for another fourteen months.  After he was discharged, he was picked up for car theft and returned to Fort Grant, where he remained until his eighteenth birthday.

Like his parents and brother, Tom battled alcoholism and it led to seven arrests for Driving While Intoxicated.  His drinking intensified in 1980 after his father Alvin was beaten to death.  Tom drank up to forty eight beers a day, and sometimes drank more.  He often drank a pint or a fifth of vodka at a time.  Tom also used marijuana, uppers, downers, and injected speed.

Tom's temper, tendency to carry weapons, and alcohol abuse was a dangerous combination that led to seven felony convictions in Arizona and a reputation as a bad guy in town.  In 1974, Tom participated in a court-ordered psychiatric evaluation and was diagnosed with Passive-Aggressive Personality and Alcoholism and his doctor recommended he participate in weekly mental health treatment.  Tom was hostile, belligerent, and aggressive when intoxicated or sober, and in need of very strong external controls as his internal controls were insufficient to control his behavior and temper.  He was deemed unable to function within the norms of society and needed more structured circumstances than probation.  Tom is currently supervised by parole for an aggravated-assault conviction involving the use of a knife against police officers.

Tom's son from his first marriage, Tommy Jr., has followed in his footsteps of alcoholism and felony convictions.   Tommy Jr. did not like watching his father drink because it reminded him of himself.  He suffered

severe depression and anxiety after he and his girlfriend ended their relationship, and has had trouble controlling his violent temper and contemplated suicide.  On April 16, 2013, Tommy Jr. was released from ADOC after serving concurrent sentences for two counts of aggravated driving while under the influence in 2001.

### 2.  Newell's early childhood was marked by a callous lack of parental care or love.

Eula was the true stabilizing force in the family and her home acted as the family's home base.  (Tr. 2/23/04 p.m. at 40, 86; Tr. 2/23/04 a.m. at 44.)  While her home provided permanency, it was nevertheless situated in an unsafe, impoverished South Phoenix neighborhood overridden with drugs, criminal activity, and gang violence.  Everything was available on the streets, particularly methamphetamine.

Kathy was emotionally and physically unavailable to her young children in the most extreme way.  Entangled in her methamphetamine addiction, she would take her welfare check and food stamps (Tr. 2/23/04 p.m. at 82), and disappear for weeks at a time without telling anyone where she was going (usually off with her various boyfriends) (Tr. 2/23/04 p.m. at 44), and leaving Eula to care for Newell and Tracy (Tr. 2/23/04 p.m. at 43-44.)  When Kathy returned, she was high on drugs and physically violent. She would call Newell "little bastard" and wished him dead.  (Pet. For PCR Appendix ("Appx."), PCR ROA at 0871.)  Connie was unable to recall ever hearing Kathy tell Newell and Tracy she loved them.  (Wake Chron. at 4.)

For most children the holidays are a time to look forward to, but with Kathy, they were a time of pain.  Every year, Kathy's sisters Sherry and Connie bought the children gifts the night before Christmas. Kathy would remove the tags and replace them with her own.  (Wake Chron. at 4.)  One year Sherry and Connie decided to teach Kathy a lesson by delivering the gifts the morning of Christmas Day but the plan backfired and Newell and Tracy were hurt when

they found out Kathy did not get them a single gift.  (Wake Chron. at 4.)  Years later, Kathy bought Tracy a coloring book and crayons for Christmas but nothing for Newell.  (Wake Chron. at 4.)  Newell was starved for love from his mother, and although Kathy would show kindness towards Tracy, she would never show any towards Newell. As they grew older, the children would try to avoid holidays because the family get-togethers always devolved into fights and physical violence.  (Tr. 2/23/2004 p.m. at 47.)

Connie and Sherry were never close to Kathy, mainly because of her drug use and because she stole from the family.  (Wake Chron. at 9.)  They believed Kathy used Eula (Tr. 2/23/04 p.m. at 82-83), who defended and supported her (Wake Chron. at 8.)  Connie also had disagreements with Kathy about how she failed to care for Newell and Tracy and, in part because of this, she estranged herself from Kathy.  (Tr. 2/23/04 p.m. at 80, 82.)

### 3.  Kathy continuously and unrepentantly endangered and failed to protect her children.

Most of his life, Newell lacked safety and stability.  Beginning in his youngest years, Kathy placed him in shockingly dangerous situations.  The men she dated had active substance abuse problems, serious mental illness, and were extremely violent towards her and the children.  Aware of these dangers and often contributing to them herself, Kathy maintained relationships with these men and allowed them free access to her children.

### a.  Living with Kenneth Auflick

Kathy took eighteen-month-old Newell and Tracy to Marion County, Ohio to live with her boyfriend, Kenneth Auflick, whom she had met at a local bar in Phoenix.  (Tr. 2/23/04 p.m. at 14; Tr. 2/23/04 a.m. at 43-44; Wake Chron. at 3.)  Kenneth physically abused Kathy and Newell and almost beat Kathy to death.  (Report by Pablo Stewart, M.D., 11/16/03 ("Stewart Report"), PCR Evid. Hrg. Ex. 9, PCR ROA at 2936; Tr. 2/23/04 a.m. at 45.)  Once, when Kathy was

7

in the bathroom, she heard Tracy screaming and walked out to see Kenneth holding Newell face first against a wall because he had dropped his sippy cup and spilled milk on the floor.  (Wake Chron. at 3.)  When Kathy went to aid Newell, Kenneth hit her in the head.  (Wake Chron. at 3.)  Eventually, the day arrived when Kathy had a small window of time to escape Kenneth's control, and she quickly bagged some belongings, called Eula to book airplane tickets for them (Wake Chron. at 4), and they returned to Arizona (Wake Chron. at 4.)

### b.    Moving to California

Kathy, who had a penchant for bikers and truck drivers (Wake Chron. at 6), moved her children to Fort Bragg, California (Report by Richard Lanyon, Ph.D., 9/20/03 ("Lanyon Report"), PCR Evid. Hrg. Ex. 14, PCR ROA at 3038), to live with her biker boyfriend, Kip.  While in California, Kathy and her children subsisted on state assistance and lived with Kip in a biker compound made up of trailers set back in the woods.  During this period of time, Newell was exposed to pornographic magazines and violence, including watching Kathy violently fight a woman who beat her fairly badly.  After a couple of months in California, Kathy and her children again headed back to Eula's home in Arizona.

### c.    Exposing Newell to severe danger and sexual abuse while living at Eula's

One day, Julian "Kiki" Alcala, an older neighbor, lured five-year-old Newell with drawing books and attempted to sodomize him.  (Tr. 2/23/04 a.m. at 50-51; Tr. 2/23/04 p.m. 10; Wake Chron. at 5.)  Newell was scared and angry.  (Tr. 2/23/04 p.m. at 10.)  About two weeks later, Connie showed up at Eula's home and learned what Kiki had done to Newell.  (Tr. 2/23/04 p.m. at 80-81.)  When she asked whether anyone had called the police, she discovered that no one had done so, despite the fact that Newell had told Kathy what happened.  (Tr. 2/23/04 p.m. at 80-81.)  At Connie's urging, Kathy finally called the police (Tr. 2/23/04 p.m. at 81, 87), but was told the police were unable to do anything

because Kathy had waited too long (Sherry Orsborn Aff. at 3).  Despite the horrific acts against Newell, Kathy continued to allow Kiki in Eula's home. (Sherry Orsborn Aff. at 3.)  About fifteen years later, at the time of Newell's trial, Kiki sat in prison serving a sentence for molesting a ten-year-old family member. After serving almost eight years, he was deported to Mexico.

When Newell was eight years old, Kathy was dating Honeycutt Brown ("Honeycutt") (Tr. 2/23/04 p.m. at 11-12), a man with a dangerous substance abuse problem and a history of serious mental illness and horrific violence. Before darkening the door of Kathy and her children, Honeycutt was transient and had a history of violence.  In June 1981, he slit a man's throat with a kitchen butcher knife.  The wound – eight inches long and one to two inches deep – severed the victim's jugular vein, required 100 stitches, and almost killed him. A few weeks earlier, Larry was arrested for knife and hashish possession in Las Vegas.  His prior encounters also included an arrest for Driving While Under the Influence in Colorado.

Born in Phoenix, Honeycutt had a troubled, emotionally-chaotic childhood.  He was arrested as a juvenile and expelled from the eighth grade for drinking on school grounds.  At thirteen, he began drinking alcohol heavily and ingesting barbiturates. Throughout the years, Honeycutt experimented with LSD, and used marijuana, amphetamines, Valium, pain killers, and speed.  He used any drug he could get his hands on, but his favorites were heroin, crack, marijuana, and pills.

Honeycutt made many unsuccessful attempts at treatment.  He participated in an inpatient program at Charter Hospital in Glendale, Arizona, for drug and alcohol abuse, as well as depression, which he suffered since age seventeen.  At 33, he spent time in a psychiatric hospital at Samaritan Behavioral Health Center in Scottsdale after attempting suicide by cutting his wrists. He attempted suicide a total of five times.  Honeycutt also saw a

1   psychiatrist on a monthly basis for a chronic mood disorder and received

2   prescriptions Serzone, Elavil, amitriptyline, and Depakote.

3       When Kathy started dating Honeycutt, he lived with his mother in the

4   same neighborhood as Eula.  He sometimes spent the night at Eula's home (Pet.

5   for PCR Appx., PCR ROA at 0988), and beat Kathy in front of her children

6   (Stewart Report, PCR ROA at 2935.)  Kathy, nonetheless, once travelled to

7   California and left the children in Honeycutt's care at Eula's home.  (Tr. 2/23/04

8   p.m. at 11-12.)  Honeycutt forced Newell and Tracy to sleep in Kathy's bedroom

9   with him. The following morning they emerged from the bedroom crying and

10  told their cousins that Honeycutt had sexually molested them.  (Pet. for PCR

11  Appx., PCR ROA at 0988.)  When Kathy returned to Arizona, Tracy told Kathy

12  what Honeycutt had done to them.  Rather than call the police, kick Honeycutt

13  out, or even hug her traumatized child, Kathy slapped Tracy hard across the

14  face.  (Pet. for PCR Appx., PCR ROA at 0988.)  When Eula confronted

15  Honeycutt, he threw a lamp at her, hitting her in the head.  (Pet. for PCR Appx.,

16  PCR ROA at 0988.)  Despite the horrific violation of her children, Kathy

17  continued to allow Honeycutt in Eula's home.  (Sherry Orsborn Aff. at 3; Pet.

18  for PCR Appx., PCR ROA at 0988.)

19      About five years after dating Kathy, Honeycutt entered a long-term

20  relationship with Angela.  Angela was repeatedly the victim of his violence.  His

21  21-year history of domestic violence and refusal to participate in treatment as

22  directed landed Honeycutt in the ADOC.  On November 11, 2004, about 15

23  months after he was released to parole, Angela found Honeycutt lying dead on

24  the floor in possession of a syringe.   He died of narcotic and cocaine

25  intoxication. Violent, mentally ill, and chronically addicted, Kathy leaving her

26  children in Honeycutt's care was emblematic of her life, choices, and inability to

27  put her children's basic safety before her own needs.

28                    **d.  Marrying Richard Lincks**

10

Around 1989, Kathy started dating Richard Lincks ("Lincks"), an alcoholic and cocaine addict.   Lincks's former wife, Susan, claimed he physically abused her and their son and pulled a shotgun on them. A psychologist opined it was in the best interest of the child that he not have any contact with his father, and the court took away Lincks's visitation rights.

After dating only a short period of time, Kathy uprooted her children and followed Lincks to Las Vegas and married him October 7, 1989.  (Wake Chron. at 7.)  By the time Newell was eight years old, Lincks and Kathy were doing at least a quarter of a gram of methamphetamine every day.  (Tr. 2/23/04 p.m. at 20-21.)   After losing his short-lived job in Las Vegas and subsequently their apartment, they returned to Eula, who, by then was in poor health.  (Tr. 2/23/04 p.m. at 25-26.)  Newell, only in the third grade, helped care for Eula as she fought a losing battle to breast cancer.  (Wake Chron. at 8; Pet. for PCR Appx., PCR ROA at 1056.)

### 4.   Eula's death destroyed what little stability persisted in Newell's life and family.

The loss of Eula (Tr. 2/23/04 p.m. at 41), crushed Newell and was a major turning point in his life.  Already a very quiet child (Tr. 2/23/04 p.m. at 86), Newell bottled up his emotions even more (Wake Chron. at 8), attempted suicide by cutting his wrists (Lanyon Report, PCR ROA at 3036), and started abusing methamphetamine and other drugs (Tr. 3/4/11 at 30-31; Tr. 3/3/11 at 65.)  He also started exhibiting self-destructive behaviors that continued into his adulthood.  (Wake Chron. at 8; Tr. 2/23/04 p.m. at 16.)    Newell burned and cut himself with knives, wire hangers, broken glass, and nails.  (Wake Chron. at 8.) Kathy saw marks on his arm and forearm but did nothing about it.  (Tr. 2/23/04 p.m. at 16-17.)  His self-mutilation continued throughout his life. In his mid-twenties, he once tied plastic bags to the ends of a string and wrapped the string around his penis to inflict pain upon himself.  (Wake Chron. at 8.)  He also self-

pierced countless parts of his body with various instruments.  (Wake Chron. at 8.)  Once, when Kathy was angry with Newell, she ripped his nose or eyebrow piercing completely through his skin.  (Pet. for PCR Appx., PCR ROA at 0814.)

Newell was depressed all the time.  He hustled for money to buy food. People saw that he was having a hard time and tried to help by giving him food, including Kiki's younger brother, who fed Newell ramen noodles on a few occasions.  An elderly woman in the neighborhood, Mary Lou Troendle, also helped Newell and fed him whenever he showed up on her doorstep, as he sometimes did at all hours of the day and night.  (Tr. 2/23/04 p.m. at 56-57.) Troendle did not see much parenting from Kathy (Tr. 2/23/04 p.m. at 55), and most of the time Kathy had no idea where Newell was going or where he had been (Tr. 2/23/04 p.m. at 57-58.)  Troendle saw Newell roam the neighborhood streets all hours of the day.  (Tr. 2/23/04 p.m. at 56-57.)  Newell told Troendle several times he had no reason to be at home because his mother was not there. (Tr. 2/23/04 p.m. at 56.)

Kathy, Lincks, and her children continued living in Eula's home after her death, but failed to pay the $98.00 mortgage for five months and faced foreclosure.  (Tr. 2/23/04 p.m. at 73.)  Kathy's siblings intervened and Sherry, the executor of Eula's will, sold Eula's home, forcing Kathy, Lincks, Newell, and Tracy to move out in September 1991.  They were left on the streets with no money and nowhere to go or sleep but vacant fields.  (Tr. 2/23/04 p.m. at 73-74; Wake Chron. at 9.)

After eviction from Eula's home, Kathy and her children were transient and did not stay in any place longer than six months, whether it was an apartment, rental trailer, or vacant field.  (Tr. 2/23/04 p.m. at 15, 40, 45; Tr. 2/23/04 a.m. at 53-54; Pet. for PCR Appx., PCR ROA at 0988.)  Newell's homelessness had serious educational consequences, leaving him intellectually behind.  (Pet. for PCR Appx., PCR ROA at 0988-89.)  Newell, who was later

diagnosed with Attention Deficit Hyperactivity Disorder and Cognitive Disorder, was placed in special education classes and pulled in and out of schools in Arizona and Nevada.  (Stewart Report, PCR ROA at 2935; Lanyon Report, PCR ROA at 3036.)   Sixth grade was the last level of school he completed.  (Pet. for PCR Appx., PCR ROA at 1056.)

Mirroring his home life, Newell's education was chaotic and sporadic to say the very least.  In 1986, Newell attended kindergarten at Laveen Elementary School and had difficulty reading and writing (Pet. for PCR Appx., PCR ROA at 1056; Wake Chron. at 5), and was placed in transitional kindergarten the following year (Pet. for PCR Appx., PCR ROA at 1056).  He was withdrawn from Laveen in October 1989 (Pet. for PCR Appx., PCR ROA at 1056), and a month later enrolled in C.C. Ronnow Elementary School in Las Vegas, where he only attended fifteen days and was absent ten days.  After returning to Arizona, he re-enrolled in Laveen, then attended sixteen days at Crockett Elementary School (Pet. for PCR Appx., PCR ROA at 1056), and sixty days at Palm Lane Elementary School.

Newell spent seven months – a lifetime in one place for Newell – of his fifth grade year at Fowler Elementary School.  He was noted as an enthusiastic student with excellent class participation and showed responsibility for his homework. By the third quarter, it was noted that Newell knew he was moving soon and had shut down when it came to work. He spent part of his fifth grade year at Williams Air Force Base Accommodation School District No. 510 and completed the remainder at Thomas J. Pappas School, a school for homeless children in Phoenix, where his behavior was noted as in need of improvement. From August to November 1993, Newell and his family lived in a cockroach-infested apartment near his sixth-grade school.  (Pet. for PCR Appx., PCR ROA at 1056; Wake Chron. at 10.)  After forty-two days of attendance at Mesendick Middle School, he was withdrawn and forced to move with his family to Las

Vegas, Nevada a second time.  (Pet. for PCR Appx., PCR ROA at 1056; Wake Chron. at 10.)  Newell only attended about two weeks at K.O. Knudson Middle School in Las Vegas and received failing "F" grades in six of seven classes.

At first, the family was living in a seedy one-room motel in downtown Las Vegas.  (Wake Chron. at 11.)  Newell walked the streets to get away from Kathy and escape their squalid section of town.  He started regularly drinking alcohol several times per week and used drugs, particularly methamphetamine, daily.  (Lanyon Report, PCR ROA at 3041.)  Newell experimented with almost every type of drug (Lanyon Report, PCR ROA at 3042), but his main drugs of choice were speed, marijuana, ecstasy, opium, and LSD (Stewart Report, PCR ROA at 2937; Lanyon Report, PCR ROA at 3042.)

Kathy reported Newell missing on June 20, 1994, to the Las Vegas Metropolitan Police Department.  She had been having problems with Newell and told an officer he and his friend got into some trouble and were taken to juvenile hall.  She picked him up from juvenile hall and he ran away again. Kathy believed Newell was staying with friends at an apartment complex but did not know the unit number.

After a brief time in Las Vegas, Lincks, the sole breadwinner in the family, lost the job that brought him to Las Vegas and he could no longer pay to stay in the motel.  (Tr. 2/23/04 p.m. at 27-28; Wake Chron. at 11.)  Homeless, on drugs, and in dire straits, further tension and fighting took place among the four of them.  (Tr. 2/23/04 a.m. at 49-50.)  Many of Kathy and Lincks's fights happened in front Newell and Tracy (Tr. 2/23/04 p.m. at 46; Tr. 2/23/04 a.m. at 56), and involved pushing and shoving and Kathy throwing things at Lincks (Tr. 2/23/04 p.m. at 22-23.)  Tracy, whose relationship with Kathy was already rocky (Tr. 2/23/04 p.m. at 41), could no longer deal with Kathy and found friends to stay with (Pet. for PCR Appx., PCR ROA at 0988), while Kathy, Lincks, and Newell stayed wherever they could, including vacant fields and lots near the Las

14

Vegas Strip (Tr. 2/23/04 p.m. at 46; Tr. 2/23/04 a.m. at 47; Wake Chron. at 11.) Newell slept in the streets and bounced around finding places to stay (Wake Chron. at 11), sometimes staying all night in casinos (Lanyon Report, PCR ROA at 3041).  To survive physically and emotionally, he panhandled, stole food, and used drugs. (Wake Chron. at 11.)

Methamphetamine ruled the lives of Kathy and Lincks.  (Tr. 2/23/04 p.m. at 20-21; Tr. 2/23/04 a.m. at 47-48.)   Every day, they snorted or smoked a quarter of a gram of methamphetamine.  (Tr. 2/23/04 p.m. at 20-21.)   Kathy also used methamphetamine intravenously.  She became very thin, lost teeth, and had sores on her body.  (Tr. 2/23/04 p.m. at 84.)   Kathy and Lincks stayed up for days hearing voices and fighting.  (Tr. 2/23/04 p.m. at 22.)

The foursome split up and all eventually returned to Arizona.  (Tr. 2/23/04 a.m. at 47.)   Lincks was the first to return to Phoenix while Tracy, Kathy, and Newell remained in Las Vegas and went their separate ways.  (Tr. 2/23/04 p.m. at 27-28; Tr. 2/23/04 a.m. at 47.)   Newell landed in police custody and was sent on a bus to his Aunt Sherry in Phoenix, who had foster children at the time.  (Tr. 2/23/04 p.m. at 75-77.)   During the three days Newell stayed with Sherry, he was respectful of her and her foster children but did not follow the rules in her home, particularly curfew.  (Tr. 2/23/04 p.m. at 75-77.)   Never having to follow any kind of rules before, Newell could not cope with the structure, left the house without telling Sherry where he was going, and came and went as he pleased. (Tr. 2/23/04 p.m. at 75-77.)   He also continued cutting and burning himself with cigarettes. (Tr. 2/23/04 p.m. at 84.)

With Kathy still in Las Vegas, a judge granted Lincks guardianship of Newell.  (Tr. 2/23/04 p.m. at 34.)   Lincks was not exactly guardian material.  He was unemployed, living in a field, and manufacturing methamphetamine to support his daily habit.  (Tr. 2/23/04 p.m. at 36; Wake Chron. at 12.)   While Lincks did love Newell (Tr. 2/23/04 p.m. at 7), and did the best he could under

the crushing influence of his methamphetamine addiction, he could not appropriately parent Newell (Tr. 2/23/04 p.m. at 34-35.)

Wanting to be a "cool dad," Lincks smoked methamphetamine with Newell, who at the time would have been a seventh grader.  (Tr. 2/23/04 p.m. at 28-29.)  Newell, who already seemed depressed, was usually quiet and would sit and draw for hours.  (Tr. 2/23/04 p.m. at 28-29.)  Lincks said he and Newell smoked methamphetamine about every Friday until Kathy returned from Las Vegas (Tr. 2/23/04 p.m. at 35-36), but according to Newell, they used crystal methamphetamine all day every day (Wake Chron. at 12.)  Methamphetamine caused Newell to experience difficulties sleeping and sometimes he was completely unable to sleep.  (Stewart Report, PCR ROA at 2938.)  He became very skinny and paranoid.  (Stewart Report, PCR ROA at 2937; Lanyon Report, PCR ROA at 3036; Tr. 2/24/04 at 38-39.)   Many times Newell believed someone was after him and did not know who.  He constantly looked around and over his shoulder saying someone was after him.

In Las Vegas, Kathy did not maintain regular communication with Newell.  (Tr. 2/23/04 p.m. at 30.)  Lincks would send her money so that she could return to Phoenix (Tr. 2/23/04 p.m. at 30.) but she would say she was returning and not follow through (Tr. 2/23/04 p.m. at 30).  When Kathy finally returned, she left Tracy in Las Vegas.  (Pet. For PCR Appx., PCR ROA at 0988-89.)  No one knew where Tracy was in Las Vegas (Pet. For PCR Appx., PCR ROA at 0988-89), and she too had also fallen victim to the powerful hold of methamphetamine (Tr. 2/23/04 p.m. at 48-49.)

**5.   Each of the places Newell tried to find shelter were plagued with the same pervasive atmospheres of danger, drug use, and serious mental illness.**

     **a.   Living in a methamphetamine lab at 14: Ginger Whitley's**

When Newell was about thirteen years old, he was taken in by Ginger Whitley, the mother of Newell's girlfriend, Kristi.  Unfortunately, she was also a severe addict and was known for cooking the best methamphetamine product in Phoenix, with people coming from as far as Cottonwood, Arizona, to buy her product.  (Tr. 2/23/04 p.m. at 61-62.)

Newell met Kristi through a mutual friend, Ronald Roe, whose family lived next to Ginger.  Ronald's father allowed Newell to sleep on the porch or in the yard, but not inside his trailer.  Newell was around thirteen and Kristi was around twelve.  They became friends, started dating, and Newell moved from Ronald's porch to a small trailer on Ginger's property.

Ginger's property was "tweaker heaven." The lot was about a quarter-acre with two trailers and one camper.  Newell and Kristi lived alone without any parental supervision in a small metal trailer with one bed, no air conditioning or insulation, a broken toilet, and a door did not close correctly.  In front of Kristi and Newell's trailer was a single-wide where Kristi's younger sister Meghan lived. It had a running toilet, which Newell and Kristi used.  Connected to Meghan's trailer was a camper where Ginger and her boyfriend, Ray Whitley, stayed.  Located in front of the camper was a three-man tent where Ginger, who did not wear a mask or any type of protective gear, mixed explosive, noxious chemicals and then cooked the chemical mixture in the oven in her camper.

It was obvious there was a methamphetamine lab was on the property. The strong rotten-egg smell of methamphetamine and toxic chemicals was detectable a half-mile away. An electrical power cord ran from Ginger's camper to Ronald Roe's trailer. People came in and out of the property all hours of the day and night.  The property was a junkyard. Tremendous amounts of trash, including glass beakers and tubes, were strewn near the three-man tent in the front yard. Tires were everywhere, especially in the back of the lot, where Ginger had a double horse trailer filled with junk and a tarp hanging over it.

Despite these telltale signs of a methamphetamine lab, an employee of the Arizona Division of Child, Youth, and Families showed up on Ginger's property but turned right back around after seeing her dog.

Constantly aware they lived in a dangerous environment, Newell and Kristi, still only in their very early teens, kept knives on them at all times in case they needed to defend themselves from the unpredictable drug addicts walking in and out of the property all hours of the day and night. Newell protected Kristi and her younger sister Meghan and watched over them, including on the night they ran from police helicopters flying over the property. That night, they ran across dirt roads and fields, jumped over a three-strand barbed wire fence, and hid in bushes until the morning.

Tracy showed up at Ginger's every now and then. Newell and Tracy were not affectionate like typical siblings. Tracy was very thin at the time. She was at Ginger's the night Newell, Kristi, and Meghan ran from the police helicopters and ran with them.

While Newell lived with Ginger, Kathy would call to say she was coming over, but would not show up. (Tr. 2/23/04 p.m. at 68-69.) Kathy only saw Newell a couple of times when he lived with Ginger, and Kathy signed a document giving Ginger guardianship over Newell. (Tr. 2/23/04 p.m. at 68-69.) Newell, hurt and abandoned, wanted nothing to do with Kathy, and she had nothing nice to say to him when he did see her. During the time Newell lived with Ginger, he referred to Ginger as "mom." His actual mother, Kathy, was worthless.

Ginger, who was more focused on her methamphetamine business, failed to provide her children and Newell with the basic necessities or any type of parental supervision. She did not even make sure they were fed. It was Kristi who used money she earned babysitting to buy everyone hamburgers from the local convenience store.

Ginger knew Newell and Kristi had a sexual relationship.  Although they were only about twelve and thirteen, Ginger allowed them to live alone in a trailer with one bedroom with one mattress and did not tell them to sleep separately.  (Tr. 2/23/04 p.m. at 8.)  Ginger once asked Kristi to switch sexual partners with her, meaning Ginger wanted to have sex with Steven, who was only 14 years old, and Kristi would have sex with Ginger's boyfriend, Ray.

Life with Ginger was not much different than life with Kathy.  Through methamphetamine, Ginger allowed violent addicts around her children. Methamphetamine brought Ray and Ginger together.  Prior to dating Ginger, Ray drank about twelve to twenty four beers daily, and served time for burglary in an Alabama prison in 1981.  Ray and Ginger married April 23, 1999.

Ginger had abandoned her three sons from a previous relationship and was an alcoholic.  She had been a physically beautiful woman until methamphetamine took it all away.  Ginger injected methamphetamine between her toes and went without sleep for as many as twenty days. She scarred her face and arms with constant digging and scratching, and lost so much weight she fit into Kristi's size-zero jeans. She had a full set of dentures by age thirty two.

Ginger supplied Newell with methamphetamine and in exchange, he peddled drugs for her. Steven tried to hide his methamphetamine use from Kristi for fear of disappointing her but she noticed signs of his use: his skin broke out, he picked at his face, and he had trouble sleeping.  Ginger was angry that Kristi wanted Newell to stop using methamphetamine and had tried to help him quit. Despite Kristi's attempts, Newell was literally surrounded by methamphetamine and had easy access to it, and his drug use intensified, making his earliest teenage years one of his heaviest periods of drug use.

During their relationship, Newell and Kristi were inseparable.  Kristi noticed Newell became bored easily and tried to constantly keep him busy.  If he sat still long enough, he would stare off into space and it was as if he was not

19

there at all.  He did not talk about what he was thinking during these moments, but they seemed to take place when he had a chance to sit and breathe. Newell kept things in and did not talk to Kristi about his past or family.

Even though Newell was a very important part of Kristi's life, she abruptly ended their relationship when she left Ginger's after Ginger failed to attend her eighth-grade graduation because she was busy with her methamphetamine business.  Kristi escaped to a friend of Ginger's, who lived in Ahwatukee, Arizona.  She wished she could have taken Newell with her but the woman was only able to take in one person.  Kristi was in survival mode and wanted to get away from Ginger and methamphetamine.

Newell continued living on Ginger's property after Kristi left.  (Tr. 2/23/04 p.m. at 64.)  Ginger and Ray did not treat Newell well (Wake Chron. at 14), and, desperate to escape, he called the police in hopes of going to jail (Wake Chron. at 14.)  When the police did not care, Newell eventually decided that returning to homelessness was better and went back to life on the South Phoenix streets.

Ginger and Ray moved to Show Low, Arizona, and on January 5, 1999, both were arrested for selling methamphetamine to a confidential informant and having a scale, glass pipe, five plastic baggies with white residue, and two syringes in the home. In June 1999, Ginger pled guilty to Attempt to Sell a Dangerous Drug and Possession of Drug Paraphernalia.  Ray pled guilty to the same charges and had subsequent run-ins with the law for dangerous drug-related crimes in 2008 and 2011.

In her Navajo County Superior Court presentence report, Ginger listed Newell as her son and reported marrying seven times. Ginger self-reported using methamphetamine during the time Newell lived with her, and stated she mainlined, snorted, smoked, and ingested methamphetamine for pain.

Ginger was placed on intensive probation supervision, but after two positive drug tests for methamphetamines, Ginger was sent to prison.  On July 4, 2003, she was released to parole, returned to Show Low (Tr. 2/23/04 p.m. at 63), and went back to selling and using methamphetamine.

About six months prior to testifying at the penalty phase of Newell's capital trial, Ginger was classified as seriously mentally ill, diagnosed with Major Depressive Disorder, and prescribed Prozac, Lexapro, and Neurontin. She also participated in intensive outpatient treatment and attended Narcotics Anonymous meetings weekly.  From September to December 2003, she received prescriptions Remeron, Zoloft, Neurontin, Zyprexa, and Wellbutrin.  She had loose thought process, depression, racing thoughts, flat affect, and heard voices. Ginger was very moody and went from okay to going on a rampage in a snap of two fingers.

Ginger was ultimately diagnosed with schizophrenia and bipolar disorder. She also required counseling to help her with creating good boundaries and having better judgment regarding safer intimate partners. She reported a history of heroin abuse and had chronic Hepatitis C.

The last years of Ginger's life were chaotic.  During one of her hospitalizations, she was not allowed to return to her single-wide trailer because its condition was unfit for a human being.  Ginger told hospital staff she liked being hospitalized because she was fed, and she was caught hoarding food. Ginger continued to use drugs but made an attempt to stop and, on April 25, 2009, she died of complications related to quitting methamphetamine.

### b. Bounced around at the bottom:  Johnny Hawkins and the Seymours

After living with Ginger Whitley, Newell stayed the night with various friends from the streets and eventually moved in with his friend, David Seymour ("Little Dave") and his father ("Big Dave"), who lived in a dope house owned

by their relative, John "Johnny" Hawkins, in North Phoenix.  Newell stayed with Johnny and the Seymours a couple of years.  (Tr. 2/23/04 p.m. at 9.)  During that time, he slept on the floor of the dope house.

Johnny was a schizophrenic drug addict. Unstable and seriously mentally ill, Johnny suffered from visual hallucinations and saw rabbits jumping through the walls and chased them with knives.  Several times Newell told a friend, Thomas "Tommy" Hayes, he did not feel safe around Johnny and asked to stay the night in his car parked in an alley.

Almost everyone Newell associated with used or sold drugs.  (S*ee* Tr. 2/23/04 p.m. at 44.)  Depressed and broke, Newell panhandled for money all hours of the day.  People in the neighborhood tried to "help" Newell the only way they knew how, by giving him drugs to use or sell.

Newell used a lot of hallucinogenic drugs with Tommy and other friends. Newell, Tommy, Little Dave, and Little Dave's girlfriend went on a three-week drug binge, smoking methamphetamine and marijuana and ingesting approximately 300 hits of acid.  They fried their brains.

While living at Johnny's, Newell sustained a serious head trauma when he slipped and fell off Johnny's roof while looking for a leak.  He hit his head on the side of a chain-link fence pole and lay on the ground unconscious about forty five minutes.[2]

Tracy continued to pop in and out of Newell's life, showing up at Johnny's house every now and then.  She dated a physically abusive man who beat her and with whom she used drugs.  After the beatings, Tracy sometimes showed up at Johnny's and cried in Newell's lap.  Sooner or later, her boyfriend would call saying he had scored more dope, and she would run back to him. Her boyfriend later died of a heart attack related to his methamphetamine use.

---

[2] This is in addition to the numerous times he was thrown or dropped on his head.  (Report by Kiran Amin, Ph.D., PCR ROA at 2369.)

Kathy's whereabouts during this time were unknown.  One day Newell finally found Kathy and introduced her to Tommy and asked if he could find drugs for them.   That day, Newell, Tommy, and Kathy smoked methamphetamine together.  Tommy sold methamphetamine to Kathy, and Big Dave sold her crack cocaine.  Tommy is currently in a Colorado prison and he has served a prison term in ADOC.

"Little Dave" also had an extensive history of substance abuse starting at a young age and ended up in ADOC. In one presentence report, Little Dave admitted that his father, "Big Dave," who let Newell stay with him, was not a stable influence.  Big Dave was arrested for possession of a narcotic drug for sale, possession of methamphetamine for sale, and drug paraphernalia possession in 2002. A failure to appear warrant issued in September 2004, but the case never went forward as Big Dave passed away April 4, 2004.

### 6.     Newell's neighborhood was awash with an epidemic of methamphetamine and legal troubles.

It was not simply the people Newell stayed with, but his entire neighborhood that was a haven of drug-addled people barely surviving, many with serious mental health issues. One cannot overstate the perils this neighborhood presented to each person living there or the havoc it wreaked, especially on the lives of the young men who were thrown unsupported into its midst. Indeed, that is borne out by the fact that most of Newell's friends and acquaintances from the streets fell into an abyss of methamphetamine addiction, destruction, and criminal behavior.  Ronald Roe, whose father allowed Newell to sleep on his porch, has a lengthy history of substance abuse and juvenile and adult arrests.   He is currently in ADOC for burglary and his past felony convictions include: drug-paraphernalia possession, burglary-tool possession, unlawful use of means of transportation, and misconduct involving weapons.

Phillip Allen, Steven Koke, and Justin Westbay all used drugs with Newell in the days leading up to the homicide–all are in ADOC.  Phillip Allen is serving a five year prison term for burglary, and most of his crimes were committed while under the influence of methamphetamine.  Steven Koke is incarcerated for drug-paraphernalia possession and he has past convictions for marijuana, methamphetamine, and glass-pipe possession.  Justin Westbay smoked methamphetamine and marijuana, and is serving close to ten years for trafficking in stolen property.

Methamphetamine led to criminal behavior and many contacts with law enforcement for Kathy and Lincks as well.  In October 1996, Lincks grabbed Kathy by her shoulders and hit her in the chest after she refused to pick up cans in the street. At the time, Kathy and Lincks were homeless and living in a car in the area of 35th Avenue and the Gila River bottom.  An officer transported Kathy to Central Arizona Shelter Services, a homeless shelter in Phoenix.

In March 1997, Lincks was suspected of breaking into his stepfather's garage and stealing tools, which he had done before.  Lincks was a serious drug abuser and transient.  A few months later his stepfather found the stolen property at an abandoned house where Lincks and Kathy were known to stay. An officer went to the abandoned home and did not make contact with Lincks or Kathy, but found a methamphetamine lab.

On May 2, 1997, Kathy and Lincks were arrested after police were dispatched to a mobile home due reports of a strong odor of methamphetamine and people frequently walking in and out of the trailer. They were later found in possession of drug equipment and chemicals used to make methamphetamine. Kathy admitted she was a heavy methamphetamine user to police, pled guilty to her first felony conviction of dangerous drug possession, and was placed on three years of probation.  (Tr. 2/23/04 a.m. at 48-49.)  Lincks pled guilty to his

fourth and fifth felony convictions (Wake Chron. at 2, 6), and was sentenced to three years in ADOC (Tr. 2/23/04 a.m. at 48.)

### 7. Newell's brief period away from the neighborhood, his lingering scars, and his return to the neighborhood.

After Eula, the best part of Newell's life was with Danielle Denson. Newell met Danielle through a mutual friend and they started dating when he was 16 years old and she was around 14.  (Pet. for PCR Appx., PCR ROA at 0811.)  After dating almost a year, Newell and Danielle moved in with Kathy, who then had an apartment.  (Pet. for PCR Appx., PCR ROA at 0811.)  Danielle and Kathy worked at a drycleaner's and, for a short time, Newell worked there as well. (Pet. for PCR Appx., PCR ROA at 0811-13.)

Danielle wanted to get away from Kathy.  Lincks sent Kathy several love letters from prison and she wrote back saying she missed him.  Yet, Kathy had many men in and out of her bedroom.  (Pet. for PCR Appx., PCR ROA at 0812.)  Tired of Kathy lying to Lincks, Danielle wrote a letter to Lincks, who she considered the more-involved parent, informing him of Kathy's infidelities.  (Pet. for PCR Appx., PCR ROA at 0812.)  Danielle and Newell decided to move out to get away from Kathy and her lifestyle.  (Pet. for PCR Appx., PCR ROA at 0812.)  When they told Kathy they planned to leave, she became angry and hit Newell close-fisted square in his face.  (Pet. for PCR Appx., PCR ROA at 0812.)  Danielle also heard rumors Kathy may have sexually molested Newell while he was growing up.

Like Kristi, Danielle also observed Newell have out-of-body experiences, but he said very little about them and what he experienced while in those states.  (Pet. for PCR Appx., PCR ROA at 0815.)  He also had a temper and broke things.  (Pet. for PCR Appx., PCR ROA at 0813.)  During a four-hour period, Newell angrily wrote "I HATE LIFE," all over boxes containing Danielle's

dishes, and did not recall doing so the next day.  (Pet. for PCR Appx., PCR ROA at 0813.)

Danielle wanted Newell to quit using methamphetamine.  (Stewart Report, PCR ROA at 2938.)  Newell was able to cut down his methamphetamine use, but continued to used ecstasy and marijuana heavily.  (Stewart Report, PCR ROA at 2936.)  Newell's continued drug use and behavior led Danielle to break up with him.  (Stewart Report, PCR ROA at 2938.)  Newell spun out of control.

On February 7, 2000, Newell lost control after two straight days of methamphetamine and alcohol intoxication and committed a serious offense.  He recognized he had done something wrong and turned himself in to police.  (Wake Chron. at 17; Lanyon Report, PCR ROA at 3042.)  While he was in jail, Kathy moved in with Danielle and, over time, Kathy got Danielle hooked on methamphetamine.  (Wake Chron. at 17.)  On June 21, 2000, Newell was sentenced to jail time. By the time he finished serving his sentence; Danielle had again ended their relationship.  (Pet. For PCR Appx., PCR ROA at 0815.)

### 8.   Newell's last place to stay throws him out and he is homeless again.

On December 21, 2000, Newell was released from jail and supervised by the probation department.  (Wake Chron. at 17.)  With nowhere to go, he was taken in by the parents of a childhood friend, Debbie and Terry Elliott Sr.  (Wake Chron. at 18.)  The Elliott family lived in a trailer home located in a bad area of town.  (Tr. 2/24/04 at 34-35.)  As conditions of probation, Newell was ordered to participate in outpatient substance counseling at Chicanos Por La Causa and obtain employment.   (Wake Chron. at 18; Tr. 2/24/04 at 20.)  Although finding new employment after spending years of his childhood and adolescence homelessness was an almost impossible task, Newell was able to secure employment at Olson Precast of Arizona.  In a short time, however, he developed a skin condition on his arms and hands from working with the

1    cement.  (Stewart Report, PCR ROA at 2937, 2938; Lanyon Report, PCR ROA

2    at 3039.)  This led to the end of his employment on April 10, 2001.

3           After losing his job, Newell felt like the failure his mother always told

4    him he was (Tr. 2/24/04 at 47), and stopped reporting to his probation officer

5    (Wake Chron. at 19-20), and fell back into using methamphetamine after several

6    months of abstinence (Stewart Report, PCR ROA at 2938).  On May 19, 2001,

7    probation officer James Edwards made an unannounced visit at the Elliott home.

8    (Tr. 2/24/04 at 39.)   Edwards suspected Newell was using methamphetamine

9    again based upon his fifty-pound weight loss and sunken eyes.  (Wake Chron. at

10   20; Tr. 2/24/04 at 39.)  A few days later, the Elliotts kicked Newell out of their

11   home because he was not working and they believed he had stolen money from

12   them.  (Wake Chron. at 21.)

13          Homeless and alone again with no money or support, Newell sat on the

14   ground near the door to Sam's Grocery Store by the pay phone all night.

15   (Lanyon Report, PCR ROA at 3041.)  He plummeted into despair and deadened

16   his pain the only way he had known since he was a child–with drugs.  (Lanyon

17   Report, PCR ROA at 3032.)  Overwhelmed with feelings of depression (Lanyon

18   Report, PCR ROA at 3032), Newell drank alcohol, used vast quantities of drugs

19   every day, and began to experiment with heroin by mixing it with

20   methamphetamine, or "speed balling" (Stewart Report, PCR ROA at 2938.)  In

21   the four to five days preceding the crime, hopeless and devastated from his

22   losses and failures, believing no one cared if he lived or died, out-of-his-mind

23   high from regularly injecting a hazardous combination of methamphetamine and

24   heroin and not sleeping, Newell took the life of Elizabeth Byrd.  (Stewart

25   Report, PCR ROA at 2938.)  In one of his many apologies to the victim's family

26   and his community, Newell unknowingly gave one of the most telling

27   indictments of the background and circumstances that afflicted his whole life,

28

"My mother told me I couldn't amount to anything. She was right and I'm sorry."  (Tr. 2/24/04 at 47.)

### B.  Procedural History

#### 1.       The Crime

Counsel will not go into great detail regarding the crime itself because the details are graphically laid out in the direct appeal opinion and later in this Petition.

Additionally, it must be remembered that so many of the details are known because Newell confessed and gave law enforcement detailed information about the crime.  In many other capital cases, the detailed facts surrounding the victim's last moments are simply not known because the defendant did not confess.  *See, e.g.*, *State v. Lehr*, 38 P.3d 1172, 1186 (Ariz. 2002) (overturning the aggravating factor of especially cruel on appeal because "[v]ery little [was] known about the circumstances of the victim's death.  Her remains were out in the desert for several months").

Elizabeth Byrd was reported missing on the evening of May 23, 2001. Her body was found the next day in a canal in an area of Phoenix known as the Pits.  (Tr. 11/5/03 at 18.)  She was eight years old.  The medical examiner determined that cause of death was strangulation.  DNA evidence found on her clothing was found to match the loci from a blood sample from Newell.  (Tr. 2/2/2004 at 80.)

#### 2.       Pre-trial proceedings

On June 14, 2001, a Maricopa County grand jury indicted Newell on one count of first degree murder (both premeditated and felony murder) in the death of Elizabeth Byrd.  (ROA 1.)  Additional charges included one count of sexual conduct with a minor under the age of 15, and one count of kidnapping, both dangerous crimes against children.  (ROA 1.)  The State did not allege any

1   aggravating factors in the indictment.

2   <center>**a.     Rush to trial**</center>

3          It was immediately apparent that Newell's case would be voluminous, and

4   on July 5, 2001, the State filed a notice of discovery with a witness list in excess

5   of 100 individuals.  (ROA 7.)  On July 9, 2001, the State filed notice of its intent

6   to seek the death penalty.  (ROA at 12.)  The State also filed notices alleging that

7   Newell was on release from confinement when he committed the offenses and

8   that he had been convicted of a prior historical dangerous felony.  (ROA 14, 15.)

9   Over a year after the indictment, on August 19, 2002, the State supplemented the

10  notice to include the aggravating factors that the crimes were committed in an

11  especially heinous, cruel and depraved manner and that the victim was under the

12  age of 15.  (ROA 45.)

13         Initially attorneys Gary Bevilacqua and Joe Stazzone were appointed to

14  represent Newell.  Both were extremely experienced capital defense lawyers in

15  the Maricopa County Public Defender's office.[3]   Unfortunately, Bevilacqua and

16  Stazzone were not just extremely experienced, they were extremely busy. On

17  May 3, 2002, counsel filed a motion to continue Petitioner's October 1, 2002

18  trial date.   The motion noted that Bevilacqua was assigned to represent six

19  defendants in death or potential death penalty cases.  Three, including Newell's,

20  were set in September or October of 2001.  Bevilacqua detailed his lengthy case

21  schedule for five pages.  (ROA 32.)  At a May 10, 2002 status conference

22  Stazzone explained that he and Bevilacqua were supposed to be in a two-month

23  trial starting that past Monday.  That trial was continued over their objection and

24  would now conflict with the Newell case.  Stazzone noted however that they

25  were moving forward with setting up as many interviews as possible and

26  working diligently on the case.  (Tr. 5/10/2002 at 3-4.)   Counsel for the State

27  _____

28  [3] There does not appear to be a formal order appointing them, but their first
    appearance is on a motion dated June 27, 2001.  (ROA 6.)

<center>29</center>

agreed they probably could not go before January.  (Tr. 5/10/2002 at 5.)  Due to policy implemented by the Maricopa County Superior Court, the judge did not have the authority to address the motion.  It had to go before a "continuance panel" to determine whether or not additional time would be granted.[4]  On May 16, 2002, counsel appeared before the continuance panel and the following exchange occurred:

> THE COURT:  I appreciate your candor.  You need a long continuance on the Newell case.
>
> MR. BEVILACQUA:   Partly because of my trial calendar, partly the continuance made over our objection [on another case], yes, and partly because of the nature of the case, typically, and volume of this case, I can't be effective before the middle of May.

(Tr. 5/16/2002 at 7.)

Despite these avowals, counsel's continuance request was denied.  (ROA 35.)  The court stated "I am not arguing with your logic at all . . . I will deny the motion.  But I certainly can see you need to withdraw on it."  (Tr. 5/16/2002 at 7.)

Accordingly, on May 21, 2002, counsel filed a motion to withdraw from Petitioner's case.  The motion noted that there was no qualified attorney in the Public Defender's Office who could be prepared to take the case to trial on the scheduled date.  (ROA 37.)   Counsel further noted that the case had two

---

[4] In June 2000, by Administrative Order 2000-30, the Maricopa County Superior Court instituted a panel to "master calendar" all motions to continue to a small group of judges who would hear motions to continue in criminal cases.  The idea was that the judges would enforce Arizona Rule of Criminal Procedure. 8 and the local guidelines for continuances.   The panel operated for over four years and was suspended in October of 2004 by Administrative Order 2004-159. *See* http://www.superiorcourt.maricopa.gov/superiorcourt/administrativeorders/adminorders/ao2004-159.pdf

banker's boxes of police reports and approximately 200 hundred audio and videotapes of witnesses.  (ROA 37.)  At the hearing on the motion to withdraw, the prosecutor noted that Newell's "is probably the most extensive case that we have pending before the criminal bench, I think, right now."  (Tr. 6/10/2002 at 2.)  Further the prosecutor stated, "I think there's a lot of preparation that will have to take place and I believe that if we allow defense counsel to withdraw, we're pretty much in the same spot either way.  I kind of doubt that this will be ready by October."  (Tr. 6/10/2002 at 3.)  The court nonetheless granted counsel's motion on June 10, 2002.  (ROA 38.)

### b.    Lost in the system

After losing two of the most experienced capital defense lawyers in Arizona, Newell bounced around the system.  First, he was shuffled off to the Office of the Legal Defender ("OLD").  On July 8, 20012, OLD too filed a motion to withdraw.  The attorney's name who appeared on the motion was one who was leaving the office.  (Tr. 7/31/2002 at 3.)  The motion was based on OLD's prior representation of Newell's mother, Kathy, that an investigator with OLD was part of the team that searched for Elizabeth after her disappearance, and that no counsel in the office could be ready to try the case by October 1, 2002. (ROA 39.)  The motion was denied without prejudice. (ROA 40.)

At a subsequent status conference held July 31, 2002, Bob Briney, head of OLD appeared before the court.  He avowed to the court that they had seven lawyers that could handle these types of cases and that two of them had resigned in the last three months.  He stated there was no one in his office that could handle the case within a year.  (Tr. 7/31/2002 at 4.)  He stated the presiding criminal judge had personally advised him not to accept cases they could not do in a year because the timelines were important.  (Tr. 7/31/2002 at 4.)  Briney noted that Bevilacqua was in the best position to try the case, and that the Public Defender's office was willing to take the case back, but that they "just couldn't

get it prepared by October."  (Tr. 7/31/2002 at 4-5.)  Even the State agreed that "this case doesn't . . . fit into Judge Campbell's 270 day time limit.  It's not that kind of case."  (Tr. 7/31/2002 at 6.)  The court granted the motion to withdraw from OLD on the ground they could not be ready.  (Tr. 7/31/2002 at 7-8.)

### c.   New counsel and new death-penalty statute

Finally, after almost two months without counsel, Newell was assigned to Bruce Peterson with the Office of the Legal Advocate ("OLA") to represent him. (ROA 43.)  Peterson was joined by Tim Agan, and they would ultimately take Newell's case to trial. OLA mitigation specialist Linda Thomas was assigned to take on her first capital case, and assist Peterson and Agan with mitigation.

Peterson too, was an experienced lawyer and busy with a heavy caseload. Unlike Bevilacqua, who was denied at every turn, Peterson sought and was granted several continuances.  In the first, Peterson asked to vacate the October 1, 2002, trial date and a status conference was set for November 4, 2002.  (Tr. 9/4/02 at 4-5.)  In is unclear from the record why the court did not require Peterson to go before the continuance panel.

On September 17, 2002, a hearing was held on several cases regarding motions to stay proceedings pending action by the state supreme court after *Ring v. Arizona*, 536 U.S. 584 (2002) and to address the impact of the new death-penalty statute enacted August 1, 2002.  *See* Arizona Laws 2002, 5th Spec. Sess. Ch 1, § 3).  Despite the seismic shift from judge to jury sentencing, the court denied the stay for all the cases but noted it made no comment "on whether or not motions to continue should be filed, or if filed, whether they should be granted.  That's a . . . case by case basis."  (Tr. 9/17/02 at 24.)   For both Peterson and Agan, Newell would be their first post-*Ring* case and both described the experience as "flying blind."  (Tr. 3/3/11 at 12, 36.)

### d.   Fundamental dispute arises:   whether to submit to State's experts

On September 10, 2003, the State filed a request for disclosure of mitigation evidence.   Specifically, the State requested that "should the Defendant intend to offer any mental health or other expert opinion during the penalty phase, the State requests this Court order the Defendant submit to an examination by the State's expert(s) in the same or related field of practice" and if Newell would not submit to examination that the testimony be precluded. (ROA 67.)  On October 22, 2003, an informal status conference was held.  The state noted that they were close to trial and had no information from the defense on what the defense was going to present for mitigation regarding mental health experts.  Peterson argued he had not disclosed anything because his expert had not completed a report.   At the informal conference, the following exchange occurred:

> PROSECUTOR LYNCH:  And if he doesn't come back with anything good, there's a possibility you might have somebody else?
>
> MR. PETERSON:  I have to bring somebody.  There are cases that say I have got to bring somebody.

(Tr. 10/22/03 at 9.)

After much discussion about a continuance and scheduling, the court set a November 17, 2003, deadline for completion of the report.  The trial date was continued to start jury selection in early January 2004.  (Tr. 10/22/03 at 8-20.)

On November 20, 2003, the State filed a renewed request for disclosure of mitigation evidence and motion for sanctions.  (ROA 98.)  The State noted that Newell was to disclose his mitigation witnesses and evidence by the beginning of November and to date there was no disclosure. The State requested immediate disclosure of all mitigation witnesses or in the alternative, preclusion of their testimony.  (ROA 98.)  On December 1, 2003, Newell responded by filing an objection to the State's request for a court ordered psychological exam based on

33

his rights guaranteed by the 5th, 6th, and 14th Amendments.  (ROA 100.)
However, on the same date, Newell filed a disclosure statement which included
the names of two experts, John Wicks, Ph.D. and Pablo Stewart, M.D.  It noted
the experts' reports had been provided to the State.  (ROA 101.)

At a December 5, 2003 status conference, the issue of an exam by the
State's doctor was renewed.  Peterson stated that "in a nutshell . . . the defense
position is that we are not required by rule or law to have Mr. Newell submit to
an evaluation."  (Tr. 12/5/03 at 7.)  The State argued that they could not
adequately rebut the defense mental health examination without an examination
of their own. (Tr. 12/5/03 at 27.)  The State noted that the issue had been raised
in numerous capital cases and was currently pending before the state supreme
court in *State v. Phillips.*  (Tr. 12/5/03 at 15.)  The court took the issue under
advisement and asked for copies of the cases the parties relied on for their
arguments. (Tr. 12/5/03 at 29.)  The issue of whether or not to submit to a State
expert was one of the many open questions in Arizona post-*Ring*.

On December 12, 2003, the court found that although the issue of whether
a defendant has to submit to an examination by a state psychiatrist was "one of
first impression in Arizona" as to its application to mitigation, "it is clear that the
overwhelming authority supports the State's position."  (ROA 105.)
Accordingly, the court ordered Newell to submit to a mental health examination
by the State's expert and found that there was no constitutional right to have
counsel present.  *Id.*  That same day in a separate minute entry the court held that
the mental health evaluation would not be sealed, and that "if defendant does not
cooperate with the mental health examination his mitigation expert evidence
*shall* be precluded." (ROA 106) (emphasis added).  At a status conference that
same day, Peterson requested a stay based on the pending special action in
*Phillips*, before the state supreme court. (Tr. 12/12/03 at 9-10.)  Despite *Phillips
v. Araneta*, 93 P.3d 480 (Ariz. 2004) being a nearly identical issue, and despite

34

1  having given numerous continuances without sending the case to the
2  continuance panel the court, suddenly in a rush to trial again, denied the request
3  and forced counsel into a trial where the rules were unknown. (Tr. 12/12/03 at
4  10, 14.)[5]

5      Undeterred, Newell filed a special action in the Arizona Supreme Court
6  and again requested a stay relying on a similar case, *Phillips v. Araneta*, 93 P.3d
7  480 (Ariz. 2004), that was pending before the Arizona Supreme Court. On
8  January 7, 2004, the Arizona Supreme Court denied the stay and issued an order
9  to the trial court giving it discretion to order Newell to submit to the State's
10  mental examination. (ROA 115.) Additionally, the order stated if Newell
11  refused to cooperate then the trial court had the discretion to preclude Newell
12  from presenting expert evidence on the issue of his mental condition. (ROA
13  115.)

14      In a January 8, 2004 minute entry, following a status conference where the
15  denial of the stay and the issue of preclusion of mitigation evidence was
16  addressed, the court affirmed its December 12 order and reiterated that "if
17  defendant does not cooperate with the mental health examination his mitigation
18  expert evidence shall be precluded." (ROA 112.) Defense counsel did not allow
19  Newell to submit to an examination by any State expert prior to trial.

20
21  [5] At a November 4, 2002 status conference the defense again asked that a trial
    date not be set and instead continue the status conference. (Tr. 11/4/02 at 3-4.)
22  The court agreed to the request and a status conference was set for February 3,
    2003. (ROA 52.) At the February status conference, trial was set for September
23  16, 2003. (Tr. 2/3/03 at 3-5; ROA 53.) On June 26, 2003, the court again
    continued the trial, without going before the continuance panel, to October 16,
24  2003, based on counsel's conflict with another death penalty trial. (ROA 58.)
    On September 5, 2003, the trial was yet again continued by the court alone, on
25  defense counsel's request, and set for November 5, 2003. (ROA 66.) "[D]ue to
    the fact that defendant's psychiatric examination and report [would] not be ready
26  in time for the State to respond," the trial was yet again continued by the court to
    January 14, 2004. (ROA 85.) Again, upon request of the defense, that trial date
27  was vacated and jury selection was set to begin on January 20, 2004, where it
    ultimately began. (ROA 107.)
28

### e.      Voluntariness

On October 16, 2003, counsel filed a motion to suppress Newell's statements and requested oral argument on the issue.  (ROA 81.)  The State filed a response October 31, 2003.  The trial court held a voluntariness hearing on November 5, 2003.  At the hearing, the State argued that its position was that there were "not clear invocations of a right to counsel because you can't hear them."  (Tr. 11/5/03 at 11.)  Peterson countered that position was disingenuous because, among other arguments, you could hear the officer say "Did you ask for a lawyer?"  (Tr. 11/5/03 at 13.)  Numerous officers testified about their interactions with Newell and his statements and portions of the tapes were played.  (Tr. 11/5/03 at 22-97.)

At the close of testimony, the court took the matter under advisement but shortly thereafter, found no *Miranda* violation.  (ROA 94.)

### 3.      Trial

### a.      Guilt Phase

Jury selection began on January 20, 2004.  (ROA 129.)  The first few days, the jurors were simply questioned for hardship.  (Tr. 1/20/04; Tr. 1/21/04; Tr. 1/22/04.)   Prior to *Ring*, Arizona courts did not have to worry about questioning the jury about their fitness for the penalty phase.  Jury selection was yet another aspect of the case that was a brave new world, post-*Ring*.  The court noted for the jury, "this is the first time we're doing this, so we're all trying to figure this out as we go along."  (Tr. 1/27/04 at 4.)  Unfortunately, as the record bears out, Newell suffered as a result of everyone's learning curve.

On February 2, 2004, after several days of voir dire, the trial commenced. The first witness to testify was Elizabeth's mother, Linda Stone.  She testified that her older daughter, Lori, dated Newell in March of 2001.  (Tr. 2/2/04 at 105-106.)  Elizabeth disappeared on Wednesday, May 23, 2001.  (Tr. 2/2/04 at 107.) She left for school on her own.  That afternoon when Linda got home, Elizabeth

was not there.  Linda assumed she was at her friend's house and did not call the police until around 11:00 p.m. By morning there was lots of police and media activity.  (Tr. 2/2/04 at 114.)

Next, the State called a neighbor, who testified that on the day of Elizabeth's disappearance she saw Elizabeth walking to school and Newell near her riding on his bicycle.  (Tr. 2/2/04 at 124.)   The State also presented the testimony of several officers who engaged in the search for Elizabeth (Tr. 2/2/04 at 134; Tr. 2/3/04 a.m. at 12-17; Tr. 2/3/04 a.m. at 46-49; Tr. 2/3/04 p.m. at 47-69.)  The area where Elizabeth was ultimately found, known as the pits, was in the jurisdiction of Maricopa County so they took over the investigation.  (Tr. 2/2/04 at 144-45.)

The State called Maricopa County Sheriff's Office ("MCSO") Detectives Rudy Acosta, Gary McGuire, and Roger Marshall who testified about their contact and interviews with Newell.  (Tr. 2/4/04 at 79; Tr. 2/4/04 at 97; Tr. 2/5/04 at 84.)  The videotapes were played for the jury except for one date where the video was lost and the audio was played instead.  The process was very lengthy and took several days of trial to get through.  (Tr. 2/4/04 at 99; Tr. 2/5/04 at 90-91; Tr. 2/9/04; Tr. 2/10/04 a.m. and p.m.)

Philip Keen, M.D., was the Chief Medical Examiner for Maricopa County.  (Tr. 2/11/04 at 56.)  He did not perform the autopsy; a deputy medical examiner, Marco Ross did.  (Tr. 2/11/04 at 59.)  Peterson objected that any of the body diagrams were inadmissible as hearsay but was overruled.  (Tr. 2/11/04 at 60-61.)  Dr. Keen testified that Elizabeth had bruising on her right hand and wrist area.  (Tr. 2/11/04 at 61.)  Additionally, Elizabeth had contusions on her labia and an abrasion to her hymen, although there was no penetration to the hymen.  (Tr. 2/11/04 at 71, 73.)  The State used Keen to show autopsy photos of Elizabeth.  Some of the photos showed damage that was not inflicted by Newell. One photo showed that skin was sloughing off.   Keen clarified that it had

nothing to do with her injuries; it was just part of decomposition.  (Tr. 2/11/04 at 62-63.)  Another photo showed marbling of the skin, and again Keen clarified that was also from decomposition.  (Tr. 2/11/04 at 66.)  Finally, Keen testified that most likely Elizabeth would have been dead within a minute or two after the ligature was applied, but it is possible that consciousness could be lost in mere seconds.  (Tr. 2/11/04 at 77, 80.)

Finally, the State concluded testimony with an Arizona Department of Public Safety Criminalist who performed DNA analysis in Elizabeth's case.  The criminalist took a cutting from Elizabeth's underwear and found sperm.  She found the sperm from the underwear was consistent with Newell's.  (Tr. 2/11/04 at 102.)  The defense called no guilt-phase witnesses.  (Tr. 2/11/04 at 118.)  The jury returned a unanimous verdict of both premeditated and felony murder.  (Tr. 2/12/04 at 75.)

### b.     Penalty Phase Proceedings

The aggravation phase commenced February 18, 2004. The state argued three aggravators:  1) that the crime was especially cruel, heinous or depraved; 2) the victim was under the age of fifteen; 3) and that Newell had a previous conviction for a serious offense.  In order to prove the aggravators, the State pointed to the testimony of Dr. Keen. The State argued the bruises on Elizabeth's arms, the pain from the sexual contact, and the mental suffering of knowing she was about to be killed established the cruelty factor.  (Tr. 2/18/04 at 29.)   As to heinous or depraved, it argued that Newell killed Elizabeth to eliminate a witness.  The State also argued that if the victim was helpless or the crime senseless that could be additionally weighed.  (Tr. 2/18/04 at 31.)

The State called Newell's probation officer to prove the prior of kidnapping, as well as a fingerprint analyst.  (Tr. 2/18/04 at 35-37.)  During a break in trial, Agan again moved for a mistrial based on the jury hearing that Newell was on probation.  Agan argued that there were other ways to prove the

1  prior conviction, in fact it was done with the criminalist, and the State did not

2  need to show he was on probation.  (Tr. 2/18/04 at 45.)

3  The defense aggressively challenged the (F)(6) aggravator.  They argued

4  that the jury needed to compare this case to other murder cases. "Especially"

5  was key here.  (Tr. 2/18/04 at 71.)  Counsel argued that he did not intend to

6  belittle the injuries Elizabeth suffered, but they were not unique to a murder

7  case.  (Tr. 2/18/04 at 72.)  If the carotid artery was struck, as Keen testified was

8  possible, consciousness would have been lost within seconds.  (Tr. 2/18/04 at

9  73.)  Despite the defense's attempt to argue against the (F)(6) factor, the jury

10  determined that the State had proven all three aggravators beyond a reasonable

11  doubt.  (ROA 155.)

12  Prior to presentation of mitigation, the State successfully precluded any

13  evidence of Newell's family testifying to the jury "what the impact would be if

14  the defendant were sentenced to death."  (Tr. 2/20/04 at 6-7.)

15  Prior to the presentation of mitigation, the jury heard victim impact

16  statements.  The record indicates that one juror asked "[c]ould we have some

17  tissue boxes?"  (Tr. 2/23/04 a.m. at 28.)  First, Elizabeth's mother, Linda Stone

18  made a statement.  She told the jury she was so depressed at Christmas she was

19  going to commit suicide.  For some reason she decided to clean out the closet,

20  and inside she found Christmas cards that Elizabeth had made for everyone back

21  in May.  She believed that was Elizabeth still looking out for her.  (Tr. 2/23/04

22  a.m. at 29-30.)  She learned in February of 2002 that Elizabeth's father

23  committed suicide.  He had Elizabeth's pictures with him.  (Tr. 2/23/04 a.m. at

24  30.)  Stone said that her depression had gotten worse, and she took medication

25  for depression and high blood pressure.  She was seeing a psychiatrist and a

26  counselor.  She had nightmares all the time.  She ended with "I love you,

27  Elizabeth."  (Tr. 2/23/04 a.m. at 31.)

28  Next, Elizabeth's aunt, uncle, sister, and sister-in-law made statements.

1   (Tr. 2/23/04 a.m. at 31-34; Tr. 2/23/04 a.m. at 34-35; Tr. 2/23/04 a.m. at 35-37;

2   Tr. 2/23/04 a.m. at 37-39.)  They talked about the impact of the loss of Elizabeth

3   on the family, and the difficulties the family had endured.

4         The defense put forward their mitigation presentation in a single day.  The

5   mitigation presentation consisted solely of lay witnesses.  Newell's mother,

6   Kathy Newell was the first mitigation witness.  Kathy testified that Newell's

7   relationship with his grandmother, Eula, was wonderful, and the time they lived

8   at her house was the most stable.  (Tr. 2/23/04 a.m. at 44.)  After Eula died,

9   Kathy lost the house because she was unable to make the payments, and the

10   family moved a lot.  (Tr. 2/23/04 a.m. at 52-54.)  Kathy and her husband Lincks

11   both used methamphetamine and were both convicted of offenses connected to

12   their drug use.  (Tr. 2/23/04 a.m. at 47-48.)  Because of financial and drug

13   problems, they were never in one place more than six months at a time.  (Tr.

14   2/23/04 p.m. at 15.)  Eventually the family became homeless and everyone split

15   up.  (Tr. 2/23/04 a.m. at 47.)

16         Kathy was also asked about Newell's sexual abuse.  All she knew about

17   the incident was that a neighbor got Newell in one of the bedrooms and was

18   trying to sodomize Newell.  (Tr. 2/23/04 a.m. at 50.)  On cross-examination,

19   Kathy said that there "was not much penetration" and conceded she told the

20   prosecutor he did not act that differently afterwards.  (Tr. 2/23/04 p.m. at 10.)

21   Another incident occurred when Kathy went to California.  She left the children

22   with Larry Honeycutt.  When she returned, she learned that Honeycutt tried to

23   molest Tracy.  There were also allegations he tried to abuse Newell as well, but

24   Kathy would not concede that it happened.  (Tr. 2/23/04 a.m. at 51-52.)

25         On cross examination Kathy asserted she was a good mother to Newell.

26   Kathy said that they were only homeless a couple of weeks.  (Tr. 2/23/04 p.m. at

27   6.)  She testified Lincks was a good father to Newell and loved him very much.

28   (Tr. 2/23/04 p.m. at 7.)  She said Newell lived with Ginger Whitley and her

40

family for a year or two because Kathy was unable to care for him. They "took care of him like their own." (Tr. 2/23/04 p.m. at 7-8.) The Whitley's daughter, Kristi was Newell's girlfriend. They were allowed to sleep together in the same trailer even though he was 14 and she was 13. (Tr. 2/23/04 p.m. at 8.) Ginger Whitley testified that she took Newell in to live with her family. Ginger was using and manufacturing methamphetamine. (Tr. 2/23/04 p.m. at 61-62.)

Next, Newell's step-father, Lincks testified. Lincks that testified prior to meeting Kathy, Lincks did not have a drug problem. (Tr. 2/23/04 p.m. at 19.) About six months into their marriage, methamphetamine was a daily habit. (Tr. 2/23/04 p.m. at 20-21.) Lincks testified he wanted to be a "cool dad" so he used methamphetamine with Newell. (Tr. 2/23/04 p.m. at 29.) Newell's older sister, Tracy, testified briefly about their tumultuous lives. She testified that until Eula passed away, they lived with her, after that the family became less stable and moved around a lot. (Tr. 2/23/04 p.m. at 40.) Tracy characterized their childhood as growing up in a "drug life." (Tr. 2/23/04 p.m. at 44.) Finally, two of Newell's aunts and a neighbor also testified briefly about Newell's unstable childhood. (Tr. 2/23/04 p.m. at 55; Tr. 2/23/04 p.m. at 71-76; Tr. 2/23/04 p.m. at 80-85.)

Outside the presence of the jury, Peterson made an offer of proof that at this point he would call Dr. Pablo Stewart to testify and that Dr. Stewart would diagnose Newell with post-traumatic stress disorder ("PTSD") as a result of the physical abuse, emotional abandonment, and drug use from his childhood. Counsel noted that the State had told the jury they would hear no evidence to connect the incidents of Newell's life with what happened to Elizabeth and noted that Dr. Stewart would provide that. (Tr. 2/23/04 p.m. at 88-89.) However, due to the preclusion order, no expert testimony was presented to the jury.

In rebuttal, the State called Newell's probation officer, James Edwards.

Newell's counsel attempted to keep out the testimony on the grounds it was unfairly prejudicial, pursuant to Arizona Revised Statutes § 13-703(f)(7)(b), which was an aggravating circumstance where one is eligible for the death penalty if they are on probation for another offense. (Tr. 2/24/04 at 11.) The court allowed Edwards to testify. He testified that at the time Newell went on probation, he told the probation screener that his girlfriend had been supporting him for two years, that Newell denied physical and sexual abuse as a child, and he described his relationship with his family as positive. (Tr. 2/24/04 at 15, 17-18.) Finally, Edwards testified that Newell failed to report numerous times, was not working, and had not started any substance-abuse treatment. (Tr. 2/24/04 at 25.)

In addition, Newell exercised his right to allocute. He apologized for Elizabeth's death, and said not a day goes by that he did not think about it. He was using extreme amounts of crystal methamphetamine and it affected the way he functioned mentally and physically. (Tr. 2/24/04 at 46.) The results of trying to end his life "resulted in the death of Elizabeth." (Tr. 2/24/04 at 46.) He had been up for four days prior to Elizabeth's death. He did not remember everything that happened. He had the death of an innocent child on his conscience and prayed for strength for Elizabeth's family. He said it was true he was molested as a child but it was no excuse for his actions. His mother told him he would not amount to anything and she was right. He told Elizabeth's family he was sorry. He could not bring her back but could only stand up and take full responsibility for his actions. (Tr. 2/24/04 at 47.)

Following the conclusion of the penalty phase, the jury sentenced Newell to death for the first-degree murder of Elizabeth Byrd. (ROA 162, 163.)[6]

### 4.    Direct Appeal Proceedings

---

[6] Additionally, Newell was sentenced to consecutive terms of 27 years for sexual conduct with a minor, 24 years for kidnapping, and 3.5 years for his probation violation. (ROA 164; Tr. 2/25/04 at 10.)

Newell appealed his conviction and sentence.  Ginger Jarvis, from OLA was assigned to represent Newell on direct appeal.  The notice of appeal was timely filed on March 2, 2004.  (DA Doc. 1.)  Jarvis sought, and was granted three extensions of time.  (DA Docs. 21-26.)  The Opening Brief was ultimately filed on February 23, 2005.  (DA Doc. 28.)  On April 26, 2006, the Arizona Supreme Court affirmed Newell's conviction and sentence.  *State v. Newell*, 132 P.3d 833 (Ariz. 2006).  The United States Supreme Court denied Newell's petition for certiorari on November 27, 2006.  *Newell v. Arizona*, 549 U.S. 1056 (2006).[7]  On December 13, 2006, the Arizona Supreme Court issued its mandate in Newell's direct appeal.  (DA Doc. 53.)  On May 31, 2007, the court directed the Clerk of Court to file a Notice of Post-Conviction Relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure on Newell's behalf.  (DA Doc. 57.)

### 5.    Post-Conviction Proceedings

Newell returned to Maricopa Superior Court for his post-conviction proceedings.  On June 5, 2007, Newell's Notice for Post-Conviction Relief ("PCR") was automatically filed per the order of the Arizona Supreme Court.  (PCR ROA at 0582.)  Almost a year later, on May 23, 2008, the Arizona Supreme Court appointed Kerrie Droban to represent Newell in the state proceedings.  (DA Doc. 59.)  Droban sought funds for experts, a mitigation specialist, and an investigator.  (Req. for Mitigation Expert, 6/27/08; Aff. in Support of Appt. of Expert, 6/30/08; Req. for Expert Pharmacologist, 9/5/08; Req. for Investigator, 9/5/08.)  Holly Wake came on board as the mitigation specialist and Stella Salinas as the investigator.  The team did not work closely together, and several areas of mitigation were not followed up on.  Wake and Salinas had no contact with the experts retained or access to many of the records

---

[7] Newell filed his petition for certiorari with the United States Supreme Court on July 21, 2006.  (DA Doc. 51.)  By that point, Thomas J. Dennis had taken over as Newell's counsel and Jarvis had accepted a position with the Arizona Attorney General's office in the very unit trying to keep Newell on death row.

1   in Newell's file.

2       On May 4, 2009, after several extensions of time, Newell filed his Petition

3   for Post-Conviction Relief.  (Pet. for PCR, PCR ROA at 0584.)  The same day,

4   Droban filed a request for a two-week extension of time to return Newell's

5   signed and notarized verification and supplemental exhibits.  (Req. for Ext. of

6   Time, 5/4/09.)  The following day, Wake's report was filed as an exhibit to the

7   Petition.  In her opening letter, alluding to the issues in teamwork, Wake notes

8   she was not able to view video or audiotapes, and some pages, and "possibly

9   complete transcripts are missing" from the interrogation.  (Not. of Filing, 5/5/09,

10  Wake Letter at 1.)  She noted she only received four days of trial transcripts and

11  the only expert report she reviewed was Dr. Lanyon's, an expert the defense

12  never intended to call.   (Not. of Filing, 5/5/09, Wake Letter at 1.)   Wake

13  proceeded to list numerous individuals that still needed to be contacted and

14  interviews conducted.   She noted that she was not provided with copies of

15  interviews referenced by law enforcement.   She noted that she "forwarded

16  information to Ms. Droban on how to obtain [Newell's] Nevada juvenile

17  records," but she did not know if those were ever requested.  (Not. of Filing,

18  5/5/09, Wake Letter at 2.)  Wake noted that she did not give the opening letter to

19  counsel to review before filing it with the court.  (Not. of Filing, 5/5/09, Wake

20  Letter at 4.)

21      Newell presented three issues for relief, with subparts.   First, Newell

22  argued that the Arizona Supreme Court's independent review deprived him of a

23  right to fair sentencing and due process under the Fifth, Eighth, and Fourteenth

24  Amendments.   Second, Newell's Sixth and Fourteenth Amendment rights to

25  counsel were violated when he received ineffective assistance of counsel,

26  outlined in detail under sub-claims. Finally Newell raised issues for purposes of

27  preservation that included challenges to the (F)(6) aggravator, Arizona's

28  sentencing scheme, victim impact evidence, the lack of special verdict forms,

that the death penalty was categorically cruel and unusual, and that limiting mitigation to that proven by a preponderance violated the constitution. (Pet. for PCR, PCR ROA at 0584-0639.) On March 10, 2010, the state court issued an order dismissing claims 1, 2(a), and 3, and granting an evidentiary hearing to the remainder of the claims under claim 2. (Min. Entry, PCR ROA at 1772-76.)

The evidentiary hearing began on March 3, 2011. Despite being granted a hearing on numerous issues, including incomplete mitigation, Droban stated that for the purposes of the hearing they were focusing on ineffective assistance of counsel, specifically on the decision of whether or not to present mental health experts. (Tr. 3/3/11 at 4.) The State agreed and said that the only decision the court needed to make was whether there was deficient performance and prejudice under *Strickland.* The issue presented was "very narrow as to the timing of what happened because of *Phillips v. Araneta.*" (Tr. 3/3/11 at 5.) Droban did not present her mitigation expert or investigator, or any additional mitigation beyond that which came through with the expert-witness issue. Thus Droban duplicated the very issue she raised in her PCR petition and failed to present evidence of Newell's difficult childhood, sexual abuse, addiction and unstable childhood.

Droban called trial counsel Bruce Peterson and co-counsel Tim Agan to testify. Newell's was their first trial, post-*Ring.* (Tr. 3/3/11 at 7; Tr. 3/3/11 at 35-36.) Peterson testified that he retained two experts, Dr. Lanyon, and Dr. Stewart, but in retrospect he would have retained additional experts. Specifically, one to talk about the effect of methamphetamine on Newell's behavior. (Tr. 3/3/11 at 9-11.) Both acknowledged that they were "flying blind" in light of all the changes post-*Ring*, especially with respect to the independent evaluation by the State. (Tr. 3/3/11 at 12; Tr. 3/3/11 at 36-38.) Agan acknowledged looking at the *Phillips* decision that came down after Newell's case, they could have predicted it based on the order they received from the

court, but they did not view it that way at the time.  (Tr. 3/3/11 at 37-38.)  Agan said he would not consider their decision to prevent Newell from being evaluated by a state expert an informed strategic decision.  (Tr. 3/3/11 at 39.)

Next, Droban called Dr. Edward French, a pharmacologist.  (Tr. 3/3/11 at 53.)  He was retained by Droban for post-conviction proceedings and authored a report addressing the behavioral effects of methamphetamine in Newell and general clinical information about what methamphetamine does to people.  (Tr. 3/3/11 at 57.)

Finally, Droban called Dr. Pablo Stewart, the forensic psychiatrist retained by Newell's trial lawyers.  (Tr. 3/4/11 at 5, 13-14.)  Dr. Stewart testified about Newell's life and the factors that negatively impacted him.  He testified that Newell's PTSD, major depressive disorder and ADHD all affected his executive functioning–"the ability of the brain to incorporate new information."  (Tr. 3/3/11 at 48.)  Further, he said that those conditions actually predated Newell's substance abuse and actually contributed to it because untreated mental illness is a risk factor for substance abuse.  He was using drugs to deal with the symptoms of his disorder.  (Tr. 3/3/11 at 48-49.)

The evidentiary hearing picked up a few months later on June 10, 2011. The parties reached an agreement to stipulate to the admission of the neuropsychologist's reports from Dr. Froming retained by Newell, and Dr. Amin retained by the State.  (Tr. 6/10/11 at 4.)  The State called Dr. Steven Pitt, a doctor of osteopathic medicine.  (Tr. 6/10/11 at 7.)  He completed a forensic interview of Newell.  Pitt opined that Newell had a history of drug abuse, depressive order, not otherwise specified, and believed he was malingering as to the amnesia about the offense.  (Tr. 6/10/11 at 16.)

Following the hearing, both sides submitted memoranda to the court. Again, despite being granted a hearing on more than one issue, Newell's counsel posited that the only issue for the court's consideration was whether Newell

received ineffective assistance of counsel when the trial lawyers failed to present expert testimony concerning the correlation between Newell's mental health history and subsequent conduct.   (Pet's Closing Memorandum, 12/21/11.) While Droban had retained additional experts, her failure to work with her team, develop underlying facts and obtain individualized information and evaluations resulted in a further failure to support the claims raised in the petition.

On January 12, 2012, the trial court issued a minute entry denying relief. It specifically noted that although the evidentiary hearing was granted to prove ineffective assistance of counsel on the grounds of: 1) failure to present mitigation evidence sufficient to call for leniency; 2) trial counsel's failure to present expert mental health testimony; 3) trial counsel's failure to request an expert on addiction and/or polysubstance abuse; 4) trial counsel's failure to subpoena certain witnesses to testify at the penalty phase; 5) trial counsel's lack of preparedness and the failure to rebut the testimony of probation officer Edwards, the evidence presented at the hearing did not support claims 4 and 5. (PCR Min. Entry, 1/12/12 at 2.)  As to the remaining claims, the court found that there were two grounds to support defense counsel's decision not to present mental health evidence.  First, they had a good faith belief that allowing Newell to be interviewed would violate his 5th and 6th Amendment rights and second, it would open the door to unfavorable rebuttal evidence.   Both amounted to strategy.  (PCR Min. Entry, 1/12/12 at 4.)  Regarding prejudice, the court found that "the evidence proffered in the Petition would not have convinced the trial jury to impose a life sentence.  Thus this Court does not find that Defendant has satisfied the second prong of *Strickland*."  (PCR Min. Entry, 1/12/12 at 9.)

Droban filed a petition for review of the superior court's denial of the petition for post-conviction relief in the Arizona Supreme Court on February 10, 2012.  (PR Doc. 1.)  Droban raised only two issues:  whether Newell received ineffective assistance of counsel for failure to present expert testimony; and

whether Newell's attorneys failed to present evidence of mitigation that established a causal nexus between Newell's substance abuse and the crime. (PR Doc. 1.)  On July 13, 2012, Newell filed a pro se Supplement to the Petition for Review due to concerns about "proper exhaustion" of his other claims in his PCR.  (PR Doc. 3.)  On September 25, 2012, the Arizona Supreme Court issued a one word denial of Newell's petition for review.  (PR Doc. 4.)

On September 25, 2012, the Arizona Supreme Court then issued a warrant for Newell's execution.  (DA Doc. 60.)  Newell filed a motion for stay of execution, a motion for appointment of federal habeas counsel, a statement of intent to file a federal habeas petition, and an application to proceed *in forma pauperis* in this Court.  (Dist. Ct. Doc. Nos. 1-4.)  This Court issued a stay of execution on September 26, 2012 (Dist. Ct. Doc. No. 5), and appointed undersigned counsel to represent Newell in his federal habeas proceedings on October 4, 2012 (Dist. Ct. Doc. No. 6).  On November 30, 2012, undersigned counsel filed a motion seeking to disqualify the Arizona Attorney General's Office ("AG") from further representation of Newell, as Newell's direct appeal attorney Jarvis was now employed in their capital division.  Further briefing and a status conference bore out that the AG had failed to follow their internal policies for screening cases and the motion was granted on December 19, 2012. (Dist. Ct. Doc. Nos. 15, 24.)  On April 4, 2013, the Maricopa County Attorney's Office filed a Notice of Appearance.  (Dist. Ct. Doc. Nos. 35-36.)

## II. STATE COURT PRESUMPTION OF CORRECTNESS

Newell hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state courts in his case. Certain findings of fact by the state court in Newell's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court and the opinion by the Arizona Supreme Court on direct appeal.

Pursuant to 28 U.S.C. § 2254(e)(1), Newell intends to assert that certain findings of fact by the state court at trial or on direct appeal, if any are found to exist, are not fairly supported by the record. Newell also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at the state court hearings; that Newell did not receive full, fair and adequate hearings in the state court proceedings; and that Newell was otherwise denied due process of law in the state court proceedings.

In addition, Newell asserts that certain findings of fact by the state court in regard to his state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to: any and all factual findings made by the trial court in regard to Newell's state post-conviction proceedings, as well as the decision of the Arizona Supreme Court on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Newell intends to assert that certain findings of fact by the state court, concerning his state post-conviction proceeding, if any are found to exist, are not fairly supported by the record.

### III. EXHAUSTION

Newell states that several of the federal constitutional claims alleged herein have been exhausted in proceedings before the Arizona courts.   Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum.[8]

Newell expressly reserves his right to amend this petition. In *McCleskey v.*

---

[8]The burden is on the respondents to demonstrate that Petitioner failed to exhaust a particular claim. *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

49

*Zant*, the United States Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." 499 U.S. 467, 498 (1991). Referring to Rule 6 (discovery), Rule 7 (expansion of the record) and Rule 8 (evidentiary hearing), of the Rules Governing Section 2254 Cases in the District Courts, the Supreme Court held that a habeas petitioner must have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *See id.* Newell believes additional claims may be identified through a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Newell will present any additional claims through amendments or supplements to the petition.

## IV. THE AEDPA IS UNCONSTITUTIONAL

Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court. *See Bounds v. Smith*, 430 U.S. 817, 822-23 (1977). One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus. However, the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the doctrine of separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

### A. The AEDPA suspends the writ of habeas corpus

Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ. The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that

"[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.  The Suspension Clause is a structural limitation on the power of Congress.  Like bills of attainder and *ex post facto* laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred."  *United States v. Lovett*, 328 U.S. 303, 315 (1946).  The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void."  *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Because the AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus.  *See* 28 U.S.C. § 2254.  For example, there is no dispute that Petitioner's right to a jury trial was violated and that his death sentence is unconstitutional.  However, under the tenets of AEDPA, the federal court must determine whether the complete deprivation of a jury, in a capital case, was a "reasonable" or "unreasonable" constitutional violation.

### B. The AEDPA violates the separation-of-powers doctrine

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

Congress has the power to constrain courts' authority.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993).  "[T]he judicial Power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art., § 1.

1  However, Congress must not manipulate the "test for determining the scope of
2  [habeas corpus]" because the writ "is designed to restrain" Congress, and
3  because the writ is "an  indispensable mechanism for monitoring the separation
4  of powers." *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008).

5         The separation of powers doctrine found in Article III "serves both to
6  protect the role of the independent judiciary within the constitutional scheme of
7  tripartite government . . . and to safeguard litigants' right to have claims decided
8  before judges who are free from potential domination by other branches of
9  government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848
10  (1986) (internal citations and quotation marks omitted).  When it was confronted
11  with an unconstitutional provision, the Supreme Court in *Marbury* asked
12  whether courts are bound by "an act of the legislature" that is "repugnant to the
13  constitution;" the Court answered that "[i]t is emphatically the province and duty
14  of the judicial department to say what the law is."  5 U.S. at 177.

15         "[I]f Congress does provide for habeas in the federal courts, Congress
16  cannot . . . instruct the federal courts, whether acting in a federal or in a state
17  case, how to think, how to ascertain law, how to judge."  *Irons v. Carey*, 505
18  F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring).  Because the AEDPA
19  requires courts to ignore unlawful detentions if the prisoner does not meet
20  certain provisions, it unconstitutionally suspends the writ of habeas corpus.  The
21  question before the federal court should simply be whether Newell's
22  constitutional rights were violated in such a way that he is entitled to habeas
23  relief.  Adding the gloss of "unreasonable" versus "reasonable" constitutional
24  violations robs the writ of its ability to remedy constitutional wrongs.

## C. Conclusion

25
26         The AEDPA suspends the writ of habeas corpus and violates the
27  separation of powers doctrine because it dictates that courts must not "grant
28  relief to citizens who are being held in prison in violation of their constitutional

rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, the AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, the AEDPA is unconstitutional.

## V. FEDERAL CONSTITUTIONAL CLAIMS

Newell petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgment and sentence of the state courts of Arizona, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the Constitution of the United States. In support of this request, Newell offers the following:

### Claim One

**Newell was denied effective assistance of counsel when his trial counsel failed to present expert testimony on his mental health and drug addiction.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Prior to trial, the State sought to compel Newell to submit to a mental health examination by the State's experts. Over Newell's objection, the court granted the State's request and ordered Newell to comply. (ROA 100; ROA 105.) On the advice of his counsel, Newell refused to submit to the State expert's interview. As a result, the court precluded all of Newell's expert testimony as a sanction for not following its order.

Newell raised this claim in Claim 2(a) of his post-conviction petition. (Pet. for PCR, PCR ROA at 0608.) The post-conviction court denied this claim on the merits. (PCR Min. Entry, 1/12/12.) The court's denial of this claim was

contrary to, or involved an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented.  *See id.* § 2254(d)(2).  Relief is warranted because the state court's finding was in error, rendering Newell's death sentence constitutionally unreliable.

As discussed in the procedural history section, *supra*, on September 10, 2003, the State filed a Request for Disclosure of Mitigation Evidence.  (ROA 67.)  The court ordered the defense to disclose its mitigation witnesses and evidence by the beginning of November, 2003.  On November 20, 2003 the State filed a renewed motion for disclosure and indicated that it intended to retain an expert witness to examine Newell.  (ROA 98.)  Shortly thereafter, Newell filed an objection to the State's request for a court-ordered psychological examination.  (ROA 100.)  Newell's objection was based on his Fifth, Sixth, and Fourteenth Amendment rights.  Newell noted that he had disclosed the names and opinions of the experts he intended to call to the State, but that the court did not have the authority to order Newell to submit to a government-sponsored examination for any issue other than sanity or competency.  Newell's expert however, was willing to submit to an interview by the State.  (ROA 100 at 2-3.)

The trial court was unpersuaded, and issued a minute entry granting the State's motion.  (ROA 105.)  After additional argument on December 12, 2003, the court further ordered that the evaluation would not be sealed, and that if any information from the evaluation "seeped" into the guilt phase, it would be dealt with then.  (Tr. 12/12/03 at 7-8.)

Newell filed a request to stay in order to file a special action and although that request was denied, (Tr. 12/12/03 at 10-14), Newell filed a special action in the Arizona Supreme Court and again requested a stay relying on a similar case, *Phillips*, 93 P.3d 480, that was pending before the Arizona Supreme Court.  On January 7, 2004, the Arizona Supreme Court denied the stay and issued an order

to the trial court.  (ROA 115.)  The order gave the trial court discretion to order Newell to submit to the State's mental-health examination, as long as no information gained during the examination would be used in "a manner or for a purpose that contravene[d] [Newell]'s privilege against self-incrimination." (ROA 115.)  The court further ordered that no information gained during the examination could be used in any criminal proceeding, except on issues raised by Newell in the penalty phase.  Finally, the order specified that if Newell refused to cooperate, the trial court had the discretion to preclude him from presenting expert evidence on the issue of his mental condition.  (ROA 115.) Based on the trial court's December 12, 2003 order, counsel was clearly on notice that if Newell declined to be interviewed, the court intended to impose the harshest sanction available, "preclusion," and based on the order from the Arizona Supreme Court denying the stay, that the trial court had discretion to do so.

Without question, defense counsel were in a terribly difficult spot, it was both lead and co-counsel's first capital trial post-*Ring*, and the issue in *Phillips* was one of first impression in Arizona due to the recent change from judge to jury sentencing.  (Tr. 3/3/11 at 7, 14, 34.)  Both counsel testified at the post-conviction evidentiary hearing they felt as if they were "flying blind" when it came to the decision of whether to have Newell submit to the State's expert. (Tr. 3/3/11 at 12, 36.)  However, there was ample case law from other jurisdictions where the law was quite clear that the court did indeed have authority to order a defendant to submit to a State psychiatric interview and to order sanctions for failure to do so.  In fact, the State, in its response to the special action, cited numerous cases from outside the Ninth Circuit in which courts found that they possessed the power to order a psychiatric examination so that the prosecution could rebut mitigating evidence. (Ariz. Supreme Court, CV-03-0436-SA, ("Special Action Doc.") 7 at 10-11) (citing *United States v. Allen*,

247 F.3d 741, 773 (8th Cir. 2001), *rev'd on other grounds*, 536 U.S. 953 (2002); *United States v. Webster*, 162 F.3d 308, 338-40 (5th Cir. 1998); *United States v. Edelin*, 134 F. Supp. 2d 45, 50-51 (D.C., 2001); *United States v. Beckford*, 962 F. Supp. 748, 757 (E.D. Va., 1997); *United States v. Haworth*, 942 F. Supp. 1406, 1408 (D. N.M., 1996); *United States v. Vest*, 905 F. Supp. 651, 653 (W.D. Mo. 1995)).

Unfortunately, trial counsel limited their research on whether or not Newell should submit to the State's expert interview to "what was in their pleadings," which was only Ninth Circuit and state law, and United States Supreme Court cases *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Estelle v. Smith*, 451 U.S. 454 (1981), for the propositions that the trial court could not limit mitigation, and Newell's Fifth Amendment right against self-incrimination extended to the penalty-phase of his trial.  (Tr. 3/3/11 at 14; ROA 100; Special Action Doc. 1.)  As the preceding paragraph shows, the weight of cases from other jurisdictions could have provided clear guidance on what the law in Arizona would likely become.

Ultimately, Newell refused to submit to the examination, even after the order from the Arizona Supreme Court gave some guidance on protecting the information from the guilt phase, and the trial court–as promised–imposed the harshest sanction possible–the preclusion of all mental health evidence.  (ROA 112.)  At the close of argument at penalty phase, the court gave trial counsel the opportunity to make a detailed offer of proof as to what they would have presented through their experts.   (Tr. 2/24/04 at 91.)  Counsel said that they would rely solely on what they told the court, noting that the report had been turned over to the State but it had not been submitted to the Court.  Counsel's offer of proof was "based on [his] conversations with Dr. Stewart in addition to the report."  (Tr. 2/24/04 at 91.)  Trial counsel insisted he "didn't want an appellate court to think that the parameters of the report were the whole extent of

this testimony because that wouldn't be true." (Tr. 2/24/04 at 91.) However, counsel did not proceed to say what the extent of the testimony *would in fact* be. The court responded, "I just want to make that offer to you so that the record would be there. And that's your choice not to make it part of the record in that respect." (Tr. 2/24/04 at 91.) As a result, there was essentially no record of what the extent of the testimony would have been.[9]

Shortly after Newell's trial, the Arizona Supreme Court decided *Phillips*, holding that a defendant charged with capital murder who notifies the State of his intent to call mental health experts at the penalty phase opens the door to examination by a State mental health expert by placing his mental health at issue. Similar to the order denying Newell's stay, the *Phillips* court further held that the trial court must issue an order to assure that no statements by the defendant, or other testimony or evidence derived therefrom, may be used by the State except on those issues that a defendant introduces at penalty phase. 93 P.3d at 483-484. As co-counsel noted in the post-conviction evidentiary hearing, the order in Newell from the Arizona Supreme Court could have been a roadmap for the *Phillips* decision, as it contained the same protections for the information garnered from a State psychiatric review. Counsel nevertheless said he "did not at the time understand it that way." (Tr. 3/3/11 at 38.)

In the post-conviction evidentiary hearing, trial counsel conceded that this refusal to submit to the interview was not a "strategic decision because we didn't know the rule." (Tr. 3/3/11 at 15.) He testified that despite the order giving some protection, he still had objections. (Tr. 3/3/11 at 23.) Further, despite the trial court's clear indication that if Newell did not submit, it would preclude his

---

[9] The day prior, Counsel made a brief offer of proof that at this point he would call Dr. Pablo Stewart to testify and that Newell had PTSD as a result of the physical abuse, emotional abandonment, and drug use from his childhood. He noted that the state told the jury they would not hear evidence connecting Newell's life with the crime and noted that Dr. Stewart would provide that. (Tr. 2/23/04 p.m. at 89.)

evidence, counsel relied on "the specific language of the order denying the special action that said . . . in an appropriate case, the judge has preclusion as a remedy."  Based on that, counsel took the position that "the Court should take the least onerous sanction to address the failure to submit to the interview."  (Tr. 3/3/11 at 27.)  Co-counsel agreed and testified that he would not say it was a strategic decision.  "It is difficult to say that it was an informed decision when we did not know the entire implications of it or what the rules were going to be."  (Tr. 3/3/11 at 39.)

As a result of the expert preclusion, the jury did not hear about Newell's cognitive brain impairment, the effects of methamphetamine on his behavior and pathology, his low intelligence, or the effects that his background of sexual abuse and unstable and often unsafe childhood had on his behavior.  Trial counsel conceded that the lay witnesses they called could not testify as to Newell's history of cognitive impairment or whether he suffered from any mental disorders. (Tr. 3/3/11 at 29.)  Finally, counsel recognized how important the expert testimony would have been to their case and testified that "the linchpin of the mitigation was the experts that we were going to call."  (Tr. 3/3/11 at 20-21.)  Without this linchpin, the mitigation from the lay witnesses fell flat, and the jury found it insufficient to call for leniency.

At the post-conviction evidentiary hearing, Dr. Stewart, a forensic psychiatrist who had been retained by trial counsel to do a forensic interview of Newell, was called to testify.  (Tr. 3/4/11 at 5.)  Trial counsel affirmed that they would have called Stewart to testify at the penalty phase, absent the order precluding expert testimony.  Stewart testified he only spent 2.5 hours interviewing Newell.  He said that, normally, he would spend that amount of time on a first visit and then would conduct follow up visits. He testified that he had hoped he would have been able to follow-up in Newell's case.  (Tr. 3/4/11 at 17-18.)  He further testified that looking back, he had not prepared an adequate

1   evaluation.  (Tr. 3/4/11 at 21.)  Post-conviction counsel did not ask Stewart to

2   conduct a more detailed evaluation.

3       Stewart also testified that Newell's background of "childhood neglect,

4   abuse, including sexual abuse, early introduction to substance abuse, parental

5   substance abuse, lack of really any sort of educational experience, positive

6   educational experience . . . isn't a guarantee you are going to have bad choices,

7   but it certainly starts you off at a much greater probability that you will."  (Tr.

8   3/4/11 at 29.)  Newell was at high risk for substance abuse due to parental drug

9   use.  Witness statements indicated that Newell's mother was using substances

10  during pregnancy, a known contributor to cognitive impairments.  His life was

11  marked by trauma and neglect.  Stewart testified "these things don't exist

12  independently" – the substance abuse and the mental health and psychosocial

13  background are all connected.  (Tr. 3/4/11 at 30-31.)  He noted that substance

14  abuse at age eleven, when Newell's started, is indicative of other psychiatric

15  disorders and almost 100 percent correlated with early sexual abuse or other

16  trauma.  (Tr. 3/4/11 at 30-31.)

17      Both trauma and early sexual abuse existed in this case.  (Tr. 3/4/11 at

18  31.)  Stewart testified that the early substance abuse shows "how severe the

19  traumatic experiences were," and supported his diagnosis of PTSD.  (Tr. 3/4/11

20  at 31-32.)  Even during the most stable period of Newell's life – while he was

21  living with his grandmother–he was subjected to sexual abuse on at least two

22  occasions, witnessed his mother being beaten and struggling with her own

23  substance abuse issues, and was exposed to ongoing trauma.  (Tr. 3/4/11 at 33.)

24  When a child like Newell experiences severe trauma, he is left suffering from

25  PTSD and his coping skills are stunted to the age of the trauma.  (Tr. 3/4/11 at

26  44-45.)  The trauma even impacts the developing brain of a child; some areas

27  overdevelop and some underdevelop, and the child is left dealing with severe

28  issues for the rest of their lives.  (Tr. 3/4/11 at 45.)  Newell engaged in behaviors

59

such as cutting and burning himself, which are symptoms consistent with childhood PTSD. (Tr. 3/4/11 at 45-46.) There was no evidence, other than finally receiving antidepressant medications in jail, that Newell ever received any treatment for his PTSD. (Tr. 3/4/11 at 46.)

Newell's academic life mirrored the chaos in his life. (Tr. 3/4/11 at 33.) The fact he was not able to go past the sixth grade "really speaks to the depravity of his childhood." (Tr. 3/4/11 at 34.) Psychological testing indicated that in addition to PTSD, Newell had Attention Deficit Hyperactivity Disorder ("ADHD"), and a cognitive disorder, not otherwise specified ("NOS"), which also helped to explain his poor academic performance. (Tr. 3/4/11 at 34.) Additionally, Stewart diagnosed Newell with major depressive disorder. (Tr. 3/4/11 at 47.) Stewart concluded that Newell's brain did not function properly. (Tr. 3/4/11 at 61-63.)

An integral part of the penalty phase of a capital trial is the Eighth Amendment's demand that all relevant evidence bearing on a defendant's character, propensities, and background be considered by the sentencer in determining the appropriateness of the penalty. *Lockett*, 438 U.S. at 605. If the sentencer is deprived of this information due to the failings of counsel, the sentencing procedure is unfair, the sentence itself suspect, and one cannot have "confidence in the outcome of the proceedings." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Penalty phase investigations in capital cases should include inquiries into social background and evidence of family abuse, potential mental impairment, physical health history, and any history of drug and alcohol abuse. *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc). Confidence in the outcome is undermined where counsel fails to present available mitigation evidence that, had it been presented, could have tipped the scales for life. *Karis v. Calderon*, 283 F.3d 1117, 1141 (9th Cir. 2002). Dr. Stewart's testimony is precisely the kind of evidence that, properly presented,

1   could have affected the outcome at sentencing.  *See Wiggins v. Smith*, 539 U.S.
2   510, 534-535 (2003) (finding counsel's performance deficient when, among
3   other things, counsel failed to investigate and present evidence of Wiggins's
4   poverty, homelessness and diminished mental capacity).

5        The post-conviction court denied relief on this claim after holding an
6   evidentiary hearing.  The court found that this claim failed under both prongs of
7   *Strickland*, first, because counsel had a good-faith belief that submitting to the
8   interview violated Newell's Fifth and Sixth Amendment rights, and second,
9   because allowing the State to present rebuttal evidence opened to the door to
10  unfavorable evidence about Newell.  (PCR Min. Entry, 1/12/12.)

11       The post-conviction court's denial was based on an unreasonable
12  determination of the facts in light of the evidence presented.  *See* 28 U.S.C. §
13  2254(d)(2).  First, the court noted that counsel's belief that they were correct in
14  their refusal to consent to the State psychiatric examination was bolstered by
15  their legal research and conversations with other counsel.   The record of
16  pleadings on this issue, and counsel's testimony, however, shows that
17  conversations with experienced counsel produced only disagreement on the
18  correct course of action and that the issue was one of first impression in Arizona.
19  The State's brief made clear that case law from other jurisdictions that had dealt
20  with jury-sentencing much longer than Arizona agreed that a court could order a
21  defendant to submit to an interview and that preclusion was an appropriate
22  sanction.  Trial counsel's testimony made it clear that they had not researched
23  any of this persuasive authority.  (Tr. 3/3/11 at 14.)  Finally, the order from the
24  trial court made it unequivocally clear that, right or wrong, the sanction would
25  be preclusion, and counsel's testimony that they relied on the Arizona Supreme
26  Court's order denying the stay that said a court *could* sanction with preclusion
27  was unreasonable in light of the clear message from the trial court that it *would*
28

1    preclude the expert testimony absent the State getting an opportunity to have its

2    expert examine Newell.  The writing was on the wall but counsel did not read it.

3         In denying this claim, the post-conviction court further relied on the fact

4    that some of the information in the experts' reports was already known.  When

5    an investigation uncovers facts that require the services of an expert to explain

6    their significance to the finder of fact, the Sixth Amendment requires counsel to

7    obtain an expert.  In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the United States

8    Supreme Court recognized the need for competent expert assistance. It is not

9    enough simply to allow the defendant to present mitigating evidence to the

10   sentencer. The sentencer must also be able to consider and give effect to that

11   evidence in imposing its sentence. *Williams v. Taylor*, 529 U.S. 362, 399 (2000);

12   *Tennard v. Dretke*, 542 U.S. 274, 276 (2004) (citing *Penry v. Lynaugh*, 492 U.S.

13   302 (1989)). Counsel has "an obligation to conduct an investigation which will

14   allow a determination of what sort of experts to consult. Once that determination

15   has been made, counsel must present those experts with information relevant to

16   the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.

17   1999).  *See also Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999)

18   (commenting on the duty to seek out information and bring it to the attention of

19   the experts); *Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001) (to

20   perform effectively counsel must engage in sufficient preparation to be able to

21   explain "the significance of all the available mitigating evidence"); *Turner v.

22   Duncan*, 158 F. 3d 449, 456 (9th Cir. 1998) ("[Counsel's] failure to arrange a

23   psychiatric examination or utilize available psychiatric information also falls

24   below acceptable performance standards.").  The mitigation investigation in this

25   case uncovered facts that required an expert to put them into context for the jury.

26   Specifically, a connection between Newell's social history and conduct.  The

27   post-conviction court's finding to the contrary was contrary to, and an

28

1    unreasonable application of clearly established federal law and an unreasonable

2    determination of fact.

3         Further, the post-conviction court's adjudication of deficient performance

4    and prejudice involved an unreasonable application of *Strickland* and its

5    progeny, and is not entitled to deference by this Court. In denying relief, the

6    court emphasized that "[a]ctions by counsel that 'might be considered sound

7    trial strategy' do not constitute ineffective assistance." (PCR Min. Entry,

8    1/12/12) (citing *Strickland*, 466 U.S. at 689). As noted above, in light of the

9    abundance of out-of-state case law, the order from the Arizona Supreme Court

10   outlining the protections that would be put in place should an interview occur,

11   and the edict from the trial court making clear it would preclude the evidence,

12   there was no sound strategy in counsel's decision. Even counsel admitted that

13   you cannot call it strategy when you do not know the rules. While the post-

14   conviction court was correct that "[c]lairvoyance is not a required attribute of

15   effective representation," the materials counsel had available made quite clear

16   the way other jurisdictions handled this issue. To decide as they did, they had to

17   assume that Arizona would break with every other jurisdiction that faced this

18   issue. (PCR Min. Entry, 1/12/12) (citing *Collins v. Miller & Miller, Ltd.*, 943

19   P.2d 747, 752 (Ariz. 1996)). What is more, trial counsel had not adequately

20   investigated any of Newell's potential mitigation and, thus, did not know the full

21   impact of what they were foregoing. A decision made without adequate

22   investigation is not "sound trial strategy." *Wiggins*, 539 U.S. at 512.

23        The failure to present mitigating evidence during the penalty phase of a

24   capital case, where there are no tactical considerations involved, constitutes

25   deficient performance, because competent counsel would have made an effective

26   case for mitigation. *See id*. (counsel performed deficiently where they failed to

27   put on any evidence of petitioner's life history, failed to follow up on

28   preliminary information suggesting that petitioner had a traumatic childhood,

and failed to comply with the standards of performance established in their state and by the ABA at the time of trial); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998); *Smith v. Stewart*, 140 F.3d 1263, 1269 (9th Cir. 1998); *Correll v. Stewart*, 137 F.3d 1404, 1412 (9th Cir. 1998); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995). The failure to investigate a defendant's mental condition as a mitigating factor in a penalty-phase hearing, without a supporting strategic reason, constitutes deficient performance. *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995).

The post-conviction court also erred in finding no prejudice as a result of counsel's failure to call the experts to testify. The court found that most of the mental health experts' testimony was heavily dependent on self-reporting and differed in some instances from the other mitigation witnesses that testified at trial. Additionally, the court found that the information, "while couched in the cloak of science" was somewhat cumulative to what the jurors heard at the guilt and penalty phases. (PCR Min. Entry, 1/12/12.) This finding is simply incompatible with the record before the court. While the jury heard a truncated version of Newell's traumatic childhood, they heard no evidence, like that which Dr. Stewart testified to, to explain how that childhood affected his development, decision-making, and overall brain function. Finally, the post-conviction court found that the State's experts would have been able to introduce evidence, such as a possible prior molestation and Newell's prior for attempted kidnapping that would have affected the weight the jury gave to Newell's experts. (PCR Min. Entry, 1/12/12.) These incidents were things that Newell's expert, had he been properly prepared by trial or post-conviction counsel, could have addressed as indicia of just how damaged Newell was. While unquestionably unflattering at first blush, they are more indicia of how damaged Newell was as a result of his tragic history. A well-prepared expert could have addressed these issues.

A court must analyze how the mitigation bears on the "development of the person who committed the crime." *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001). The court must also determine whether there is a reasonable probability that the mitigation evidence now proffered would have made a difference to at least one juror. *Stankewitz v. Woodford*, 365 F.3d 706, 718 n.6 (9th Cir. 2004). Here, the jurors had no knowledge of the level and impact of Newell's drug abuse and were not presented with any nexus between the mitigating factors and the crimes. While such a nexus clearly is not required, a causal link may be considered in assessing the quality and strength of the mitigation. *Tennard*, 542 U.S. at 287.[10]

In sum, Newell's trial counsel failed to present Newell's personal history through a competent mental-health expert, and thus failed to present Newell's mitigation to the court, which, in turn, resulted in Newell being deprived of a fair and reliable sentencing hearing.

## Claim Two

**Newell was denied effective assistance of counsel when his trial counsel failed to request an expert on addiction and/or polysubstance abuse.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Trial counsel was aware Newell had severe substance abuse problems. Counsel failed to request an appropriate expert to explain the effects of long-term drug use on human behavior and the impact it likely had on Newell's

---

[10]Unfortunately, Newell was not only failed by trial counsel, but post-conviction counsel as well. PCR counsel failed to interview a single juror to see if they would have been impacted by the expert testimony proffered at the evidentiary hearing, which would have been powerful evidence of the prejudice Newell suffered as a result of trial counsel's failure to present expert testimony. Nonetheless, even without this evidence, it is clear the court erred when it found the expert testimony cumulative to the lay witness testimony at the penalty phase.

thought process and behavior in the days and hours preceding the crime.  Failure to do so constituted ineffective assistance of counsel.

Newell raised this claim in Claim 2(b) of his PCR.  (Pet. for PCR, PCR ROA at 0620.)  The post-conviction court denied this claim on the merits.  (PCR Min. Entry, 1/12/12.)  The court's denial of this claim was contrary to, and an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented.  *See id.* § 2254(d)(2).  Relief is warranted because the state court's finding was in error, rendering Newell's death sentence constitutionally unreliable.

In the post-conviction evidentiary hearing, Dr. Edward French, a pharmacologist, retained by Droban for post-conviction proceedings, testified that he had reviewed Newell's case and history, and authored a report addressing both the behavioral effects of methamphetamine in Newell and general clinical information about what methamphetamine does to people.  Dr. French was not retained for the trial proceedings in the case.  (Tr. 3/3/2011 at 53-57.)

Dr. French is qualified as an expert witness on addiction, the State did not argue otherwise, and the court did not make any findings that French was unqualified as an expert witness on this topic.  French was able to examine the documentary evidence provided by Newell's counsel and render an expert opinion regarding the effects that methamphetamine use had on Newell at and around the time of the crime.  (French Report, Evid. Hrg. Ex. 7, PCR ROA at 2900-03.)  French testified that it is not always necessary to meet with a subject; he leaves that decision to the attorney.  PCR counsel chose not to have French meet with Newell and conduct an individualized evaluation.  (Tr. 3/3/2011 at 60-61.)  Instead, he reviewed numerous books, the DSM-IV, research articles, and a National Geographic video on methamphetamine. Additionally French reviewed some transcripts of the interrogation, but not view the actual interrogation itself.

He read the reports from Dr. Wicks and Dr. Stewart.  (Tr. 3/3/2011 at 58-60.)
Unfortunately, Droban did not provide French the videotape of Newell's
interrogation so he could view rather than read it; the reports of Dr. Pitt, Dr.
Froming; or Dr. Amin; or anything from people in contact with Newell in the
days before and after the offense.  (Tr. 3/3/11 at 79-81, 87.)

Dr. French explained how methamphetamine works generally, stimulating
neurotransmitters and that it can stay in the system up to 24 hours, with
psychological effects lasting from 8 to 12 hours. (Tr. 3/3/11 at 62-63.)  He
testified that it was well documented that methamphetamine can cause
irreversible brain damage.  (Tr. 3/3/2011 at 63.)  "Binge users" go for days and
days using methamphetamine and staying awake.  (Tr. 3/3/2011 at 64.)  While
short term users will feel good and stimulated, a long-term user will become
tolerant to those effects and will start to have bad reactions to the
methamphetamine such as depression, hallucinations, disorganized lifestyle,
psychological problems, aggressive violent behavior, poor coping skills,
decreased social life, and brain damage. Starting at age eleven, and using almost
daily, Newell was certainly a long-term methamphetamine user and suffered the
symptoms listed above.  (Tr. 3/3/2011 at 64-66.)

French testified that his understanding was that Newell was using
methamphetamine for days leading up to the crime and had gone without sleep
for four or five days.  Individuals can develop what is called "meth psychosis"
and will have alterations in their behavior and personality for weeks and even
months after they stop using methamphetamine.  Although French did not make
that finding in his report, he testified that it fit with what the psychiatric reports
found.  (Tr. 3/3/2011 at 66-69.)

"Meth rage" is a point at which a methamphetamine user becomes
extremely irritable, impulsive and volatile.  Meth rage is often accompanied by
paranoia and delusions.  The impulsivity brought on by the methamphetamine

67

use "takes away from the [user], his or her ability to formulate a really rational plan of behavior and so they become irrational in their behavior." (Tr. 3/3/2011 at 73-74.)  French opined that specific to Newell, methamphetamine negatively affected his cognitive ability to control his actions at the time of the crime.  (Tr. 3/3/2011 at 74.)   Additionally, methamphetamine can exacerbate existing psychological conditions.  French noted that Dr. Stewart's report noted issues such as borderline personality disorder and the possibility of PTSD.  French stated if a person is already challenged in their "ability to . . . modulate or control their behavior, and then you give them or they take a drug which brings them out of control, you are actually getting 2 plus 2 is equal to 5 now.  And so they tip over and they go off the edge." (Tr. 3/3/2011 at 74-75.)

Dr. French's testimony would have put Newell's social history, drug use, and conduct into context for the lay jury.  Some of the evidence trial counsel did present to the jury was that Newell observed his mom and his step-dad, Lincks, use methamphetamine from a very young age.  (Tr. 2/23/04 p.m. at 18-21.)  When Newell was approximately 11 years old, Lincks shared methamphetamine with Newell saying he wanted to be the "cool dad." (Tr. 2/23/04 p.m. at 28-29.)  Newell watched both his step-father and Ginger Whitley, who he lived with for a long period of time, cook methamphetamine, and all the while he continued to use.  (Tr. 2/23/04 p.m. at 23-36, 59-65.)   While the jury was given some snapshots of Newell's tragic and drug-filled childhood through lay witness testimony, they were not given a framework to understand how it affected his development.

Dr. French's testimony could have provided a nexus for the jury between his behavior before, during, and after the crime and his drug use.  In his report, French discussed Newell's binge use of methamphetamine and how that could cause sleep deprivation, psychological deterioration, spells of delirium, and even psychotic behavior.  (French Report, Evid. Hrg. Ex. 7, PCR ROA at 2900-02.)

In his police interrogation, Newell told the detective he had been up for four days straight.  The detective asked Newell if he had ever heard of meth psychosis or if he had blacked out.  Counsel could have used testimony of a pharmacologist like French to bolster an argument that Newell, under the influence of methamphetamine, had diminished ability to control his conduct due to the severe psychological effects of methamphetamine abuse.

At trial, no evidence was presented to tie together Newell's social history, behavior, and drug use.  Even the Arizona Supreme Court found that "no evidence explains how Newell's drug addiction and unstable childhood led to the sexual assault and murder of eight-year old Elizabeth." *Newell*, 132 P.3d at 850.  Counsel should have recognized the impact of Newell's drug use on his life and crime, and its importance in mitigation.  Failing to obtain an addiction specialist constituted deficient performance, especially due to the role Newell's drug addiction played for him and his life, and he was prejudiced because the jury was not able to hear testimony from an expert explaining the effects of such an addiction on his behavior and mental processes generally and at the time of the crime.  Trial counsel admitted at the evidentiary hearing that trying the case post-*Ring*, they were "flying blind" and, looking back, they would have hired an expert on substance abuse who had not interviewed Newell to talk about the impact of methamphetamine and the "ramifications of that kind of extended drug use." (Tr. 3/3/11 at 10-11.)  Counsel said it was not a strategic decision to not retain such an expert because "strategy to me implies that we knew all of the rules, and we didn't know all of the rules at the time." (Tr. 3/3/11 at 11.)

However, despite the concessions of counsel, and the parties' agreement on Dr. French's qualifications and his ability to render an opinion, the court paid very little attention to his report or testimony.  Despite the fact that the court granted a hearing on counsel's failure to request an expert on addiction and/or polysubstance abuse claim, the claim's rejection was lumped together with the

claim that counsel failed to present mental health expert testimony and was given no separate analysis.[11] (PCR Min. Entry, 1/12/12.)  The little the court did address this claim was objectively unreasonable and was scarcely a decision on the merits.

Because this claim was not addressed separately, the grounds for denial of relief were the same as outlined *supra* in Claim One.  The court found that there were two grounds to support the failure to present an addiction experts testimony.  First, counsel's good faith belief that allowing the State to interview Newell prior to trial violated his Fifth and Sixth Amendment rights, and second that presenting such evidence would have opened the door to unfavorable rebuttal evidence.  (PCR Min. Entry, 1/12/12 at 4.)  However, Dr. French was able to form a professional opinion regarding Newell and his drug addiction from the documentary evidence he received from Newell's counsel without meeting with Newell, thus the State would not have been entitled to interview him, even had that evidence been presented at trial.  Dr. French found this information sufficient from which to render a professional opinion, and the State did not argue otherwise.  While the court's conclusions were contrary to and unreasonable application of federal law as they related to Claim One, they are objectively reasonable an inapplicable as to this claim.  The post-conviction court unreasonably applied *Strickland* in denying relief.  Newell has satisfied his burden under 28 U.S.C. § 2254(d)(1) and (2).

### Claim Three

**Newell's trial counsel ineffectively failed to investigate, develop, and present a wealth of powerful mitigating evidence during his capital trial proceedings in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

---

[11]The analysis for these claims should have been addressed separately.  The "strategic" decisions the court found that applied to Claim One were not transferred to this issue as a substance abuse expert could have testified without meeting with Newell.

1    Newell incorporates by specific reference all facts, allegations, and

2  arguments made elsewhere in this Petition.

3    These ineffective assistance of counsel claims were raised in Newell's

4  state post-conviction petition and reply.  (Pet. for PCR, PCR ROA at 0586,

5  0594-602, 0605-28; PCR Reply Brief, PCR ROA at 1765-69.)[12]  To the extent

6  any aspects of this claim were not exhausted, that failure is attributable to the

7  ineffective assistance of Newell's post-conviction counsel.  *Martinez v. Ryan*,

8  132 S. Ct. 1309, 1315 (2012).  The state court's denial of these claims was

9  contrary to and an unreasonable application of clearly established federal law, 28

10  U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *id.* at

11  § 2254(d)(2).

12    **A. Introduction**

13    "There is no more important hearing in law or equity than the penalty

14  phase of a capital trial."  *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir. 2008)

15  (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt,

16  J., concurring and dissenting)).  As such, a capital sentencing body must be

17  afforded the opportunity to assess "the character and record of the individual

18  offender."  *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal citation

19  omitted).  As the United States Supreme Court has explained, "[i]f the sentencer

20  is to make an individualized assessment of the appropriateness of the death

21  penalty, evidence about the defendant's background and character is relevant

22  because of the belief, long held by this society, that defendants who commit

23  criminal acts that are attributable to a disadvantaged background, or to emotional

24  and mental problems, may be less culpable than defendants who have no such

25  excuse."  *Penry*, 492 U.S. at 319 (internal citation omitted), *abrogated on other*

26  *grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also California v.*

27

28  _____

[12] While this issue was divided up into several different but overlapping claims in the post-conviction proceedings, for clarity, Newell combines them here.

*Brown,* 479 U.S. 538 (1987) (O'Connor, J., concurring); *Eddings*, 455 U.S. at 112 (consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").

In *Strickland*, the Court outlined the standard for determining when counsel has provided ineffective assistance. Under *Strickland*, counsel is ineffective if: (1) their "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial, "a trial whose result is reliable." *Id.* at 687. In reviewing claims of ineffective assistance of counsel, this Court must consider counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

As the United States Supreme Court has clearly established, trial counsel has a Sixth-Amendment obligation to recognize leads to relevant mitigation and pursue those leads. *E.g.*, *Wiggins*, 539 U.S. at 535. In appropriate cases, a reasonable attorney may well choose "to prioritize the mitigation case" over guilt-phase issues. *Id.* The underlying principle is clear: counsel must be attuned to avenues of potential mitigation and actually investigate those avenues. The failure to do so and to present the relevant results undermines confidence in the outcome of a capital-sentencing, especially because it deprives the jury of the opportunity to hear precisely the type of evidence the petitioner has a constitutional right to present. *Id.*

Consistent with this view, the Court has also held that during the penalty phase of a capital trial, defense counsel has a constitutional duty to investigate

72

and present mitigating evidence to the jury. *Bean*, 163 F.3d at 1079. Accordingly, trial counsel's failure to adequately investigate, develop, and present mitigating evidence during Newell's penalty-phase proceedings constituted ineffective assistance of counsel. *Id.*; *Ainsworth*, 268 F.3d at 877 ("[D]efendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse") (quoting *Penry*, 492 U.S. at 319); *see also Douglas v. Woodford*, 316 F.3d 1079, 1090-91 (9th Cir. 2003). The state court's decision to the contrary constituted an objectively unreasonable application of the controlling law to the facts and an unreasonable determination of the facts and, thus, Newell is entitled to relief.

**B. Newell's trial counsel ineffectively failed to investigate, develop, and present the mitigating evidence of Newell's upbringing amid a multi-generational history of violence.**

As described in more detail above, *see Section I. a.*, *supra*, both of Newell's biological parents and his step-father were products of families with widespread histories of serious mental illness, drug use, and violence. The family Newell was raised with and surrounded by was no different. His father Tom Smith had a serious history of drug abuse and violence, growing up in an unloving home with alcoholic parents who beat him with a razor strap. His family had a history of mental health issues, and Tom himself had a serious criminal history from a young age, including committing multiple assaults, one with a machete. Newell's step-father Richard Lincks also had a well-recorded history of serious domestic violence and substance abuse.

Newell's mother Kathy also grew up in a large family plagued by generations of violence, substance abuse, and dysfunction. By 18, she was abusing drugs, running away from home, and had a slew of dangerous and unstable men in her life.[13]

---

[13] The history of Newell's family background and life is described in detail in

73

Nothing changed when Kathy gave birth to Newell. As described in more detail above, *see Section I. a.*, *supra*, his childhood and young-adult life were spent bombarded by neglect, sexual abuse, emotional abuse, and physical violence. At just 18 months old, he was living with a man who held him face-first against a wall for spilling his milk cup. The rest of his life, he was surrounded by violence, including severe physical and mental violence at his mother's own hands.

This information was available at the time of trial and, indeed, serious red flags should have led counsel to investigate, develop, and present this evidence. In Newell's third interrogation, for example, police brought in Newell's mother to see if he would confess to her. Kathy, trying to convince the detective in the interrogation room that she loved Newell, told him, "we would literally physically fight, I'm telling you, and he knew it was never personal." (6/4/01 Tape Seven at 8:57-8:58.) Yet at trial, counsel elicited no testimony from Kathy that she abused Newell, and allowed her testimony that the family relationships and holidays were "normal" to go unchallenged. (Tr. 2/23/04 at 53.) It is also clear that trial counsel knew Thomas Smith was Newell's biological father. (Tr. 2/23/2004 a.m. at 42.) Trial counsel, however, did not ever investigate or even speak to Mr. Smith, leaving an entire half of the equation of Newell's family history out of the picture.

Despite these and other red flags in the record, trial counsel failed to investigate the significant histories of mental illness, substance abuse, and violence in the families of Newell's parents, guardians, and in his own family. Instead, without presenting any records to support their claims, trial counsel allowed Kathy and Lincks to present a minimalistic mitigation presentation that hinted at issues of violence, (Tr. 2/23/2004 p.m. at 23), but said nothing about

*section I. a.* To avoid repetition, Newell simply highlights examples of that information here.

their families' histories and the significant pervasive atmosphere of violence that shrouded Newell's parental history and his own life.  To make matters worse, counsel went as far as presenting evidence and testimony that was not only minimalistic, it was misleading about the abuse Newell was subjected to and the types of people Newell was surrounded by.  This was constitutionally ineffective assistance of counsel.

Each instance of ineffective assistance was on its own and taken together sufficient to undermine confidence in the outcome of Newell's case.   For brevity, however, Newell will detail each category of counsel's failure to investigate and present relevant mitigating evidence before expounding on the applicable law. *See subsection F*, *infra*.

### C. Newell's trial counsel ineffectively failed to investigate, develop, and present the mitigating evidence of Newell's severe, pervasive, and long-term drug addiction and the effects of his drug use at the time of the crime.

As described in more detail above, *see Section I. a.*, *supra*, Newell's mother, step-father, sister, and almost entire community was mired in the bogs of severe and pervasive substance abuse and addiction, particularly methamphetamine addiction.   When his grandmother passed away, Newell, already living in abject poverty, subjected to abuse, and neglected by everyone, started an intense and acute relationship with methamphetamine.   Already subject to additional risk factors like PTSD, ADHD, trouble concentrating, and self-mutilating behaviors, by the age of thirteen, when he should have been in the seventh grade, Newell was using methamphetamine and other dangerous substances on a daily basis and roaming the streets of Las Vegas alone.

As he was bounced from place to place, Newell's addictions and symptoms snowballed.[14]   By fourteen, he was living in a trailer doing

---

[14]Again, to avoid repetition, Newell only highlights examples of relevant evidence here. For further evidence, he respectfully refers the Court to *Section I. a.*

methamphetamine and peddling it for Ginger Whitley, who "took him in" because he was dating her daughter.

The massive quantities of drugs, especially methamphetamine, that he ingested on a daily basis took a devastating toll on his mind and body, inducing hallucinations, thought distortions, and paranoia, to say nothing of the physical effects on his body. He would stay awake for days on end, roaming the streets depressed and paranoid. At the time of the crime, he had been awake for days and had, on top of everything else, succumbed to the mind-altering effects of a dangerous mix of heroin and methamphetamine.

Newell's history – raised and neglected by a family of methamphetamine addicts, starting methamphetamine before the seventh grade, staying in porches, trailers, and garages with methamphetamine addicts and manufacturers – was never fully investigated or presented by trial counsel. It was clear that drugs were an issue in this case throughout, but counsel did not investigate those who had the most insight into the pervasiveness, severity, and effects of Newell's nearly-lifelong addiction. For example Ginger Whitley testified, but told an untrue and misleading story, leaving out Newell's drug peddling for her at only fourteen, and affirmatively lying about his methamphetamine use, (Tr. 2/23/2004 p.m. at 59-69), which she encouraged. Further, counsel never investigated the people Newell stayed with or constantly did drugs with on the streets, who knew the effects of the drug on him and the atmosphere he subsisted in.

The failure to present this troubled history and its serious effects on an already at-risk boy who was raised homeless with parents who smoked methamphetamine with him was constitutionally deficient performance. Further, as described below, this failure to investigate and present relevant mitigating evidence prejudiced Newell's case. *See infra*, *subsection F.*

**D. Newell's trial counsel ineffectively failed to investigate, develop, and present the mitigating evidence of Newell's family history of instability and neglect, and the serious physical, mental, emotional, and sexual abuse of Newell.**

The paltry nature of the mitigation trial counsel presented to the sentencing jury cannot be overstated.  The State jumped all over this presentation, emphasizing that, even though his life was not perfect, Newell always had someone looking out for him and doing the best they could.  (Tr. 2/24/2004 at 77-83.)  The picture painted by trial counsel's presentation and the State's characterization are nearly one and the same, and could not be farther from the true awful history of Newell's life.  Trial counsel failed to present or even investigate entire avenues of mitigation that would have shown the jury the true picture of his life.

As described in more detail above, *see Section I. a.*, Newell's life was one of neglect, lack of protection, physical abuse, mental abuse, sexual abuse, homelessness, and loneliness.  At 18 months, he was already seriously physically abused by his mother's boyfriend and, from there, the cycle never stopped.  Kathy was hardly ever home, leaving her children alone as she went to spend her welfare checks on drugs and parties.  She had a parade of dangerous, mentally ill, substance-abusing men in and out of her bed and life, and constantly exposed her children to them.  She cared nothing for Newell, did not buy him any gifts at Christmas, and told him she wished he was dead.  She repeatedly allowed his sexual abuse at the hands of older males and, despite her knowledge of the abuse, allowed the abusers to have continued access to her son.

When Kathy's and Lincks's drug habits destroyed what little connections they had, the children were forced to live in vacant fields and lots in Phoenix and Las Vegas.  Homeless before the seventh grade, Newell was subjected to nearly

1   everything that can go along with a life on the streets – abuse, hunger, neglect,
2   abandonment, despair, and exposure to drugs.

3        Trial counsel's mitigation presentation barely brushed the surface, and
4   included evidence that people allowed Newell to stay with them, giving the
5   impression that people like witness Ginger Whitley took him in off the streets
6   and improved his life.  The real story could not be farther from that picture.
7   Ginger, for example was a drug-addict who allowed Newell to peddle drugs for
8   her at 14, wanted to have sex with him, and at the time of trial was struggling
9   with schizophrenia.  The situation at Ginger's became so bad that the young
10  Newell called the police asking to go to jail, just to have somewhere else to stay.
11  Because of trial counsel's feeble investigation and presentation, however, the
12  State was able to aptly characterize what little the jury heard as simply showing
13  that Ginger took him in and "tried to do right by him in her way.  She was nice
14  to him.  She set down standards for how he should live."  (Tr. 2/24/2004 at 80.)

15       Again, as described in more detail above, *see Section I. a.*, and only
16  briefly summarized here, with little exception, Newell found places to stay
17  wherever he was able, often sleeping on porches or couches in houses where
18  violence, serious mental illness, and drug abuse ran rampant.  Almost everyone
19  in the neighborhood could tell and explain the horror stories of the neighborhood
20  and Newell's subsistence bouncing around there.  What is more, when Kathy
21  would show up in her son's life – sometimes to smoke methamphetamine with
22  him – she not only screamed at him, but physically abused him, punching him in
23  the face and attacking him.  Trial counsel, however, did not investigate these
24  circumstances or gather any supporting records, leaving the sentencing jury in
25  the dark regarding the true community of abuse, neglect, and depravity that
26  raised Newell.

27       Counsel should have, at the very least, not relied upon Kathy's story,
28  gathered records related to the people Newell stayed with and was surrounded

by, interviewed Newell's peers in the neighborhood, and presented a comprehensive picture of the true circumstances of his life. The failure to present even a shadow of the story of the community in which Newell bounced around as a young man – trying to find a place to sleep, subject to sexual, physical, and emotional abuse and neglect, hungry, tired, and addicted to drugs, all before the seventh grade – was constitutionally deficient performance. Further, as described below, this failure to investigate and present relevant mitigating evidence prejudiced Newell's case. *See infra*, subsection F.

**E. Newell's trial counsel ineffectively failed to investigate, develop, and present the mitigating evidence of Mr. Newell's mental and cognitive impairments**

As described in more detail above, *see Section I. a.*, Newell's life was both plagued by and caused further serious mental and cognitive impairments. These stemmed not only from his biological parents' histories and behaviors, but from his neglected and drug-addled life on the streets and injuries he sustained throughout. Despite this, trial counsel failed to investigate, develop, or present readily-available testimony about the sources, effects, and manifestations of his serious mental and cognitive impairments. As described below, these failures constituted constitutionally ineffective assistance of counsel. *See infra*, subsection F.

**F. Each instance of trial counsel's failure to investigate, develop, and present this readily-available and relevant mitigation evidence was constitutionally deficient performance that undermines confidence in the outcome of Newell's case.**

In light of all the red flags in the record and the available evidence as highlighted above, counsel's failure to investigate, develop, and present evidence of the wealth of information regarding Newell's background and life was constitutionally ineffective deficient performance. As the United States Supreme Court has clearly established, the failure to adequately investigate is not adequate or effective under *Strickland*. Just as trial counsel did in *Wiggins*,

Newell's trial counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *See* 539 U.S. 510, 524 (2003).  Trial counsel failed to recognize significant red flags presented by Newell's social history, which should have led them to investigate further, gather records, interview witnesses far beyond the handful they spoke to only superficially, and present the real picture of Newell's history and home life to the jury who held his life in its hands.  *See id.* at 527 ("In assessing the reasonableness of an attorney's investigation . . .  a court must consider . . . whether the known evidence would lead a reasonable attorney to investigate further).  Under the Sixth and Fourteenth Amendments and clearly-established federal law, trial counsel's failure to complete a reasonable investigation was deficient performance. *E.g.*, *Wiggins*, 539 U.S. at 535-36.

What is more, trial counsel's deficient performance prejudiced Newell. The evidence Newell's trial counsel should have uncovered and presented is worlds away from the truncated picture presented at sentencing.  The evidence they failed to investigate and develop would have demonstrated precisely the type of "troubled history [the United States Supreme Court has] declared relevant to assessing" moral culpability and mitigation. *Id.* at 535. (Newell's "troubled history" included severe privation, abuse at hands of absentee mother, physical torment, sexual molestation, and time spent homeless).  Indeed, the State jumped on and repeatedly emphasized the paltry nature of trial counsel's mitigation presentation, summarizing for the jury, "What we're looking at here is a case that has the worst aggravation and some lukewarm mitigation."  (Tr. 2/24/2004 at 83.)

Had trial counsel properly investigated and presented the real extent of Newell's troubled history, there is a reasonable probability, sufficient to undermine confidence in the outcome of his case, that the sentencing result would have been different. *See Wiggins*, 539 U.S. at 537-383.  Instead they

1   presented not only a "lukewarm" picture but one that was, at times, affirmatively
2   misleading about the extent of the abuse and neglect Newell suffered.

3          The trial court, however, denied Newell's petition for post-conviction
4   relief regarding the performance of trial counsel.  Its findings were both contrary
5   to and an unreasonable application of clearly-established federal law and an
6   unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Giving short
7   shrift to the petitioner's mitigation evidence, the court focused its findings on the
8   issue of mental health experts.  Mixed into those findings, however, the court
9   improperly found that Newell was not entitled to relief based in part on the fact
10  that the Arizona Supreme Court's opinion denying relief "took into account the
11  evidence of [Newell's] exposure to drugs at an early age, his long history of
12  substance abuse, and his stepfather's participation in it.  They accepted as
13  proven [his] mitigation evidence related to his unstable childhood and drug use."
14  (PCR Min. Entry, 1/12/12 at 8.)  Thus, although the post-conviction court
15  identified the correct standard generally (*Strickland*), it applied it entirely
16  incorrectly.  An analysis of *Strickland* deficient performance and prejudice
17  requires comparing "the totality of the evidence – 'both that adduced at trial, *and*
18  *the evidence adduced in the habeas proceeding[s].*'"  *Wiggins*, 539 U.S. at 536
19  (emphasis in original) (quoting *Williams*, 529 U.S. at 397-398).  The post-
20  conviction court's reliance on the Arizona Supreme Court's direct appeal
21  opinion necessarily left out the second half of this equation – the evidence trial
22  counsel did not investigate or present – and factored this into its final decision.

23         Second, the post-conviction court relied on the fact that had Newell
24  presented additional evidence, the State would have been permitted to present
25  further damaging evidence in rebuttal.  As a general principle, this is true.  This
26  does nothing, however, to advance the analysis of whether confidence in the
27  sentencing outcome is undermined by the fact that the jury did not hear even a
28  tip of the iceberg of Newell's true troubled history.  An adequate and

constitutionally-effective investigation would have included investigating and dealing with the State's potential rebuttal. That speculative rebuttal is neither here nor there when counsel's investigation and presentation was inadequate.

In sum, trial counsel failed to investigate or present a large and considerable swath of relevant mitigating evidence, preventing the sentencing jury from hearing the true story of Newell's squalid upbringing. This failure was deficient performance under, *e.g.*, *Strickland* and *Wiggins* and prejudiced Newell. Contrary to and unreasonably applying clearly-established federal law, making an unreasonable determination of the facts, and in violation of Newell's Sixth, Eighth, and Fourteenth Amendment Rights, the trial court denied relief.

## Claim Four

**Newell was denied effective assistance of counsel and his due process rights when his trial counsel failed to subpoena certain witnesses and failed to adequately prepare others in the mitigation phase of his capital trial.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Trial counsel failed to call several witnesses who could have shed light on valuable mitigation evidence that could have swayed a jury to impose a life rather than a death sentence. Additionally, counsel failed to effectively prepare and question their own witnesses and allowed them to present an incomplete picture that minimized the trauma in Newell's life. These failures violated Newell's rights to due process and the effective assistance of counsel.

Newell raised this claim in Claim 2(c) of his PCR. (Pet. for PCR, PCR ROA at 0623.) The court found that PCR counsel had failed to present any evidence at the evidentiary hearing to support this claim. (PCR Min. Entry, 1/12/12.) Any failure to properly develop, present, or exhaust this claim is due to the ineffective assistance of post-conviction counsel. *Martinez*, 132 S. Ct. at 1315. That ineffective assistance constitutes cause and prejudice sufficient to

overcome any procedural default.  *Id.*  Due to PCR counsel's failure to adequately present this claim, the PCR court did not rule on the merits.  Thus, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

Alternatively, if this Court finds that the post-conviction court ruled on the merits, then denial of this claim was contrary to, or involved an unreasonable application of, clearly-established federal law.  *See* 28 U.S.C. § 2254(d)(1).  In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented.  *See id.* § 2254(d)(2).  The ineffectiveness of failing to investigate evidence the State intends to produce in seeking a death sentence is something "no one could misunderstand in the circumstances of a case like this."  *See Rompilla v. Beard*, 545 U.S. 374, 387 (2004).  Despite this, the trial court summarily concluded that no evidence supported Newell's post-conviction claim that his counsel's failure to investigate, prepare, and/or subpoena mitigation witnesses and rebut the State's probation testimony was ineffective.  (PCR Min. Entry, 1/12/12 at 2.)  This conclusion was contrary to and an unreasonable application of the United States Supreme Court's clearly-established Sixth and Fourteenth Amendment law, including, *inter alia*, *Strickland*, *Wiggins*, and *Rompilla*.  In addition, it was an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Here the entire mitigation presentation was completed in a single day. The mitigation presentation consisted solely of lay witnesses who, despite knowing that Newell's life was on the line, minimized the abuse, neglect and trauma of Newell's childhood. Additional witnesses that could have given a more accurate and complete picture of Newell's history were not called and the jury was left with an incomplete picture of Newell's life based on the incomplete investigation by counsel.

Newell's mother, Kathy testified that Newell's relationship with his grandmother, Eula, was wonderful, and the time they lived at her house was the most stable.  (Tr. 2/23/04 a.m. at 44.)  The reality was, however, even during that "best" time, Newell experienced physical and sexual abuse, neglect, and parental drug abuse.  Trial counsel allowed Kathy and the other mitigation witnesses to minimize and misrepresent the sad reality of Newell's life.

One of the witnesses whom PCR counsel noted that trial counsel failed to subpoena was Newell's cousin, Carey Michelle Cowan.  She could have testified that she lived "on and off" with Eula, and that she was there when Kiki, a next-door neighbor sexually molested Newell.  (Pet. for PCR, PCR ROA at 0623, 0987.)  In a complete failure to show an iota of concern for her child, Kathy continued to allow Kiki in Eula's home, even after she knew that he had attempted to sodomize her son.  (Pet. for PCR, PCR ROA at 0623, 0987.)  Further, Kathy testified that she had heard that Larry Honeycutt, her boyfriend at the time, had tried to molest Tracy, but testified that she was not aware there may have been an incident with Newell until recently.  (Tr. 2/23/04 a.m. at 51-52; Tr. 2/23/04 p.m. at 11-12.)  The jury did not hear that Honeycutt was a dangerous man with a serious history of substance abuse, mental illness, and horrific violence.  Kathy did not share with the jury that Honeycutt beat her mercilessly in front of her children.  (Stewart Report, Evid. Hrg. Ex. 9, PCR ROA at 2936.) Cowen could have testified that Honeycutt forced both Tracy and Newell to sleep in Kathy's bedroom with him, and that Newell came out crying and told his cousins that Honeycutt "forced himself" on him and molested him. Further when Eula confronted Honeycutt, he attacked her with a lamp.  (Pet. for PCR, PCR ROA at 0988.)   Following her pattern, rather than protect her children, Kathy slapped Tracy when Tracy told her that Honeycutt had molested them, and continued to allow Honeycutt in the house.  (Pet. for PCR, PCR ROA at 0623, 0988.)  Contrary to Kathy's testimony that she loved her son, was a

good mother to him, and that he was a "mama's boy," Cowan would have told the jury that "Kathy's first concern was never her children" and that after Eula's death, Kathy was responsible for getting Newell and Tracy "hooked on drugs." (Pet. for PCR, PCR ROA 0623-24, 0988-89.)

While Newell's aunt, Sherry Orsborn testified at trial, she was nervous and reluctant. In retrospect, she felt the questions counsel asked did not give her the opportunity to "tell the jury about the Steven I knew. They just asked me questions about Steven not being a good kid. He was a wonderful little boy before [Eula] died. Then Kathy and Richard dragged him into their awful, awful world." (Pet. for PCR, PCR ROA 0625-26; Sherry Orsborn Aff. at 5.) Like Cowan, Orsborn, if adequately prepared, would have countered the picture that Kathy was good mother who did the best she could. Kathy smacked Newell around and called him a "little bastard." (Pet. for PCR, PCR ROA at 0626; Sherry Orsborn Aff. at 3.) She too could have testified that Kathy continued to allow sexual predators that she knew had already attacked her children to remain in the home. "Kathy never knew how to be a parent . . . the children just got in her way." (Pet. for PCR, PCR ROA at 0626; Sherry Orsborn Aff. at 4.)

After Eula died, Kathy lost the house because she was unable to make the payments and, under Kathy's version of events the family moved a lot. (Tr. 2/23/04 a.m. at 52-54; Tr. 2/23/04 p.m. at 14-15.) Although Kathy testified that they were only homeless "a couple of weeks," (Tr. 2/23/04 p.m. at 6), the reality was that because of Kathy and her husband's financial and drug problems, they were never in one place more than six months at a time. (Tr. 2/23/04 p.m. at 15.) Eventually the family became homeless and everyone split up. (Tr. 2/23/04 a.m. at 47.) Cowan would have testified that Newell "only lived on the streets"; that Newell slept in fields; and that there were periods where no one knew where Tracey was. (Pet. for PCR Appx., PCR ROA at 0989.) Orsborn could have told the jury that Newell called her from Las Vegas, penniless and asking for money

for food.   He was "constantly in survivor mode" and at almost 14, had experienced what "no child should ever be forced to experience."   (Sherry Orsborn Aff. at 4.)  To survive, Newell panhandled, stole food, and used drugs. (Wake Chron. at 11; Lanyon Report, PCR ROA at 3040.)

Kathy and her husband Lincks both used methamphetamine and were both convicted of offenses connected to their drug use.  (Tr. 2/23/04 a.m. at 47-48.) Kathy testified Lincks was a good father to Newell and loved him very much. (Tr. 2/23/04 p.m. at 7.)   While Lincks may have loved Newell, he failed miserably as a father.  Lincks testified that trying to be a "cool dad," he used methamphetamine with Newell when Newell was still a pre-teen.  (Tr. 2/23/04 p.m. at 29.)  Lincks also had a history of violence and had lost custody of his own child.  Properly prepared, Orsborn could have brought to light that Lincks was a "lifelong drug addict" who was cooking methamphetamine and using it with Newell.  (Sherry Orsborn Aff. at 5.)

Kathy further testified that Newell lived with Ginger Whitley and her family for a year or two because she was unable to care for him.  They "took care of him like their own."  (Tr. 2/23/04 p.m. at 7-8.)  While this statement was not inaccurate, it was misleading, as most animals give more care to their children than Ginger Whitley did.  Ginger indeed took Newell in to live with her family.  All the while, Ginger was using and manufacturing methamphetamine. (Tr. 2/23/04 p.m. at 61-62.)  An alcoholic who had abandoned her own sons, the children would watch as she injected methamphetamine in between her toes. She allowed violent addicts around her children, and was in no position to parent her own children–much less a traumatized, lonely child like Newell.

Ginger's daughter, Kristi, was Newell's girlfriend.  They were allowed to sleep together in the same trailer even though he was only 14 and she was only 13.  (Tr. 2/23/04 p.m. at 8.)  Had counsel pressed further, or interviewed Ginger's daughter, Kristi, they would have learned that because of the

methamphetamine lab on the property, scores of unsavory characters were constantly around.  Newell and Kristi would always carry knives to protect themselves and Newell would try and protect Kristi and her sister.  It was not just strangers that Newell was not safe from; Ginger once asked Kristi to "swap partners" so that Ginger could have sex with Newell.  Wrapped up in her methamphetamine business and her own addiction, Ginger did not bother to ensure the kids were fed.  In fact, Kristi used her babysitting money to buy hamburgers.  Rather than the picture painted at trial, one in which Newell was taken in by a troubled, but good family, Ginger Whitley's was one more place where Newell was unstable and unsafe.

Finally, trial counsel did not call Danielle Denton, Newell's girlfriend of many years and arguably the person that knew him best.  Danielle could have testified that Kathy continued to be unpredictable and physically abuse Newell, even when he was older.  Newell and Danielle briefly lived with Kathy and when they informed her they were moving out, Kathy physically attacked Newell, hit him close-fisted in the face, and knocked him over.  Another time Kathy ripped a nose ring through Newell's skin.  (Pet. for PCR Appx., PCR ROA at 0814.)  Danielle witnessed Newell's depression, and he shared with her about the times he slept in fields when his family was homeless in Las Vegas, the circumstances living with the Whitley's, and how he felt using drugs.  (Pet. for PCR Appx., PCR ROA at 0814-15.)  Danielle could have filled in details about the times when no one else was around Newell could have helped the jury see that he was someone worthy of love.  These witnesses only scratched the surface of the wealth of mitigation witnesses and testimony counsel could have presented from Newell's tragic life.

Trial counsel's investigation and presentation of mitigation evidence to the jury was constitutionally inadequate because, among other shortcomings, it failed to provide a complete picture of Newell's life history and trauma.  As a

general matter, a decision by counsel to limit the presentation of mitigation evidence cannot be excused as a strategic consideration unless the decision to forego mitigation is supported by reasonable investigations. *Williams (Terry)*, 529 U.S. at 394; *Wiggins*, 539 U.S. at 521; *see also* 1989 ABA Guideline 11.8.3 (emphasizing the importance of discussing sentencing and mitigation with the client, as well as finding and developing witnesses who will support the sentencing defense). In fact, the Ninth Circuit has made abundantly clear that "[a]n uniformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll*, 539 F.3d at 949 (citing *Strickland*, 466 U.S. at 690-91, for the proposition that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

In assessing the reasonableness of counsel's performance, this Court should look to guides such as the American Bar Association ("ABA") standards in place at the time of the trial, *Bobby v. Van Hook*, 558 U.S. at 4, 8 (2009), as well as standards of practice in the defense community in Arizona, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). In doing so, this Court must find that trial counsel's performance here fell below the standards of competency.

At the time of Newell's sentencing, capital defense attorneys were bound by the provisions of Rule 6.8 of the Arizona Rules of Criminal Procedure. Ariz. R. Crim. P. 6.8 (1999). The version of Rule 6.8 in effect at the time of Newell's trial required lead counsel to be familiar with the performance standards in the 1989 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Ariz. R. Crim. P. 6.8(b)(1)(iii) (2000). The Arizona Supreme Court had therefore incorporated the ABA Guidelines into the standards of practice for Arizona attorneys.

In this case, counsel's failure to present available mitigation cannot be excused as a tactical decision, because their investigation was inappropriately

narrow in scope.  *See Correll*, 539 F.3d at 955-56 (noting that capital defendants are "constitutionally entitled to the presentation of a mitigation defense").  Further, it is simply not enough to present limited evidence in support of a few mitigating factors.  As the Ninth Circuit has often made clear, counsel's duty to investigate all potentially mitigating evidence related to a defendant's mental health, family background, and prior drug use, and to provide the sentencer with a full presentation of the evidence that might lead the sentencer to spare his client's life, is not discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or "abbreviated" presentation of potentially mitigating factors.  *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (citations omitted).

The "deficient performance and prejudice questions may be closely related."  *Correll*, 539 F.3d at 951 (citations omitted).  This is particularly true when counsel's deficient performance relates to a failure to develop and present mitigation in a capital sentencing proceeding.  *Id*. (citing *Summerlin*, 427 F.3d at 643).  Here, Newell's readily available history included evidence of significant, humanizing mitigation information that was never investigated or presented at sentencing.  This evidence may have been enough to call for leniency, and is at least enough to undermine confidence in Newell's death sentence.

In this context, prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome."  *Id*.  A reviewing court must evaluate "the totality of the evidence before the judge or jury."  *Id.* at 695.  The prejudice analysis does not depend on whether the outcome of the proceeding would have been different.  "[T]he (outcome determinative) standard is not quite appropriate."  *Id.* at 694.  Rather, Newell

1    must show "a probability sufficient to undermine confidence in the outcome" of

2    the proceeding.  *Id.*

3          Trial counsel's mitigation presentation during the sentencing phase of

4    Newell's trial was deficient.  *See Summerlin*, 427 F.3d at 630 (noting that

5    penalty phase investigations in capital cases should include inquiries into social

6    background and evidence of family abuse, potential mental impairment, physical

7    health history, and history of drug and alcohol abuse).  Trial counsel's failure to

8    properly investigate and prepare the witnesses they did call, and the failure to

9    call witnesses with important insight into Newell's traumatic, abusive, and

10   neglectful childhood, left the jury with an incomplete and inadequate picture to

11   make a fully informed decision on life or death.  Accordingly, Newell is entitled

12   to relief.

**Claim Five**

14   **The Arizona Courts violated Newell's Fifth, Sixth, and Fourteenth**
15   **Amendment rights by permitting the State to play the statements that**
     **it obtained from him over the course of a thirteen-hour interrogation**
16   **in violation of *Miranda*, *Edwards*, and the Constitution's voluntariness**
     **principles.**

17         Newell incorporates by specific reference all facts, allegations, and

18   arguments made elsewhere in this Petition.

19         **A.  The state courts permitted the State to admit statements**
20             **that were obtained in violation of *Miranda v. Arizona* and**
                 ***Edwards v. Arizona*.**

21         These claims were raised on direct appeal (DA Doc. 28 at 21-49), and in

22   state post-conviction court (Pet. for PCR, PCR ROA at 0602-05).  To the extent

23   any aspects of this claim were not exhausted, that failure is attributable to the

24   ineffective assistance of Newell's post-conviction counsel.  *Martinez*, 132 S. Ct.

25   at 1315.  The state courts' denial of these claims constituted an unreasonable

26   application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and an

27   unreasonable determination of the facts, *id.* at § 2254(d)(2).

28

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth, guarantees that "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  It is beyond question that the United States Supreme Court has clearly established rules the police must follow when interrogating a person in custody to ensure that the State does not violate the "basic" and "precious" rights of the Fifth Amendment.  *Miranda v. Arizona*, 384 U.S. 436, 442 (1966).  Among these clearly-established rules of constitutional and federal law is that the "assertion of the right to counsel [is] a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'"  *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (quoting *Miranda*, 384 U.S. at 474).  A person, "having expressed his desire to deal with the police only through counsel," must not be "subject to further interrogation by the authorities until counsel has been made available to him."  *Id.* at 484–85.  The rule is bright-line: once a person has asserted his right to counsel, "law enforcement officers must *immediately cease* questioning."  *Davis v. United States*, 512 U.S. 452, 454 (1994) (emphasis added) (citing *Edwards*, 451 U.S. 477).  These principles are meant to protect a person's Fifth Amendment rights and "prevent police from badgering a [person] into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).  The Arizona Courts violated these clearly-established principles.

On June 2, 2001, a MCSO detective interviewed Newell for several hours.  At the very end of the interview, right before Newell submitted to a "Computer Voice Stress Analyzer" test, (Ex. 104, 6/2 Tape Three at 10-11)[15] the detective read Newell his *Miranda* rights.  As he began reading them, Newell interjected,

---

[15]  The MCSO lost the video tapes of this interrogation.  The audio tapes, presumably in order, are Exhibit 102-104 in the trial record.  For clarity, Newell has cited to the location on each tape where these statements would appear using the number on a standard type counter.

"woah, woah, woah."   Despite Newell's hesitations, the detective repeatedly insisted that he was just going to finish reading the list of rights.  When Newell started to say "[the o]nly time I hear that, them words . . .," the detective cut him off, saying "No, no, no. No no.  Listen, . . . I've gotta read everything to you for you to take the test right?"   (6/2 Tape Three at 10-11.)   Newell answered, "I guess," and took the test.  After the short exam, the police released him and he left the station.  (Ex. 104, 6/4 Tape Three at 10-11, 29-31.)

On June 4, 2001, for the third time in little over a week, two Maricopa County Sheriff's detectives began interrogating Newell at about 8 o'clock in the evening.   Within the first few minutes of the interrogation, Detective Kim Seagraves told Newell:

> What I'd like to do is, my policy is that when people come in here, I [like] to let them know what their rights are and I do that to everybody that I interview as opposed to what other people do, I can't say, but this is what I do. So I'm going to go ahead and get this and then we'll just move on with the information that you have.

(Ex. 106, 6-4 Interrogation Tape Two at 20:13:30.)[16]   She then rapidly read Newell his rights to remain silent, to the presence of an attorney, and to an appointed attorney.   He answered, "Yep," he understood those rights, and proceeded to talk about subjects such as his whereabouts over the preceding few weeks, but did not make any inculpatory statements.  (Ex. 106, 6/4 Tape Two.)

After over two hours of discussion, the detectives left Newell alone.  (Ex. 106, 6/4 Tape Two at 22:17.)   As Newell sat alone, often picking his arms and chest, he said things to himself like, "I just wanna go.  Fuck!"  (Ex. 106, 6/4

---

[16]At trial, the State played video tapes of Newell's June 4, 2001 interrogation to the jury.  According to the record, those tapes were redacted by the parties and appear as Exhibits 105 through 112.  As explained in a separate claim, at some point, the State played portions of the un-redacted tapes to the jury.  Newell's federal habeas counsel viewed the un-redacted tapes.  For clarity, Newell cites both the exhibit number and the name of each tape.  The specific citations refer to the MCSO time stamp which appears on the screen in each tape, and should be the same regardless of whether one views the redacted or un-redacted versions.

Tape Two at 22:18-22:32.)  When the detectives returned, Detective Seagraves carried in a pile of large binders with a large photo of the victim sitting on top of them.  The other detective walked in humming a song.  (Ex. 106, 6/4 Tape Two at 22:33.)

Detective Seagraves then immediately began a long speech to Newell, telling him they knew it was him and there was no question in her mind that he had something to do with the victim's death.  She continued, listing items of evidence they purported to have against him, and told him "the investigation is done, it's over with, it's complete, you're the person that's responsible for her death."  (Ex. 106, 6/4 Tape Two at 22:34.)  Newell tried to interject, and the detective interrupted each time, putting her hand in his face and telling him to listen to her.  (Ex. 106, 6/4 Tape Two at 22:33-22:36.)  Detective Seagraves, sitting between Newell and the door, scooted closer to him, and continued listing the purported evidence against him.  Finally, she told him: "you have a decision right now and the decision you have is to sit there and to deny and to continue to deny it and let us go [on] with our report."  (Ex. 106, 6/4 Tape Two at 22:34-22:36.)

At this point, Newell asked to call a lawyer (the "first invocation").  Detective Seagraves, apparently unsure about what he had said, asked "Did you just ask for a lawyer, is that what you're asking me for?"  (Ex. 106, 6/4 Tape Two at 22:36.)  Newell responded, "If I'm getting charged for it yeah, I want a lawyer,"[17] (the "second invocation").  Employing the same tactic of barreling forward regardless of what Newell said, the detective told him:

> "Stop talking, stop talking. I want to tell you something.
> If you've asked for a lawyer, then I can't ask you
> anything else.   And *we are going to go on with our*

---

[17]In ruling on Newell's motion to suppress his statements, the Arizona courts made much of the fact that he may have said the word "No" before he said "if I'm getting charged for it yeah, I want a lawyer." As explained below, this distinction is of little importance.

1

2

*questions* but I just don't want it to be confused, I want to understand if you want to talk to me then you need to tell me."

3

(Ex. 106, 6/4 Tape Two at 22:36.) (Emphasis added.)

4

5

6

7

8

9

10

11

12

13

Newell again explained, "I already told you.  If I'm going to go to jail now, I want to talk to my lawyer," (the "third invocation").  (Ex. 106, 6/4 Tape Two at 22:26.) Detective Seagraves responded, "Okay."  Newell then told her, "That's – I'm going to leave."  (Ex. 106, 6/4 Tape Two at 22:36-22:37.) Not to be deterred, Detective Seagraves once more persisted, "Listen to me – do you want to talk to me or do you want your lawyer here?"  Newell then gave in, answering, "I want to talk to you."  (Ex. 106, 6/4 Tape Two at 22:37.) What followed was, including some breaks, almost ten more hours of interrogation in which Newell made unquestionably damaging statements.  (Ex. 106-112, 6/4 Tapes 2-8.)

14

15

16

17

18

19

20

21

22

Even assuming *arguendo* that Detective Seagraves did not hear Newell's first statement that he wished to call his lawyer, he then explained twice more that he wanted a lawyer.  Detective Seagraves acknowledged these requests by saying "Okay."  Nevertheless, just as she had earlier pushed forward interrupting Newell and telling him "listen to me" as she listed the reasons she "knew" he was guilty, she chose to ignore these two clear invocations of the right to counsel, saying "listen to me" and asking him to continue to talk.  This practice and the later admission of his statements at trial were wholly inconsistent with clearly-established federal law.

23

24

25

26

27

Despite this, the trial court found that Newell's second invocation was ambiguous, because he may have, in response to Detective Seagraves's question whether he has asked for a lawyer, said "No, if I'm getting charged for it yeah, I want a lawyer."  (Tr. 11/5/2003 at 126.) The State argued and the court accepted that using the words "no" and "yes" in the same sentence made his request

28

94

unclear and thus, under *Davis*, 512 U.S. 452, the detectives were free to continue questioning him.  (Tr. 11/5/2003 at 112, 126.)  This was both contrary to and an unreasonable application of *Edwards* and *Davis*, and an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1)-(2).  *Davis* held that the statement "Maybe I should talk to a lawyer" was not sufficiently clear to invoke the right to counsel and halt the interrogation.  512 U.S. at 462.  Here, with or without the word "no," it is clear that Newell said he wanted a lawyer if he was being charged.  He made it abundantly clear he wanted the assistance of counsel.  *See id.* at 459 (internal citation and quotations omitted)  ("[A] suspect need not speak with the discrimination of an Oxford don.").

        The trial court went on to note that "while you may pick out one part of that and say it's clear in that unintelligible sentence he's saying 'I want to talk to my lawyer,' in the total context of what is being exchanged, it seems to me not at all clear."  (Tr. 11/5/2003 at 126.)  This is belied by at least two facts.  First, even if one could imagine that the word "no" made his second invocation unclear, Newell went on to invoke a third time, emphasizing "I already told you.  If I'm going to go to jail now, I want to talk to my lawyer."  (Ex. 106, 6/4 Tape Two at 22:36.)  Second, Detective Seagraves acknowledged Newell's request by saying "Okay."  (Ex. 106, 6/4 Tape Two at 22:36.)  The context was clear, and if the detectives were not required to cease questioning after the first and second invocations, they surely were after the third.

        Again, the court found no *Miranda* violation after looking at the "total context of what is being exchanged."  (Tr. 11/5/2003 at 126.)  Its ruling further improperly relied on the following:  "[I]t's still important to me she hasn't asked him anything other than about the lawyer.  She's not asking him, 'Well, did you do it?  Were these your shoes?'  In this exchange she's only talking about 'lawyer' and trying to get a clarification."  (Tr. 11/5/2003 at 127.)

A comparison to *Smith v. Illinois* demonstrates that this was contrary to and an unreasonable application of clearly-established federal law. In *Smith*, the petitioner told detectives he would like to talk to a lawyer, and the detectives responded "Okay," but continued reading him the remainder of his rights.  469 U.S. 91, 93 (1984).  The detectives then asked, "Do you wish to talk to me at this time without a lawyer being present?"  Smith responded, "Yeah and no, uh, I don't know what's what, really."  The detectives persisted, "Well. You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to."  Smith then gave in and agreed, "All right. I'll talk to you then." *Id.* at 92-93.  The Court made clear, "[a] statement either is . . . an assertion [of the right to counsel] or it is not."  *Id.* at 97-98 (internal citation and quotations marks omitted). It explained:

> *Edwards* set forth a "bright-line rule" that all questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation."

*Id.* at 98-99 (internal citations omitted).

Thus, the trial court's reliance on considering the conversation as a whole, after Newell's invocations, and on the fact that Detective Seagraves only asked whether he would talk, should not change the analysis.  Newell said "I already told you.  If I'm going to go to jail now, I want to talk to my lawyer."  Detective Seagraves persisted, "Listen to me–do you want to talk to me or do you want your lawyer here?"  (Ex. 106, 6/4 Tape Two at 22:36.) This is either the impermissible police badgering described in cases such as *Edwards* and *Smith* or

it is not.  *Smith*, 469 U.S. at 97-98.  Newell submits that it is, and the trial court's reasoning and ruling otherwise was contrary to and an unreasonable application of clearly-established federal law, and an unreasonable determination of the facts.[18] 28 U.S.C. § 2254(d).

The Arizona Supreme Court compounded this violation of Newell's constitutional rights, when it agreed with the trial court that Newell "did not make unequivocal requests for counsel."  *Newell*, 132 P.3d at 847.  The Court further held the trial court had not abused its discretion in finding "one of the alleged requests was ambiguous because it was contradictory" and both of the "alleged requests were ambiguous because they occurred while Newell and the detective were talking over each other."  *Id.* at 842.  For the same reasons described in detail above, the Arizona Supreme Court's decision was contrary to and an unreasonable application of clearly-established federal law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Newell attempted twice more to obtain the assistance of counsel, to no avail.  Again, the Arizona courts ruled his statements admissible in violation of clearly-established federal law.    Further, trial counsel was prejudicially ineffective for failing to amplify and make clear the contents of the interrogation tapes.[19]

---

[18]Indeed, the detectives here used against Newell many of the same overzealous practices used in *Miranda*, which the Court found created the potential for violations of the Fifth Amendment. After Newell asked for an attorney, for example, Detective Seagraves barreled forward and persisted in questioning. The detectives told him with "an air of confidence" they knew he was guilty, and placed him "in a psychological state where his story [was] but an elaboration of what the police purport[ed] to know already – that he [was] guilty." *See Sessoms v. Runnels*, 691 F.3d 1054, 1059 (9th Cir. 2012) (quoting *Miranda*, 684 U.S. at 450).

[19] What is more, it is unclear which portions of the eight videotapes of Newell's interrogation the parties put forward and the courts actually reviewed. This failure of trial and appellate counsel to make an adequate and complete record is explained more fully in a later claim. *See infra* Claim Six.

**B. The state courts permitted the State of Arizona to admit statements obtained through force, threats, coercion, and promises.**

The Fifth and Fourteenth Amendments "secure[] against state invasion . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). Thus, the United States Supreme Court has clearly established that in order for a statement to be found voluntary and therefore admissible, it must be "free and voluntary: that is, must not be extracted by any sorts of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *Malloy*, 378 U.S. 1 (Fifth Amendment privilege applicable to states; incorporating *Bram* definition of compulsion).

Here, as explained above, the MCSO, for the third time in little over a week, interrogated Newell in one of its interrogation rooms. Detective Seagraves read Newell his *Miranda* rights as if they were a mere formality, telling him it was simply something she does with everyone and that she was "going to go ahead and get this and then . . . just move on with the information that you have." (Ex. 105 6/4 Tape One at 20:13.)

Just after ten o'clock in the evening, Detective Roger Marshall promised Newell he would get him a telephone landline to call his mother. After talking a little more, the detectives told Newell they were taking a break, and Detective Marshall said he would take care of calling Newell's mother and telling her that he was "fine." (Ex. 106, 6/4 Tape Two at 22:05-22:08.) The detectives then left Newell sitting alone, as he constantly picked at his arms and chest. (Ex. 106, 6/4 Tape Two at 22:08-22:32.)

About 30 minutes later, the detectives entered the small room with large binders, with a large photo of the victim on top of the binders, and Detective

98

Marshall was humming a tune.  (Ex. 106, 6/4 Tape Two at 22:33.)  As described above, as soon as she closed the door, Detective Seagraves began assailing Newell with a barrage of accusations, scooting knee-to-knee with him, and refusing to let him interject.  As also described above, Newell asked for counsel repeatedly, but Detective Seagraves said "Okay," then simply continued forward, asking him whether he would talk to them.  (Ex. 106, 6/4 Tape Two at 22:33-22:37.)

When Newell gave in and said he would talk to them, the barrage continued.  Detective Seagraves, while holding the victim's photo in his face, told him that his mother had told the police he was "having a hard time dealing with this."  (Ex. 106, 6/4 Tape Two at 22:40-22:42.)  Seagraves repeated that they were 100 percent sure it was him and continued telling him about "evidence" they had of his guilt, including that they had pulled film from a nearby camera.[20]  She insisted that "only a person that [was] evil would sit there and not tell what happened."  (Ex. 106, 6/4 Tape Two at 22:44.)

Newell then asked to leave.  Detective Seagraves responded, "You're not leaving.  You need to tell me what happened.  You're not leaving."  (Ex. 106, 6/4 Tape Two at 22:44-22:45.)

The detectives then continued to do more than the lion's share of talking at Newell, asking him if he was religious, telling him that whether he confessed would make or break what kind of person he was, asking him how people would perceive him if he didn't confess, and telling him it was all "over." (Ex. 106, 6/4 Tape Two at 22:49-22:58.)

As Detective Seagraves whispered to Newell that it was all "over" and that he needed to confess, Newell candidly told her, "I'll probably end up, probably dead within the next two days anyways, so.  What does it actually

---

[20]Much of the inculpatory evidence the detectives held over Newell's head either did not actually exist at the time of this interrogation or, like this alleged videotape, never existed at all.

really matter?"  (Ex. 106, 6/4 Tape Two at 22:58.)  He went on to express his deep love for his mother and ex-girlfriend Danielle, and the detectives told him that Danielle would want to know if he was going to do the right thing and confess.  (Ex. 106, 6/4 Tape Two at 22:59.)  Detective Marshall asked whether Danielle would "ever believe anything" Newell had to say, and began an enduring and increasingly intense series of religious statements to Newell.  (Ex. 106, 6/4 Tape Two at 23:07-23:08.)

As Detective Marshall started telling Newell about the "early Catholic Church" and the need for children to be "right with God," he asked Newell, "Do you have a heart inside of you?"  He then told Newell that he had something to prove to Danielle, the victim, and God, then continued quoting Bible verses about forgiveness and the cleansing of sins.  (Ex. 106, 6/4 Tape Two at 23:09-23:13.)

Newell, listening to all of this, asked the detectives what would happen to someone who had committed these offenses.  Detective Seagraves told him that the decision was not up to them.  (Ex. 106, 6/4 Tape Two at 23:14.)  Just three minutes later, however, Detective Seagraves said they needed to know what happened, and told him, "[I]f you're worried about your safety in the jail, then we can make arrangements for that."  Newell scoffed, presumably in disbelief, and Detective Seagraves assured him "we can."  (Ex. 106, 6/4 Tape Two at 23:17-23:18.)

She continued insisting, "We can. Okay. . . . Steve, when I tell you that Jeff was not booked, that had nothing to do with us, he was booked for a warrant that had nothing to do with us."[21]  (Ex. 106, 6/4 Tape Two at 23:18.)  She further promised, "that had nothing to do with us. If that's something, concern about

---

[21]As explained in detail below, "Jeff" was a person the MCSO originally publicly accused of the victim's death in this case, then placed in general population in the Madison Street Jail. This led to his severe and widely-publicized beating.

your safety, . . . we can make arrangements for that.  We can make arrangements for that." (Ex. 106, 6/4 Tape Two at 23:17-23:18.)  Newell finally agreed, "I know you can."  (Ex. 106, 6/4 Tape Two at 23:18.)

Within the next two minutes, Newell made his first inculpatory statements.  Although he did not make a full confession, the very next statement he made after Detective Seagraves's promise was, "I am a smart guy.  I spend a lot of time thinking. Watching and thinking, and you know what I mean.  And if I was.  If something like that did happen, or if I did black out, if I did black out I wouldn't know until I come to, come to and you got a dead little eight-year old girl that you know. . . . You look around, you don't see nothing besides maybe a truck coming your way down a dirt road or something."  (Ex. 106, 6/4Tape Two at 23:19-23:20.)  Notably, at trial, the State presented evidence that a man driving a truck or tractor down a dirt road had seen Newell on the day of the victim's disappearance and Newell had seen him and run.[22]  (Tr. 2/3/2004 p.m. at 12-14, 16.)  Thus, although Newell's confession was concededly piecemeal, he gave his very first inculpatory statement, which led to others, less than two minutes after Detective Seagraves promised to keep him safe.

This promise takes on even greater force when viewed in the context of the detectives' and Newell's shared knowledge at the time.  As discussed, Detective Seagraves repeatedly assured Newell that what happened to "Jeff" was not their fault, and that they would ensure that the same would not happen to him.  (Ex. 106, 6/4 Tape Two at 23:17-23-18.)  What happened to Jeff was that in "one of the most publicized investigations of . . . the year," the Maricopa County Sheriff's Office has "spent the days prior to May 28, [2001] calling

[22]Indeed, one minute after Newell made this statement, Detective Seagraves noted he had come close to confessing and that the burden on him must be heavy. Newell answered, "yeah, that's why . . . This . . . [is the] last time, this is it right?" (Ex. 106, 6/4 Tape Two at 23:23-23:24.) Although Newell wavered about the details he spoke about, it is clear that this moment, directly following Detective Seagraves's promises, was the turning point in his statements to police.

[Jeff] a prime suspect" in this case.  Robert Nelson, *Jail Bait*, Phoenix New Times   (Dec.   26,   2002),   http://www.phoenixnewtimes.com/2002-12-26/news/jail-bait/.  Contrary to its standard policy and despite its knowledge of dangers to inmates facing charges of the nature of the charges in this case, the Sheriff's Office placed Jeff in general, open population in the Madison Street Jail.  *Id.*  In the same jail pod as Jeff was housed, the Sheriff's Office played local television which included the MCSO's continued publicity that Jeff was the suspect in this case.  *Id.*  "For more than 10 minutes, dozens of prisoners . . . rotated in and out of [Jeff's] cell.  They walked in, beat him until they got tired of beating him, and then let others at him."  *Id.*  "They rhythmically [came and went], as if hauling sand bags to a flood wall."  *Id.*  According to the Sheriff's Office, not a single guard or officer noticed.  As a result, Jeff was "beaten to the brink of death," had a 14-inch scar from his solar plexus to his pubic bone, and "survived with only the loss of his spleen."[23]  *Id.*  Even more so in light of this knowledge, Detective Seagraves's promises of safety, which Newell relied upon, fit squarely within *Bram*'s definition of impermissible "promises, however slight."  168 U.S. at 543-43.

In addition to these promises, the detectives wrought upon Newell an almost 13-hour interrogation.  The detectives applied several key points of inquisitorial pressure, including needling into Newell's religious beliefs, lack of sleep, his intoxication, his personal history, and his age.

As noted, Detective Marshall quickly picked up on Newell's religious beliefs and went far beyond discussing them as a reason to confess.  His religious discussion and indictments became increasingly intense, breaking Newell down even further.  He tested the waters by asking if Newell was religious, and became increasingly persistent about biblical themes of murder,

---

[23]These details were known at the time of Newell's interrogation on June 4, 2001. Indeed, Detective Marshall discussed them with Newell. (Ex. 107, 6/4 Tape Three at 1:03.)

confession, and cleansing.   (Ex. 106, 6/4 Tape Two at 22:49, 23:07-23:08, 23:09-23:13.)   After Newell mentioned the truck in response to Detective Seagraves's promises, however, Detective Marshall turned up the heat.  He told Newell:

> You're thinking all the time.  You said so yourself. I can see it in your eyes.  And you're thinking all the time. Why isn't any of this getting through?  You read the Bible.  You know what it says.  Is God a liar?  Say it out loud, "God's a liar, because I'm going to continue to lie. I'm going to keep my lies and therefore I'm not gonna trust what God says."  If you believe that, say it out loud. Let me know what kind of person you are.
>
> . . .
>
> One hundred percent.  There is no doubt in anybody's mind.  This thing is done.  This is over.  One of two things is going to happen.  You're going to forever be, be the one, in your mind, between you and God, between you and [this] family, and you and [the victim] who I believe 100 percent knows what's going on even as we speak right now.

(Ex. 106, 6/4 Tape Two at 23:40-23:41.)  Again, less than a minute later, Newell made inculpatory statements, indicating that everyone in the room knew what had happened.  (Ex. 106, 6/4 Tape Two at 23:41-23:42.)

Detective Marshall went on to tell Newell, who seemed to be crying, that he had read all about his background and family, including that he had been molested, and continued asking him to tell him what happened, all the while interspersing religious references.  After midnight, he again asked Newell if he had read the Bible and told him, "There's a specific verse . . . and that's that all liars will have their part in the lake of fire.  I don't want you to be a liar.  You're a killer."  (Ex. 106, 6/4 Tape Two at 00:25-00:26.)  These religious indictments and Newell's corresponding admissions continued throughout the interrogation.

Further compounding the effects of these religious accusations were Detective Marshall's passive-aggressive accusations that Newell was a sociopath –at times telling him he was a sociopath, at times saying he knew that he was

not.  For example, Detective Marshall told Newell there was no scarier person in the world to him than a sociopath.  (Ex. 106, 6/4 Tape Two at 23:52-23:53, 23:55.)  After he learned how strongly Newell felt about his ex-girlfriend Danielle, the detective deepened these accusations by telling him that he might speak to Danielle and the "worst thing to tell her is, Danielle, be careful, I've spent a lot of time with Steve and he might be a sociopath.  Would be my advice to never be around that young man again."  (Ex. 106, 6/4 Tape Two at 23:58.)  These accusations and references to Newell being a sociopath continued throughout the interrogation, often accompanied by religious references or probes about what Danielle would do if she knew.

At nearly one o'clock in the morning, Detective Marshall again told Newell that if he didn't tell the truth and say he remembered what happened, it would mean he was a sociopath.  He then threatened to bring in photos – presumably from the crime scene – to show to Newell.  Newell pleaded not to see the photos, and the detective persisted, "I want to see if you have any emotion in you besides anger."  (Ex. 107, 6/4 Tape Three at 00:50-00:51.)

At 1:16 in the morning, he continued, "all you are, is I think . . . showing yourself to be nothing more than a sociopath, because you don't care about anything, except Danielle and yourself."  Holding the victim's photo in Newell's face, he went on, "You don't care about her.  Go ahead and look at her and say 'I don't give a rat's ass about you.'"  (Ex. 107, 6/4 Tape Three at 1:16-1:17.)  Again, Newell responded with details about the crime.[24]  (Ex. 107, 6/4 Tape Three at 1:20, 1:22.)

---

[24]The fact that Detective Marshall's insistence that Newell was a sociopath and people would know so clearly influenced Newell.  This became especially clear when the detectives unleashed Newell's mother on him in the interrogation room in the morning, and he insisted upon telling her that he loved her and needed her to know that he was not a sociopath.  (Ex. 111, 6/4 Tape Seven at 8:56-8:58.)

On top of these and many other pressures by the detectives, Newell was under the mind-altering influence of methamphetamine,[25] and was sleep-deprived both before and during his over-13-hour interrogation. Moreover, although he was twenty years old, his educational level – sixth grade – and serious cognitive impairments further impeded his ability to stand his own ground and not give in to the detectives' inquisitorial interrogation. *See Miller v. Fenton*, 474 U.S. 104, 112 (1985) (determining voluntariness in light of totality of circumstances includes considering "both the characteristics of the petitioner and the details of the interrogation").

In sum, Newell was subjected to an extremely lengthy interrogation, tried to obtain counsel but could not, was exhausted and under the influence, was harried with religious indictments and accusations he was a sociopath, had a photo of the victim repeatedly held in his face, was told the detectives were unwavering in their 100-percent conviction he was guilty, was promised the detectives would arrange for his safety in jail, and was told he was not leaving and needed to tell what happened. These circumstances all combined to compel Newell to make involuntary inculpatory statements. His statements should have been suppressed.

Despite this, contrary to and unreasonably applying clearly-established federal law, and unreasonably determining the facts, the trial court found Newell had voluntarily confessed. (ROA 94 at 3.) In making this determination, the court found that Newell had not confessed until hours after the detective's statements about Danielle – a finding belied by the many inculpatory statements made close in time to the detective's statements. The court also found that sleep deprivation did not render the confession involuntary, seeming to reason that any

---

[25]His constant picking and scratching of his skin was one clear outward manifestation of this intoxication. (Ex. 106, 6/4 Tape Two at 22:08-22:17, 22:18-22:33; Ex. 108, 6/4 Tape Four at 2:28-2:32, 4:06-4:13; Ex. 109, 6/4 Tape Five at 4:13-4:22, 5:17; Ex. 111, 6/4 Tape Seven at 8:35, 8:37, 9:10-9:16.)

1    sleep deprivation was simply a product of Newell's guilty conscience keeping

2    him awake.[26]  (Tr. 11/5/2003 at 139-40.)

3        The Arizona Supreme Court compounded these unreasonable

4    determinations and applications of clearly-established federal law and

5    unreasonable determinations of fact by affirming the trial court's admission of

6    Newell's statements.  *Newell*, 132 P.3d at 843-44. The court reasoned that the

7    length of an interrogation alone does not make it involuntary.  *Id.* at 843  (citing

8    *State v. Doody*, 930 P.2d 440, 446 (Ariz. Ct. App. 1996), *rev'd* 649 F.3d 986

9    (9th Cir. 2011)).  Further – in a finding that was, as discussed in detail above,

10   contrary to and an unreasonable application of federal law and an unreasonable

11   determination of the facts – the court found his attempts to gain counsel were

12   equivocal.  *Newell*, 132 P.3d at 843.  The court also improperly characterized

13   Detective Seagraves's weighty promises to keep Newell safe as "mere

14   assurances" to provide for his safety and assurances he did not rely on.  *Id.*  This

15   is belied by, at a minimum, the fact that he made his first inculpatory statements

16   mere moments later.  Further, despite the principle that it is the State's burden to

17   demonstrate a confession is voluntary and despite evidence in the videotapes to

18   the contrary, the court found there was no evidence Detective Marshall's

19   religious statements overbore Newell's will.  *Id.*  Without considering any of the

20   other circumstances, the court concluded the detective's statements about

21   Danielle did not rise to the level of a threat.  *Id.* at 844.  Finally, the court

22   reasoned that Newell's confession was voluntary because he never agreed to

23   confess every detail the detectives wished him to, so his will must not have been

24   overborne.  *Id.*  These findings and holdings are all contrary and an unreasonable

25   application of clearly established federal law, and an unreasonable determination

26

27   [26]The trial court, it seems, made its ruling without viewing the entirety of the
     interrogation tapes. Worse, although the record is unclear, it seems the court
28   may have only viewed the portions of the tapes relevant to the *Miranda* inquiry.
     (Tr. 11/5/2003 at 135, 143; ROA 94 at 3.)

1    of the facts.  28 U.S.C § 2254(d); *see, e.g.*, *Bram*, 168 U.S. 532; *Malloy*, 378

2    U.S. 1.

3            To compare, in *Doody v. Ryan*, 649 F.3d 986, 991-992 (9th Cir. 2011) (en

4    banc), detectives first made the warnings of *Miranda* seem as if they were a

5    "mere formality."  They then "commenced with casual questions" until, about an

6    hour into the interrogation, they began lecturing the petitioner about telling the

7    truth.  At that point, the detectives also began listing evidence they purportedly

8    had against him.  After keeping this up, they told the petitioner he had to tell

9    them what he knew.  *Id.* at 992-93.  The petitioner immediately volunteered

10   some inculpatory information, but held out on further details until many hours

11   into the night.  The detectives continued to intensify the pressures on the

12   petitioner, suggesting he was a liar, and telling him he needed to give them an

13   explanation.  *Id.* at 993-94.  The interrogation lasted nearly 13 hours.  *Id.* at 990.

14   The Arizona state courts nevertheless rejected the petitioner's arguments his

15   statements were involuntary, finding "the troublesome length of Doody's

16   questioning [did] not, in itself, establish that the officers overcame Doody's

17   will."  *State v. Doody*, 930 P.2d at 446.  The Arizona courts further found the

18   detectives' tactics, though deceptive, were not "so egregious as to overcome

19   Doody's will."  *Id.* at 447-48.  When Doody challenged these decisions in a

20   federal habeas petition, his claims were denied.  *See Doody*, 649 F.3d at 1001.

21           Reviewing the voluntariness claims under the standards established by

22   AEDPA, the Ninth Circuit, sitting en banc, held that the Arizona courts had

23   unreasonably applied clearly-established federal law.  *Id.* at 986.  The court

24   noted that the accused must be "*adequately* and *effectively* apprised of his rights

25   and the exercise of those rights must be fully honored."  *Id.* at 1006 (emphasis in

26   original) (quoting *Miranda*, 384 U.S. at 467).  Further, the court found the

27   Arizona courts had run afoul of clearly-established voluntariness law, including

28   *Watts v. Indiana*, 338 U.S. 49, 53-54 (1949) (statement that is "product of

                                          107

1   sustained pressure by the police . . . does not issue from a free choice), and

2   *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (due process requires

3   taking into account all the circumstances of an interrogation in determining

4   voluntariness).  The court examined the tapes of the interrogation and considered

5   the petitioner's age and "the intensity of his interrogation and his isolation

6   during twelve-plus sleep-deprived hours of continuous questioning" to find his

7   statements involuntary.  *Doody*, 649 F.3d at 1009.

8        Given the facts described above and those that can be gleaned from

9   viewing the videotapes of Newell's interrogation, Newell's case echoes

10  Doody's.  The crucial facts are the same: detectives made *Miranda* seem as if it

11  were a mere formality – the appearance of this was exacerbated by the fact he

12  had been told it was a formality and released just two days earlier.   The

13  detectives began lecturing him on the importance of telling the truth, telling him

14  he was lying, making claims about the evidence they had against him, telling

15  him he was not leaving, and demanding that he tell them what happened.  The

16  detectives led him through an increasingly intense overnight interrogation that

17  lasted late into the morning.  Although there were some breaks, as in *Doody*,

18  Newell was "peppered with a barrage of questions, exhortations, and commands.

19  This pattern recurred throughout the interrogation."  *See* 649 F.3d at 1011.

20       Much like the Arizona courts in *Doody*, the courts here paid mere lip

21  service to an analysis of the totality of the circumstances surrounding this

22  interrogation.  They made much of offers of food and drink, and "tick[ed] off a

23  list of circumstances rather than actually considering them in their totality."  *See*

24  649 F.3d at 1011.  The Arizona courts unreasonably minimized factors such as

25  the length of the interrogation, and a close view of the videotapes "reveals a

26  picture that bears no resemblance to the avuncular scene" painted by the Arizona

27  courts.  *See id.* at 1014.  Moreover, the Arizona Supreme Court's reliance on the

28  fact that Newell may have denied some details is of little relevance to whether

1   the myriad inculpatory statements he *did* make were voluntary.  Under these
2   circumstances, "Comity does not command abdication."  *Id.* at 1006.

3   Further, here, the admission of Newell's statements affected the jury's
4   aggravation findings.  Indeed, one of Newell's most damaging inculpatory
5   statements, especially as it relates to aggravation, was made just after seven
6   o'clock in the morning.  As Detective Marshall badgers him for details, a
7   woman who the detectives have in close proximity to the interrogation room
8   begins a horrible wailing.  She screams, "no, no, no, no" and "Steven!"  (Ex.
9   110, 6/4 Tape Six at 6:43.)  Newell, who has been asking to speak with his
10  mother since early on the night before, notes "That's my moms."  (Ex. 110, 6/4
11  Tape Six at 6:43-644.)  Detective Marshall attempts to say that it may be
12  someone else, but Newell is certain it is his mother.  Detective Marshall then
13  tells him to continue confessing, and that he will then let Newell talk to his
14  mother.  (Ex. 110, 6/4 Tape Six at 6:43-6:44.)  The woman's wailing continues,
15  and Newell, already making inculpatory statements after many hours of
16  pressure, becomes completely exasperated with the detective's hounding.  He
17  tells the detective: "Fuck.  Get a tape recorder or something, I'm tired of talking.
18  . . . I'm just tired. . . . I grabbed the strap, dude, fuck, how hard is it to
19  understand that.  I grabbed the fucking strap, picked her up and fucking dropped
20  her in the fucking water. . . . Water splashed, psh, psh.  Her eyes were open and
21  bubble, bubbles. Bluh, bluh, bluh. That's when I looked up and there he was,
22  threw the fucking carpet over and fucking ran for my fucking life."  (Ex. 110,
23  6/4 Tape Six at 7:02-7:03.)  The next moment, he apologizes:  "Sorry for
24  getting frustrated, but when my mom is here . . ."  (Ex. 110, 6/4 Tape Six at
25  7:03.)  The detective again pushes him to keep talking, promising he can speak
26  to his mother when he is finished.  (Ex. 110, 6/4 Tape Six at 7:03.)  The effect of
27  these words, as well as Newell's other statements, on the jury's aggravation
28  findings cannot be overstated.

What is more, trial counsel ineffectively failed to ensure the trial court saw all of the tapes detailing all the acute pressures put on Newell.   Direct appeal counsel compounded this error by ineffectively "assum[ing] the trial court viewed [the tapes] in their entirety," (DA Doc. 28 at 27), and failing to make any record based on this.[27]  *Evitts v. Lucey,* 469 U.S. 387 (1985).

As the United States Supreme Court has explained, "the American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay."  *Malloy*, 378 U.S. at 7 (citing *Rogers v. Richmond*, 365 U.S. 534, 541 (1961)).   The Court has "held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed."  *Id.* (citing *Haynes v. Washington*, 373 U.S. 503 (1963)).

### Claim Six

**Newell's trial counsel, in violation of his Sixth, Eighth, and Fourteenth Amendment rights, failed to ensure crucial portions of the record were preserved and recorded.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Arizona courts did not address these claims on the merits.  Because it did not do so, the limitations on relief of 28 U.S.C. § 2254(d) do not apply.  Further, any failure to present these meritorious claims to the state courts was a result of appellate and post-conviction counsel's deficient performance.   The prejudicial deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of

---

[27]Again, counsel's ineffective failure to ensure a proper record is addressed further in Claim Six *infra*.

a minimally competent capital post-conviction attorney when she failed to raise these meritorious claims.

"As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law." *Hardy v. United States*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring).  The United States Supreme Court has made clear that an indigent defendant has both due process and equal protection rights to the "basic tools" of a constitutionally complete and adequate judicial review – a constitutionally effective attorney acting as an advocate, *e.g.*, *Strickland*, 466 U.S. at 684-85; *Evitts,* 469 U.S. 387, and a record that will permit meaningful, effective presentation of his claims, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956).

Before trial, Newell's appointed counsel asked the trial court to order the recording of all of the proceedings in his case.[28]  (ROA 20 at 1-2.)  His counsel specified that this request for recording included "pretrial hearings, legal arguments, voir dire and jury selection, in-chambers conferences, bench conferences, conference calls, all discussions regarding jury instructions, and all matters during the trial." (ROA 20 at 2.)  The court granted this motion.  (ROA 23 at 1.)  Despite this, the record is incomplete in several crucial ways.[29]

---

[28]At the time, Newell was represented by Messrs. Gary Bevilacqua and Joe Stazzone of the Office of the Maricopa County Public Defender.  Because the Maricopa County continuance panel would not permit them to continue Newell's trial based on scheduling conflicts with their caseloads, they moved to withdraw.  (Tr. 5/16/02; ROA 37.)  By the time of trial, Newell was represented by new counsel from the Maricopa County Office of the Legal Advocate. (ROA 43 at 2.)

[29]Newell has filed his petition for writ of habeas corpus as soon as possible to avoid delay.  He would nevertheless like to reserve the opportunity to file a motion to reconstruct the record.

First, as discussed in detail above, Newell's counsel argued to the trial court that his confession to law enforcement was obtained in violation of *Miranda*, 384 U.S. 436 and involuntary.  (ROA 81; Tr. 11/5/03 at 12-14, 114-122, 129-137, 139-141.)  Despite the fact that the full length of the interrogation and all the pressures wrought on Newell were crucial to understanding the totality of the circumstances, especially as to voluntariness, counsel did not ensure the court viewed all of the relevant evidence, including the eight tapes of Newell's third interrogation.  Indeed, in addressing the parties' suppression arguments, the court noted it had seen "portions of the videotape" that Newell's counsel had provided.  (Tr. 11/5/03 at 10.)  The court noted it had not seen all of the tapes, but had "tried" to look at some portions referenced in the State's response to the motion to suppress.  (Tr. 11/5/03 at 10.)  Although it is somewhat unclear, from the court's discussion at the voluntariness hearing, it appears as if the court only watched one portion in which Newell invoked his right to counsel.  (Tr. 11/5/03 at 141-142.)  This occurred at the beginning of the interrogation at eight o'clock in the evening, and does not give even a shadow of a glimpse of the compulsive pressures later employed.  Thus, watching the full tapes should have been part of the court's determination.

Trial counsel performed deficiently by failing to support their voluntariness argument with references to the entirety of the tapes and a request for the court to view them.  This prejudiced Newell because, at a minimum, the admission of these statements weighed on the jury's aggravation findings, undermining confidence in the outcome of his penalty–phase proceedings.

In addition, trial counsel impeded Newell's ability to gain complete and adequate review of the trial court's reasoning and rulings.  Trial counsel ineffectively failed to ensure that there was an adequate record of which portions of which tapes the court actually reviewed.  This prejudiced Newell, undermining confidence in the outcome of the proceedings.

Direct appeal in Arizona is based solely on a review of the record. Because counsel failed to preserve a complete record, counsel ineffectively and prejudicially failed to ensure there was any record of what precisely the trial court reviewed.  *See generally People v. Barton*, 21 Cal. 3d 513, 520 (Cal. 1987) ("Where the appropriate record is missing or incomplete, counsel must see that the defect is remedied, by requesting augmentation or correction of the appellate record . . . or by other appropriate means.").

Second, the State played to the jury audio and videotapes of Newell's three interrogations by the Maricopa County Sheriff's Office.  (Tr. 2/4/04 at 85, 100; Tr. 2/5/04 at 28-29, 91; Tr. 2/9/04 at 6, 11, 18; Tr. 2/10/04 a.m. at 6-7; Tr. 2/10/04 p.m. at 2-4.)  According to the transcripts, some or all of the tapes were redacted and the parties agreed to play only certain portions of each.  (Tr. 2/4/04 at 99-100; Tr. 2/5/04 at 28-29; Tr. 2/9/04 at 3, 6.)  On at least two occasions, however, contrary to the parties' agreement, the State played portions from the un-redacted tapes.  (Tr. 2/9/04 at 6-7, 11.)

On these two occasions, Newell's trial counsel moved for a mistrial.  (Tr. 2/9/04 at 7-14.)  The first time, counsel referred to Defense Exhibit 113 – apparently a highlighted partial transcript of one or some of the tapes – to argue the State had played an improper portion.  This exhibit, and others that may relate to Newell's claims, however, were released after the trial, were not sent to the Arizona Supreme Court for review, and are not part of the currently-existing record.  (Supp. ROA 165A at 5.)

Even more significantly than the failure to preserve those partial-transcript exhibits, trial counsel did not make any record of what, exactly, was played to the jury.  Each time, the court reporter simply noted a tape was played.  Thus, even though the thirteen tapes of Newell's interrogations may be in the record, it leaves missing any record of what precisely the jury heard.  This knowledge was

and is crucial to any meaningful judicial review of claims including the propriety of playing the portions that were played and counsel's performance.

Third, despite the court's order granting Newell's request to have all portions of the proceedings recorded, the record does not include transcriptions of numerous bench conferences throughout the trial. A complete record was necessary to an adequate and effective review of Newell's case and claims. Some of the unrecorded bench conferences alluded to in the record are as follows.

On February 3, 2004, Newell's counsel objected to testimony regarding a photographic lineup. The court overruled the objection after an unrecorded bench conference. (Tr. 2/3/04 p.m. at 41.) A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the propriety of admitting the lineup, the court's reasoning, and counsel's performance.

The same afternoon, counsel objected to the State holding pieces of physical evidence in front of the jury and the parties participated in an unrecorded bench conference. (Tr. 2/3/04 p.m. at 49-50.) A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the propriety of the State's actions, the court's reasoning, and counsel's performance.

The next day, after the State played a tape of Newell's interrogation, the court held an unrecorded bench conference. (Tr. 2/4/04 at 100-101.) A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, what was played to the jury, the court's reasoning, and counsel's performance.

The next day, as the State examined one of its witnesses, Newell's counsel noted they had "a motion," the court held an unrecorded bench conference, and the State then simply continued examining its witness. (Tr. 2/5/04 at 69.) A

record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the testimony presented, the court's reasoning and ruling, and counsel's performance.

On February 10, 2004, one of the jurors told the court he had seen news coverage related to this case.  Again, the court handled this with an unrecorded bench conference.  (Tr. 2/10/04 p.m. at 6.)  A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the juror's knowledge, the court's reasoning and ruling, and counsel's performance.

The next day, Newell's trial counsel objected to testimony regarding the victim's autopsy report and none of the argument leading to the court's decision to overrule the objection was recorded.  (Tr. 2/11/04 at 60-61.)  A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the propriety of admitting the testimony, the court's reasoning, and counsel's performance.

On February 20, 2004, the parties discussed the scope of the evidence and argument the State could present in rebuttal at the penalty phase.  The court noted, "we've talked about this both on and off the record, I think, a number of times."  (Tr. 2/20/04 at 9.)  A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the arguments presented, the court's reasoning and findings, and counsel's performance.

During the penalty phase, Newell's counsel objected at least twice to the State's arguments to the jury and again noted their desire to make an unspecified motion.  Each time, the court held unrecorded bench conferences.  (Tr. 2/24/04 at 83, 84.)  A record of the parties' and the court's discussion was and is necessary to reviewing, at a minimum, the State's arguments, the court's reasoning, and counsel's performance.

In each instance, trial counsel ineffectively failed to preserve these crucial pieces of the record.  This prejudiced Newell, depriving him of an adequate and complete review and undermining confidence in the outcome.

<div align="center">

**Claim Seven**

</div>

**Newell's was denied effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment Rights, when appellate counsel failed to raise the issue of the incomplete record.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As detailed *supra*, appellate counsel received a record that was incomplete in several crucial ways.  Appellate counsel rendered deficient performance to Newell's prejudice by failing to raise this claim on direct appeal to the Arizona Supreme Court and failing to request a remand to reconstruct the record.  The standard faced by appellate counsel in raising this claim was not an onerous one.

This claim was not raised in Newell's state court proceedings.  Newell's failure to raise the claim previously can be excused by demonstrating cause and prejudice.  The ineffective assistance of Newell's state post-conviction counsel in failing to raise this claim constitutes cause and prejudice for any default.  *See Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.

The effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  *Evitts*, 469 U.S. at 396 ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.");  *see id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits.").  As such, "nominal

1   representation" during an appeal "does not suffice to render the proceedings

2   constitutionally adequate." *Id.* at 396.

3       Ineffective assistance of appellate counsel claims are governed by the

4   standard set forth in *Strickland*, 466 U.S. at 686-87. *See Smith v. Robbins*, 528

5   U.S. 259, 285 (2000). Accordingly, Newell must show that appellate counsel's

6   representation "fell below an objective standard of reasonableness," *Strickland*,

7   466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's

8   unprofessional errors, the result of the proceeding would have been different,"

9   *id.* at 694. In addition, the ABA Guidelines are instructive in evaluating the

10  reasonableness of counsel's conduct. *See Rompilla*, 545 U.S. at 387.

11      Appellate counsel performs ineffectively when he or she fails to discover

12  and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir.

13  2000). Regarding appellate performance, the 1989 ABA Guidelines indicate

14  that "[a]ppellate counsel should seek, when perfecting the appeal, to present *all*

15  *arguably meritorious* issues." 1989 ABA Guidelines § 11.9.2(D) (emphasis

16  added). "While appellate attorneys should always attempt to winnow their best

17  issues for presentation to the courts, in a capital case, which by definition

18  involves the ultimate sanction, appellate attorneys must err on the side of

19  inclusion, particularly when, as here, there exist a significant number of facts to

20  support the claim." *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001).

21  Moreover, "[a]ppellate counsel should be familiar with all state and federal

22  appellate and post-conviction options available to the client, and should consider

23  how any tactical decision might affect later options." 1989 ABA Guidelines §

24  11.9.2(A). Therefore, when appellate counsel fails to raise meritorious issues

25  that could have resulted in a reversal of conviction or a sentence, counsel has

26  necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466 U.S. at

27  694 (prejudice occurs when, absent counsel's deficiencies, there is a reasonable

28  probability that the result of proceeding would have been different).

1    To demonstrate prejudice, a petitioner must show a reasonable probability
2    that, but for appellate counsel's failure to brief the non-frivolous issue, he would
3    have prevailed on appeal.  *See Smith*, 528 U.S. at 285-86.  Here, appellate
4    counsel failed to raise numerous meritorious issues, issues that were stronger
5    than other issues presented and there was no reasonable justification for the
6    omission.  *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing
7    whether omitted issues were "'significant and obvious'"); *Gray v. Greer*, 800
8    F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a
9    significant and obvious issue, the failure could be viewed as deficient
10   performance").

11   The most basic duties of direct-appeal counsel include ensuring a proper
12   record for review and reviewing that record scrupulously.  The issues with the
13   record in this case were readily apparent to reasonably competent appellate
14   counsel.  Appellate counsel failed to take any measures to correct this error.
15   Counsel did not ask to remand to reconstruct the record nor raise any issues
16   before the Arizona Supreme Court about the incomplete record before it.

17   Thus, on direct appeal, which in Arizona is based solely on a review of the
18   record, counsel ineffectively and prejudicially failed to ensure there was any
19   record of what precisely the trial court reviewed.  *See generally Barton*, 21 Cal.
20   3d at 520  ("Where the appropriate record is missing or incomplete, counsel
21   must see that the defect is remedied, by requesting augmentation or correction of
22   the appellate record . . . or by other appropriate means.").  Due to appellate
23   counsel's failure to seek to ameliorate the state of the record or raise any issues
24   regarding it, Newell was denied an adequate and complete review of his case.
25   Accordingly, confidence in the outcome is undermined and Newell is entitled to
26   relief.

### Claim Eight

**The Arizona Courts violated Newell's rights under the United States Constitution and clearly-established federal law by permitting the**

118

**State to introduce in rebuttal the improper testimony of a probation officer that was based on information that the officer did not author and that Newell had never seen.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

On the second day of the penalty phase of Newell's trial, right before Newell's counsel rested their case, the State informed his counsel it intended to offer, through probation officer James Edwards, information about Newell's probation history and social history to rebut his mitigation presentation.  (Tr. 2/24/04 at 4.)  The trial court allowed the State to present Edwards's testimony despite the fact that it did not rebut any argument Newell made.  (Tr. 2/24/04 at 9.)  The court also permitted the State to present testimony from Edwards that was based solely upon a probation prescreening report that Edwards himself had nothing to do with writing, and that the State had never disclosed to Newell's counsel.  (Tr. 2/24/04 at 4-5.)

**A.  The Arizona Courts violated clearly-established federal law by allowing the state to present evidence in the penalty phase of Newell's trial that did not rebut any arguments he made.**

This claim was raised on direct appeal (DA Doc. 28 at 59-63), and in state post-conviction court (Pet. for PCR, PCR ROA at 0628-32.)  To the extent any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Newell's post-conviction counsel.  *Martinez*, 132 S. Ct. at 1315.  The state courts' denial of these claims was contrary to and an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *id.* at § 2254(d)(2).

Before the penalty phase of Newell's trial, the State argued it should be permitted to admit rebuttal testimony from Newell's probation officer James Edwards.  The State argued that calling Edwards would show that Newell was "offered services" to help him with his drug addiction, but that he did not use

them.[30]  (Tr. 2/20/04 at 8, 15.)  The trial court permitted the State to present Edwards's testimony.  The court reasoned that this testimony would rebut statements Newell made during his interrogation, which was played to the jury.  Specifically, the court relied on statements in the interrogation that Newell had asked for help with his drug problems, statements the court characterized as "self-serving explanation, or minimization of it, or excusing of what his conduct was." (Tr. 2/20/04 at 17-18, 20.)  Newell's counsel insisted, however, that they had no intention of offering any evidence or arguments that he "was seeking help and never received any." (Tr. 2/20/04 at 13-14.)  The court nevertheless ruled that it did not matter that Newell's statements were only offered as part of the State's case, explaining "it's not, to me, significant that the defense is not going to argue it, or not going to mention it." (Tr. 2/20/04 at 17-18.)  After Newell had presented his mitigation-related witnesses, his counsel again argued that any further testimony from Edwards was irrelevant, unreliable, prejudicial, and did not rebut any of the evidence the defense had offered.  (Tr. 2/24/04 at 6, 10-11.)  The court simply replied, "We have had that discussion." (Tr. 2/24/04 at 11.) Similarly, the Arizona Supreme Court relied on Newell's statements during his interrogation to hold that although Newell did not "expressly offer" his inability to get help as a mitigating factor, "the jury still could have factored his complaints on this topic" and other evidence of his drug problems into its penalty decision. *Newell*, 132 P.3d at 848.

These decisions were contrary to and an unreasonable application of clearly-established federal law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d).  First, the catalyst to the court admitting this evidence – statements made in Newell's interrogation – never should have been played to the jury.  *See supra* Claim Five.  As described above, admitting those statements

---

[30]This testimony included that once he was placed on probation at twenty years old, he was told to attend drug treatment classes.  (Tr. 2/24/04 at 20-23.)

violated clearly-established federal law and, without them there was especially no basis for admitting Edwards's "rebuttal."   Second, the Arizona courts permitted the State to end-run around the purpose of the mitigation hearing, essentially ruling that the State could open the door for itself by admitting the statements in the tape, then walk right through it by introducing evidence to contradict those statements.  Finally, Newell's counsel made clear and adhered to their intention not to present evidence or arguments that Newell asked for help with his drug problems and did not receive any.  The State was nevertheless permitted to introduce evidence to "rebut" claims that did not exist and introduce evidence that amounted to non-statutory aggravation.  *See, e.g.*, *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (quoting *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir.2005); *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir.1999); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991); John Henry Wigmore, *Evidence in Trials at Common Law* § 1873 (1976)) (function of rebuttal is to "explain, repel, counteract or disprove evidence of the adverse party"; principal objective is to counter new, unforeseen facts brought out in the other side's case; court should allow rebuttal evidence only if it is necessary to refute the opponent's case).

**B. The Arizona Courts violated Newell's rights under the confrontation clause by permitting the state to present Edwards's testimony based on information taken solely from reports he did not author or witness.**

Trial counsel presented this argument to the state courts, (Tr. 2/24/04 at 4-5), but the trial court did not reach the merits of this claim.  Further, no other court reached this meritorious claim due to the ineffective assistance of Newell's appellate and post-conviction counsel.  The deficient performance of state appellate and post-conviction counsel prejudiced Mr. Newell and provides cause and prejudice to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Evitts*, 469 U.S. 387; *Martinez*, 132 S. Ct. at 1315.  Moreover, to the extent

this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The United States Supreme Court has repeatedly held that admitting testimonial out-of-court statements violates these principles.  *E.g.*, *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.").

Here, the State introduced evidence through Edwards that Newell had told someone named Gloria Vallecillo, who had completed a probation prescreening report, that he had a good relationship with his family, was not addicted to methamphetamine, and had never been sexually abused.  (Tr. 2/24/04 at 17-18, 25-26, 40-42.)  The State, however, never noticed Vallecillo as a witness or made her available for examination.  Edwards, however, was not present for the prescreening and never even spoke with Vallecillo about the information in her prescreening report.  (Tr. 2/24/04 at 25-26.)  What is more, he never personally spoke to Newell about his social history, never spoke to any members of Newell's family and, indeed, did not discuss Newell's social history with anyone at all.  (Tr. 2/24/04 at 25-26, 28-29.)

The court also permitted Edwards to testify that  Newell had told another probation officer – who had supervised Newell before Edwards – that, other than drinking beer, he had been "substance free."  (Tr. 2/24/04 at 19-20.)  Again, that probation officer was not made available and did not testify about his own interactions with Newell, depriving Newell of the right to cross-examine him.

Thus, the State introduced evidence to undermine Newell's mitigation evidence related to his abusive and traumatic childhood and his drug addiction. This evidence, however, was recorded by a witness who never appeared and who Newell never had the opportunity to examine and confront.   The State relied heavily on this information in its closing argument.   (Tr. 2/24/04 at 77-80.)   The admission of this evidence and testimony had a substantial and injurious effect on the jury's sentencing decision.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Putting this evidence before the jury that would sentence Newell violated his Sixth and Fourteenth Amendment rights to confront the witnesses against him, and was wholly inconsistent with the United States Supreme Court's Sixth Amendment jurisprudence including *Crawford*.   Even if the rules of evidence did not apply to the State's penalty-phase presentation and what would otherwise be considered "hearsay" could be admitted, the Sixth Amendment demands more. *See Crawford*, 541 U.S. at 1374.[31]   What is more, this evidence lacked *any* sufficient indicia of reliability and was belied by the testimony of every other witness presented during the penalty phase.

### C. The Arizona Courts violated Newell's constitutional rights to Due Process and a fair trial by permitting the state to elicit testimony about evidence it did not disclose to Newell's counsel.

To the extent the trial court reached the merits of this claim, its denial of Newell's request to preclude this evidence was contrary to and an unreasonable application of clearly-established federal law and an unreasonable determination of the facts.[32]   28 U.S.C. § 2254(d).   The Arizona Supreme Court, however, did

---

[31]For this reason, to the extent the Ninth Circuit has held the Confrontation Clause does not apply to sentencing proceedings, *see United States v. Petty*, 982 F.2d 1365, 1367-69 (9th Cir. 1993), *amended by* 992 F.2d 1015 (9th Cir. 1993), that holding does not survive *Crawford. But see United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) ("[T]he law on hearsay at sentencing is still what it was before *Crawford*.").

[32]It is not clear the trial court actually reached the merits of this claim; the court

not review this meritorious claim due to the ineffective assistance of Newell's appellate and post-conviction counsel. This ineffective assistance prejudiced Newell and provides cause and prejudice to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Evitts*, 469 U.S. 387; *Martinez*, 132 S. Ct. at 1315. Moreover, to the extent any aspect of this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

Constitutional due process dictates that a person must have a meaningful opportunity to present a complete defense and that, more fundamentally, sending a man to his death "on the basis of information which he had no opportunity to deny or explain" is contrary to those principles. *Gardner v. Florida*, 430 U.S. 349, 362 (1977). In *Gardner*, a judge sentenced a man to death on the basis of a presentence report that was not made available to him. *Id.* The United States Supreme Court held this violated the most fundamental principles of due process. *Id.*

Here, as explained above, crucial portions of Edwards's testimony – including that Newell had a good relationship with his family, was not addicted to methamphetamine, and had never been sexually abused – relied solely upon a prescreening report he did not author or even witness.[33] Despite the fact that the State had noticed Edwards as a witness and argued at length about the possibility of him testifying, (Tr. 2/20/04 at 7-22), the State did not once mention Vallecillo or that it intended to present any testimony about her prescreening report. The State's excuse was that Newell's counsel, in his interview, did not ask Edwards about Vallecillo's report. (Tr. 2/24/04 at 7.) As Newell's counsel

---

simply noted, without indicating why, that the "request to have the evidence precluded is denied." (Tr. 2/24/04 at 9.)

[33]To exacerbate matters further, Newell's counsel did not obtain a copy of the probation file or this document. The failure to properly investigate this evidence is discussed in more detail in Claim Nine, *see infra.*

explained, however, the State represented to them that the only form Edwards would rely on in testifying was a list of the times probation officers had contact with Newell. (Tr. 2/24/04 at 4-5, 10.) Yet, well into the penalty phase, after Newell had presented all of his witnesses, and right before Edwards testified, the State disclosed that Edwards would testify regarding Vallecillo's prescreening report.[34]   Newell's counsel asked the trial court to preclude this evidence based on the State's failure to disclose it, but the trial court denied their request.  (Tr. 2/4/04 at 4-5, 8-9.)

This is not simply a case in which the State gave notice of what charges it would present in rebuttal then suddenly produced additional, previously-unknown evidence to bolster those charges.  *See Gray v. Netherland*, 518 U.S. 152, 167-168 (1996).   Here the State sought and was permitted to present entirely new avenues of rebuttal evidence it never disclosed.  What is more, it misrepresented to Newell's counsel that it intended to rely merely on one form then, at the last minute, relied upon much more.  Thus, the State's lack of notice and misrepresentations regarding what it would present deprived Newell of due process and a fair trial.  *See Gardner*, 430 U.S. at 362; *see generally Gray*, 518 U.S. at 166 (remanding for determination on claim State misrepresented evidence it would present).   This deprivation had a substantial and injurious effect on the penalty verdict.

## Claim Nine

**Newell's trial counsel, in violation of his Sixth and Fourteenth Amendment rights, ineffectively failed to investigate or obtain the probation file upon which the State relied in the aggravation and penalty phase of his trial.**

---

[34]These actions cannot be explained by any argument that Newell presented something unexpected in mitigation necessitating the State to suddenly require this evidence. The State, in its prior notices of and arguments on rebuttal predicted precisely the mitigation Newell would present and argued the scope of its rebuttal accordingly. (ROA 153A; Tr. 2/20/04 at 14-15.)

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

This claim was raised in Newell's post-conviction proceedings (Pet. for PCR, PCR ROA at 0632-33.)  The trial court's denial of this claim was contrary to and an unreasonable application of clearly-established federal law and an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Any failure to properly develop, present, or exhaust this claim is due to the ineffective assistance of post-conviction counsel.  *Martinez*, 132 S. Ct. at 1315.  That ineffective assistance constitutes cause and prejudice sufficient to overcome any procedural default.  *Id*.  Moreover, to the extent any aspects of this claim have not been fully adjudicated by the Arizona courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

It is beyond question that under the Sixth and Fourteenth Amendments trial counsel is obligated to conduct a reasonable investigation.  *E.g.*, *Strickland*, 466 U.S. at 673; *Wiggins*, 539 U.S. at 521-22.  The duty to investigate includes the essential tasks of looking into known leads and possible avenues of mitigation, and gathering records.  *E.g.*, *Rompilla*, 545 U.S. at 382-83.  As the United States Supreme Court has explained, "the American Bar Association Standards for Criminal Justice . . . describe[] the obligation in terms no one could misunderstand":

> "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities."

*Rompilla*, 545 U.S. at 387 (quoting ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.)).  Thus, the principle "that defense counsel must obtain

information that the State has and will use against the defendant is not simply a matter of common sense," it is a matter of clearly-established federal law. *Id.*

Here, the State first presented the testimony of Newell's probation officer James Edwards at Newell's aggravation hearing.  (Tr. 2/18/04 at 33-36.)  The State also gave notice of its intent to present further evidence through Edwards as rebuttal during the penalty phase, argued at length about its power to do so, and then, with the court's blessing, presented Edwards's testimony.  (ROA 153A at 1; Tr. 2/20/04 at 7-8, 14-16; Tr. 2/24/04 at 13-44.)  As described in Claim Eight, *supra*, before presenting Edwards's rebuttal testimony, the State informed Newell's counsel that, contrary to its earlier representations, Edwards would testify regarding a prescreening report completed by Ms. Gloria Vallecillo.  (Tr. 2/24/04 at 4.)  When Newell's counsel objected to the admission of this testimony because, *inter alia*, the State had not disclosed the prescreening report and they had never seen it, the State replied that it was part of Edwards's file and Newell's counsel had simply failed to ask for it.  (Tr. 2/24/04 at 4-5, 7.)

This report and Edwards's testimony contained important information, including that Newell may have told Vallecillo he had a positive relationship with his family, was not addicted to methamphetamine, and was not physically or sexually abused.  (Tr. 2/24/04 at 15-18.)  Requesting and investigating this information, the full probation file, and the underlying prescreening report was crucial to Newell's penalty-phase case for several reasons.  First, the State relied on the probation report in proving the statutory aggravating circumstance that Newell had a prior conviction.  (Tr. 2/18/04 at 34-36.)  Second, the information in Vallecillo's prescreening report directly undermined Newell's mitigation presentation, including, at a minimum, the evidence of his pervasive and severe methamphetamine addiction and his sexual victimization.  Finally, a myriad of factors indicate the information in Vallecillo's report was unreliable, including but not limited to the context and consequences of a probation prescreening

report and the other incentives working against Newell disclosing his full and true personal history.   Investigating and presenting the reliability of this information should have been a key part of trial counsel's mitigation efforts.

Thus, the errors of Newell's trial counsel mirror the errors that the United States Supreme Court found constituted deficient performance in *Rompilla*. "There is an obvious reason that the failure to examine [petitioner's] prior conviction file fell below the level of reasonable performance."   545 U.S. at 383. Trial counsel knew the State intended to seek the death penalty by proving the history of the petitioner's prior and intended to present information from that file to prove the jury should not grant him any leniency.   *Id.* at 383-84.   It was clear that trial counsel knew the State intended to present Edwards's testimony, (ROA 153A at 1; Tr. 2/20/04 at 7-8), and it is also clear trial counsel did not obtain his file or investigate the information contained therein.   *See id.*   Indeed, as Newell's counsel acknowledged during the penalty phase, had they known about the prescreening report, they would have contacted Vallecillo.   (Tr. 2/24/04 at 6.) Thus, being on notice of the State's intent to introduce evidence from Newell's probation file in the aggravation hearing and penalty phase, and given the import of knowing, investigating, and dealing with the information in this file, trial counsel had a duty to obtain and investigate the information in the probation file. The failure to do so was constitutionally defective deficient performance.   *E.g.*, *Rompilla*, 545 U.S. at 383.

What is more, this deficient performance prejudiced Newell.   *See Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694) (petitioner must demonstrate reasonable probability that, but for counsel's unprofessional errors, result of proceeding would have been different; reasonable probability is a probability sufficient to undermine confidence in the outcome).   As explained above, the information contained in the prescreening report and the probation file was crucial to the State's case in aggravation and, most especially, to

undermining Newell's mitigation presentation.  If Newell's counsel had looked into this file, they would have known to investigate and interview Vallecillo and her claims, would have discovered further leads, and would have been prepared to respond effectively to the State's rebuttal evidence.  Instead, they merely questioned Edwards during the penalty phase about whether he himself had written the prescreening report or investigated Newell's social history.  (Tr. 2/24/04 at 25-39.)   Had counsel investigated, they would have painted an entirely different picture for the sentencing jury and "the likelihood of a different result . . . is 'sufficient to undermine confidence in the outcome.'" *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

Again, the ineffectiveness of failing to investigate evidence the State intends to produce in seeking a death sentence is something "no one could misunderstand in the circumstances of a case like this."  *See Rompilla*, 545 U.S. at 387.   Despite this, the trial court summarily concluded that no evidence supported Newell's post-conviction claim that his counsel's failure to investigate, prepare, and rebut this probation testimony was ineffective.  (PCR Min. Entry, 1/12/12 at 2.)  This conclusion was contrary to and an unreasonable application of the United States Supreme Court's clearly-established Sixth and Fourteenth Amendment law, including, *inter alia*, *Strickland*, *Wiggins*, and *Rompilla*.  In addition, it was an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

## Claim Ten

**Newell's trial counsel, in violation of his Sixth, Eighth, and Fourteenth Amendment rights, ineffectively failed to properly investigate and obtain records essential to a complete mitigation presentation.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

1    Newell did not present this meritorious claim to the state courtsas a result

2    of appellate and post-conviction counsel's deficient performance.  The deficient

3    performance of state appellate and post-conviction counsel prejudiced Newell

4    and provides cause and prejudice to excuse any procedural default.  *See*

5    *Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate

6    at an evidentiary hearing that post-conviction counsel fell below the standards of

7    a minimally competent capital post-conviction attorney when she failed to raise

8    this meritorious claim.  Therefore, the Court will be able to consider the merits

9    of this claim pursuant to *Martinez*.  Moreover, because the claim has not been

10   adjudicated by the Arizona state courts, the limitations on relief imposed by 28

11   U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court

12   may consider the claim de novo.

13   It is beyond question that under the Sixth and Fourteenth Amendments

14   trial counsel is obligated to conduct a reasonable investigation.  *E.g.*, *Strickland*,

15   466 at 673; *Wiggins*, 539 at 521-22.  The duty to investigate includes the

16   essential tasks of looking into known leads and possible avenues of mitigation,

17   and gathering records.  *E.g.*, *Rompilla*, 545 U.S. at 382-83.

18   Here, trial counsel failed to consider several "classic" sources of

19   mitigation.  *See, e.g.*, *Correll*, 539 F.3d at 944.  It is well-established that such

20   failures can indicate deficient performance.  *Correll*, 539 F.3d at 943-44 (noting

21   that the constitutionally-reasonable investigation discussed in *Summerlin* should

22   also include examination of physical and mental health records, school records,

23   and criminal records); *Ainsworth*, 268 F.3d at 877 (criticizing counsel's

24   performance as deficient for a similar failure).  ABA Guideline 5.1(b) requires

25   that the defense team "must include individuals possessing the training and

26   ability to obtain, understand, and analyze *all* documentary and anecdotal

27   information relevant to the client's life history."  ABA Guidelines for

28

Appointment and Performance of Counsel in Death Penalty Cases 5.1 (2003 revision) (emphasis added.)

Here, counsel failed to obtain numerous documentary records that were relevant to Newell's life history.  It does not appear that the mitigation specialist ever obtained releases from Kathy, Ginger, or Tracy.  Getting releases from family members and important people in Newell's life was one of the most basic first steps a competent mitigation expert would take.  Counsel never obtained a complete set of Newell's school records, medical records, past police and sheriff reports, or juvenile and probation records even though there were records available in both Arizona and Nevada.

Despite the fact that ABA Guideline 5.1 makes clear that multi-generational family history was integral to Newell's life history, counsel failed to get any records from Newell's biological father, Tom Smith, and relatives on his side of the family that would have shown a family history of mental illness and violence.  Further, counsel did not obtain police reports or medical records for his family or for individuals that he lived with, like Ginger Whitley.  Counsel did not obtain marriage, divorce, or other records from Lincks, and other men in Kathy's life, like Honeycutt who had a lengthy criminal history and records that would have shown a history of violence and addiction.  Trial counsel also failed to obtain state benefits/assistance records and it was well known that Kathy and her children received state assistance.  Child Protective Services would have had records under the same agency (Arizona Department of Economic Security) for contacts with Kathy and Ginger.

These records include crucial mitigation evidence. Counsel should have obtained these records to assist their retained experts prior to trial, and to look for other potential witnesses and sources of mitigation.  Instead, because counsel failed to do an adequate investigation, and obtain essential records, counsel presented an incomplete and inadequate portrait of Newell's life to the jury.

As a result of trial counsel's failure to compile important records of Newell's life history, their representation of Newell during the sentencing phase of his trial was deficient.  *See Summerlin*, 427 F.3d at 630 (noting that penalty phase investigations in capital cases should include inquiries into social background and evidence of family abuse, potential mental impairment, physical health history, and history of drug and alcohol abuse).  Counsel's duty to investigate and present mitigation is not "discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright*, 490 F.3d at 1120; *see also Wiggins*, 539 U.S. at 524 (finding deficient performance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Douglas*, 316 F.3d at 1090 (finding ineffective assistance where trial counsel "introduced some of [the petitioner's] social history, [but] did so in a cursory manner that was not particularly useful or compelling").  "Only after a thorough investigation can a less than complete presentation of mitigating evidence ever be deemed reasonable, and only to the extent that a reasonable strategy supports such a presentation." *Lambright*, 490 F.3d at 1120 (citing *Wiggins*, 539 U.S. at 527-28).  Counsel's failure to collect records hindered their ability to make a reasonable strategy towards mitigation presentation.  Newell was prejudiced by this failure and is entitled to relief.

## Claim Eleven

**Newell's Sixth and Fourteenth Amendment rights to confront witnesses against him were violated when a medical examiner who did not perform the autopsy testified at trial.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

During Newell's trial, Dr. Philip Keen, Maricopa County Chief Medical Examiner testified about an autopsy performed by one of his subordinates.  This

1    testimony violated Newell's Sixth and Fourteenth Amendment rights of
2    confrontation.

3         Newell did not present this meritorious claim to the state courts as a result
4    of appellate and post-conviction counsel's deficient performance.  The deficient
5    performance of state appellate and post-conviction counsel prejudiced Newell
6    and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S.
7    668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary
8    hearing that post-conviction counsel fell below the standards of a minimally
9    competent capital post-conviction attorney when she failed to raise this
10   meritorious claim.  Therefore, the Court will be able to consider the merits of
11   this claim pursuant to *Martinez*.  Moreover, because the claim has not been
12   adjudicated by the Arizona state courts, the limitations on relief imposed by 28
13   U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider
14   the claim de novo.

15        Dr. Keen was one of the State's final witnesses in their case against
16   Newell.  Keen testified about Elizabeth's autopsy.  Although Keen testified
17   about Elizabeth's age, where she had been found, the manner or death and marks
18   on her body, Keen did not participate in the autopsy himself.  Rather, a deputy
19   medical examiner, Dr. Marco Ross had completed the autopsy.  (Tr. 2/11/04 at
20   56-88.)  Ross was not called as a witness, and thus, defense counsel was not
21   given an opportunity to cross-examine him.

22        The Sixth Amendment guarantees criminal defendants the right to
23   confront the witnesses against them.  Prosecutors may not introduce out-of-court
24   testimony of unavailable witnesses if the defendant has not had the opportunity
25   to cross examine them.  *Crawford*, 541 U.S. 36.  Courts have also barred
26   prosecutors from introducing tests that are "testimonial in nature" without
27   allowing the defense to cross-examine the scientist who performed those tests.
28

1   *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming v. New*
2   *Mexico*, 131 S. Ct. 2705 (2011).

3        In *Williams v. Illinois*, 123 S. Ct. 2221 (2012), the United States Supreme
4   Court suggested that a prosecutor may present as evidence certain forensic tests
5   that, having been performed before the authorities identified a suspect, are not
6   "testimonial in nature."   The Court added that, even if those tests are
7   "testimonial in nature," there are two ways the prosecutor may present them to
8   the jury.  First, she may call a scientist who performed or participated in the
9   tests.  Second, she can call an expert witness who did not participate in the tests
10  as long as two conditions are met:  First, the tests themselves must not be
11  introduced into evidence; second, the judge must clarify to the jury that it may
12  consider those tests only as a predicate to the expert's testimony and not for their
13  truth.

14       Keen's testimony focused on two autopsy diagrams with notes and photos
15  taken by Ross.  (Tr. 2/11/04 at 60-65.)  Through Keen's testimony, Exhibit 73,
16  which depicted Elizabeth's entire body, and Exhibit 74, which depicted only her
17  vagina, were admitted into evidence.  (Tr. 2/11/04 at 61.)  Neither during Keen's
18  testimony, nor during jury instructions did the court specifically instruct the
19  jurors to consider Exhibit 73 as only a predicate to Keen's testimony.   (Tr.
20  2/11/04 at 88; Tr. 2/12/04 at 7.)  Trial counsel did not object to Keen's testimony
21  but did object to the documents admission.  The State argued Keen was an
22  expert and allowed to rely on other information.  (Tr. 2/11/04 at 60.)  The court
23  overruled the objection and the documents were admitted.  (Tr. 2/11/04 at 61.)
24  At the close of testimony, through stipulation of counsel, Exhibit 73 was
25  withdrawn, and the jury was not instructed why.  (Tr. 2/11/04 at 88.)

26       The evidence discussed, and the exhibits admitted were testimonial in
27  nature. *See United States v. Williams*, 740 F. Supp. 2d 4 (D.C. 2010).  *See also*
28  *United States v. James*, 712 F.3d 79, 89-90 (2d Cir. 2013) (after *Melendez-Diaz*

134

and *Bullcoming*, autopsy reports written by medical examiners aware that the body was the victim of a homicide are "testimonial in nature"). Medical examiners know from looking at the body that the report they write will be used in a homicide investigation and, eventually, at trial. *Williams*, 740 F. Supp. 2d at 7. Moreover, the reports and forms they sign to memorialize the autopsy are "marked by a formality characteristic of documents to be introduced in court." *Id.* In this case, Ross, Keen's deputy and the one who performed the autopsy, knew that Elizabeth was the victim of homicide. He recorded the cause of death as "homicide" and noted the ligature marks on the victim's neck, her young age, and the unusual location of her body (a canal). (Trial Ex. 73 at 2-4.) Moreover, Arizona law requires that the medical examiner perform only an external examination of bodies he receives into his care. A.R.S. § 11-597 (2007). The decision to perform a full autopsy suggests that Ross knew even before creating his diagram that the body belonged to a homicide victim. This knowledge, would render the autopsy diagram "testimonial."

Accordingly Keen's expert testimony runs afoul of *Williams* and the Confrontation Clause. First, parts of the autopsy diagram – Exhibit 74 – were introduced into evidence even though Keen had not written them. (Tr. 2/11/04 at 60-61; Supp. ROA 165A at 4.) The jury had that exhibit available during their deliberations, and the judge gave no instruction that it did not carry full evidentiary weight. (Tr. 2/11/04 at 88; Tr. 2/12/04 at 7.) Second, Exhibit 73, the full-body diagram, was ultimately removed from evidence. (Tr. 2/11/04 at 88; Supp. ROA 165A at 4.) But the judge never specifically admonished the jury to consider that diagram only as a predicate to Keen's testimony. (Tr. 2/11/04 at 88; Tr. 2/12/04 at 7.) To comport with *Williams*, Keen's testimony on an autopsy he did not perform required at least an instruction not to accept the autopsy diagram for its truth. Because the judge failed to instruct jury on this

point, Keen's testimony violated the Confrontation Clause and Newell is entitled to relief.

### Claim Twelve

**Trial counsel was ineffective for failing to object to the Medical Examiner's testimony that was in violation of Newell's rights under the Confrontation Clause.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As outlined in Claim Eleven, *supra*, during Newell's trial, Dr. Philip Keen, the Maricopa County Chief Medical Examiner testified about an autopsy performed by one of his subordinates. This testimony violated Newell's Sixth and Fourteenth Amendment rights of confrontation. Counsel's failure to object on these grounds violated Newell's right to effective assistance of counsel.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim. Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

As outlined *supra*, while trial counsel did object to the admission of the autopsy diagrams on hearsay grounds, trial counsel did not object to Keen's testimony itself. (Tr. 2/11/04 at 60.) Keen's testimony was used effectively by the State to argue that the (F)(6) aggravator applied. Specifically, Keen testified

that Elizabeth had bruising on her hands, forearms, and wrists, consistent with "a grasp type injury where you squeeze the hands." (Tr. 2/11/04 at 61, 64.) Keen described the ligature on Elizabeth's neck and the abrasions around it that were consistent with "fingernail patterns of fingers grasping at the ligature." (Tr. 2/11/04 at 66-67.) Elizabeth also had some blunt force injuries that would have occurred before death. (Tr. 2/11/04 at 70.) Most damaging, Keen testified about the injuries to Elizabeth's labia, hymen, and vulva. She had contusions and lacerations, bruising and abrasions. (Tr. 2/11/04 at 71-72.) He testified that the injuries were caused by penetration and that in an eight-year-old child that would be painful. (Tr. 2/11/04 at 74.)

During closing argument after aggravation, the State argued that Elizabeth had physical pain caused by the injuries from Newell grabbing her arms and restraining her, penetrating her, and from the strap being wrapped around her neck. Further, the State argued that she felt mental pain when she realized she could not get away and realized what danger she was in. (Tr. 2/18/04 at 65-67.) These arguments relied in their entirety on Keen's testimony. At the close of aggravation, the jury unanimously found the (F)(6) factor applied. (Tr. 2/18/04 at 84.)

A minimally competent capital defense attorney would have moved pursuant to the Confrontation Clause to preclude Keen's testimony. Failure to do so resulted in prejudice to Newell. Specifically, the jury heard testimony from someone who did not perform the actual autopsy of the victim opine on whether she felt pain, suffered, and how long it may have taken her to die. (Tr. 2/18/04 at 61-75.)

But for the highly influential testimony of Keen, a reasonable probability exists that the jury would not have returned a unanimous verdict for the (F)(6) factor, nor for the penalty of death. *See Strickland*, 466 U.S. at 694.

Accordingly, Newell is entitled to relief for his trial attorneys' ineffective assistance of counsel with regard to the testimony of Dr. Keen.

### Claim Thirteen

**Appellate counsel was ineffective, in violation of Newell's Sixth, Eighth, and Fourteenth Amendments rights, for failing to raise a confrontation clause issue with respect to the medical examiner's testimony.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668 (1984); *Martinez*, 132 S. Ct. at 1315. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim. Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court may consider the claim de novo.

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado*, 223 F.3d at 980-81. To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285-86.

Here, as outlined in Claim Eleven, *supra*, appellate counsel could have easily established that Dr. Keen's testimony violated Newell's rights under the Confrontation Clause. Newell's Confrontation Clause claim is meritorious.

Review of this error demonstrates that it was not harmless.  Keen's testimony was offered to prove the cruel, heinous, and depraved aggravating factor.  As such, the infringement on Newell's Confrontation Clause rights was not harmless.  Appellate counsel's failure to raise this meritorious claim was deficient performance that prejudiced Newell.  A reasonable probability exists that the courts would have overturned Newell's death sentence without the evidence, pulled from Keen's testimony that was used to establish the (F)(6) aggravating factor.  *See Strickland*, 466 U.S. at 694.  Accordingly, Newell is entitled to relief.

### Claim Fourteen

**The trial court erred when it precluded all expert testimony about Newell's mental health in violation of Newell's due process rights under the Fifth, Sixth, and Fourteenth Amendment of the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Prior to trial, the State sought to compel Newell to submit to a mental health examination by the State's expert.  Newell objected and refused to submit.  As a sanction, the trial court precluded Newell from presenting expert evidence on his mental health.

Newell raised this claim in Claim Five of his direct appeal (DA Doc. 28 at 64), and the Arizona Supreme Court denied this claim on the merits.  *Newell*, 132 P.3d at 848-49.  The Arizona Supreme Court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented.  *See id.* at § 2254(d)(2).  Relief is warranted because the state court's finding was in error, rendering Newell's death sentence constitutionally unreliable.

1    As detailed in Claim One, the State sought and received an order from the

2    court for Newell to submit to a psychological examination by a State expert.

3    Newell filed an objection to the State's request for a court ordered psychological

4    examination.  (ROA 100.)  Newell's counsel objected to the examination and

5    argued it violated his Fifth, Sixth, and Fourteenth Amendment rights.  Newell

6    further argued that a court may not limit the introduction of evidence in

7    mitigation (ROA 100) (citing *Lockett*, 438 U.S. 586).  Under the Arizona

8    sentencing scheme, the burden was on Newell to prove the existence of

9    mitigating factors, and the government was not required to prove they did not

10   exist.  *See* A.R.S. § 13-703 and § 13-703.01.  Newell argued, accordingly, that

11   the government had no basis to require that Newell submit to an examination.

12   Newell argued forcing him into an examination for the purpose of establishing

13   aggravation or rebutting mitigation would violate his Fifth Amendment

14   protection against self-incrimination.  *See Estelle*, 451 U.S. 454 (extending right

15   to penalty phase of capital cases).

16   The trial court disagreed, and issued a minute entry granting the State's

17   motion, relying on *State v. Schackart*, 858 P.2d 639 (1993), a case about

18   insanity, to find that because Newell had placed his mental health at issue, the

19   State was entitled to an opportunity to rebut that evidence.  (ROA 105.)  The

20   court further denied Newell's request to have counsel present, concluding he had

21   no constitutional right to do so.  *Id.*  After additional argument held on

22   December 12, 2003, the court further ordered that the evaluation would not be

23   sealed, and that if any of the evaluation "seeped" into the guilt phase, it would

24   be dealt with then.  (Tr. 12/12/03 at 7-8.)  Newell filed a request to stay in order

25   to file a special action and that request was denied.  (Tr. 12/12/03 at 9-14.)

26   Newell filed a special action in the Arizona Supreme Court and requested

27   a stay.  Again, as detailed more fully in Claim One, on January 7, 2004, the State

28   Supreme Court denied the stay, despite the fact it had a case with similar facts,

1   *Phillips*, 93 P.3d 480, pending before it.  (ROA 115.)  The Arizona Supreme

2   Court's order gave the trial court discretion to order Newell to submit to the

3   State's mental examination and stated if Newell refused to cooperate, the trial

4   court had discretion to preclude Newell from presenting expert testimony.

5   (ROA 115.)

6         Newell refused to submit to the examination and the trial court imposed

7   the harshest sanction possible – the preclusion of all mental health evidence.

8   (ROA 112.)  This ruling was in error for several reasons.  First, there were lesser

9   sanctions available.  The trial court could have ordered that Newell submit to the

10   evaluation, but granted his request to have the results of that evaluation sealed

11   until the penalty phase.   Although not reflected in a minute entry, Newell

12   avowed he had made an oral motion that he would submit to the interview if the

13   results were sealed.  (Special Action Doc. 1 at 7.)  Here, the trial court ordered

14   that Newell submit to an unconditional evaluation by a mental health

15   professional chosen by the State, with no limitations placed on the evaluation

16   and no assistance of counsel.  While *Phillips*, which came down after Newell's

17   trial clarified that a court could order an exam, the state supreme court was very

18   careful to build in protections for any information recovered from such an

19   evaluation.

20         Additionally, in relying on *Schackart*, the trial court imposed the rules

21   governing a case where a defendant uses his mental state as an affirmative

22   defense – insanity – upon a case where Newell only sought to present mental

23   health as mitigation.  The penalty phase of a capital proceeding differs from the

24   guilt phase of a jury trial where the defendant is presenting an insanity defense.

25   First and foremost, in the penalty phase of a capital proceeding, the Rules of

26   Evidence do not apply and mitigation is not limited.  A.R.S. § 13-703(C) and

27   (G).  An accused's mental health, not limited to mental state at the time of the

28   crime, will always be relevant to allow the jury to find leniency.

Further, as the *Schackart* court noted, in Arizona's Rule 11 proceedings, the procedure under which defendants are evaluated for competency and insanity, there are procedural safeguards against unqualified or biased experts and the misuse of any information obtained.  Rule 11 protects against the use of information from an evaluation at the guilt phase unless insanity is raised.  *Schackart*, 858 P.2d at 501.  Here, in the court's rush to trial amidst all the post-*Ring* changes, there were no such safeguards, guidance in conducting the examination, or rules to prevent misuse of the information.

The Arizona Supreme Court denied relief on this claim and found it was foreclosed by *Phillips*.  Their denial of this claim was contrary to, or involved an unreasonable application of, clearly-established federal law.  *See* 28 U.S.C. § 2254(d)(1).  Presentation of any available mitigation evidence is a fundamental constitutional right.  *Johnson v. Texas*, 509 U.S. 350 (1993); *Lockett*, 438 U.S. 586; *Eddings*, 455 U.S 104.  The court's refusal to consider a lesser sanction or compromise where Newell's fundamental right to present mitigation was not impaired was in direct conflict with established federal law.  In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2).  An accused has a Fifth Amendment right at the penalty phase of a capital case.  *Estelle*, 451 U.S. 454.  The trial court's order that Newell comply with a State's expert examination without any built in safeguards, and subsequent preclusion of Newell's expert testimony when he refused to do so was unreasonable.  The Arizona Supreme Court's decision affirming the trial court's order was unreasonable in light of the lack of any safeguard for the evaluation.

### Claim Fifteen

**The trial court erred when it forced counsel into trying a case post-*Ring* before the new rules were clear, in violation of Newell's right to due process of law and effective assistance of counsel.**

1     Newell incorporates by specific reference all facts, allegations, and
2     arguments made elsewhere in this Petition.

3     Newell's was one of the early cases to go to trial after the sea change from
4     judge to jury sentencing under *Ring*, 536 U.S. 584.  By forcing Newell to trial
5     while the rules were still unclear, the court forced trial counsel to try a case
6     where the rules were not known.  Accordingly, Newell bore the cost of counsel's
7     learning curve.

8     Newell did not present this meritorious claim to the state courts as a result
9     of appellate and post-conviction counsel's deficient performance.  The deficient
10    performance of state appellate and post-conviction counsel prejudiced Newell
11    and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S.
12    668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary
13    hearing that post-conviction counsel fell below the standards of a minimally
14    competent capital post-conviction attorney when she failed to raise this
15    meritorious claim.  Therefore, the Court will be able to consider the merits of
16    this claim pursuant to *Martinez*.  Moreover, because the claim has not been
17    adjudicated by the Arizona state courts, the limitations on relief imposed by 28
18    U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider
19    the claim de novo.

20    On June 24, 2002, the United States Supreme Court invalidated Arizona's
21    death penalty statute after *Ring* made it constitutionally impermissible for a
22    judge rather than jury to find those facts making a defendant eligible for the
23    death penalty.  The Arizona legislature amended Arizona's death penalty statute
24    to comply with *Ring* on August 1, 2002.  The new law included a clause making
25    it applicable to any capital sentencing commenced after the effective date of the
26    law.  *See* Arizona Laws 2002, 5th Spec. Sess., Ch.1, § 3.  Newell's crime was
27    committed while the old statute was in place, but his trial commenced under the
28    post-*Ring* law.

In July of 2002, the State sought stays in all capital cases pending enactment of a new death penalty statute. As the State's motion noted, it was an open question on what the effect a new statute would have on cases that were charged prior to *Ring* but that were still pending trial. (ROA 42.) Before that motion was ruled upon, the legislature enacted the new law and the State filed a motion withdrawing their previous motion to stay. (ROA 44.) On September 17, 2002, a hearing was held on several cases regarding motions to stay proceedings pending action by the state supreme court after *Ring*, 536 U.S. 584 and to address the impact of the new death penalty statute enacted August 1, 2002.[35] *See* Arizona Laws 2002, 5th Spec. Sess. Ch. 1, § 3. Despite the seismic shift from judge to jury sentencing, the court denied a stay in all the cases, but noted it made no comment "on whether or not motions to continue should be filed, or if filed, whether they should be granted. That's a . . . case-by-case basis." (Tr. 9/17/02 at 24.)[36]

Although trial counsel were experienced and accomplished defense lawyers, Newell's was their first post-*Ring* case, and both described the experience as "flying blind." (Tr. 3/3/11 at 12, 36.) This was especially true as to the issue of whether or not Newell had to submit to an interview with a State

[35]That motion to stay does not appear to have been made part of Newell's ROA; however the State's response can be found at ROA 46. Newell is included in the caption, and was included in the status conference discussed above.

[36]Newell filed several motions challenging the application of the new statute to his case. On September 10, 2002, and again on January 20, 2004, trial counsel filed motions to strike the allegation of death because the application of the amended statute violated the ex post facto clause. (ROA 49; 128.) On October 16, 2003, Newell filed a Motion to Remand for a New Determination of Probable Cause on the grounds that the evidence submitted to the jury was insufficient as a matter of law pursuant to *Ring*. (ROA 78.) Finally, Newell filed a Motion to Dismiss Death Penalty Allegations arguing that even if the court did not find an ex post facto violation, the State should be precluded from seeking death because, under *Ring* and *Summerlin*, capital murder was a different crime than "murder *simpliciter*." (ROA 80 at 10.) The court denied all of the above at a November 5, 2003 pre-trial motions hearing. (Tr. 11/05/03 at 6-7.)

expert.  While counsel were clear they had a duty to call in an expert to create a connection for the jury between Newell's crime and his history, (s*ee* Tr. 10/22/03 at 8-9, where defense counsel stated, "I have to bring somebody. There are cases that say I have got to bring somebody."), it was not at all clear what the rules were on whether or not their client had to submit to the psychiatric evaluation with the State's expert.  (Tr. 3/3/11 at 13.)  There was no policy within counsel's office as to how to deal with this situation.  (Tr. 3/3/11 at 13, 22.)  As detailed more fully in other parts of this petition, counsel objected to submitting to a State psychiatric evaluation and filed numerous arguments against it.

The same issue had been raised in numerous capital cases and, at the time of Newell's trial, was pending before the state supreme court on a special action in *Phillips*, 93 P.3d 480.  (Tr. 12/5/03 at 15.)  Newell sought a stay based on *Phillips*, both before his trial court and the Arizona Supreme Court.  Despite *Phillips* being a nearly identical issue, both courts denied the requests for stay. (Tr. 12/12/03 at 9-10, 14; ROA 115.)  In the post-conviction evidentiary hearing, co-counsel testified "[w]e tried to seek a continuance of the trial until after this issue was decided so we would know what to do.  And that was the concern I had is we didn't know what the rules were but we were forced to go forward." (Tr. 3/3/11 at 47.)  By forcing the case forward the court placed Newell's counsel in a terrible position, where they had to gamble Newell's life on their guess regarding how *Phillips* would come down and decide whether to forgo important information or risk a violation of their client's right to remain silent, a violation that could not be undone.

Ultimately, defense counsel did not allow Newell to submit to an examination by any State expert prior to trial.  In the evidentiary hearing, trial counsel conceded that when they made the decision not submit to the State's interview "we didn't know the rule." (Tr. 3/3/11 at 15.)  He testified that despite

the order giving some protection regarding how the statements could be used, that he still had objections. (Tr. 3/3/11 at 23.)  Further, trial counsel testified that he did not believe that the court would impose the onerous sanction of complete preclusion under these circumstances. (Tr. 3/3/11 at 27.)  Co-counsel agreed and testified, "[i]t is difficult to say that it was an informed decision when we did not know the entire implications of it or what the rules were going to be." (Tr. 3/3/11 at 39.) "[T]he linchpin of the mitigation was the experts that [counsel was] going to call." (Tr. 3/3/11 at 20-21.)  Forcing counsel to choose between critical mitigation evidence and giving the State access to their client when the rules were unclear violated Newell's constitutional rights and put both counsel and Newell in an untenable position.

Just four months after Newell's trial, the Arizona Supreme Court decided *Phillips*, holding that a defendant charged with capital murder who notifies the State of his intention to call mental health experts at the penalty phase, opens the door to examination by a State mental health expert by placing his mental health at issue.  Similar to the order denying Newell's stay, the *Phillips* court further held that the trial court must issue an order to assure that no statements by the defendant, or other testimony or evidence derived therefrom, may be used by the State except on those issues that a defendant introduces at the penalty phase.  93 P.3d at 483-484.

The penalty phase of a capital trial "must satisfy the requirements of the Due Process Clause."  *See Gardner*, 430 U.S. at 362.  "The fundamental requisite of due process of law is the opportunity to be heard."  *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).  By forcing the case to trial before the post-*Ring* rules were clear, the court placed counsel in an unfair dilemma where they had to guess the outcome of *Phillips* and make a choice in which either alternative would damage a constitutional right.  Under such circumstances, even experienced counsel could not be effective because they did not know the

146

rules they were playing by.  "The right to effective representation originated in the Due Process Clause, which prohibits the government from depriving any person of liberty by fundamentally unfair or unreliable procedures."  *Williams v. Jones*, 571 F.3d 1086, 1099 (10th Cir. 2009) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)).  By forcing counsel to trial before they could make a strategic decision on how best to represent their client and protect his rights, the court essentially ensured that counsel would be ineffective and, in doing so, denied Newell's rights to a fair trial.

### Claim Sixteen

**Appellate counsel was ineffective, in violation of Newell's Sixth, Eighth, and Fourteenth Amendments rights, for failing to raise the Due Process violation of forcing Newell to trial.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court may consider the claim de novo.

Reasonably competent appellate counsel would have paid heed to the flurry of motions that were filed regarding issues that arose in the trial courts post-*Ring*.  Amid such a shift in how trials in Arizona proceeded, there was sure

to be a steep learning curve.  Appellate counsel, in any case that occurred during this time period, should have looked for any issues to raise connected to the aftermath of *Ring*.  In Newell's case in particular, as outlined in several claims *supra*, trial counsel raised numerous challenges, especially in regard to the expert issue.  While appellate counsel raised the issue that the trial court erred in its sanction, she failed to recognize the error of forcing counsel to make the unfounded choices between two constitutional violations when the rules were not clear.

In failing to brief the meritorious issues preserved by trial counsel's numerous challenges to submitting Newell to the State's expert, appellate counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent defense attorney.  *See Evitts*, 469 U.S. at 396  ("nominal representation on appeal . . . does not suffice to render the proceedings constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all").

### Claim Seventeen

**The trial court erred, violating Newell's Eighth and Fourteenth Amendment rights, when it permitted the ligature to be admitted into evidence and then to go back to the jury room.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits of

this claim pursuant to *Martinez*.   Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

At trial, there were two exhibits regarding the ligature used in Elizabeth's death.  Exhibit 65 was a photo of the ligature.  Exhibit 27 was the ligature itself. A detective opened the sealed evidence bag and took out the ligature in front of the jury.  (Tr. 2/3/04 p.m. at 47-50.)  Defense counsel objected and asked to have the item moved from in front of the jury.  (Tr. 2/3/04 p.m. at 50.)  Argument was held outside of the presence of the jury, and the bench conference portion was not transcribed.[37]   (Tr. 2/3/04 p.m. at 50.)   Defense counsel stated what he believed to be fibers because he had only seen the photographs, were actually strands of hair.  (Tr. 2/3/04 p.m. at 51-52.)  Defense counsel argued that only the picture should be used so the State could still get in their evidence, but the jury should not have to be faced with the "visceral" reaction to Elizabeth's hair.  (Tr. 2/3/04 p.m. at 52.)  Finally, counsel argued that it was essentially "body parts," and should be precluded from going back to the jury room as it was unduly prejudicial.  (Tr. 2/3/04 p.m. at 52.)

The State countered that it needed the actual ligature, as it was an important part of the case with bearing on cruelty and premeditation.  Defense counsel noted that if the court was going to allow it, that the ligature should not be untied on the rail in front of the jury.  (Tr. 2/3/04 p.m. at 54.)  The court found that it was not unfairly prejudicial, that the ligature should be put inside a clear container when it went back to the jury, and that if any work would be done untying the knot, it should not be done on the jury rail.  (Tr. 2/3/04 p.m. at 55.)

---

[37]Counsel's failure to preserve the record is outlined in Claim Six, *supra*.

1    The constitutional guarantee of due process is violated when evidence

2    admitted is not relevant to an element of the crime charged and is so

3    inflammatory as to prevent a fair trial.  *See, e.g.*, *Duncan v. Henry*, 513 U.S.

4    364, 366 (1995) (claim challenging violation of due process must allege that

5    admission of evidence so inflammatory as to prevent a fair trial); *Romano v.*

6    *Oklahoma*, 512 U.S. 1, 12-13 (1994) (admission of irrelevant evidence violates

7    due process if it so infects the proceeding with unfairness as to render the jury's

8    determination a denial of due process); *Estelle v. McGuire*, 502 U.S. 62, 70

9    (1991) (due process rights not violated by the admission of evidence that was

10   relevant to an issue in the case).

11    The Ninth Circuit has adhered to this standard by consistently holding that

12   the admission of irrelevant evidence violates due process if its admission renders

13   the trial unfair.  *See, e.g.*, *McKinney v. Rees*, 993 F.2d 1378, 1380 (9th Cir.) (due

14   process is violated if contested evidence is not relevant to an essential element of

15   the prosecution's case and renders the trial fundamentally unfair), *cert. denied*,

16   510 U.S. 1020 (1993); *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

17   1991) (due process violated "if there are *no* permissible inferences the jury may

18   draw from the evidence" and the testimony is "of such quality as necessarily

19   prevents a fair trial").  Other circuits have similar formulas for analyzing due

20   process violations.  *See, e.g.*, *Bounds v. Delo*, 151 F.3d 1116, 1119 (8th Cir.

21   1998) (state court evidentiary errors violate due process when they were "so

22   conspicuously prejudicial or of such magnitude as to fatally infect the trial and

23   deprive the defendant of due process"); *Walker v. Engle*, 703 F.2d 959, 968-69

24   (6th Cir.) (admission of irrelevant and prejudicial evidence deprived defendant

25   of due process), *cert. denied*, 464 U.S. 962 (1983).

26    In general, a defendant is denied a fair trial when improper evidence

27   misled a jury, clouded its deliberations, or otherwise distracted the jury from

28   carefully analyzing relevant evidence.  *See McKinney*, 993 F.2d at 1385

(admission of irrelevant evidence violates due process when it served to prey on the jury's emotions, making it likely that they would avoid careful analysis of relevant evidence and convict on an improper basis); *see also Maurer v. Dept. of Corrections*, 32 F.3d 1286, 1289 (8th Cir. 1994) (improperly admitted statements that invaded the jury's determination denied defendant due process of law); *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1994) (due process violated when inflammatory remarks "invoke emotions which may cloud the jury's determination of the defendant's guilt"); *Dudley v. Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988) (due process violated where review of the record strongly suggested that the contested evidence was intended to prejudice the defendants rather than address its proffered purpose), *cert. denied*, 490 U.S. 1011 (Ill. 1989); *Walker*, 703 F.2d at 968-69 (by allowing trial to focus on irrelevant issues instead of defendant's guilt or innocence, trial court denied defendant a fair trial).

Here, the court erred by allowing the actual ligature to be admitted at trial when the photograph, without the actual biological body parts of the victim attached, would have been sufficient. "Whenever physical evidence is allowed into the jury room, the proximity of the exhibit to the jury and the potential that the exhibit may be in the jury's possession for an extended period of time give the proponent of the exhibit a distinct advantage over the opposing party. For this reason, the court will closely scrutinize the exhibit to ensure that its prejudicial value does not outweigh its value as evidence." *People v. Blue*, 724 N.E. 2d 920, 932 (Ill. 2000) (internal citations omitted). Further, when "exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions, they should be promptly excluded." *People v. Jenko*, 102 N.E. 2d 783, 785 (1951).

Here, there was no dispute that Elizabeth was strangled with a ligature, or over the nature of the knot used to tie it. Admission of the ligature was not

probative of any issue in dispute in the guilt phase, and even if it were, the picture would have been sufficient evidence for the jury to view.  The jury was not just given a ligature, but one that contained hair of a dead little girl.  This is the type of physical evidence "uniquely charged with emotion."[38]  *Blue*, 724 N.E. 2d at 934.   Here, the nature, and presentation of the exhibit was "so disturbing, that its prejudice outweighed its probative value.  Its admission into evidence was error."  *See Blue*, 724 N.E. 2d at 934 (holding it was error to allow the bloody uniform of a deceased police officer to go back to the jury room).  Accordingly, Newell is entitled to relief.

### Claim Eighteen

**Newell was denied effective assistance of appellate counsel, in violation of his Sixth, Eighth and Fourteenth Amendment rights, when counsel failed to raise the issue that the trial court erred by admitting the ligature into evidence.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause and prejudice to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court may consider the claim de novo.

---

[38]As outlined in detail in Claim Nineteen, *infra*, the State took advantage of this inflammatory evidence and jumped on the opportunity to emphasize it.

As discussed in Claim Seventeen, *supra*, at trial a detective opened a sealed evidence bag and took out the ligature used to strangle Elizabeth, held it in front of the jury, and the victim's hair fell out of the knot.  (Tr. 2/3/04 p.m. at 47-52.)  The defense objected to its admission into evidence as it was essentially body parts.  (Tr. 2/3/04 p.m. at 50-52.)  The court overruled the objection and the exhibit was admitted.  (Tr. 2/3/04 p.m. at 55-56.)  As outlined in Claim Nineteen, *infra*, the prosecutor then seized upon the opportunity to emphasize the gruesome evidence and made numerous references to the hair.  (*See* Tr. 2/3/04 p.m. at 60-63.)

This error was apparent from the record.  Between the defense's objection and request to have only the photograph go to the jury, and the State's capitalization on the irrelevant and prejudicial evidence, a reasonably competent appellate attorney would have been prompted into action.  *See Mapes*, 171 F.3d at 427-28 (consideration of counsel's performance involves assessing the obviousness of the omitted issue).  However, on appeal, counsel ineffectively failed to challenge this violation of Newell's right to a fair trial.  *See Evitts*, 469 U.S. 387.

<div align="center">

**Claim Nineteen**

</div>

**Newell was deprived of the right to a fair trial because the State engaged in various instances of misconduct.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell's conviction and death sentence are unlawful and unconstitutionally imposed in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  His right to a fair trial, to present a defense, to due process of law, to a reliable and accurate determination of guilt and penalty, and to be free from cruel and unusual punishment were violated by the prosecutor's multiple instances of misconduct.

1        Part A. of this claim was presented to the Arizona Supreme Court on

2    direct appeal (DA Doc. 28 at 53), and was rejected on the merits.  *Newell*, 132

3    P.3d at 846-848.  The state court's rejection of this claim was contrary to, or

4    involved an unreasonable application of, clearly established federal law.  The

5    state court's rejection of this claim was also based on an unreasonable

6    determination of the facts in light of the evidence presented in the state court

7    proceedings.  An "unreasonable determination of the facts" occurs when a state

8    court's conclusion or characterization of evidence is unsupported by the record.

9    *Williams (Terry)*, 529 U.S. at 386.

10       As to the remainder of the claim, Newell did not present this meritorious

11   claim to the state courts as a result of appellate and post-conviction counsel's

12   deficient performance.  The deficient performance of state appellate and post-

13   conviction counsel prejudiced Newell and provides cause and prejudice to

14   excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S.

15   Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-

16   conviction counsel fell below the standards of a minimally competent capital

17   post-conviction attorney when she failed to raise this meritorious claim.

18   Therefore, the Court will be able to consider the merits of this claim pursuant to

19   *Martinez*.  Moreover, because the remainder of the claim has not been

20   adjudicated by the Arizona state courts, the limitations on relief imposed by 28

21   U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court

22   may consider the claim de novo.

23       Prosecutorial misconduct may "so infec[t] the trial with unfairness as to

24   make the resulting conviction a denial of due process."  *Donelly v.*

25   *DeChristoforo*, 416 U.S. 637, 643 (1974).  Prosecutorial misconduct does not

26   rise from one act of misconduct alone; rather, the reviewing court must consider

27   the cumulative effect of the harm.  *Berger v. United States*, 295 U.S. 78, 89

28   (1935).  In Newell's case, the State's misconduct was not confined to a single

instance but was persistent.  The prosecutor occupies a unique position in the bar, and is subject to uniquely rigorous standards.  "[W]hile he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce the wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. "Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers . . . [t]he prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *United States v. Kojayan*, 8 F.3d 1315 1323 (9th Cir. 1993) (internal citations omitted).  The prosecutors in Newell's trial violated these bedrock principles and in doing so, denied Newell his right to a fair trial.

### A.  Closing argument.

The prosecutor in Newell's case committed misconduct through several inflammatory statements during closing arguments.  First, as discussed in Claim Twenty, *infra*, the prosecutor improperly vouched and burden shifted by implying that there was vast evidence not presented at trial stating:  "Now Mr. – defense counsel said that the defense doesn't have to prove anything, and that's true.  But this case had 3,000 pages of police reports.  Not every witness was called into this courtroom.  But just one thing to keep in mind is the power to subpoena witnesses goes both ways."  (Tr. 2/12/04 at 57.)  Newell's counsel objected that this was an "improper comment" and the objection was sustained. (Tr. 2/12/04 at 57.)  Rather than move on, the prosecutor argued with the court in front of the jury stating "That's wrong.  It was the statement of the law, Your Honor."  (Tr. 2/12/04 at 57.)

During rebuttal closing, the prosecutor referenced matters outside the record and again vouched stating:

> And no matter what defense counsel tells you, we all know that DNA is, at this point, the most powerful investigative tool in law enforcement at this time.  We all know that.  There's nothing we're going to hear in this courtroom that's going to change the fact that DNA is the

most powerful tool to investigate crimes that we have right now.

(Tr. 2/12/04 at 59.)   Defense counsel objected, and the court overruled the objection.   Not satisfied, the prosecutor continued to argue "[Defense counsel] knows that, we all know that.  DNA—."  (Tr. 2/12/04 at 59.)  Newell's counsel again objected and moved for a mistrial on the two improper arguments.  (Tr. 2/12/04 at 59, 63.)

Counsel based their request for mistrial on the misconduct of the prosecutor.  First, they argued that the initial "subpoena" comment improperly shifted the burden to the defense and also that the error was compounded by the State's disrespectful follow up comment regarding the "statement of the law." (Tr. 2/12/04 at 63-65.)   The trial court ruled that it was "not a fan of that statement" and it was "overreaching," but denied a mistrial.  (Tr. 2/12/04 at 65-66.)

Counsel further requested a mistrial on the grounds that the prosecutor referred to matters outside the record and vouched for the superiority of DNA evidence.  He then exacerbated the error by commenting that defense counsel knew that DNA was superior evidence, impliedly suggesting that counsel was disingenuous for suggesting otherwise.  (Tr. 2/12/04 at 66-67.)

The average juror has confidence in the prosecutor as a public servant, so improper suggestions "are apt to carry much weight against the accused when they should properly carry none."  *Berger*, 295 U.S. at 88.  Comments create prejudicial error if they constitute personal and institutional guarantees of the trustworthiness of the government and its case.  *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992).

The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision."  *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000).  Arguments that frustrate this purpose and are

inflammatory or prejudicial to the defendant are improper. *Id.* In this case, the prosecutor intended his argument to have an effect on the jury, and it did; the cumulative effect of the prosecutor's improper assertions infected the trial with unfairness, so as to make the resulting conviction a denial of due process.

In reviewing the merits, the Arizona Supreme Court agreed that "both comments were improper." *Newell*, 132 P.2d at 847. "The prosecutor's statement about the superiority of DNA evidence improperly vouched for the State's evidence." *Id.* Further, "[t]he prosecutor also improperly commented about what defense counsel knew about the strength of DNA evidence" and "called into question the integrity of defense counsel" before the jury. *Id.* Despite this, the court found that because the jurors were later instructed that "any sustained objection meant the information must be disregarded" the comments did not affect the jury verdict. *Id.* Further, the Court found the evidence of guilt was so overwhelming that the comments, though improper, did not deprive Newell of a fair trial. *Id.* at 848.

The state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly-established federal law. The prosecutor's vouching and burden shifting infected the trial and denied Newell due process. *See Donelly*, 416 U.S. at 643. The state court's rejection of this claim was also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Here, the state court's conclusion that the statements were not prejudicial is unsupportable and Newell is entitled to relief.

## B.  Use of actual ligature at trial

At trial, although the court spent considerable time discussing and considering the impact of grotesque photographs, (*see* Tr. 2/3/04 a.m. at 7-8), it nevertheless allowed the State to wave part of Elizabeth's body – her hair – in

front of the jury.  This action was severely prejudicial and denied Newell a fair trial.

Elizabeth died due to strangulation with a ligature placed around her neck. The ligature was the strap of her purse.  At trial, Detective Steven Roberts testified that when they found Elizabeth, there was something tied around her neck.  Trained not to disturb ligatures and knots, they cut it off.  (Tr. 2/3/04 p.m. at 46.)  Exhibit 65, a photo of the ligature was admitted into evidence and shown to the jury.[39]  (Tr. 2/3/04 p.m. at 47, 51.)  Exhibit 27, admitted initially without objection, was the ligature itself.  The State had Roberts open the bag and take out the ligature, and asked him various questions about the ligature, its formation, where it was cut, and where it was on the body.  (Tr. 2/3/04 p.m. at 47-50.)  Several questions in, defense counsel objected stating: "Judge, I'm going to ask that be pulled back further from the jury.  There are other items connected with that that I didn't realize were on there that I would like to revisit the admission at least going back to the jury room."  (Tr. 2/3/04 p.m.  at 50.)  The judge then called for a bench conference and the discussion was not transcribed.  (Tr. 2/3/04 p.m. at 50.)  The judge then dismissed the jury and further discussion was held on the record.  Defense counsel argued that he did not have an opportunity to view the actual ligature because it was sealed.  When he finally saw it for the first time in court, what he believed to be fiber when viewing the photographs was in fact strands of hair.  He said he did not have a problem with it when he was under the impression it was fiber.  (Tr. 2/3/04 p.m. at 51-52.)  Defense counsel argued that the picture was unduly prejudicial and did not "sanitize or diminish any of the state's evidence but the visceral reaction that one has to seeing that hair, especially when it is a foot from you, is one that

---

[39]Both parties mistakenly identified the exhibits.  (*See* Tr. 2/3/04 at 47, 51.)  The photograph of the ligature is Exhibit 65.  The ligature itself is Exhibit 27. Exhibit 66 is a photograph of Elizabeth clipped to a car's visor and not relevant to this claim.  (*see* Tr. 2/3/04 at 76-77.)

1   a juror should not have to contend with."  (Tr. 2/3/04 p.m. at 52.)   Counsel

2   further argued that it was "body parts" and should be precluded from going back

3   to the jury room as it was unfair prejudice.  (Tr. 2/3/04 p.m. at 52.)

4         The State countered that it was an important part of the case, bearing on

5   cruelty and premeditation and that they needed to look at the knot.  Defense

6   counsel said if the court was going to allow that, it should not be done on the rail

7   in front of the jury.  (Tr. 2/3/04 p.m. at 54.)  The court found that it was not

8   unfairly prejudicial, that it should be put inside a clear container when it went

9   back to the jury, and that if any work would be done on the knot it should not be

10  done on the jury rail.  (Tr. 2/3/04 p.m. at 55.)

11        When  the  jury  returned,  the  State  seized  upon  and  emphasized  the

12  prejudicial and shocking effect of the hair to the jury.  The State questioned:

13  Q:  Now, just kind of put that together and then hold that
       up so we can see that's what it – so that is kind of the size
14     that was around her neck?

15  A: Right.

16  Q: And it went around her hair also; is that correct?

17  A: Yes.

18  (Tr. 2/3/04 p.m. at 60-61.)  A few questions later:

19  Q: Okay.  Now a lot of her hair is coming off from the
       Scotch tape; is that right?
20
    A: Yes.
21
    (Tr. 2/3/04 p.m. at 61.)
22
23        This did not go unnoticed by the jury.  A juror submitted a question "How

24  did her hair get in front of the knot if the knot was under her chin, if you know?"

    (Tr. 2/3/04 p.m. at 63.)
25
26        The prosecutor's seizing upon damaging information served no purpose

27  other than to inflame the jury and "so infected the trial with unfairness as to

28  make the resulting conviction a denial of due process."  *Darden v. Wainwright*,

477 U.S. 168, 181 (1986). The State's alleged focus was on how the knot was tied and it was thus unnecessary to discuss the victim's hair and hold a part of her body inches from the jury. The hair was not relevant to the issue and simply prejudicial.

The constitutional guarantee to due process is violated when evidence admitted is not relevant to an element of the crime charged, and is so inflammatory as to prevent a fair trial. *See, e.g.*, *Duncan*, 513 U.S. at 366; *Romano*, 512 U.S. at 12-13 (admission of irrelevant evidence violates due process if it so infected the proceeding as to render the jury's determination a denial of due process); *Estelle*, 502 U.S. at 70. Because the evidence preyed on the jurors' emotions, Newell was denied due process. *See McKinney*, 993 F.2d at 1385.

Here, it was only after defense counsel admitted his "visceral" reaction to the victim's strands of hair that the prosecutor seized upon the opportunity to bring it up to the jury as often as he could. The prosecutor's purpose – showing how the knot was tied – could have been achieved without the repeated references to the hair. The prosecutor was aware of the effect that the repeated references to Elizabeth's hair would have on the jury. Doing so was a violation of Newell's due process. *Dudley*, 854 F.2d at 972 (due process violated where review of the record strongly suggested that the contested evidence was intended to prejudice the defendants rather than address its proffered purpose), *cert denied*, 490 U.S. 1101.

### C. The State engaged in misconduct when it played an un-redacted tape of Newell's interrogation for the jury.

On February 9, 2004, tapes of Newell's June 4, 2001 interrogation were played for the jury. (Tr. 2/9/04 at 6.) Outside the presence of the jury, trial counsel alerted the judge he had a motion for mistrial. He had marked as Defense Exhibit 113 a transcript of the interrogation. He indicated page 10 was

1    highlighted with a portion that he and the State had agreed would not be
2    played.[40]  (Tr. 2/9/04 at 7.)  From the record, it appears that what was played
3    was a reference by Newell or the detectives interviewing him that Newell had
4    been in jail.[41]  (Tr. 2/9/04 at 8.)  The State confirmed that they had agreed to do
5    redactions, but by accident had played the original tape rather than the redacted
6    copy.  (Tr. 2/9/04 at 8-9.)  The court denied the motion for mistrial, but offered
7    up a curative instruction in the form of "tell[ing] the jury what it was that he was
8    in jail for."  (Tr. 2/9/04 at 9-10.)  Counsel declined this curative instruction and
9    the court denied the motion for mistrial.  (Tr. 2/9/04 at 10.)

10          Later that same day, defense counsel renewed his motion for mistrial,
11   when towards the end of the tape, the State played to the jury another
12   inadmissible exchange between the detective and Newell.  According to trial
13   counsel, the exchange was "Newell says he's going to leave, no matter what,
14   referring to Danielle.  The detective's response is she came to visit you in jail.
15   She came to visit you in jail after you did what you did.  How can you possibly
16   say that about a woman who I think does care about you, and you don't – and
17   then he's interrupted by Mr. Newell."  (Tr. 2/9/04 at 11.)  Counsel noted this
18   was a *second* reference to jail.  Unlike the last, where the jury apparently could
19   have inferred an alcohol problem, here the jury could infer a serious offense
20   based on the detective's characterizations.  (Tr. 2/9/04 at 11-12.)  The State
21   defended the error saying that it redacted the tape and sent it to defense counsel
22   asking if there was anything additional.  Originally they believed it was fine, but
23   then they saw a few more things and had to rush to go through everything.  The
24   State complained that it should have been more of a "team effort" to redact.  (Tr.
25   2/9/04 at 13.)  Defense counsel countered that his role was not to assist the State

26   ───────────────
     [40]Apparently this exhibit was released and not sent up to the Arizona Supreme
27   Court to review, leaving it unclear what exactly was played and said.  (Supp.
     ROA 165A at 5.)  This issue is addressed more fully in Claim Six.

28   [41]Again this is because counsel failed to preserve the record.

1    in putting on its case, and whether it was an omission or inadvertent did not cure

2    the issue.  The trial court said it was unconvinced that there was "such prejudice

3    [that] this needs to be cured by a mistrial."  (Tr. 2/9/04 at 14.)  The motion for

4    mistrial was denied and the trial proceeded with the State playing more of the

5    tapes.  (Tr. 2/9/04 at 15.)  The trial court's ruling was in error and Newell is

6    entitled to relief.

7            **D.  The prosecutor engaged in misconduct in closing argument
                 when they appealed to vengeance in their closing argument
8                at penalty phase.**

9            Near the end of their penalty phase closing, the prosecutor displayed two

10   photographs to the jury, Exhibits 30 and 86, which showed the ligature, and

11   swelling of Elizabeth's face and neck from the environmental factor from being

12   in the water for a day.  Pointing at the photo, the prosecutor argued "[if] there's

13   ever a person who deserves the death penalty for what he did . . . not for what

14   happened, for what he did.  It's this man right over here, Mr. Newell."  (Tr.

15   2/24/04 at 85.)  He went on,

16           "[n]ow this is Elizabeth Byrd as she was when she was
             alive.   And this is what happened to Elizabeth Byrd
17           because of what Mr. Newell did.   That is what Mr.
             Newell did.  Right there.  That's what he did.  This what
18           Mr. Newell did right there.   And if anybody ever
             deserved to receive the death penalty for what he did, it's
19           Mr. Newell."

20   (Tr. 2/24/04 at 85.)

21           After closing arguments were complete, defense counsel objected and

22   moved for a mistrial arguing that those statements were "inflammatory

23   prejudice," and "appeal to sympathy, prejudice, and more importantly . . . to

24   vengeance."  (Tr. 2/24/04 at 97.)  The jury had already found the aggravating

25   factor of cruel, heinous and depraved at that point.  Showing those photos, which

26   showed the ligature and swelling from environmental factors and to say that was

27   what Newell had done was an extremely prejudicial misstatement of the

28   evidence, was "an attempt to inflame the jury" and undermines confidence in the

1    outcome of Newell's case.  Counsel argued it was a violation of the Eighth and

2    Fourteenth Amendments of the United States Constitution.  (Tr. 2/24/04 at 97-

3    98.)

4           The State argued there was nothing improper about the argument because

5    he pointed to the ligature, not the injuries, when he made those statements, that

6    the photograph was in evidence, and that it showed the severity of the offense.

7    (Tr. 2/24/04 at 98.)  The court agreed with the State and denied the motion for

8    mistrial.

9           Earlier, during the guilt phase of the trial, there was considerable

10   discussion over which photographs would be admissible.  The State argued it

11   had carefully chosen those photographs it felt it "absolutely need[ed] to use" and

12   was "not trying to get gratuitous use of the photographs."  (Tr. 2/5/04 at 8.)  Part

13   of defense counsel's objection to several photographs was that they showed

14   significant bloating and decomposition.  (Tr. 2/5/04 at 10.)  He noted that in the

15   defense interview with the medical examiner, Dr. Keen, Keen agreed that most

16   of what one sees in the photographs, from the bloating to the discoloration was

17   more properly attributed to post-mortem decomposition than to any injury

18   sustained during the offense.  (Tr. 2/5/04 at 11.)  Counsel made very specific

19   objections to Exhibit 30.  Exhibit 30 was a photograph of the ligature and the

20   front of the victim. The State argued if it cropped the photograph too much you

21   would not have perspective of what you were looking at.  Defense counsel noted

22   again, "I think the one that I'm the most concerned about is Exhibit 30 and the

23   bloating of the child's face above the ligature."  (Tr. 2/5/04 at 14.)  Although

24   defense counsel asked that it be cropped, the court allowed the photo in without

25   further cropping.  (Tr. 2/5/04 at 14.)

26          It was certainly no coincidence that the photo defense counsel was the

27   "most concerned about," the photo that showed the bloating and disfiguration of

28   the victim, was the one the prosecutor chose to show the jury.  There were other

163

exhibits showing the ligature; if that was his intent, it could have been achieved through other exhibits.  The prosecutor's role is to "vindicate the public interest in punishing crime" and "not to exact revenge on behalf of an individual victim." *Drayden v. White,* 232 F.3d 709, 713 (9th Cir. 2000.)  Further, a prosecutor commits misconduct during closing argument when the prosecutor manipulates or misstates the evidence at trial.  *Darden*, 477 U.S. at 181-182. Here, in using the most gruesome photograph that showed the environmental factors of bloating, discoloration and disfigurement and stating "this is what he did" the prosecutor violated his role to vindicate the public interest and appealed to vengeance of the jury.  Further, by using a photograph that showed the most damage to Elizabeth's body because of decomposition, he misled the jury and manipulated the evidence to be more effective in his appeal for revenge.

The prosecutor's argument intended to inflame the passions and prejudices of the jury, and was improper.  *See Viereck v. United States*, 318 U.S. 236, 247-48 (1943).  This type of argument offends the purpose of a closing argument, which is "to explain to the jury what it has to decide and what evidence is relevant to its decision."  *Sandoval*, 241 F.3d at 776. These comments infringed on Newell's right to present a defense at trial and were highly prejudicial because they deliberately undermined his mitigation presentation. *See Darden*, 477 U.S. at 182; *Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006); *Towns v. Jackson*, 287 F. Supp. 2d 749, 760 (E.D. Mich. 2003) (even though prosecutor's improper closing remarks were not extensive, they were prejudicial to the defense because they "spoke directly to a critical issue at trial").  The lack of any effort by the trial judge to "cure or minimize the problem through admonishment or special instruction of the jury" despite the defense's request also contributed to the prejudicial effect.  *Mahorney v. Wallman*, 917 F.2d 469, 473 (10th Cir. 1990).  As a result of this argument, Newell was denied a fair trial.

**E. The Attorney General's Office engaged in misconduct when it failed to disclose to Newell that his direct appeal lawyer had moved to their capital litigation unit while they were attempting to uphold his death sentence in post-conviction and failed to follow its internal policies to screen her from the case.**

Newell was sentenced to death in Maricopa County Superior Court on February 25, 2005.  (ROA 164.)  Although the direct-appeal record does not include any notice of Ginger Jarvis's appearance, she had appeared in the case by at least June 30, 2004.  (DA Doc. 19.)  Jarvis, then a Deputy Legal Advocate, authored Newell's opening and reply briefs (DA Docs. 28, 42), and presented his case at oral argument before the Arizona Supreme Court (DA Doc. 47.)  At the time the Arizona Supreme Court filed its direct-appeal opinion on April 26, 2006, Jarvis was still listed as Newell's counsel of record.  (CR-04-0074-AP Doc. No. 48.)  On June 1, 2010, Jarvis began working for the Office of the Arizona Attorney General ("AG").  (Dist. Ct. Dkt. No. 17 at ¶ 2.)  At that time, the AG represented the State of Arizona in Newell's state post-conviction proceedings.

After representing Newell in his direct-appeal proceedings, Jarvis owed him a continuing duty of loyalty.  Ariz. R. Prof'l Cond. 1.9; *In re Estate of Shano*, 869 P.2d 1203, 1210 (Ariz. Ct. App. 1993).  Because Jarvis participated "personally and substantially" in his defense by, at a minimum, authoring his direct-appeal briefs and presenting his direct-appeal claims during oral argument to the Arizona Supreme Court, (DA Docs. 28, 42, 47),  she was clearly prohibited from assisting the AG's office in its efforts to defend his convictions and sentences.  Ariz. R. Prof'l Cond. 1.11(c)(1) ("[A] lawyer serving as a public officer or employee shall not . . . participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment.").  Ultimately, due to Jarvis's role in Newell's case, the district court vicariously disqualified the AG's Office from continuing

to prosecute Newell's case.  (Dist. Ct. Dkt. No. 24.)  Although the AG's had a policy requiring a written screening memorandum be published to individuals working on a screened matter, the AG failed to follow its own internal procedure and in fact did not draft one until the day before the hearing in district court on disqualification, over two years after Jarvis's hiring date and after Newell completed a post-conviction evidentiary hearing in state court.  (Dist. Ct. Dkt. Nos. 20, 20-1.)  Further, the AG never communicated that Jarvis had begun working in their Capital Litigation division nor any screening mechanism applied to Newell or his counsel.  *See State ex rel. Romley v. Superior Court (Pearson)*, 184 Ariz. 273, 227, 908 P.2d 37, 41-42 (Ariz. App. 1995) ("details of the mechanism *must* be communicated to the defendant and his counsel").

Prosecutorial misconduct does not have to be intentional but can be as here, "sloppy, careless and negligent."  *See United States v. Chapman*, 642 F.3d 1236, 1240 (9th Cir. 2011).  Here, the AG's office did not follow their own internal screening procedures, and failed to notify Newell of the conflict, which persisted throughout his state court proceedings.  Newell's fundamental right to un-conflicted counsel was violated.

### Claim Twenty

**The trial court erred when it denied Newell's motion for mistrial due to prosecutorial misconduct, in violation of Newell's due process rights under the Fourteenth Amendment of the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

During closing arguments, the prosecutor repeatedly vouched, and made reference to matters outside the record before the jury.  Based on these violations, Newell moved for a mistrial which the court denied.  Such denial was error, and Newell is entitled to relief.

### A.    Claim raised on direct appeal.

This claim was presented to the Arizona Supreme Court on direct appeal (DA Doc. 28 at 53), and was rejected on the merits.  *Newell*, 132 P.3d at 846-848.  The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly-established federal law.  The state court's rejection of this claim was also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  An "unreasonable determination of the facts" occurs when a state court's conclusion or characterization of evidence is unsupported by the record.  *Williams (Terry)*, 529 U.S. at 386.

As detailed in Claim Nineteen, *supra*, the prosecutor violated Newell's right to a fair trial when he improperly vouched and burden shifted by implying that there was vast evidence not presented at trial stating: "Now Mr. –  defense counsel said that the defense doesn't have to prove anything and that's true.  But this case had 3,000 pages of police reports.  Not every witness was called into this courtroom.  But just one thing to keep in mind is the power to subpoena witnesses goes both ways."  (Tr. 2/12/04 at 57.)  Newell's counsel objected on grounds of "improper comment" and the objection was sustained.  (Tr. 2/12/04 at 57.)  Rather than move on, the prosecutor doubled down on his misconduct and in front of the jury argued with the court, stating "That's wrong.  It was the statement of the law, Your Honor."  (Tr. 2/12/04 at 57.)

During rebuttal closing, the prosecutor referenced matters outside the record and again vouched stating:

> And no matter what defense counsel tells you, we all know that DNA is, at this point, the most powerful investigative tool in law enforcement at this time.  We all know that.  There's nothing that we're going to hear in this courtroom that's going to change the fact that DNA is the most powerful tool to investigate crimes that we have right now.

1    (Tr. 2/12/04 at 59.)   Defense counsel objected, and the court overruled the
2    objection.  Not satisfied, the prosecutor continued to argue, "[Defense counsel]
3    knows that, we all know that.  DNA—."  (Tr. 2/12/04 at 59.)  Newell's counsel
4    interrupted again and objected and moved for a mistrial on the two improper
5    arguments.  (Tr. 2/12/04 at 59, 63.)

6         Specifically, defense counsel argued that the "subpoena" comment,
7    compounded by the follow-up comment regarding the "statement of the law"
8    improperly shifted the burden to the defense.  (Tr. 2/12/04 at 63-65.)  Further,
9    counsel argued that by vouching for the superiority of DNA evidence and then
10   again compounding the error by commenting that defense counsel was aware of
11   its superiority, not only referenced matters outside the record but implied that
12   defense counsel was disingenuous for suggesting that DNA was not as superior
13   as the prosecutor claimed it to be.  (Tr. 2/12/04 at 66-67.)  The court denied both
14   motions for mistrial.  (Tr. 2/12/04 at 65-67.)

15        The Arizona Supreme Court found that the statements regarding the
16   subpoena "were not meant to bolster the State's case.  Rather they were an
17   attempt to explain to the jury . . . why certain witnesses had not been called."
18   *Newell*, 132 P.3d at 846.  The court agreed that the comments regarding DNA
19   were improper, but did not require reversal because they did not deny Newell a
20   fair trial.   These findings were unreasonable findings of fact as well as an
21   unreasonable application of clearly-established federal law.

22        Prosecutorial vouching occurs where the prosecutor suggests that
23   information not presented to the jury supports the witness's testimony.  *United*
24   *States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir. 1988).  Here, the prosecutor
25   commented that there were "3,000 pages of police reports" and that "[n]ot every
26   witness was called."  (Tr. 2/12/04 at 57.)  This statement improperly suggested
27   that there was additional information that the State could have presented but did

28

1  not, only because of the volume.  This suggestion was squarely in the category

2  of vouching discussed in *Wallace*.

3       The prosecutor improperly vouched again when he argued the power of

4  DNA evidence to the jury, and stated that "we all know" its power.  (Tr. 2/12/04

5  at 59.)  There was no evidence at trial discussing the effectiveness of DNA, or

6  its rank among investigative tools.  The prosecutor's claim implied a universal

7  consensus that the techniques used by the State were the most effective

8  available.  Again, this was squarely in the category of improper vouching as it

9  suggested information not before the jury – the efficacy of DNA testing –

10  supported their DNA expert.

11      There is no bright-line rule that establishes when vouching necessitates

12  reversal.  *United States v. Combs*, 379 F.3d 564, 575 (9th Cir. 2004).  Instead

13  this court must consider a number of factors, including:

14             the form of vouching; how much the vouching implies
             that the prosecutor has extra-record knowledge of or the
15             capacity to monitor the witness's truthfulness; any
             inference that the court is monitoring the witness's
16             veracity; the degree of personal opinion asserted; the
             timing of the vouching; the extent to which the witness's
17             credibility was attacked; the specificity and timing of a
             curative instruction; the importance of the witness's
18             testimony and the vouching to the case overall.

19  *Id.* (citing *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th. Cir. 1993)).

20  Further, in close cases, the court must balance the seriousness of the vouching

21  against the strength of the curative instruction.  *Combs*, 379 F.3d at 575.

22      These factors weigh in favor of finding that the prosecutor's vouching

23  here was plain error and, thus, the court's denial of a mistrial on those grounds

24  was in error as well.  The prosecutor implied that he had thousands of pages of

25  extra-record knowledge and asserted his personal opinion that DNA was the

26  most powerful investigative tool as fact, and in doing so bolstered the credibility

27  of his witnesses, who the defense had not even attacked.  Finally, the prosecutor

28  timed his vouching for his rebuttal closing, where the defense would not get to

respond.   Because the improper vouching "seriously affected the fairness, integrity, or public reputation" of Newell's trial, relief was appropriate, and the court's denial of a mistrial was in error.  *See Combs*, 379 F.3d at 576 (internal citations omitted).

The court also erred in denying a mistrial when the State impugned the honesty of opposing counsel.  After the trial court overruled defense counsel's objection to the prosecutor's statements above regarding the superiority of DNA evidence, the prosecutor doubled down on his misconduct, and called defense counsel by name and said that he knew that the DNA comment was accurate.  This time, the trial court sustained defense counsel's objection.  (Tr. 2/12/04 at 59.)

This comment was especially damaging, because, as the court had denied defense counsel's initial objection, the prosecutor's comment that defense counsel knew the State was right further implied that defense counsel was dishonest by objecting in the first place.  "Impugning opposing counsel's integrity is a very serious matter."  *Kojayan*, 8 F.3d at 1321.   Here, the prosecutor's impugning of defense counsel's veracity in a rebuttal closing argument in a capital murder trial unfairly infected the case before the jury and the trial court erred in denying defense counsel's motion for mistrial.

A reasonable likelihood exists that, individually, and taken together, the improper comments affected the jury's penalty phase verdicts.  The prosecutor's comments vouching for the State and impugning the integrity of defense counsel had a reasonable likelihood of affecting the jury's weighing process when reaching a verdict of a death sentence.  Thus, the trial court's denial of the mistrial was in error.  The state supreme court's findings that the comments did not require reversal were unreasonable in light of the evidence before it as well as an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d).

1        **B.  Additional motions for mistrial.**

2              As outlined in greater detail in Claim Nineteen, *supra*, during trial,

3     counsel moved for mistrials based on un-redacted tapes of Newell's

4     interrogation being played to the jury (Tr. 2/9/04 at 7-9; 11-15); the State's

5     irrelevant and unnecessary introduction of evidence that Newell was on

6     probation in order to prove his prior conviction, even though they also had done

7     so through fingerprints (Tr. 2/18/04 at 44-46); what appears to be a motion for

8     mistrial for the prosecutor's comment on Newell's allocution, (although due to

9     the incomplete record this is not entirely clear) (Tr. 2/24/04 at 83-84); and

10    finally the State's misstatement of the evidence in penalty phase closing by

11    pointing to a photo that showed environmental disfigurement to Elizabeth and

12    saying, "This is what Mr. Newell did right there" (Tr. 2/24/04 at 98).   Newell

13    asserts that in addition to the errors raised above, the trial court committed

14    further error by denying these motions for mistrial.

15            During trial, counsel moved for more than just the mistrial addressed by

16    appellate counsel on direct appeal.  As outlined *supra*, first, on February 9, 2004,

17    a tape of Newell's interrogation was played to the jury.  (Tr. 2/9/04 at 6.)  While

18    the State and defense counsel had agreed to redactions, the incorrect tapes were

19    played for the jury and at least two references to material the parties had agreed

20    to redact were played.  On both occasions counsel moved for a mistrial.  (Tr.

21    2/9/04 at 7-9, 11-12.)  Both motions for mistrial were denied.  (Tr. 2/9/04 at 10,

22    15.)

23            The next motions for mistrial were a few days later on February 12, 2004,

24    which are the motions addressed in Section A, *supra*.  Shortly after that, on

25    February 18, 2004 Newell's counsel again sought a mistrial.  (Tr. 2/18/04 at 45.)

26    They argued that proving Newell was on probation was not relevant to any

27    aggravator in Newell's case,

28

171

however, it is a specific statutory aggravator set forth in the statute, I believe it's 703(F)(7)(b), which indicates that the defendant committed the offense while on probation for a felony offense.  Having been a specific aggravator, it's hard to imagine that producing that information and letting the jury know that a thing that the legislature has deemed to be an aggravating circumstance would not be prejudicial to the defendant.

(Tr. 2/18/04 at 44-45.)  Counsel noted there were other ways that the State could have proven the prior conviction.  (Tr. 2/18/04 at 45.)  Counsel noted that it was prejudicial to Newell under the Eighth and Fourteenth Amendments.   (Tr. 2/18/04 at 46.)  The court denied the motion finding that regardless of whether it should not have been presented to the jury, it did not view it as unfairly prejudicial.  (Tr. 2/18/04 at 46.)

Finally, on February 24, 2004, the State gave their closing arguments after the presentation of mitigation.  As outlined *supra*, during the closing argument the prosecutor stated "[Newell] made a statement to you.  What did he say to you?  He said he was sorry for what happened to Elizabeth.  Still not taking responsibility.  He didn't say, 'I'm sorry what I did.' [sic]  He said I'm sorry for–."  (Tr. 2/24/04 at 83.)  At that point defense counsel objected, and said "I have a motion."  (Tr. 2/24/04 at 83.)  Presumably, this was a motion for mistrial but the grounds and argument and the court's ruling are unknown, because the bench conference was not recorded.  All that is clear is that the objection was sustained.  The court asked the jury to not consider the statements made by the prosecutor, and ordered them to be struck from the record.  (Tr. 2/24/04 at 83.)  The court noted that the allocution was not in evidence and was not subject to cross-examination.  Defense counsel again objected arguing that the jury now had before it the State's "spin on that allocution."   (Tr. 2/24/04 at 84.)  Seemingly related, Newell's counsel also asked that a paper that the State had left in front of the jury be removed and the jury be told to disregard anything on it.  Again, the record is unclear what was on the paper, but the court ordered the

1  State to "turn it around for the time being."  (Tr. 2/24/04 at 84.)  Another bench

2  conference was held and the state continued with its argument.  (Tr. 2/24/04 at

3  84.)

4       Later, after the jury left the court room, trial counsel seemed to address

5  what was on the paper.  Counsel said there was a page that said "Sorry what

6  happened to Elizabeth.  Drugs the Excuse.  Depression resulted.  Death of

7  Elizabeth.  Death of an innocent child cause me, which is underlined, to be

8  depressed.  And then sniveling."  (Tr. 2/24/04 at 92.)  Counsel argued those

9  statements were argument and were put on a paper in front of the jury while

10 counsel was at the bench arguing.  Counsel argued the State violated due

11 process, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments by

12 making improper statements about Newell and by leaving the paper in front of

13 the jury.  (Tr. 2/24/04 at 94-95.)  The court denied that motion for mistrial.  (Tr.

14 2/24/04 at 97.)

15      Trial counsel raised a final mistrial motion based on the prosecution's

16 misstatement of the evidence.  Counsel argued that when the State showed

17 Exhibit 86 and Exhibit 30 in his closing, which shows a ligature, which shows

18 swelling, and which shows environmental factors about which the State insisted

19 "that's what he did to her and that's the worst of the worst."  (Tr. 2/24/04 at 97-

20 98.)  Counsel argued it was an attempt to inflame the jury, it was unfairly

21 prejudicial, and it was a violation of the Eighth and Fourteenth Amendments to

22 the Constitution because it was an appeal for vengeance.  (Tr. 2/24/04 at 98.)

23 The prosecutor justified the statement by saying that when he said "this is what

24 he did," he pointed to the ligature.  (Tr. 2/24/04 at 98.)  The court denied that

25 motion for mistrial as well.

26      As outlined in Claim Nineteen, *supra*, trial counsel made numerous

27 motions for mistrial.  Appellate counsel raised only two of the motions raised

28 during the State's closing argument.  Appellate counsel's failure to raise

173

additional motions, apparent from the record, derived Newell of effective assistance of counsel.  *Evitts*, 469 U.S. at 396.

Newell did not present these additional claims regarding the motions for mistrial to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause and prejudice to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court may consider the claim de novo.

### Claim Twenty-One

**Newell was denied the effective assistance of appellate counsel in violation of his Sixth, Eighth and Fourteenth Amendment rights where appellate counsel failed to challenge multiple instances of prosecutorial misconduct and the trial court's rulings.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause and prejudice to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits

of this claim pursuant to *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and the Court may consider the claim de novo.

Claim Three of Newell's direct appeal was that "The trial court abused its discretion by denying appellant's motion for mistrial based on prosecutorial misconduct."  (DA Doc. 28 at 53.)  As detailed in Claim Nineteen, *supra*, this was based on the issue that the prosecutor repeatedly vouched, and made reference to matters outside the record before the jury.  Based on these violations, Newell moved for a mistrial which the trial court denied.  The Arizona Supreme Court rejected this claim on the merits.  *Newell*, 132 P.3d at 846-848.  While appellate counsel recognized this claim, she failed to raise the additional instances of prosecutorial misconduct and violations to the fairness and integrity of Newell's trial.

Reasonably competent appellate counsel would have recognized that motions for mistrial are red flags for potential issues to bring before the court.  Trial counsel raised and preserved a record for appeal, a record of repetitive misconduct by the prosecutor, and appellate counsel proceeded to ignore that record.  Counsel's cumulative failure to raise and preserve significant motions for mistrial and bring them before the Arizona Supreme Court denied Newell effective assistance of counsel on appeal.  *See Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003); *see also Harris v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in counsel's performance was prejudicial to the defense and warranted habeas relief).

In failing to brief the meritorious issues preserved by trial counsel's numerous motions for mistrial, appellate counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent defense attorney.  *See Evitts*, 469 U.S. at 396 ("nominal representation on appeal . . . does not

1 suffice to render the proceedings constitutionally adequate; a party whose

2 counsel is unable to provide effective representation is in no better position than

3 one who has no counsel at all").

4 **Claim Twenty-Two**

5 **The trial court improperly denied Newell's *Batson* challenge in**

6 **violation of his rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.**

7 Newell incorporates by specific reference all facts, allegations, and

8 arguments made elsewhere in this Petition.

9 During jury selection, the prosecutors used their peremptory challenge to

10 strike the only remaining African-American juror, leaving Newell with an all-

11 white jury in violation of the Equal Protection Clause of the Fourteenth

12 Amendment as articulated by the United States Supreme Court in *Batson v.*

13 *Kentucky*, 476 U.S. 79 (1986), *Miller-El v. Dretke*, 545 U.S. 231 (2005), and

14 *Snyder v. Louisiana*, 552 U.S. 472 (2008).  *See also Powers v. Ohio*, 499 U.S.

15 400, 402 (1991) (stating that under the Equal Protection Clause, a criminal

16 defendant may object to race-based exclusions of jurors effected through

17 peremptory challenges whether or not defendant and excluded jurors share the

18 same race).

19 This claim was presented to the Arizona Supreme Court on direct appeal

20 (DA Doc. 28 at 49), and was rejected on the merits.  *Newell*, 132 P.3d at 843-

21 846.  The state court's rejection of this claim was contrary to, or involved an

22 unreasonable application of, clearly established federal law as determined by the

23 United States Supreme Court.  The state court's rejection of this claim was also

24 based on an unreasonable determination of the facts in light of the evidence

25 presented in the state court proceedings.  An "unreasonable determination of the

26 facts" occurs when a state court's conclusion or characterization of evidence is

27 unsupported by the record.  *Williams (Terry)*, 529 U.S. at 386.

28

176

At trial, there were only two prospective jurors of African-American descent.  Of the two, one was excused for hardship leaving Juror number 34 as the only remaining African-American on the venire panel.  (Tr. 2/2/04 at 39.)  The State used a peremptory strike to get rid of Juror 34.  (Tr. 2/2/04 at 39.)  Newell raised a *Batson* challenge, arguing Juror 34 had shown no bias in her answers to the voir dire questions and noting the State struck the only African-American on the panel.  Trial counsel argued striking the sole African American left on the panel presented a prima facie case of a *Batson* violation.   (Tr. 2/4/2004 at 39-40.)

The State justified the strike based on Juror 34's answers on her jury questionnaire regarding inability to vote for death.  (Tr. 2/2/04 at 40.)  The State also argued that there were "other things" that made them uncomfortable, including that she was a social worker and that the State liked "to stay away from social workers if we can."  (Tr. 2/2/04 at 40.)  Trial counsel countered that she had "modified her answer to the questionnaire" and had not been removed for cause.  (Tr. 2/4/2004 at 40.)   Nonetheless, the trial court found this reason "race neutral" and denied the challenge.  (Tr. 2/2/04 at 41.)

The three-step analysis applied to claims of racial discrimination during a prosecutor's exercise of peremptory challenges is both well understood and clearly defined:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.   Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (plurality opinion) (citing *Batson*, 476 U.S. at 96-98).  After the prosecution puts forward a race-neutral reason for the questioned strike, the trial court is required to evaluate "the

persuasiveness of the justification." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). "The question is not whether the stated reason represents a sound strategic judgment, but 'whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting *Hernandez*, 500 U.S. at 365). While "[i]t is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is[,] . . . when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El*, 545 U.S. at 252.

*Batson* requires inquiry into "the totality of the relevant facts." *Miller-El*, 545 U.S. at 239 (quoting *Batson*, 476 U.S. at 94, 96). Such an inquiry requires scrutiny of both the prosecutor's statements about his challenges and his explanations for striking minority jurors as well as the comparative characteristics of the non-minority jurors the prosecutor did not challenge. *Kesser*, 465 F.3d at 360 (citing *Hernandez*, 500 U.S. at 363; *Miller-El*, 545 U.S. at 240); *see also Snyder*, 522 U.S. at 482-484. In *Kesser*, the Ninth Circuit specifically found that *Miller-El*'s comparative juror analysis requirement was clearly-established federal law (for AEDPA purposes) in 1992, long before Newell's trial. *Id*. at 360 & n.2.

In this case, there was only one remaining African-American in the jury venire and the prosecutor used a peremptory strike to dismiss her. Trial counsel for Newell objected and the court conducted a *Batson* inquiry. However, the rationale proffered did not hold up. While the State was correct about her answers on paper, in individual voir dire, Juror 34 stated she could "absolutely" vote for death if the situation warranted it. (Tr. 1/27/04 at 66-73.) She stated her opinion on the death penalty would not impair her ability to follow the court's instructions "at all" and that if the instructions and facts supported it, she

could vote for death.  (Tr. 1/27/04 at 70.)  After clearing up the questions, even the State agreed there were no grounds to strike her for cause.  (Tr. 1/27/04 at 70-74.)  Yet, in denying relief on this claim, the Arizona Supreme Court found that the "prosecutor's reason for striking the juror, which involved the juror's contradictory responses on whether she could vote to impose the death penalty, satisfied step two of *Batson* because it was facially race-neutral."  *Newell*, 132 P.3d at 845-846.   Accordingly, the court found no *Batson* error in the prosecutor's strike.

The Arizona Supreme Court's determination and application of the facts stated above to the constitutional guarantees expressed in *Batson* and its progeny, including *Miller-El*, was contrary to well-established Supreme Court precedent.   28 U.S.C. § 2254 (d).   The state court violated Newell's rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### Claim Twenty-Three

**The trial court violated Newell's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by giving the sentencing jury an incomprehensible instruction that misled the jury about its sentencing alternatives and the jurors individual choices.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.  Therefore, the Court will be able to consider the merits of

this claim pursuant to *Martinez*.   Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

The United States Supreme Court has clearly established that a sentencing jury "may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'"  *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Eddings*, 455 U.S. at 100). Each juror must be free to consider and give effect to any relevant mitigating evidence. As the Court has explained,

> If, for example, the defense presents evidence of three potentially mitigating considerations, some jurors may believe that only the first is mitigating, some only the second, and some only the third. But if even one of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree . . . the Constitution forbids imposition of the death penalty.

*Smith v. Spisak*, 558 U.S. 139, 144 (2010) (citing *Mills*, 486 U.S. at 380).  If a court's instructions to the sentencing jury would lead a reasonable juror to believe otherwise, the sentencing process violates a petitioner's constitutional rights.  *Mills*, 486 U.S. at 374-75.

The trial court's penalty-phase instructions in Newell's case violated these principles.  Not once, but twice the trial court instructed the sentencing jurors as follows:

> You can reach a verdict in any one of the following ways:
>
> 1. If no jurors find the defendant proved any mitigation by a preponderance of the evidence, you must return a verdict of death.
>
> 2. If some jurors find the defendant proved mitigation, the jurors who found mitigation must weigh the mitigation they found against the aggravating factors already found. The jurors who found mitigation may disagree about what mitigation exists. If all the jurors

who found mitigation find the mitigation is not sufficiently substantial to call for leniency, and all the remaining jurors continue to find no mitigation exists, you must return a verdict of death.

3. If all jurors find mitigation exists, all must weigh the mitigation they found against the aggravating factors already found. The jurors may disagree with what mitigation exists. If all the jurors find the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

4. If all jurors find mitigation exists, even if the mitigating factors found are different, *and all the mitigation they found is sufficiently substantial to call for leniency*, you must return a verdict of life imprisonment.

(Tr. 2/23/2004 a.m. at 14-15; Tr. 2/24/2004 at 52.)  (Emphasis added.)

First, these instructions had the potential to mislead jurors.  It takes careful parsing and multiple looks to make heads or tails of these instructions.  What is clear, however, is that the instructions are heavily-weighted toward the presumption that death is the appropriate sentence.  Without getting bogged down in the minutiae, the overall effect on the jury is, "if you do A, you must choose death; if you do B, you must choose death; if you do C, you must choose death; and only if you are able to do D, must you choose life."

Even more important than the overall effect of these instructions, however, is the precise message the instructions, once parsed, sent the jury.  The jurors were informed that they could only reach a verdict four ways.  They were then told that the one and only way to reach a life verdict would be for *all* the jurors to find mitigation existed, and to find "*all the mitigation* sufficiently substantial to call for leniency."  (Tr. 2/24/2004 at 52.)  (Emphasis added.)  A juror could reasonably consider this instruction to mean he could only consider mitigation that the other jurors agreed upon.[42]  *See Mills*, 486 U.S. at 380.  This

---

[42]Indeed, the State relied on and repeated this particular instruction in its closing arguments and stressed a required unanimity.  (Tr. 2/24/2004 at 76.)

181

was, therefore, precisely the type of instruction the United States Supreme Court has explained the Constitution forbids.

To make matters worse, the verdict form did nothing to clarify this problem. It simply read, "We, the Jury, upon our oaths, do find that the Defendant STEVEN RAY NEWELL should be sentenced to: ___ LIFE IN PRISON ___ DEATH."[43]   (ROA 163.)   These considerations are especially important given the jury's indication they were having trouble reaching an agreement.   The jury foreperson wrote to the trial judge and wanted to know, "What happens if we cannot agree on a decision?"  (Supp. ROA 181.)  Indeed, the jurors who sentenced Newell to death felt as if they had no other choice.

In sum, the preliminary and final instructions of Newell's penalty-phase hearing unconstitutionally gave the jury the impression they must unanimously find *all the mitigation* sufficiently substantial to call for lenience before they could return a life verdict.  With Newell's life on the line, these misleading and unconstitutional instructions cannot be countenanced.

Further, to the extent any of the trial court's other instructions may have cast confusion or doubt on the mechanisms of these instructions; this is not a circumstance in which the error can be glossed over by picking through those instructions to find one that passes constitutional muster.  As the United States Supreme Court has explained, "While juries ordinarily are presumed to follow the court's instructions . . . in some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994) (internal quotations and citations omitted); *Mills*, 486 U.S. at 376-77 (collecting

---

[43]As described in more detail in Claim Thirty-Five, *infra*, the failure to insist upon a detailed special verdict further violated Mr. Newell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to United States Constitution.

cases) ("Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing.").

### Claim Twenty-Four

**Newell's trial and appellate counsel ineffectively failed to ensure the jury was properly instructed regarding their sentencing alternatives in violation of his Sixth, Eighth, and Fourteenth Amendment rights.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell's trial counsel, though clearly desiring to stress that individual jurors should stand up for their beliefs in leniency, (Tr. 2/24/2004 at 62-63), did nothing to challenge unconstitutional instructions described in Claim Twenty-Three. In the same way, counsel's failure to make an adequate record and request a special verdict form exacerbated this error. These failures constituted objectively unreasonable deficient performance under *Strickland* and, for the reasons described above – not the least of which being the jurors felt as if they had no choice but to sentence him to death – prejudiced Newell.

What is more, direct-appeal counsel's failure to raise this meritorious claim to the Arizona Supreme Court was deficient performance under *Strickland* and *Evitts*. This deficient performance deprived Newell of an essential right of review and prejudiced him.

Further, the deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause and prejudice to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Evitts*, 469 U.S. 387; *Martinez*, 132 S. Ct. at 1315. To the extent this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

### Claim Twenty-Five

**The trial court violated clearly-established federal law and Newell's constitutional rights to Due Process and a fair trial by instructing the jury that if it did not sentence Newell to death, he could be sentenced**

**to life with the possibility of parole after 35 years when, in fact, the earliest possibility of parole would have been after 58 years.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim. Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

The Due Process Clause of the Fourteenth Amendment "does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Simmons*, 512 U.S. at 161 (quoting *Gardner*, 430 U.S. at 362); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (due process entitles petitioner to meaningful opportunity to present a defense). In *Simmons*, the United States Supreme Court considered the effect of a trial court's refusal to instruct the jury that if it returned a life verdict in a capital case, the petitioner was nevertheless parole ineligible. 512 U.S. at 159-160. The Court explained, "the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of

incarceration." *Id.* at 161.   What is more, the trial court encouraged this "grievous misperception" by refusing to "provide the jury with accurate information regarding petitioner's parole ineligibility." *Id.* at 162.   The Court held this deception violated petitioner's due process rights to explain or deny the information that could send him to his death, noting, "The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole." *Id.* at 161-62.

Here, based on the charges the jury convicted Newell of, if the jury did not select a death verdict, the only possible sentencing alternatives would have been life without the possibility of parole or life with the possibility of parole after, at the very earliest, 58 years served.   Thus, Newell's counsel asked the court to instruct the jury that even if he was given a parole-eligible sentence, there was no possibility he could be released until he had served at least 58 years.   (ROA 167 at 1; Tr. 2/24/2004 at 55-56.)   The trial court refused to give the jury this instruction.   Instead, the court twice instructed the jury, "If you find the mitigation is sufficiently substantial to call for leniency, the Court will sentence the defendant either to life imprisonment without the possibility of parole, or life without parole until at least 35 years have passed." (Tr. 2/23/2004 a.m. at 13; Tr. 2/24/2004 at 50-51.)   Thus, the jurors improperly concluded that if they did not sentence Newell to death, it was possible that he would be released from prison after serving only 35 years.

The truth of the matter was that, even under the most lenient sentence, Newell would not be eligible for parole until he was 81 years old.   What the jury heard, however, was that he would be parole-eligible when he was but 58.   In short, the State successfully "conceal[ed] from the sentencing jury the true meaning of its noncapital sentencing alternative." *See Simmons*, 512 U.S. at

162.  Had the jury known the true meaning of its alternatives, it would have been faced with an entirely different decision.  This is especially important where it is clear the jurors were struggling with their decision.  Indeed, on the day of the verdict the jury foreperson wrote to the trial judge asking, "What happens if we cannot agree on a decision?"  (Supp. ROA 181.)  In essence, struggling jurors were misled into believing that a vote against death could lead to Newell's release after only 35 years.  This violated his constitutional rights to due process and a fair trial.  *See Simmons*, 512 U.S. at 162-163; *see also Beck v. Alabama*, 447 U.S. 625, 643 (1980) (where jury misled into thinking only alternatives were death sentence or acquittal, the false choice "introduce[d] a level of uncertainty and unreliability into the fact finding process that cannot be tolerated in a capital case").

The trial court's refusal to give Newell's requested instruction, and its giving the jury an affirmatively misleading instruction was contrary to and an unreasonable application of clearly-established federal law, and was an unreasonable determination of the facts.  28.U.S.C. § 2254(d).

### Claim Twenty-Six

**Newell's direct-appeal counsel ineffectively failed to raise to the Arizona Supreme Court the meritorious issue that the trial court unconstitutionally misled the jury about its sentencing options.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Trial counsel challenged the error of misleading the jury about its sentencing options to the state trial court.  *See Supra*, Claim Twenty-Five. (ROA 167 at 1; Tr. 2/24/2004 at 55-56.)  No other court reached this meritorious claim due to the ineffective assistance of Newell's appellate and post-conviction counsel.  Direct appeal counsel should have recognized and raised this

1  meritorious issue and, instead, deprived Newell of his rights to a complete and

2  adequate review.

3      What is more, the deficient performance of state appellate and post-

4  conviction counsel prejudiced Newell and provides cause and prejudice to

5  excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Evitts*, 469 U.S.

6  387; *Martinez*, 132 S. Ct. at 1315.  To the extent this claim has not been

7  adjudicated by the Arizona state courts, the limitations on relief imposed by 28

8  U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

9                          **Claim Twenty-Seven**

10      **The trial court improperly precluded Newell's family from presenting
11  the relevant mitigation evidence of execution impact testimony in
       violation of the Eight and Fourteenth Amendments, and his counsel
12  ineffectively failed to challenge this practice in violation of the Sixth
       and Fourteenth Amendments.**

13      Newell incorporates by specific reference all facts, allegations, and

14  arguments made elsewhere in this Petition.

15      As explained in detail in Claim Twenty-Eight, *infra*, the Arizona Courts

16  did not reach the merits of this claim based on Newell's counsel's ineffective

17  assistance.  Newell can demonstrate cause and prejudice to overcome any

18  procedural default.  *Evitts,* 469 U.S. 387, *Martinez,* 132 S. Ct. 1315.  Newell did

19  not present this meritorious claim to the state courts as a result of appellate and

20  post-conviction counsel's deficient performance.  The deficient performance of

21  state appellate and post-conviction counsel prejudiced Newell and provides

22  cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*,

23  132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-

24  conviction counsel fell below the standards of a minimally competent capital

25  post-conviction attorney when she failed to raise this meritorious claim.

26  Therefore, the Court will be able to consider the merits of this claim pursuant to

27  *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona

28

1     state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not

2     apply to this Court's review and the Court may consider the claim de novo.

3           The Eighth Amendment guarantees an individual facing the death penalty

4     an individualized sentencing determination and mandates that a jury consider

5     any evidence that could aid the jury in making a reasoned moral judgment about

6     whether to sentence that person to death.  *E.g.*, *Eddings*, 455 U.S. at 110;

7     *Lockett*, 438 U.S. at 604-05 (Burger, C.J., plurality); *Woodson v. North*

8     *Carolina*, 428 U.S. 280, 304 (1976).  The United States Supreme Court has

9     clearly established that in capital cases the sentencer must not be "precluded

10    from considering, *as a mitigating factor*, any aspect of a defendant's character or

11    record and any of the circumstances of the offense that the defendant proffers as

12    a basis for a sentence less than death."  *Skipper,*476 U.S. at 4   (emphasis in

13    original) (internal quotation marks omitted) (quoting *Eddings*, 455 U.S. at 110;

14    *Lockett*, 438 U.S. at 604 (Burger, C.J., plurality)).  Further, the Court has clearly

15    established that evidence relevant to an individualized determination of the

16    appropriate sentence must not be constrained by narrow definitions of the

17    character or circumstances.  *See, e.g.*, *Skipper*, 476 U.S. 1 (exclusion of jailers'

18    testimony regarding petitioner's adjustment to time in jail denied petitioner's

19    right to put all relevant mitigation evidence before sentencer).

20          Execution impact testimony fits well within these bounds.  It is relevant to

21    both a petitioner's "deathworthiness" and to his character and background.

22          The oft-repeated essence of mitigation is evidence related to an

23    individualized determination of deathworthiness, meaning evidence that a jury

24    could reasonably find warrants a sentence less than death.  *Skipper*, 476 U.S. at 4

25    (quoting *Eddings*, 455 U.S. at 110; *Lockett*, 438 U.S. at 604 (Burger, C.J.,

26    plurality)).   "Execution impact testimony easily satisfies this sentencing

27    relevance test – it is testimony as to the value of the defendant's life and cost of

28    his death to family and friends, and this value or cost could serve as a basis for

the sentencer to determine that the death penalty should not be imposed." *Jackson v. Dretke*, 450 F.3d 614, 620 (5th Cir. 2006) (Dennis, J., dissenting); *State v. Stevens*, 879 P.2d 162 (Or. 1994); *contra Stenson v. Lambert*, 504 F.3d 873, 891-92 (9th Cir. 2007) (not unreasonable to exclude execution impact testimony). This considerable human cost relates directly to the appropriateness of a death sentence.

Execution impact evidence, including testimony about the impact that the State killing Newell would have on his family, is also evidence from which the jury could infer Newell possessed positive character traits. *Stevens*, 879 P.2d at 167; *cf. Skipper*, 476 U.S. at 4. The terms character and background, as used by the United States Supreme Court, "have been read quite broadly and have not necessarily been linked to a defendant's culpability for the crime for which he or she is being sentenced." *Stevens*, 879 P.2d at 167. As the Oregon Supreme Court explained, while execution impact evidence "may not offer any direct evidence about defendant's character or background, it does offer circumstantial evidence." *Id.* at 168. A rational juror could, for example, infer from such testimony that the petitioner's friends or family would be adversely affected by his execution because of something positive about their relationship and because of something positive about his character or background. *Id.*

> Put differently, a rational juror could infer that there are positive aspects about defendant's relationship with [the witness] that demonstrate that defendant has the capacity to be of emotional value to others. In that inference, a juror could find an aspect of defendant's character or background that could justify a sentence of less than death.

*Id.* Indeed, consistent with its prior Eighth Amendment jurisprudence, the United States Supreme Court has recognized that even though potential "favorable inferences" about a person's character may not "relate specifically to petitioner's culpability for the crime . . . there is no question but that such inferences would be 'mitigating' in the sense that they might serves 'as a basis

for a sentence less than death.'"  *Skipper*, 476 U.S. at 4-5 (quoting *Lockett*, 438 U.S. at 604).

What is more, in *Payne v. Tennessee*, the Court held that victim impact evidence is admissible in capital sentencing trials, and did so recognizing that this was the fair thing to do given that its Eighth Amendment jurisprudence gives "*the broadest latitude* to the defendant to introduce relevant mitigating evidence reflecting on his individual personality." 501 U.S. 808, 826-27 (1991) (emphasis added).  The Court reiterated that "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty."  *Id*. at 824 (quoting *McClesky v. Kemp*, 481 U.S. 279, 302-06 (1987)).  Thus the Court relied specifically on the wide latitude that should be given to capital defendants to present mitigation in permitting the State to present victim impact statements.  The Eighth Amendment cannot permit a different theory of relevance based upon which party offers the impact evidence.  *Contra Stenson*, 504 F.3d at 891-92.

Here, however, contrary to and unreasonably applying clearly-established Eighth Amendment law including *Lockett*, *Eddings*, and *Skipper*, the trial court prevented Newell from presenting any execution impact testimony.  The State filed a pretrial motion to preclude Newell from presenting any evidence from "lay witnesses, including family members or friends of [Newell], concerning whether the death penalty should be imposed."  (ROA 104 at 1.)  The State argued there could be no "provision for [execution] impact testimony" because "any voluntary extension of courtesies to the defendants' families, does not equate the defendants' families with the family of the murdered victim on either a legal or a moral plane."  (ROA 104 at 3.)  Newell's counsel merely responded by noting he had a different opinion, but agreed that based on the case law the court should grant the State's motion.  (Tr. 2/20/2004 at 3-4.)  The trial court noted Newell's counsel's "objection," but granted the State's request and

precluded Newell from presenting any evidence of the impact that executing him would have on his family.  (Tr. 2/20/2004 at 6-7.)

Thus, the State – intending to kill Newell – denied his friends and family the only opportunity they would have to explain the impact of such a decision to the members of the jury who would decide whether Newell would live or die. This evidence would be relevant both to his character and background and to whether death was the appropriate sentence.  For the reasons explained above, excluding such evidence violated Newell's rights under the Eighth and Fourteenth Amendment.  *Contra Stentson*, 304 F.3d at 892.

As the United States Supreme Court has explained, the essence of its jurisprudence extrapolating the rule established in *Lockett* is to reflect the law's effort to "develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings*, 455 U.S. at 110.  To comport with this history of granting wide latitude in mitigation presentations and thus afford each individual a "humane and sensible" sentencing when his life is on the line, the Eighth Amendment requires allowing him to present testimony about the effect his death would have on those who know him as an individual.

### Claim Twenty-Eight

**Newell's trial and appellate counsel performed ineffectively by failing to ensure the sentencing jury heard crucial evidence related to an individualized sentencing in violation of the Eighth and Fourteenth Amendments.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As described above in Claim Twenty-Seven, trial counsel ineffectively failed to fight for Newell's right to present relevant mitigation evidence of the effect his death sentence would have on his loved ones, and to confront the jury with the facts regarding whether death was an appropriate sentence.  In violation

of *Strickland*, trial counsel stated they did not agree, but essentially gave the trial court a free pass to grant the State's motion to preclude any evidence related to the impact of Newell's execution.  (Tr. 2/20/2004 at 3-4.)

What is more, direct appeal counsel failed to raise these meritorious issues to the Arizona Supreme Court.  This was due to direct appeal counsel's prejudicial deficient performance in violation of *Evitts*, 469 U.S. 387.

Finally, the ineffective assistance of appellate and post-conviction counsel constitutes cause and prejudice to overcome any possible procedural default of these meritorious issues.  *Martinez*, 132 S. Ct. at 1315.  To the extent the Arizona courts have not adjudicated these claims, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

### Claim Twenty-Nine

**Newell was denied his right to a fair sentencing and due process of law when the Arizona Supreme Court affirmed his death sentence under independent review.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

By determining the quantity and weight of aggravating and mitigating circumstances on issues not raised and advocated by counsel, the Arizona Supreme Court's system of independent review was constitutionally inadequate to protect Newell's due process rights.

Newell raised this claim in Claim 1 of his PCR.  (Pet. for PCR, PCR ROA at 0589-91; PCR Reply Brief, PCR ROA at 1762-61.)  The PCR court did not make a merits review on this claim.  Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review.  This claim was not raised to the Arizona Supreme Court in Newell's Petition for Review however.

Newell's failure to raise the claim to the Arizona Supreme Court can be excused by demonstrating cause and prejudice. The ineffective assistance of Newell's state post-conviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Newell. *See Martinez*, 132 S. Ct. 1309. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.

Because the crime took place prior to August 1, 2002, the Arizona Supreme Court conducted an independent review of Newell's death sentence. *Newell*, 132 P.3d at 849. In Arizona, the state supreme court conducts independent review of "the facts that established the aggravating and mitigating factors in order to justify the sentence imposed." *Wood v. Ryan*, 693 F.3d 1104, 1122 (citing *Correll v. Ryan*, 539 F.3d at 951). The concept behind such review was to give extra scrutiny in capital cases. In Newell's case, however, rather than serve as an additional safeguard, independent review thwarted relief.

In Newell's case, the jury aggravation hearing verdict form did not allow the jury to indicate or explain which prongs of the (F)(6) factor they found, whether it was cruelty, or heinous and depraved, or both. (ROA 156.) Nonetheless, the court focused its analysis on the "cruelty" prong and found that Elizabeth "consciously experienced physical or mental pain prior to death." *Newell*, 132 P.3d at 850 (quoting *State v. Trostle*, 951 P.2d 869, 883 (Ariz. 1997). Specifically, the court found that "bruising that occurred at or near the time of death" was consistent with grasping of Elizabeth's arms, sexual assault related bruises and injuries, testimony of length of time for death by asphyxiation to occur, and marks that appeared to show Elizabeth was tugging at the ligature. *Id.* at 844. The court determined, nonetheless, that even if it ignored the (F)(6) factor altogether, the "strength and quality of the (F)(2) and (F)(9) aggravating circumstances alone would support the imposition of the

death penalty." *Id.* at 850 n.14.  Unfortunately for Newell, appellate counsel failed to raise any issue regarding the application of the (F)(6) factor or the inadequate verdict form.

It is undisputed that, at penalty phase, the application of the (F)(6) aggravating factor was challenged.  On direct appeal, however, counsel failed to raise challenges to that or any other aggravating factor before the Arizona Supreme Court.  Instead, the court independently reviewed the application of the (F)(6) factor.  If independent review serves to cure counsel's failure to advocate meritorious penalty phase issues in a capital case, then the right to effective assistance on appeal is illusory.  "The due process clause of the fourteenth amendment guarantees a criminal defendant the right to the effective assistance of counsel on his first appeal as of right."  *Miller v. Keeney*, 882 F.2d 1428, 1431 (9th Cir. 1989) (citing *Evitts*, 469 U.S. 387).  If independent review served to cure all error when counsel's performance was, at best nominal, then the Fourteenth Amendment guarantee to effective assistance on appeal, recognized by both this Court and the United States Supreme Court, is simply a legal fiction.

While independent review on direct appeal is an important part of meaningful review of a death sentence, it is limited in its scope.  Appellate courts must rely on the written record, which diminishes their ability to make reliable factual determinations.  Their purpose is not to review the assistance of counsel.  Here, direct review for Newell was limited to the record and was unaided by effective advocacy of defense counsel on the aggravating factors.  Furthermore, "although the court 'independently reviews' the facts, and determines for itself whether the aggravating circumstances outweigh the mitigating ones, the court does not specify what standard of review it employs to decide whether to disturb the trial court's findings."  *See Jeffers v. Lewis*, 38 F.3d 411, 422 (9th Cir. 1994) (Pregerson, J. dissenting).

As *Evitts* makes clear, such a process does not comport with due process. "Just as a transcript may by rule or custom be a prerequisite to appellate review, the services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for consideration on the merits."  469 U.S. at 393. While independent review may be sufficient in some cases, in a case where Newell was left with the mere presence of counsel and not the actual assistance of an advocate, independent review cannot suffice.  Neither a criminal trial, nor an appeal, is "conducted in accord with due process of law unless the defendant has counsel to represent him."  *Id*. at 394.  "An unrepresented appellant – like an unrepresented defendant at trial – is unable to protect the vital interests at stake." *Id*. at 395.  Failure to mount a challenge to a single aggravating factor in a death case left Newell with appellate counsel in name only, at least as to penalty phase.[44]

"The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime."  *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990).  The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."  *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (citing *Clemons*, 494 U.S. at 749).  When state appellate courts independently reweigh the mitigation and aggravation in order to determine whether a death sentence is appropriate, the court's reweighing must be done in a constitutional manner so as to avoid the arbitrary or freakish imposition of the death penalty.  *See Clemons*, 494 U.S. at 749-52; *Furman*, 408 U.S. at 310.

---

[44]  Independent review was further flawed in the weighing of mitigation due to ineffective assistance of trial counsel in failing to present substantial mitigation evidence sufficient to call for leniency.  As outlined in Claim One, *supra*, counsel failed to present evidence in numerous areas that were rich with mitigating evidence that could have tipped the scales for life.  Because of counsel's deficient performance, the Arizona Supreme Court was deprived of the complete picture when conducting independent review.

Here, independent review was constitutionally infirm due to the ineffective assistance of counsel, and the lack of any special verdict forms from which the court could assess what jurors considered. Accordingly, Newell was denied effective assistance of counsel and denied the Arizona Supreme Court the information it needed to conduct independent review in a manner that comported with Newell's constitutional rights. He is therefore entitled to relief.

### Claim Thirty

**Newell was denied his right to effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to raise the flawed independent review in a Motion for Reconsideration.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state court as a result of appellate and post-conviction counsel's prejudicial deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315. Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim. Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

As outlined in Claim Twenty-Nine, *supra*, post-conviction counsel raised the claim that the Arizona Supreme Court's system of independent review was constitutionally inadequate to protect Newell's due process rights. Although this claim was raised by post-conviction counsel in claim 1, the post-conviction court

found this claim precluded because it could have been raised in a motion for reconsideration to the Arizona Supreme Court.  (Min. Entry 3/10/10, PCR ROA at 1774-75.)    Appellate counsel's failure to recognize the need for constitutionally adequate independent review, and failure to present and preserve the federal constitutional claim to the Arizona Supreme Court in a motion for reconsideration fell below the standards of reasonably competent appellate counsel.  Because Newell's constitutional due process rights were violated, and appellate counsel failed to present the issue to the reviewing court, Newell was prejudiced.  As a result, Newell is entitled to relief.

### Claim Thirty-One

**The application of Arizona's newly enacted death penalty statute to Newell violated the ex post facto clause of the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

This claim was not raised below due to the ineffective assistance of Newell's direct appeal and state post-conviction attorneys.  *Martinez*, 132 S. Ct. at 1315.

On June 24, 2002, the United States Supreme Court invalidated Arizona's death penalty statute after finding that it impermissibly permitted the judge, rather than the jury, to find those facts making a defendant eligible for the death penalty. *Ring*, 536 U.S. 584.  The Arizona legislature did not amend Arizona's death penalty statute to comply with *Ring* until August 1, 2002.  *See* Arizona Laws 2002, 5th Spec. Sess., Ch.1, § 3.  Newell's crime was committed during the time period that the constitutionally infirm statute was in place, Newell was charged with first-degree murder, and the State filed its notice to seek death under the same statute that was held unconstitutional under *Ring*.

Newell's defense counsel filed a Motion to Strike the Allegation of Death because application of the amended death penalty statute violated the ex post

1    facto clause.  (ROA 49.)   In light of subsequent case law, Newell's counsel
2    withdrew that motion, and updated with a Motion to Dismiss Death Penalty
3    Allegations, (ROA 80), and a Motion to Remand for a New Determination of
4    Probable Cause (ROA 78).  The state court denied the motions and proceeded to
5    trial under the new statute.  (Tr. 11/5/2003 at 6-7.)

6         The trial court's application of the newly-enacted death penalty statute to
7    Newell's case violated the prohibition on the retroactive application of
8    substantive changes in the law.  *See Weaver v. Graham*, 450 U.S. 24, 28-29
9    (1981).

10        Article I, Section 10 of the United States Constitution prohibits ex post
11   facto laws.  In *Weaver*, the United States Supreme Court noted that critical to the
12   ex post facto prohibition is a concern for "the lack of fair notice and
13   governmental restraint when the legislature increases punishment beyond what
14   was prescribed when the crime was consummated."  450 U.S. at 30.  *Weaver* set
15   forth two factors critical elements when examining whether a law is being
16   applied in violation of the ex post facto clause of the United States Constitution.
17   Application of a newly enacted law violates the ex post facto doctrine if:  (1) the
18   law is retrospective, meaning that it "appl[ies] to events occurring before its
19   enactment"; and (2) the law disadvantages the defendant.  *Id.* at 29.

20        The homicide at issue here occurred on May 23, 2001.  (ROA 1.)  The
21   capital punishment statute applied to Newell during his trial, however, was not
22   enacted until August 1, 2002.  Arizona Laws 2002, 5th Spec. Sess., Ch.1, § 3.
23   Therefore, the application of the newly enacted capital sentencing statute to
24   Newell was retrospective, applying to events occurring before its enactment.
25   *See Weaver*, 450 U.S. at 29.

26        The enactment of a new death penalty statute was also a substantive
27   change in the law for several reasons.  In *Ring*, the United States Supreme Court
28   found that Arizona's enumerated aggravating factors operate as "the functional

equivalent of an element of a greater offense" and that the Sixth Amendment therefore required them to be found by a jury.  536 U.S. at 608.  Further, the new law allowed the State to no longer just rebut evidence of mitigation but to present "any evidence that demonstrates that the defendant shall not be shown leniency."  A.R.S. § 13-703.01(G) (2002).  Additionally the new law allowed for victim impact evidence in any format, and did not require a special verdict by the sentencing body.  Questions of what acts violate a statute, and what elements must be proven to convict a defendant of a particular crime are not procedural issues but rather substantive.  Application of the later enacted death penalty statute violated the prohibition against ex post facto laws and, as a result, Newell should not have been sentenced under the new death penalty statute.  Application of Arizona's newly enacted death penalty statute to those charged before it was it enacted was contrary to the rule and conclusion articulated in *Weaver*, which held that the ex post facto doctrine prohibits the application of a new statute that increases the available punishment for conduct that occurred before the statute was enacted. *Weaver*, 450 U.S. at 29.

Because a reasonable application of the Supreme Court's jurisprudence on the ex post facto application of new laws would have resulted in a finding that the newly enacted death penalty statute could not be applied to Newell, he is entitled to relief.

## Claim Thirty-Two

**Newell was denied his right to the effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to raise the Ex Post Facto issue.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and

provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.  Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim. Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*.  Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues.  *Delgado*, 223 F.3d at 980-81.  As outlined in Claim Thirty-One, *supra*, the death penalty statute in place at the time of Newell's crime was invalidated as unconstitutional, and he was tried under a new statute, imposed over a year after his offense.  Appellate counsel's failure to recognize this meritorious claim, and failure to present it to the Arizona Supreme Court fell below the standards of reasonably competent appellate counsel.  Because Newell's constitutional due process rights were violated, and appellate counsel failed to present the issue to the reviewing courts, Newell was prejudiced.  As a result, Newell is entitled to relief.

### Claim Thirty-Three
**Newell was denied his right to the effective assistance of appellate counsel in violation of his Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to challenge the (F)(6) aggravator.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S.

668; *Martinez*, 132 S. Ct. at 1315.   Newell will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when she failed to raise this meritorious claim.   Therefore, the Court will be able to consider the merits of this claim pursuant to *Martinez*.   Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review and the Court may consider the claim de novo.

The State noticed and the jury found three aggravating factors in Newell's case:   1) that the murder was especially cruel, heinous, or depraved; 2) that Newell was an adult and the victim was under the age of 15; and 3) that Newell had a previous conviction for a serious offense.   (ROA 155.)   The court instructed the jury on the cruel, heinous, and depraved factor stating "'especially' means beyond the norm, standing above or apart from others."  (Tr. 2/18/04 at 22.)   Further, a cruel murder is one "'disposed to inflict pain especially in wanton, insensate, or vindictive manner:  sadistic' . . . [t]his cruelty involves the pain and suffering of the victim, including any mental distress suffered prior to death."  (Tr. 2/18/04 at 22.)   The jury was told that in order to find cruelty they "must find the defendant either knew or intended the murder to be committed in a manner to cause the victim to suffer."  (Tr. 2/18/04 at 22.) Finally, the jury was instructed, "a murder is especially heinous if it is hatefully or shockingly evil.   A murder is especially depraved if, marked by debasement, corruption, perversion or deterioration.   The terms especially heinous and especially depraved focus upon defendant's state of mind at the time of the offense as reflected by his words and acts."  (Tr. 2/18/04 at 22-23.)

Prior to submitting the instructions to the jury, Newell's counsel objected to the A.R.S. § 13-703 (F)(6) cruel, heinous and depraved factor and instruction, but the court overruled the objection.   (Tr. 2/18/04 at 4-15, 20-24.)   The jury

1    concluded that the State proved this aggravating circumstance beyond a
2    reasonable doubt however, the verdict form did not indicate whether they found
3    the circumstances cruel, heinous or depraved, or both.  (ROA 156.)

4           Reasonably competent appellate counsel would have recognized that in a
5    death case, it is important to mount a challenge to the aggravating factors, and
6    that the cruel, heinous or depraved factor was the only one that she could viably
7    challenge.  Appellate counsel failed to raise both a general challenge to the
8    overall unconstitutionality of the (F)(6) factor as well as its application to
9    Newell's case.

10          As stated in more detail in Claim Thirty-Four, and raised in Newell's
11   post-conviction petition at Claim 3.1, Arizona's (F)(6) aggravating factor fails to
12   narrow the class of death-eligible defendants as constitutionally required in
13   violation of the Eighth and Fourteenth Amendments.  At the time Newell's
14   direct appeal was filed post-*Ring*, many cases had raised this challenge to the
15   constitutionality of the (F)(6) factor, and reasonably competent appellate counsel
16   would have been aware this issue was ripe for review because *Walton v.*
17   *Arizona*, 497 U.S. 639, 653 (1990), did not apply in the context of jury
18   sentencing.  Especially in light of the recent success in *Ring*, on an issue that had
19   previously been considered "boilerplate," reasonably competent appellate
20   counsel would have raised a challenge to the only aggravating factor she could
21   potentially knock out.  Failure to do so fell far below the standards of effective
22   assistance.

23          Even more egregious, appellate counsel failed to preserve the challenge
24   raised by Newell's trial counsel prior to the court's instructions to the jury on the
25   aggravating factors.  Specifically, counsel argued that the instructions to be
26   given by the court failed to "adequately set forth the legislative nuance of the
27   (F)(6) aggravator which has been set forth in case law."  (Tr. 2/18/04 at 4-5.)
28   Counsel cited to *State v. Ross*, 886 P.2d 1354 (Ariz. 1994, which found there

were three circumstances in which a murder to silence a witness could be used to prove the heinous or depraved factor—where a government witness would testify against a gang member or organized crime, where the evidence of witness elimination as motive for murder is very clear, and in extraordinary cases like *State v. Correll*, 715 P.2d 721 (Ariz. 1986), where the defendant had bound and gagged the occupants of a home he was robbing and two more people arrived and killed three and attempted to kill the fourth. (Tr. 2/18/04 at 5-7.) Counsel requested that based on the case law that the court not instruct on heinous and depraved. Despite counsel's valid arguments that Newell's case was not analogous to the cases above, the court permitted the State to rely on that theory

In rebuttal, the State argued, although it was not clear from their transcript, it believed there were two instances in Newell's interrogation in which he agreed by shaking his head "no," that if Elizabeth would have told him she would not tell anybody about the assault he would not have had any reason to grab her. Defense counsel asked for the citation for that and the State could not provide it. (Tr. 2/18/04 at 8-9.)[45] Counsel further objected that the State's failure to "adequately cite the legislative standard would make [the heinous and depraved factor] fail under the 8th and 14th Amendment of the U.S. Constitution." (Tr. 2/18/04 at 9.)

In terms of cruelty, defense counsel cited to the cases of *State v. Jones*, 72 P.3d 1264 (Ariz. 2003), *State v. Cropper*, 76 P.3d 424 (Ariz. 2003) and *State v. Lopez*, 857 P.2d 1261 (Ariz. 1993). In each one of those cases, Dr. Keen testified. Cruelty was found in *Cropper* and *Lopez*, and not in *Jones*. In *Jones* the court focused on the amount of time that the victim was conscious, or how long it took the victim to die. Here, Keen testified it could have been thirty

---

[45] As noted in claims six and seven of this claim, no transcript of the interviews was ever provided to the court. This failure to put together a complete record infected every part of the direct appeal, and fell fall below the conduct of reasonably competent counsel.

1    seconds or less, or possibly instantaneous if the carotid artery was hit.   (Tr.
2    2/18/04 at 9-10.)   The fact that there may have been marks on the neck does not
3    show anything more than a few seconds in terms of how long Elizabeth may
4    have struggled, and that cruelty required "something much in excess" of thirty
5    seconds.  (Tr. 2/18/04 at 10-11.)  In *Lopez*, the victim took fifteen minutes to die,
6    in *Cropper*, Keen testified the victim lived at least five minutes after the injuries
7    were inflicted.   In *Jones* where cruelty was not found, in a case very similar to
8    Newell's with a sexual assault, although the victim suffered "innumerable
9    injuries," the medical examiner was not able to fix a precise time the victim lost
10   consciousness, conceding it could have been at the beginning of the assault.  (Tr.
11   2/18/04 at 11-12.)  Because of all that, counsel argued that the instruction given
12   to the jury "inadequately convey[ed] what [the jury] need to understand in terms
13   of what is needed for especially cruel" and that the instruction as it stood
14   violated the Eighth and Fourteenth Amendments and should not be given.  (Tr.
15   2/18/04 at 12.)

16        Nonetheless the instructions on the (F)(6) aggravator were given, and the
17   jury ultimately found the cruel, heinous, and depraved factor.   (ROA 156.)
18   Despite the application of the (F)(6) factor being in dispute throughout trial and
19   trial counsel's valiant efforts to challenge and preserve the issue, appellate
20   counsel failed to present this meritorious issue to the Arizona Supreme Court on
21   direct appeal.    A reasonably competent appellate attorney would have
22   recognized and raised the (F)(6) issue as it was obvious from the record, there
23   was no legal basis for not raising the claim, and counsel had no strategic reason
24   not to do so.  It certainly cannot be said that this sentencing challenge was less
25   meritorious than the few claims counsel chose to raise on appeal. *See Gray*, 800
26   F.2d at 646 (noting a reviewing court needs to compare "[s]ignificant issues
27   which could have been raised . . . [with] those which were raised").   To the

28

contrary, a successful challenge to the (F)(6) factor could have resulted in a sentence less than death.

Appellate counsel only raised five issues on appeal, none of which were a direct challenge to any aggravating factors.  Some of the issues she conceded were raised purely for preservation purposes.  As outlined above, the record reflects that trial counsel challenged the application of the (F)(6) factor to Newell's case.  It was unreasonable to fail to raise this critical issue which could have spared Newell from a death sentence.  *See Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003).  Appellate counsel's failure to raise this meritorious issues that could have resulted in a reversal of Newell's sentence prejudiced him and he is entitled to relief.  *See, e.g.*, *Strickland*, 466 U.S. at 694 (that prejudice occurs when, absent counsel's deficiencies, there is a reasonable probability that the result of proceeding would have been different).

## Claim Thirty-Four

**Arizona's "heinous, cruel, or depraved" aggravating circumstance does not genuinely narrow the class of death-eligible offenders, thus violating Petitioner's due process rights and his protection against cruel and unusual punishment.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell raised this claim in Claim 3.1 of his post-conviction petition. Newell asserted that Arizona's aggravating circumstances failed to narrow the class of death-eligible defendants as constitutionally required in violation of the Eighth and Fourteenth Amendments.  (Pet. for PCR, PCR ROA at 0634.)  The state court did not address this claim on the merits.  Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim.  Post-conviction counsel did not assert a claim of ineffective assistance of appellate counsel.  Appellate counsel was ineffective for failing to raise the issue

on direct appeal.  Post-conviction counsel's failure to raise appellate counsel's ineffectiveness was deficient performance to Petitioner's prejudice that excuses any procedural default.  *Martinez*, 132 S. Ct. at 1315.

Under Arizona law, a person convicted of first-degree murder is eligible for the death penalty if he "committed the offense in an especially heinous, cruel, or depraved manner."  Ariz. Rev. Stat. § 13-703(F)(6)(2002) (current version at A.R.S. §13-751 (F)(6) (2002.))  Newell's jury was instructed on the on the "especially heinous, cruel, or depraved" aggravating factor.  (Tr. 2/18/04 at 22-23.)  Prior to submitting the instructions to the jury, Newell's counsel objected to the cruel, heinous and depraved factor and instruction, but the court overruled it.  (Tr. 2/18/04 at 9-15, 22-23.)  The jury concluded that the State proved this aggravating circumstance beyond a reasonable doubt.[46]  (ROA 156.) Newell's right to be free from cruel and unusual punishment was violated by his prosecution for the "especially heinous, cruel or depraved" aggravating circumstance because the circumstance fails to narrow the class of those eligible for the death penalty.

The Eighth Amendment requires that within a state's capital sentencing scheme, the aggravating factors genuinely narrow the class of offenders that are eligible for the death penalty.  *See, e.g. Loving v. United States*, 517 U.S. 748, 755 (1996); *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  In order to comply with the Eighth Amendment, states must establish a threshold below which the death penalty cannot be imposed and "establish rational criteria that narrow the decision maker's judgment as to whether the circumstances of a particular defendant's case meet the threshold."  *McCleskey*, 481 U.S. at 305; *see also Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Zant,* 462 U.S.at 877.  Arizona's (F)(6) aggravating factor is unconstitutionally vague under the Eighth

---

[46] Again, because of the lack of a special verdict, what precisely the jurors found is unknown from the record.

1    Amendment, because it does not sufficiently narrow the jurors' discretion.  A

2    state's sentencing procedure must suitably direct and limit the decision maker's

3    discretion "'so as to minimize the risk of wholly arbitrary and capricious

4    action.'"  *Zant*, 462 U.S. at 874 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189

5    (1976)).  Vague standards are unconstitutional because they fail to adequately

6    "channel the sentencing decision patterns of juries."  *Gregg*, 428 U.S. at 195,

7    n.46.

8         "[T]here is no serious argument that Arizona's 'especially heinous, cruel

9    or depraved' aggravating factor is not facially vague."  *Walton*, 497 U.S.at 653,

10   *overruled on other grounds by Ring*, 536 U.S. at 584.   The United States

11   Supreme Court has repeatedly held that, on their face, aggravating circumstances

12   based on the heinousness, cruelty, or depravity of a murder fail to adequately

13   narrow death penalty eligibility because the language is too vague to adequately

14   guide the discretion of the sentence.  *See Maynard v. Cartwright*, 486 U.S. 356,

15   363 (1988) ((quoting *Godfrey v. Georgia*, 456 U.S. 420, 428 (1980))) ("There is

16   nothing in these few words, standing alone, that implies any inherent restraint on

17   the arbitrary and capricious infliction of the death sentence."); *see also Walton*,

18   497 U.S at 654.   The plain language of the heinous, cruel, or depraved

19   aggravator applies to any intentional homicide and therefore fails to "suitably

20   direct[] and limit[]" the sentencer's discretion in imposing the death penalty.

21   *See Gregg*, 428 U.S. at 189.

22        After the shift to jury sentencing in Arizona, Ariz. Rev. Stat. Ann. §13-

23   703(F)(6) is unconstitutionally vague.  When the jury is the fact-finder, the

24   vague statutory definition of "especially heinous, cruel or depraved" will not

25   suffice.  *Walton* does not apply in the context of jury sentencing.  497 U.S. at

26   653  (distinguishing prior cases which struck down similar aggravators under

27   jury sentencing schemes because the "logic of those cases has no place in the

28   context of sentencing by a trial judge").  "[A]n ordinary person could honestly

believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Maynard*, 486 U.S. at 364 (*quoting Godfrey v. Georgia*, 446 U.S. 420, 428-29(1980)). How the jury will interpret this factor can "only be the subject of sheer speculation." *Godfrey*, 446 U.S. at 429 (discussing aggravating factor of "outrageously or wantonly vile, horrible and inhuman"). A standardless capital punishment statute allows for the imposition of the death penalty in an arbitrary and capricious manner, violating the Eighth Amendment. *Maynard*, 486 U.S. at 361-62. *Ring* not only overrules a judge's finding of aggravating factors, it also invalidates *Walton*'s reluctant acceptance of the language of § 13-703(F)(6).

In addition, Arizona's judicial interpretations of the heinous, cruel, or depraved aggravating circumstance, and any jury instructions based on such interpretations, have failed to narrow the class of offenders eligible for the death penalty. In Arizona, a murder has been found to be "heinous or depraved" because there was no apparent motive. *State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive demonstrates a "shockingly evil state of mind," making it heinous and depraved). However, under Arizona law, murders may also be "depraved" because they are motivated by revenge or "cold-blooded logic." *See State v. Smith*, 687 P.2d 1265, 1266-67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness proves depravity). A murder in which the killer uses excessive force is considered "cruel" for the purposes of finding the death penalty. *State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding "cruelty" factor because the defendant used excessive force). However, using insufficient force to commit a murder is also "cruel." *See State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding the "cruelty" factor because defendants' used insufficient force causing the victim to suffer). With the arbitrary imposition of this aggravating factor,

1  this Court cannot be sure that Newell's death sentence was not imposed in a

2  wanton and freakish manner. *Cf. Gregg*, 428 U.S. at 195.

3      As the prior discussion demonstrates, this aggravator was found

4  constitutional when Arizona employed judicial sentencing.  This significant

5  change in Arizona law renders Petitioner's situation more akin to the defendants

6  in *Maynard* and *Godfrey*.  Arizona's heinous, cruel, or depraved aggravating

7  circumstance fails to adequately narrow the class offenders subject to the death

8  penalty and thus violated Newell's Eighth and Fourteenth Amendment rights.

9  Therefore, Newell is entitled to relief.

10                            **Claim Thirty-Five**

11      **The court's failure to require special verdict forms for mitigation
   violated Newell's rights under the Fifth, Sixth, Eighth and Fourteenth**

12  **Amendments to the United States Constitution.**

13      Newell incorporates by specific reference all facts, allegations, and

14  arguments made elsewhere in this Petition.

15      Newell presented this claim as 3.7 of his petition for post-conviction

16  relief.  (Pet. for PCR, PCR ROA at 0639.)  The court did not address the claim

17  on the merits. Because this claim has not been adjudicated by the Arizona state

18  courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do

19  not apply to this Court's review of the claim.  Post-conviction counsel did not

20  assert a claim of ineffective assistance of appellate counsel.  Appellate counsel

21  was ineffective for failing to raise the issue on direct appeal. Post-conviction

22  counsel's failure to raise appellate counsel's ineffectiveness was deficient

23  performance to Newell's prejudice that excuses any procedural default.

24  *Martinez*, 132 S. Ct. at 1315.

25      Arizona's sentencing statute directs the Arizona Supreme Court to

26  consider whether the jury abused its discretion when it imposed a sentence of

27  death.  *See* A.R.S. §13-703(E) (the trier of fact imposes a death sentence if it

28  finds at least one aggravating circumstance and determines that the mitigating

circumstances are not "sufficiently substantial to call for leniency"). The decision to impose the death penalty once the jury finds aggravating factors is a matter for each individual juror to consider. *See id.* §13-703(C) (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty")   Appellate courts cannot conduct a meaningful review of aggravating and mitigating factors under A.R.S. §13-703.04 unless the jury uses special verdict forms indicating *which* mitigating factors each juror found.

Here, the jury employed no such special verdict form and simply returned the verdict "We, the Jury, upon our oaths, do find that the Defendant STEVEN RAY NEWELL should be sentenced to:  DEATH."  (ROA 163.)  Because this verdict lacked any indication which mitigating factors each juror found, it violated Newell's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and deprived him of an adequate review.  Accordingly, Newell is entitled to relief.

### Claim Thirty-Six

**Arizona's capital sentencing scheme violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because it does not require the prosecution to prove that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell presented this claim as 3.4 of his petition for post-conviction relief.  (Pet. for PCR, PCR ROA at 0638.)  The court did not address the claim on the merits. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim.  Post-conviction counsel did not assert a claim of ineffective assistance of appellate counsel.  Appellate counsel was ineffective for failing to raise the issue on direct appeal. Post-conviction

1  counsel's failure to raise appellate counsel's ineffectiveness was deficient
2  performance to Newell's prejudice that excuses any procedural default.
3  *Martinez*, 132 S. Ct. at 1315.

4          Before the sentencing authority may impose a death sentence, Arizona's
5  capital sentencing scheme requires that authority to find the mitigating
6  circumstances are not "sufficiently substantial to call for leniency."  A.R.S. §13-
7  703(E).  Arizona's capital sentencing scheme does not impose any particular
8  burden of persuasion on either party to the sentencing hearing.  The prosecution
9  does not have to prove beyond a reasonable doubt that aggravating
10  circumstances outweigh mitigating circumstances.

11         In light of the qualitative difference between a sentence of death and a
12  sentence to a term of imprisonment, the Eighth Amendment demands a higher
13  degree of "reliability in the determination that death is the appropriate
14  punishment in a specific case."  *Woodson*, 428 U.S. at 305.  The reasonable-
15  doubt standard is "indispensable to command the respect and confidence of the
16  community in applications of the criminal law."  *In re Winship*, 397 U.S. 358,
17  364 (1970).  "It is critical that the moral force of the criminal law not be diluted
18  by a standard of proof that leaves people in doubt whether innocent men are
19  being condemned."  *Id.*  In addition, to avoid the arbitrary and inconsistent
20  imposition of death on a "jury-by-jury" basis, a specified burden of proof is
21  required to ensure that juries faced with similar evidence will return similar
22  verdicts.  *See Eddings*, 455 U.S. at 112 ("[C]apital punishment [must] be
23  imposed fairly, and with reasonable consistency or not at all.")  Without such
24  safeguards, Arizona's capital sentencing scheme violated Newell's rights under
25  the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
26  Newell's death sentence is constitutionally infirm on these grounds, and he is
27  entitled to relief.

28

### Claim Thirty-Seven

**Arizona's requirement that mitigating factors be proven by a preponderance of the evidence unconstitutionally prevents the jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell presented this claim as 3.6 of his petition for post-conviction relief. (Pet. for PCR, PCR ROA at 0639.) The court did not address the claim on the merits. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. Post-conviction counsel did not assert a claim of ineffective assistance of appellate counsel. Appellate counsel was ineffective for failing to raise the issue on direct appeal. Post-conviction counsel's failure to raise appellate counsel's ineffectiveness was deficient performance to Newell's prejudice that excuses any procedural default. *Martinez*, 132 S. Ct. 1309.

At trial, the state court instructed the jury that "the defendant has the opportunity to prove the existence of mitigation" (Tr. 2/23/04 a.m. at 10-11), and that the burden of proving the existence of mitigation was "by a preponderance of the evidence" (Tr. 2/23/04 a.m. at 11.) Further "[t]he party having the burden of proof by a preponderance of the evidence must persuade you by the evidence the claim or fact is more probably true than not true." (Tr. 2/23/04 a.m. at 11.) The jury instruction permitted the jury to consider only mitigation proved by a preponderance of the evidence and thus potentially limited the jury's ability to consider all of the mitigating evidence presented.

In *Lockett* 438 U.S. 586, the United States Supreme Court concluded that "in all but the rarest kind of capital case," the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or

1   record and any of the circumstances of the offense . . . [offered] as a basis for a

2   sentence less than death." 938 at 604. "[I]t is not enough simply to allow the

3   defendant to present mitigating evidence to the sentencer. The sentencer must

4   also be able to consider and give effect to that evidence in imposing [the]

5   sentence." *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (internal citations

6   omitted); *Eddings*, 455 U.S. at 110.   Upon meeting the low threshold for

7   relevance, "the 'Eighth Amendment requires that the jury be able to consider

8   and give effect to' a capital defendant's mitigating evidence." *Tennard*, 542 U.S.

9   at 285 (quoting *Boyde*, 494 U.S. at 377-78). Imposing a standard that limits the

10  mitigating evidence considered by the jury violates the Eighth Amendment's

11  requirement that the sentencer be allowed to consider any aspect of the

12  defendant's character or record that counsels in favor of a sentence other than

13  death. *See Smith v. Texas*, 543 U.S. 37 (2004); *Tennard*, 542 U.S. at 285;

14  *Lockett*, 438 U.S. at 604.

15         The fact-finder in capital cases must be able to consider all relevant

16  mitigating evidence in deciding whether to give the death penalty.   *See*

17  *Woodson*, 428 U.S. at 304.  The trial court's failure to allow the jury to consider

18  and give effect to all mitigating evidence in this case by limiting its

19  consideration to that proven by a preponderance of the evidence is

20  unconstitutional under the Eighth and Fourteenth Amendments as well as

21  contrary to, or involved an unreasonable application of clearly-established

22  federal law.   The jury instruction limited the mitigation that the jury could

23  consider in violation of the Eighth Amendment and Supreme Court

24  jurisprudence. Accordingly, Newell is entitled to relief.

25                          **Claim Thirty-Eight**
    **Arizona's capital sentencing scheme violates the Eighth and**
26  **Fourteenth Amendments to the United States Constitution because it**
    **requires a defendant to affirmatively prove that the sentencing body**
27  **should spare his life.**

28

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell presented this claim as 3.3 of his petition for post-conviction relief.  (Pet. for PCR, PCR ROA at 0638.)  Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim.  Post-conviction counsel did not assert a claim of ineffective assistance of appellate counsel.  Appellate counsel was ineffective for failing to raise the issue on direct appeal.  Post-conviction counsel's failure to raise appellate counsel's ineffectiveness was deficient performance to Petitioner's prejudice and excuses any procedural default. *Martinez*, 132 S. Ct. at 1315.

Arizona law required Newell to prove mitigating circumstances by a preponderance of the evidence before the sentencing body could rely on those circumstances to spare his life. *See* Ariz. Rev. Stat. § 13-703(C).  The law therefore presumed that death was the appropriate punishment, for if Newell did not carry his burden of persuasion the sentencing body was required to impose a death sentence. *See id.* § 13-703(E). Newell's death sentence is therefore constitutionally infirm, *see Woodson*, 428 U.S. at 305; *Patterson v. New York*, 432 U.S. 197, 210-11 (1977), and he is entitled to relief.

### Claim Thirty-Nine

**The trial court improperly permitted the introduction of victim impact evidence in violation of Newell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell presented this claim as 3.5 of his petition for post-conviction relief.  (Pet. for PCR, PCR ROA at 0638.)  The court did not address the claim on the merits. Because this claim has not been adjudicated by the Arizona state

1    courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do
2    not apply to this Court's review of the claim.  Post-conviction counsel did not
3    assert a claim of ineffective assistance of appellate counsel.  Appellate counsel
4    was ineffective for failing to raise the issue on direct appeal. Post-conviction
5    counsel's failure to raise appellate counsel's ineffectiveness was deficient
6    performance to Newell's prejudice that excuses any procedural default.
7    *Martinez*, 132 S. Ct. at 1315.

8        In the penalty phase, the court allowed victim impact statements not
9    subject to cross-examination.  (Tr. 2/23/04 at 27.)  Prior to any of the testimony,
10   one of the jurors asked for tissue boxes.  (Tr. 2/23/04 at 28.)  Newell's mother,
11   aunt, uncle, sister and sister-in-law made statements.  (Tr. 2/23/04 at 28-37.)
12   Their statements were highly charged and emotional.

13        **A. The admission of victim impact evidence resulted in a**
14           **fundamental violation of Newell's due process and Eighth**
             **Amendment rights.**

15        When members of the victim's family offer characterizations and opinions
16   about the crime and the defendant, the defendant suffers a fundamental violation
17   of his due process and Eighth Amendment rights.  *See Payne*, 501 U.S. at 830
18   n.2.  Courts have long recognized that the imposition of a capital sentence must
19   meet the dictates of the Eighth Amendment.  *See Payne*, 501 U.S. at 824
20   ("Where the State imposes the death penalty for a particular crime, we have held
21   that the Eighth Amendment imposes special limitations upon that process.").  In
22   *Booth v. Maryland*, 482 U.S. 496 (1987), the United States Supreme Court
23   considered the constitutionality of the admission of two types of victim impact
24   evidence: 1) information about the victim and the impact of the victim's death
25   on the victim's family; and 2) the victim's family members' opinions and
26   characterizations of the crimes and the defendant.  482 U.S. at 502-03, *overruled*
27   *by Payne*, 501 U.S. 808.  The Court held that the introduction of both types of
28

1  victim impact evidence at a capital sentencing proceeding violated the Eighth
2  and Fourteenth Amendments.  *Booth* 428 U.S. at 509.

3      *Booth* was overruled by *Payne v. Tennessee*, which permitted evidence
4  relating to the victim and the impact of the victim's death on the surviving
5  family.  *Payne*, 501 U.S. at 827.  *Payne*, however, did not overrule the
6  conclusion in *Booth* that the Eighth and Fourteenth Amendments prohibit "the
7  admission of a victim's family members' characterizations and opinions about
8  the crime, the defendant, and the appropriate sentence."  *Id.* at 830 n.2.  The
9  *Payne* Court also continued to recognize that any type of victim impact evidence
10 violates a defendant's federal due process rights when it "is so unduly
11 prejudicial that it renders the trial fundamentally unfair."  *Id.* at 825; *see also*
12 *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) (citing *Payne*, 501 U.S.
13 at 825).

14     Emotional victim impact evidence, likely to provoke arbitrary or
15 capricious action, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments
16 to the United States Constitution.  *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349,
17 358 (1977) ("It is of vital importance to the defendant and to the community that
18 any decision to impose the death sentence be, and appear to be, based on reason
19 rather than caprice or emotion."); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)
20 (noting that "where discretion is afforded a sentencing body on a matter so grave
21 as the determination of whether a human life should be taken or spared, that
22 discretion must be suitably directed and limited so as to minimize the risk of
23 wholly arbitrary and capricious action"); *Woodson*, 428 U.S. at 305 (recognizing
24 "the need for reliability in the determination that death is the appropriate
25 punishment in a specific case").

26     The victim impact evidence admitted by the trial court violated Newell's
27 constitutional rights to a fair trial and a reliable sentence by injecting irrelevant
28 and prejudicial characterizations of the crime into Newell's capital sentencing

proceedings. *See Payne*, 501 U.S. at 830 n.2. Such characterizations and opinions about the crime were prejudicial and inflammatory and violated Newell's due process and Eighth Amendment rights. *See Payne*, 501 U.S. at 830 n.2 ("[T]he admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."); *see also id.* at 825 (noting that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"); *id.* at 835 n.1.

The admitted victim impact evidence provided an emotional account of Elizabeth's death designed to incite the jury's passions and likely to elicit an arbitrary and capricious sentencing decision. The presentation of the victim impact evidence was unduly prejudicial, and violated Newell's rights to due process and a fair and reliable sentencing under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States. *See Payne*, 501 U.S. at 825 (noting that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"); *Gardner*, 430 U.S. at 358.[47]

The trial court's allowance of victim impact evidence that improperly included characterization of the crime and Newell was contrary to, or involved an unreasonable application of clearly-established federal law as determined by the United States Supreme Court. *See Booth*, 482 U.S. at 509; *Payne*, 501 U.S. at 825, 830 n.2. Newell is therefore entitled to relief. *See* 28 U.S.C. § 2254(d)(1), (2).

**B. The victim impact evidence violated Newell's rights under the confrontation clause.**

---

[47] The Arizona Supreme Court rejected challenges to the use of victim impact evidence in *lynn v. Reinstein*, 68 P.3d 412, 417 (2003).

The Sixth and Fourteenth Amendments guarantee a criminal defendant the "right to be confronted with the witnesses against him." *See Pointer v. Texas*, 380 U.S. 400, 405 (1965). The United States Supreme Court made clear in *Crawford*, that the Confrontation Clause guarantees confrontation against those "who bear testimony" against a defendant.   541 U.S. at 51. Here, the State presented victim impact evidence through the statements of Elizabeth's mother, sister, aunt, uncle, and sister-in-law.   (Tr. 2/23/04 at 27-39.) The trial court instructed the jury that victim impact statements were not subject to cross-examination.  (Tr. 2/23/04 at 27.)  Newell was not provided with an opportunity to cross-examine this evidence and the denial of that opportunity violated Newell's Sixth and Fourteenth Amendment rights. The Confrontation Clause prohibits the admission of testimonial statements during the penalty phase of a capital sentencing proceeding unless the statements can be tested "in the crucible of cross-examination."  *See Crawford*, 541 U.S. at 61. The state court's refusal to allow cross-examination of victim impact statements was contrary to, or involved an unreasonable application of clearly-established federal law.  *See Crawford*, 541 U.S. at 61-69; but see *Payne*, 507 U.S. at 827.

### Claim Forty

**The death penalty is categorically cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment to the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell presented this claim in claim 3.2 of his petition for post-conviction relief.  (Pet. for PCR, PCR ROA at 0637.)  Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim.  Post-conviction counsel did not assert a claim of ineffective assistance of appellate counsel.  Appellate counsel was ineffective for failing to raise the issue

on direct appeal.  Post-conviction counsel's failure to raise appellate counsel's ineffectiveness was deficient performance to Petitioner's prejudice that excuses any procedural default.  *Martinez*, 132 S. Ct. at 1315.

Newell concedes that thirty-five years ago the United States Supreme Court held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg*, 428 U.S. at 187. The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." *Id.* at 183. Nevertheless, empirical evidence has emerged over the last thirty-five years that has eroded these two justifications for the death penalty. *See, e.g.*, Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005). Newell submits that because the death penalty serves neither the goal of retribution nor that of deterrence, it should be abolished pursuant to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Accordingly, Newell's sentence is constitutionally infirm under the Eighth Amendment, and he is entitled to relief.

### Claim Forty-One

**The aggravating factors alleged by the State are not supported by findings of probable cause at the indictment stage because the State failed to allege the aggravating factors in the indictment in violation of Newell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides

1    cause to excuse any procedural default. *See Strickland*, 466 U.S. 668 (1984);
2    *Martinez*, 132 S. Ct. at 1315.

3        Pre-trial, Newell challenged the State's failure to allege any aggravating
4    circumstances in his indictment or the notice to seek the death penalty, arguing
5    that the failure resulted in a fundamental defect rendering the indictment
6    constitutionally defective. (ROA 78.) The trial court denied Newell's challenge
7    and proceeded with his capital trial. (Tr. 11/5/2003 at 6-7.)

8        The United States Supreme Court has clearly established that any fact
9    serving to increase the punishment for a crime must be treated as an element of
10   the offense. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000); *see also*
11   *Ring*, 536 U.S. at 609.  In *Apprendi*, the Court noted that "any fact (other than
12   prior conviction) that increases the maximum penalty for a crime must be
13   *charged in an indictment*, submitted to a jury, and proven beyond a reasonable
14   doubt." 530 U.S. at 476 (emphasis added). The necessity of alleging aggravating
15   facts in an indictment arises from the understanding that "[an] aggravating fact is
16   an element of the aggravated crime" and must, therefore, be included in the
17   indictment and subject to a pretrial probable cause finding. *Id.* at 501 (Thomas,
18   J., concurring).

19       Under Arizona law, first-degree murder is defined in Arizona Revised
20   Statutes Section 13-1105. The maximum sentence for first-degree murder is life
21   imprisonment unless a jury finds the presence of at least one aggravating factor
22   and determines that there are no mitigating circumstances sufficiently substantial
23   to warrant leniency. Ariz. Rev. Stat. § 13-703(E) (1989); *id.* § 13-703.01(C); *id.*
24   § 13-703.01(E). In Arizona, the aggravating factors "operate as 'the functional
25   equivalent of an element of a greater offense.'" *Ring*, 536 U.S. at 609 (quoting
26   *Apprendi*, 530 U.S. at 494 n.19). As elements of the offense of capital murder,
27   the Fifth, Sixth, and Fourteenth Amendments require aggravating factors to be
28   included in the charging document. *See United States v. Cruikshank*, 92 U.S.

542, 558, 566-69 (1875) (the Sixth Amendment requires an indictment to include "every ingredient of which the offence is composed"); *see also Apprendi*, 530 U.S. at 476 (stating that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment"). To be included in the charging document, each and every element of the alleged offense must have been subjected to a probable cause determination either by a grand jury, in the case of an indictment, or by a judicial officer at a preliminary hearing.

The State pursued charges against Newell through an indictment, but failed to allege any aggravating factors in the indictment. (*See* ROA 1 at 1-3.) Because the aggravating circumstances alleged in Newell's case were not subject to a probable cause determination by a neutral arbiter, Newell's death sentence violates the Fifth, Sixth, and Eighth Amendments of the Constitution as applied to the states by the Fourteenth Amendment. The violation of Newell's constitutional rights cannot be cured short of remanding to the grand jury for further proceedings. Newell's sentence is constitutionally infirm, and he is entitled to relief.

### Claim Forty-Two

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it affords the prosecutor with unbridled discretion to seek the death penalty.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.

In Arizona, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his unreviewable determination that one or more aggravating circumstances exist. This discretion is limited solely by the whims of individual prosecutors as to which cases, in their sole judgment, are appropriate for the death penalty. *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983). Arizona's scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson*, 428 U.S. at 303, leads to the wanton and freakish imposition of the death sentence, *see Furman*, 408 U.S. at 310 (opinion of Stewart, J., concurring). Thus, the fact that Arizona prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Newell's death sentence must therefore be vacated.

### Claim Forty-Three

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.

Because death is the ultimate penalty, unlike any other, the sentencer must provide an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879 (emphasis in original); *see also Woodson*, 428 U.S. at 303 (acknowledging that death is a

1   punishment different from all other sanctions). Under Arizona law, the trial
2   court must impose a death sentence whenever it "finds one or more of the
3   aggravating circumstances . . . and then determines that there are no mitigating
4   circumstances sufficiently substantial to call for leniency." A.R.S § 13-703(E)
5   (2002) (current version at A.R.S. § 751(E)(2012)).  Frequently, as in Newell's
6   case, mitigating evidence is not considered because of the use of a screening
7   mechanism designed to prevent the sentencer from considering such evidence.
8   *See, e.g.*, *State v. Ramirez*, 871 P.2d 237, 252-53 (Ariz. 1994) (requiring the
9   defendant to prove mitigating evidence by a preponderance of the evidence
10  before the sentencer must "accept" the evidence as mitigating).

11      The use of such a screening mechanism deprives the sentencer of
12  discretion to impose a sentence other than death, in violation of the Eighth and
13  Fourteenth Amendments. *See Woodson*, 428 U.S. at 302-03. Newell's sentence
14  is therefore constitutionally infirm, and he is entitled to relief.

<div align="center">

**Claim Forty-Four**

</div>

16   **Arizona's capital sentencing scheme violates the Eighth and**
17   **Fourteenth Amendments to the United States Constitution because it**
     **does not set forth objective standards to guide the sentencer in**
18   **weighing the aggravating circumstances against the mitigating**
     **circumstances.**

19      Newell incorporates by specific reference all facts, allegations, and
20  arguments made elsewhere in this Petition.

21      Newell did not present this claim to the state courts as a result of appellate
22  and post-conviction counsel's deficient performance.  The deficient performance
23  of state appellate and post-conviction counsel prejudiced Newell and provides
24  cause to excuse any procedural default.  *See Strickland*, 466 U.S. 668; *Martinez*,
25  132 S. Ct. at 1315.

26      Under the Eighth and Fourteenth Amendments, a capital defendant has a
27  right to an individualized sentencing determination. *See Zant*, 462 U.S. at 879.
28  There was no individualized sentencing determination in Newell's case because

the sentencing jury had no guidance in determining whether the mitigating evidence presented was sufficiently substantial to call for leniency.   The trial court instructed the jury "The law does not define what is sufficiently substantial.  Each juror must determine for him or herself what is sufficiently substantial." (Tr. 2/23/04 a.m at 14; Tr. 2/24/04 at 52.)  In the absence of any guidance, the risk that Newell's death sentence was the result of unfettered discretion is intolerably high.  Newell's sentence is constitutionally infirm, and he is entitled to relief. *See Furman*, 408 U.S. at 239-40.

## Claim Forty-Five

**Arizona's capital sentencing scheme violates Newell's Constitutional protections against cruel and unusual punishment because it denies capital defendants the benefit of proportionality review of their sentences.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.

When the United States Supreme Court sanctioned the modern death penalty scheme, it did in the belief that state courts would conduct careful and effective proportionality reviews in individual cases in order to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 204-07. The Arizona Supreme Court, however, has abandoned this procedural safeguard.  *See State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992). Abandoning the required proportionality review removes a crucial protection and violates the Eighth and Fourteenth Amendments. Newell was sentenced to death under Arizona's scheme that lacked proportionality review. His sentence is therefore

constitutionally infirm, and he is entitled to relief.

### Claim Forty-Six

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently channel the discretion of the sentencing authority.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.

Under Arizona law, a broad range of conduct constitutes first-degree murder, because that crime includes intentional, premeditated killings, killings committed in the course of a number of other crimes, and the killings of law-enforcement officers in the line of duty. *See* A.R.S. § 13-1105(A). The aggravating factors that make a first-degree-murder defendant eligible for the death penalty sweep up such a broad range of conduct that they do not meaningfully separate out a group of offenders whose crimes are so egregious they should be eligible for the death penalty. *Id.* at § 13-703(F); *compare, e.g.*, *State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive is death-eligible), *and State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used insufficient force), *with State v. Smith*, 687 P.2d 1265, 1266-67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness), and *State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding that the defendant used excessive force). Because Arizona's definitions of first-degree murder and aggravating factors sweep so broadly, they fail to perform the constitutionally required function of narrowing

and channeling the sentencing body's discretion toward imposing a death sentence on only the most egregious of murders. *See Gregg*, 428 U.S. at 192-98. Because Newell was sentenced to death under Arizona's broad capital sentencing scheme, his sentence is constitutionally infirm and he is entitled to relief.[48]

### Claim Forty-Seven

**Arizona's capital sentencing scheme discriminates against poor, young, and male defendants in violation of the Fourteenth Amendment.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell did not present this claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Newell and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. 668; *Martinez*, 132 S. Ct. at 1315.

The Fourteenth Amendment guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause protects criminal defendants from being sentenced based on purposeful discrimination. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Arizona's death row is predominantly populated by indigent males. Although women commit approximately ten percent of all murders, only three of the 121 persons on death row are women. http://www.azcorrections.gov/inmate_datasearch/Minh_NewDeathRow.aspx, (last viewed May 24, 2013).   Given the statistics, if a similarly situated defendant was lucky enough to be a woman, there would be no sentence of death imposed.  There is nothing regarding the nature of the crime, or the aggravating sentence or mitigating circumstances, that can explain this disproportionate

---

[48] Again, this is further exacerbated by Arizona's abandonment of proportionality review.

pattern other than systemic discrimination on the basis of class and sex. The discriminatory application of the death penalty in Arizona violates Newell's constitutional rights as guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

### Claim Forty-Eight

**Newell will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell has not yet presented this claim to the Arizona courts because his opportunity to seek executive clemency has not yet become ripe.   Newell presents this claim now in order to avoid difficulties with raising this claim in future federal habeas proceedings.  *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-46 (1998).   Under Arizona law, Newell has a right to seek executive clemency before execution.  *See* Ariz. Const. art. V, § 5; Ariz. Rev. Stat. § 31-401 *et seq.*   This should be part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences.  *See Herrera v. Collins*, 506 U.S. 390, 415 (1993).   Accordingly, Newell has a due process liberty interest in the impartiality of the system by which clemency may be afforded to him.  *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

Newell's clemency proceedings will not be impartial.  On information and belief, Newell asserts that both the selection process for members of Arizona's Board of Executive Clemency ("the Board") and the conflicting roles of the State will work to deprive him of a fair clemency proceeding.  Without judicial review of the bias inherent in Arizona's clemency process, Petitioner will never have an opportunity to vindicate his right to a fair and impartial clemency process.

The Board consists of five members appointed by the Governor with input

from the Director of the Department of Corrections, the Director of Public Safety, and three other individuals of her choosing. *See* Ariz. Rev. Stat. § 31-401(A). The Governor may remove members of the Board for cause. *See id.* § 31-401(E). On information and belief, Newell asserts that the Attorney General's Office , the office that advocated for his death in state appellate and post-conviction proceedings, is responsible for training the members of the Board regarding their duties. On information and belief, Newell asserts that he will neither have notice of the time and place of the hearing, the evidence the Governor will use when she decides whether to grant or deny clemency, or an opportunity to present evidence to her in favor of granting clemency. For all these reasons, Arizona's clemency procedures do not comport with the procedural due process protections guaranteed to him by the Fourteenth Amendment. Newell is entitled to habeas corpus relief.

### Claim Forty-Nine

**The State of Arizona's execution of Newell after over nine years on Arizona's death row constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell was arrested on June 4, 2001 and has been constantly incarcerated since that date. Executing Newell after his lengthy imprisonment under the conditions described below serves no legitimate penological purpose and would constitute cruel and unusual punishment in violation of the Eighth Amendment.[49] *Lackey v. Texas*, 514 U.S. 1045 (1995) (Mem.) (Stevens, J., dissenting from denial of certiorari).

### A. The Conditions of Newell's Confinement in the Maricopa County Madison Street Jail

---

[49] In the event this Court finds this claim is not yet ripe, Newell nevertheless intends to preserve it for review.

Newell was taken into custody by the Maricopa County Sheriff's Office on June 4, 2001, (Tr. 2/5/04 at 78, 81), and has been incarcerated ever since. Newell was not sentenced, however, until February 25, 2004, more than two years after his arrest. (ROA 164.) During that time he was incarcerated in the Maricopa County Madison Street Jail.  Newell's medical records from his imprisonment at the Jail include his pleas and complaints that he had not eaten in four days, and that the conditions were "inhumane," including being made to stay naked in a cell with cockroaches everywhere. (PCR Evid. Hrg. Ex. 3, PCR ROA at 2657-2658, 2660.) When someone yelled the nature of his charges out to everyone in his pod, inmates chanted and yelled at him, threatening his life. (PCR Evid. Hrg. Ex. 3, PCR ROA at 2666.) In one request to see a jail psychiatrist in 2002, he wrote, "if you can I would like to see you. I need something to sleep I don[']t think crying till I go to sleep [is] a cure." (PCR Evid. Hrg. Ex. 3, PCR ROA at 2855.) The official who answered his request responded, "Sorry buddy, the administration does not allow us to use medication for sleep anymore. . . Keep trying to work through as you are." (PCR Evid. Hrg. Ex. 3, PCR ROA at 2855.)

Indeed, this Court has found that the Maricopa County Jail does not "ensure that pretrial detainees receive access to adequate medical and mental health care."  *See* Findings of Fact and Conclusions of Law and Order ¶ 216 at 47, *Graves v. Arpaio*, No. CV-77-0479-PHX-NVW (D. Ariz. Oct. 22, 2008). Inmates are housed in deplorable conditions.  Rats and mice infest the jail, *see id*. ¶ 122 at 33, and the cells are not "consistently cleaned and sanitized," *id.* ¶ 123.  In the administrative segregation unit of the jail, where Newell was housed at times, he did not receive adequate outdoor exercise.  *See id.* ¶ 357 at 64. The jail serves its inmates overripe and bruised fruit, *see id*. ¶ 398 at 69; moldy bread, *see id.* ¶ 399; and portions of potatoes, rice, and beans containing small rocks, *see id.* ¶ 411 at 70.

These callous and inhumane conditions are only the beginning of what Newell has faced thus far.

### B.  The Conditions of Newell's Confinement on Arizona's Death Row

The extreme conditions of Arizona's Death Row constitute cruel and unusual punishment.  Since 2004, Newell has been kept in complete solitary confinement and has no physical contact with other inmates or staff. He is locked in a windowless cell that measures approximately 11 feet, 7 inches by 7 feet, 9 inches-- a total of 86.4 square feet.  Arizona Dep't. of Corrs., *Death Row Information and Frequently Asked Questions*, http://www.azcorrections.gov/dr_faq.aspx (last visited June 21, 2013) ("DOC Website").  The front of his cell is a steel barrier drilled with thousands of half-inch holes, which allow staff to see into his cell. *See Comer v. Schriro*, 230 F. Supp. 2d 1016, 1030 (D. Ariz. 2002).  His cell contains a "bunk, toilet, sink, desk, and stool constructed of metal secured to the concrete walls and floors of his cell." *Id.* at 1034.

The lights in Newell's cell are on 24 hours a day. "A 7-watt bulb burns like a votive candle around the clock, illuminating a cell stripped down to institutional furniture bolted to the floor." J.E. Relly, *Supermax: Inside No One Can Hear You Scream*, Tucson Weekly, Apr. 29-May 5, 1999, at 17 ("Supermax"). Those who attempt to cover the light are written up and refused their next meal. Except for three hours in a sweltering concrete "rec" pen each week, Newell is deprived of any natural light.

Newell's personal property is limited to "hygiene items, two appliances, two books and writing materials, which [must] be purchased from the inmate commissary." DOC Website.  Newell has no access to a law library.  The Arizona Department of Corrections has eliminated all the inmate legal assistants who helped other inmates with legal matters and lawsuits.  Inmates are charged a fee for every medical visit.

1  Hot lunches are not provided.  Newell receives a cold bagged lunch every

2  day.  His cell has a six-inch by 12-inch food slot that is locked until meals are

3  served.  At meal time, Newell must sit on his bunk at the far end of his cell until

4  his meal tray is deposited and he is instructed to retrieve it.

5  Newell's out-of-cell time is limited to outdoor exercise in a secured area

6  for two hours a day, three times a week, and he is only permitted to shower three

7  times a week. DOC Website; *see also Ceja v. Stewart*, 134 F.3d 1368, 1369 (9th

8  Cir. 1998) (Fletcher, J., dissenting); *Comer*, 230 F. Supp. 2d at 1034. Before

9  leaving his cell each time he is strip searched and handcuffed behind his back.

10  Arizona's Death Row conditions are designed to dehumanize inmates like

11  Newell.  The only human contact he is permitted is by court order. *See id.*; *see*

12  *also State v. Pandeli*, 26 P.3d 1136, 1151 (Ariz. 2001) (noting capital

13  defendant's incarceration "spent in administrative segregation, where he has had

14  fewer opportunities to interact with others"), *rev'd on other grounds*, 536 U.S.

15  953 (2002).  He is only permitted two 10-minute telephone calls per week. DOC

16  Website. Even no-contact visitation, including visits with legal counsel, are

17  conducted through a wall-to-wall and ceiling-to-floor barrier and are extremely

18  limited. The only visits Newell has had since his incarceration in the Browning

19  Unit have been from his legal team and a chaplain.

20  What is more, many of Newell's neighbors are deeply disturbed or

21  mentally ill.  It is "the most onerous place to serve time in the state prison

22  system." Supermax at 16.  He is surrounded by a wall of haunting noise. Steel

23  doors slam all day and night, echoing off the concrete walls. Alarms blare. Two-

24  way radios blast, and intercoms ring out. This is to say nothing of the human

25  element added by the noises of fellow inmates, who are frequently distressed

26  and/or mentally ill. "Undeniably, some people do not have the mental health and

27  adaptive skills to tolerate segregated housing and will immediately, or inevitably

28  develop psychiatric illnesses when housed in these units." *Comer*, 230 F. Supp.

2d at 1059. As a former warden at California's San Quentin prison observed, "[o]ne night on death row is too long and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination. It has always been a source of wonder to me that they didn't all go stark raving mad." *District Attorney for the Suffolk Cnty. Dist. v. Watson*, 411 N.E.2d 1274, 1291 (Mass. 1980) (Liacos, J., concurring).

In addition to these conditions, Newell lives under the constant stress and fear of death row, which is so oppressive and severe it has earned the name "Death Row Phenomenon." This condition includes being trapped in a situation some have described as "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 884 (Cal. 1972), superseded as stated in *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. 160, 172 (1890) ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it.").

"Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring) (citations omitted). Empirical research supports the opinions of courts regarding the psychological pain inflicted by prolonged death-row confinement. *See* Johnson & Carroll, *Litigating Death Row Conditions: The Case For Reform*, in Prisoners & the Law (1985) (quoting Johnson, *Under Sentence of Death: The Psychology of Death Row Confinement*, 5 L. & Psych. R. 141 (1979)); West, *Psychiatric Reflections on the Death Penalty*, reprinted in Bedau & Pierce, Capital Punishment in the United States 421-22 (1976).

1

2   ### C. Legal Basis for Relief

3          The modern death penalty is purported to serve two purposes – retribution

4   and deterrence.  *See Gregg*, 428 U.S. at 176.  But the "longer the delay, the

5   weaker the justification for imposing the death penalty in terms of punishment's

6   basic retributive or deterrent purposes."  *Knight v. Florida*, 528 U.S. 990, 995

7   (1999) (Breyer, J., dissenting from denial of certiorari); *Lackey*, 514 U.S. at

8   1045-47 (Mem.) (Stevens J., dissenting from denial of certiorari).  The lengthy

9   delay between the day of incarceration and the day of execution "can inflict

10  horrible feelings and an immense mental anxiety amounting to a great increase

11  of the offender's punishment."  *Foster v. Florida*, 537 U.S. 990, 992 (2002)

12  (Breyer, J., dissenting from denial of certiorari).  After inflicting such anxiety on

13  the petitioner by making him wait long periods before carrying out his death

14  sentence, the State hardly adds to the retributive purpose of the death penalty by

15  finally carrying it out after so much time.  *See, e.g.*, *Watson*, 411 N.E.2d at 1287;

16  *Anderson*, 493 P.2d at 894.  Furthermore, the marginal added deterrent value of

17  executing someone who has spent a long time on death row awaiting his

18  execution is slight indeed.  *See Coleman v. Balckom*, 451 U.S. 949, 952 (1981)

19  (Stevens, J., respecting denial of certiorari).  When the death penalty ceases to

20  realistically further the purposes of retribution and deterrence, its imposition is

21  simply "the pointless and needless extinction of life with only marginal

22  contributions to any discernible social or public purposes." *Lackey*, 514 U.S. at

23  1046 (Mem.) (Stevens J., dissenting from denial of certiorari) (quoting *Furman*,

24  408 U.S. at 312) (White, J., concurring)).  "A penalty with such negligible

25  returns to the State would be patently excessive and cruel and unusual

26  punishment violative of the Eighth Amendment." *Id.* Executing Newell after

27  spending such a length of time on Arizona's Death Row would not meaningfully

28  further the goals of retribution and deterrence, and would constitute cruel and

    unusual punishment.  *See Furman*, 408 U.S. at 312 (White, J., concurring).

1    These principles are born out of and consistent with the history of the
2  Eighth Amendment and evolving standards of decency.

3    The Eighth Amendment to the United States Constitution, applied to the
4  states through the Fourteenth Amendment, provides that "excessive bail shall
5  not be required, nor excessive fines imposed, nor cruel and unusual punishments
6  inflicted."  U.S. Const. amend. VIII.  It requires that state-imposed punishment
7  remain within civilized standards.  *See Robinson v. California*, 370 U.S. 660,
8  675 (1962) (Douglas, J., concurring).  Historically, the courts have used the
9  Eighth Amendment to bar the infliction of excessive and repugnant forms of
10 physical suffering, acts that are physically barbarous, acts that "involve the
11 unnecessary and wanton infliction of pain," and those acts that are "totally
12 without penological justification."  *Gregg*, 428 U.S. at 173-74.

13   At the time the Bill of Rights was adopted, the Anglo-American legal
14 tradition had uniformly denounced undue delays between death sentences and
15 executions as cruel and unusual.  Eighteenth-century English criminal
16 jurisprudence had a direct influence on the framers of our Constitution. That
17 jurisprudence recognizes that an inordinate delay in carrying out an execution
18 was considered "cruel and unusual."  *See* Blackstone's Commentaries on the
19 Laws of England, Book IV, reprinted in 2 Jones, Blackstone at 2650 (1976)
20 ("[I]t has been well observed, that it is of great importance, that [capital]
21 punishment should follow the crime as early as possible") (citations omitted);
22 Beccaria, *Essay on Crimes and Punishments*, ch. XIX at 72-76 (5th ed. 1804)
23 ("[B]ecause the privation of liberty, being a punishment [itself], ought to be
24 inflicted before condemnation [i.e., capital punishment], but for as short a time
25 as possible").  *See also Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (there
26 is no doubt the English Declaration of Rights of 1689, which prohibited "cruel
27 and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex
28 parte Grossman*, 267 U.S. 87, 108-09 (1925) (Eighteenth-century English

234

criminal jurisprudence directly relevant to determining what framers intended in drafting Bill of Rights).

Indeed, as the British Privy Council, applying this jurisprudence, has explained, forcing a condemned man to wait many years between sentencing and actual execution is illegal "inhuman or degrading punishment." *See Pratt v. Attorney General of Jamaica*, 2 A.C. 1, 16, 20 (P.C. 1993) (en banc). The Privy Counsel concluded:

> [A] State that wishes to retain capital punishment must accept the responsibility of ensuring that execution follows as swiftly as practicable after sentence, allowing a reasonable time for appeal and consideration of reprieve. It is part of the human condition that a condemned man will take every opportunity to save his life through use of the appellate procedure.
>
> . . . .
>
> The application of the appellants to appeal to the Judicial Committee of the Privy Council and their petitions to the two human rights bodies do not fall within the category of frivolous procedures disentitling them to ask the Board to look at the whole period of delay in this case. The total period of delay is shocking and now amounts to almost fourteen years. It is double the time that the European Court of Human Rights considered would be an infringement of Article 3 of the European Convention and their Lordships can have no doubt that an execution would now be an infringement of section 17(1) of the Jamaican Constitution.
>
> To execute these men now after holding them in custody in an agony of suspect for so many years would be inhuman punishment within the meaning of section 17(1). In the last resort the courts have to accept the responsibility of saying whether the threshold has been passed in any given case and there may be difficult borderline decisions to be made. This, however, is not a borderline case.

*Pratt*, 2 A.C. at 20.

What is more, the framers' writings confirm that they also viewed such inordinate delay as inherently "cruel and unusual." *See* Papers of Thomas Jefferson 497 (ed. J. Boyd 1950) (Jefferson proposed, in his "Bill for Proportioning Crimes and Punishments in Cases Heretofore Capital," (No. 64 in

the Revisals of Laws 1776-1786), a capital punishment statute that would have mandated that the execution be carried out "the next day but one"); 2 Robert Green McCloskey, The Works of James Wilson at 629-30 (1957); *see also* 2 The Papers of John Marshall 208 (Univ. of N.C. Press 1977) (clemency petition filed by Marshall and other members of Richmond, Virginia, bar sought commutation in part because prisoner's execution delayed five months).

Today, because defining the limits of cruel and unusual punishment has been left to the courts, they have generally measured the standards for discerning what is cruel and unusual by "evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101; *see also Weems v. United States*, 217 U.S. 349, 378 (1910) (Eighth Amendment "not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice"). "Punishments are cruel when they involve torture or a lingering death." *In re Kemmler*, 136 U.S. 463, 447 (1890). A life on death row is "torture" within this definition.

Further, the fact that several Supreme Court Justices have voiced their opinions that the Eighth Amendment may be violated by executing a person after a prolonged stay on death row reflects that our "standards of decency" have evolved. "[I]t is difficult to deny the suffering inherent in a prolonged wait for execution–a matter which courts and individual judges have long recognized." *Knight*, 528 U.S. 990 (Breyer, J., dissenting from denial of certiorari); *see also Furman*, 408 U.S. at 288 (Brennan, J., concurring) ("[M]ental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of impending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."). Indeed, as Justice Breyer has recognized:

> Courts of other nations have found that delays of 15 years or less can render capital punishment degrading, shocking, or cruel. Consistent with these

236

determinations, the Supreme Court of Canada recently held that the potential for lengthy incarceration before execution is a relevant consideration when determining whether extradition to the United States violates principles of fundamental justice. Just as attention to the judgment of other nations can help Congress determine the justice and propriety of [the United States'] measures, so it can help guide this Court when it decides whether a particular punishment violates the Eighth Amendment.

*Foster*, 537 U.S. at 992-93 (Breyer, J., dissenting from denial of certiorari) (quotations and citations omitted). Thus, courts should carefully consider that capital punishment in these circumstances involves "a lingering death . . . something more than the mere extinguishment of life," *In re Kemmler*, 136 U.S. at 447, and is a punishment most cruel and unusual.

Here, executing Newell after he has served a lengthy sentence on Arizona's death row would amount to de facto imposition of both a "life" sentence and a death sentence. Since the age of twenty he has lived as a condemned man. The psychological torture of his time on death row is a de facto and illegitimate punishment in addition to his death sentence.

Whatever penological objectives may have existed in 2004 when Newell was first sentenced to death no longer apply. At best his execution would serve "only a marginal contribution to any discernible social purpose." *See Furman*, 408 U.S. at 312-13 (White, J., concurring). The execution of this one man, more than a decade after the crime for which he was condemned, can have no deterrent or retributive purpose. The punishment would be cruel and unusual.

Finally, Newell acknowledges that any part of that delay that can be attributed to his "abuse of the judicial system by escape or repetitive, frivolous filings" should not be factored into the magnitude of the constitutional violation. *Lackey*, 514 U.S. at 1045 (Mem.) (Stevens J., dissenting from denial of certiorari). At the same time, delay attributable the legitimate exercise of his rights to review, and any delay attributable to "negligence or deliberate action by

the State" should be included in the constitutional analysis. *Id.* Here, any delay, including Newell's long wait for the appointment of post-conviction counsel, is attributable to and should be held against the State. Newell was taken into custody on June 4, 2001, and sentenced to death on February 25, 2004. The Arizona Supreme Court affirmed his convictions and sentences two years later on April 26, 2006. *Newell*, 132 P.3d 833. Due to delays in the appointment of counsel, Mr. Newell's post-conviction relief proceedings did not conclude until almost six years later on January 12, 2012, when the Maricopa County Superior Court entered a final order denying his petition for post-conviction relief. (PCR Min. Entry, 1/12/12.) The Arizona Supreme Court denied his petition for review on September 25, 2012. (PR Doc. 4.) Newell has and will continue to spend an excessive amount of time incarcerated under inhumane conditions before the State will be in a position to carry out the death sentence it imposed upon him.

In sum, allowing the State of Arizona to execute Newell after many years under the conditions of Arizona's Death Row would constitute cruel and unusual punishment. He has spent years in brutal jail and prison conditions, and experiences the daily trauma of facing death. His execution after this time under the conditions described above would not serve any legitimate purpose and would violate the Eighth Amendment.

### Claim Fifty

**Newell's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case.**

Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Newell raised this claim in Claim 2(e) of his post-conviction petition. (Pet. for PCR, PCR ROA at 0634.) The PCR court denied this claim on the merits. (PCR ROA ME 3/10/12.) The PCR court's denial of this claim was contrary to, and an unreasonable application of clearly-established federal law.

*See* 28 U.S.C. § 2254(d)(1).   In addition, the denial was based on an unreasonable determination of the facts in light of the evidence presented.  *See id.* § 2254(d)(2).   Relief is warranted because the state court's finding was in error, rendering Newell's death sentence constitutionally unreliable.

The combination of errors in this case deprived Newell of his fundamental constitutional rights including his right to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.   *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978).   As a result of the cumulative effect of the errors in the guilt and penalty phases of the trial against Newell, his convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.   When evaluating cumulative error, while only guilt phase errors are relevant to Newell's convictions, "*all errors* are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added) (citing *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Coleman v. Saffle*, 869 F.2d 1377, 1396 (10th Cir. 1989); *Alvarez v. Boyd*, 255 F.3d 820, 824 (7th Cir. 2000)).   As stated above, Newell incorporates by specific reference all facts, allegations, and arguments made elsewhere in this document.   In addition, he re-urges all objections, arguments, and claims of error made at trial and during direct-appeal and post-conviction proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error.

Even in cases where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the Ninth Circuit Court of Appeals recognizes that the cumulative effect of multiple errors may still prejudice a defendant. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala*, 334 F.3d 862, at 95 (affirming grant of

habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal); *Harris*, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (1992) (finding that counsel's deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights).

As the proceeding claims illustrate, multiple grievous errors were committed during Newell's sentencing proceedings. Even if the above errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Newell, and when viewed cumulatively in the totality of the circumstances, it is clear Newell did not receive a fair trial or sentencing. "[T]he cumulative effect of two of more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Darks*, 327 F.3d at 1018 (quotation and internal citations omitted).

Here, the cumulative effect of the errors in this case resulted in an abridgment of the fundamental fairness of the trial process during all phases. Each of these errors deprived Newell of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

The aggregate harm of these constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahmson*, 507 U.S. 619, 638 n.9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed

harmless. In any event, these violations of Newell's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.  Considering all the errors above, this Court must conclude that Newell was denied a fair trial.

**PRAYER FOR RELIEF**

WHEREFORE, Newell respectfully prays this Court to:

1.     Order that Newell be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Newell to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.     Order that upon completion of discovery, Newell be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Newell be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.     Issue a writ of habeas corpus to have Newell brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court

should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Newell brought before it to the end that he may be relieved of his unconstitutional sentences;

6.     Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted this 3rd day of July, 2013.

Jon M. Sands
Federal Public Defender
Sarah Stone
Charlotte G. Merrill
Dale A. Baich
Assistant Federal Public Defenders

s/ Sarah Stone
Counsel for Petitioner-Appellant

242

1
2

**Certificate of Service**

3
4
5
6

I hereby certify that on July 3, 2013 , I electronically filed the foregoing Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF system.   I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

7
8
9

s/ Robin Stoltze
Legal Assistant
Capital Habeas Unit

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28