**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Ray Newell,<br><br>              Petitioner,<br><br>v.<br><br>Charles L. Ryan, *et al.*,<br><br>              Respondents. | No. CV-12-02038-PHX-JJT<br><br>**ORDER**<br><br><u>DEATH PENALTY CASE</u> |

Before the Court is the petition for writ of habeas corpus filed by Steven Newell, an Arizona death row inmate. (Doc. 38.) Respondents filed an answer and Newell filed a reply. (Docs. 45, 52.) For the reasons set forth below, the Court denies the petition.

## I.    BACKGROUND

Newell sexually assaulted and murdered eight-year-old Elizabeth Byrd. The following factual summary of the crimes is taken from the opinion of the Arizona Supreme Court in *State v. Newell*, 212 Ariz. 389, 393–96, 132 P.3d 833, 837–40 (2006).

On the morning of May 23, 2001, a neighbor saw Elizabeth walking toward school with Newell following closely behind. About an hour later, a Salt River Project ("SRP") employee working in a field near the school came upon someone standing in an irrigation ditch. The person turned and looked at him and then ran away. The employee noticed a piece of green carpeting in the water near where the person had been standing.

That afternoon, Elizabeth's mother arrived home to find that Elizabeth had not returned from school. When Elizabeth did not come home that night, the police were called.

The officers were told that Elizabeth had not been in school that day. A missing persons report was called in.

The next morning, while searching the field near the school, Phoenix Police Department officers discovered a child's shoe, a children's book, a black purse or knapsack, a pair of socks, and a coin purse. That afternoon, a detective from the Maricopa County Sheriff's Office discovered Elizabeth's body in an irrigation ditch in the field, rolled up in green carpeting. Shoe prints were found along the ditch.

Later that day, the SRP employee went to the Sheriff's office after seeing a news report about the investigation. He was shown a photographic lineup, but did not identify anyone in the lineup as the person he had seen in the ditch.

An autopsy revealed bruising on Elizabeth's hands, wrists, and forearms. A ligature was still tied around Elizabeth's neck, and there were abrasions on the left side of her neck, consistent with fingers grasping at the ligature trying to remove it. She also had bruising and an abrasion on her face.

The autopsy also revealed evidence of sexual assault. Elizabeth's vulva was bruised and the vaginal tract had abrasions, with a tear on the side of one of the abrasions.

The medical examiner concluded that Elizabeth died from asphyxiation due to ligature strangulation. Once the ligature had been tightened, Elizabeth likely died within a minute or two. The medical examiner further determined that it was likely that Elizabeth had stopped breathing before she was placed in the water.

Elizabeth's underwear, along with blood, bone, and tissue samples, were collected and sent to the Department of Public Safety ("DPS") lab for testing.

A detective from the Maricopa County Sheriff's Office contacted Newell on May 27, 2001. Newell agreed to come to the station to be interviewed. He was asked about the day of Elizabeth's disappearance and if he knew anything that might be helpful to the investigation. Newell described what he did that day but made no incriminating statements.

Newell was contacted again by a detective at Elizabeth's funeral on June 2, 2001. Newell voluntarily went to the station and again answered questions about his activities at

the time of Elizabeth's disappearance. During the interview, Newell's shoes were taken to be compared with the footprints at the ditch. Two days later, an analyst from the Sheriff's office concluded that it was "highly probable" that the footprints at the crime scene had been made by Newell's shoes.

On the evening of June 4, two detectives contacted Newell and asked if he would consent to another interview. Newell agreed. Shortly after 8:00 p.m., the detectives began questioning him. The interrogation was videotaped.

Newell initially denied having anything to do with Elizabeth's death. Eventually, however, he acknowledged that he had been with her in the field on the morning of her disappearance. He admitted he had grabbed her and placed her between his legs while he rubbed up against her, causing him to ejaculate. He also acknowledged placing her in the water. When he saw the SRP employee, he covered Elizabeth with the carpeting and ran off. Newell maintained that Elizabeth was alive when he left her in the ditch and denied sexually abusing her. He was taken to jail on the morning of June 5, 2001.

Later that day, the SRP employee was shown another photo lineup, which included a picture of Newell. This time he identified Newell as the person he had seen in the ditch.

A criminalist with the DPS conducted an analysis on Elizabeth's underwear. Semen was found inside, and DNA analysis established that Newell was the source.

A jury convicted Newell of first-degree murder, sexual conduct with a minor, and kidnapping. He was sentenced to death on the first-degree murder conviction.

The Arizona Supreme Court affirmed the convictions and sentences. *Newell*, 212 Ariz. at 393–96, 132 P.3d at 837–40.

In 2009, Newell filed a petition for post-conviction relief ("PCR"), raising allegations of ineffective assistance of counsel. The PCR court denied relief after holding an evidentiary hearing. In 2012, the Arizona Supreme Court denied Newell's petition for review.

Newell filed his petition for writ of habeas corpus in this Court on July 3, 2013. (Doc. 38.) Newell filed a motion for evidentiary development, which the Court denied. (Doc. 65.)

## II. APPLICABLE LAW

Federal habeas claims are analyzed under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Under § 2254(d)(1), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), a state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Satisfying § 2254(d)(2) is a "daunting" burden, "one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). A state court's "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 1000.

In *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), the Court reiterated that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Murray (Robert) v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").

For claims not adjudicated on the merits in state court, federal review is generally not available when the claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3).

For unexhausted and defaulted claims, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *Coleman* further held that ineffective assistance of counsel in PCR proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez v. Ryan*, 566 U.S. 1 (2012), however, the Court established a "narrow exception" to the rule announced in *Coleman*. Under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798

(9th Cir. 2015). The Ninth Circuit has explained that "PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

*Martinez* applies only to claims of ineffective assistance of trial counsel; it has not been expanded to other types of claims. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (denying petitioner's argument that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court could expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017) (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## III. ANALYSIS

The Court will first address Newell's claims of ineffective assistance of trial counsel. The Court will then discuss Newell's remaining exhausted claims. Finally, the Court will address Newell's unexhausted claims.

## A. Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court explained in *Richter*:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland*, 466 U.S.] at 689. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. [*Id.*] at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (additional citations omitted); *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard").

**Claims 1–4:**

Newell raises several claims of ineffective assistance of counsel at sentencing. He alleges that counsel failed to investigate, obtain, and present mitigation evidence from lay and expert witnesses. The categories of omitted mitigating evidence include Newell's "upbringing amid a multi-generational history of violence"; severe and chronic drug addiction and "the effects of drug use at the time of the crime"; family history of instability, neglect, and physical, mental, emotional, and sexual abuse; and mental and cognitive impairments. The PCR court denied these claims on the merits. (ME 1/12/12 at 3–9.)[1]

The claims are interlinked. The discussion that follows encompasses the Court's resolution of all of Newell's allegations of ineffective assistance of counsel at sentencing.

Background

Before trial, Newell's counsel retained three experts who examined Newell. Dr. Pablo Stewart, a forensic psychiatrist, diagnosed Newell with Post-Traumatic Stress Disorder (PTSD), major depressive disorder, Attention Deficit/Hyperactivity Disorder (ADHD), cognitive disorder not otherwise specified (NOS), and polysubstance dependence. (Doc. 59-4, Ex. 39.) Dr. John Wicks, a clinical neuropsychologist, diagnosed Newell with ADHD, polysubstance abuse and dependence, and cognitive disorder NOS. (Doc. 59-5, Ex. 43.) Dr. Richard Lanyon, a psychologist, diagnosed Newell with severe methamphetamine abuse and severe borderline personality disorder. (Doc. 59-6, Ex. 44.)

On September 10, 2003, the State filed a Request for Disclosure of Mitigation Evidence. (ROA 67.)[2] The court ordered the defense to disclose its mitigation witnesses and evidence by the beginning of November 2003. On November 20, 2003 the State filed a renewed motion for disclosure and indicated that it intended to retain an expert witness

---

[1] "ME" refers to the minute entries of the trial court.
[2] "ROA" refers to the record on appeal from Newell's trial and sentencing (Case No. CR-04-0074-AP).

to examine Newell. (ROA 98.) Newell filed an objection based on his Fifth, Sixth, and Fourteenth Amendment rights. (ROA 100.)

The trial court granted the State's motion. (ROA 105.) Newell filed a request to stay in order to file a special action. The trial court denied the request. (RT 12/12/03 at 14.) Newell then filed a special action and sought a stay in the Arizona Supreme Court. He cited *Phillips v. Araneta*, 208 Ariz. 280, 93 P.3d 480 (2004), a special action the supreme court had accepted to consider whether a court could compel a defendant to participate in a mental health examination with the State's expert. (ROA 115.)

On January 7, 2004, the Arizona Supreme Court denied the stay and issued an order to the trial court. (*Id.*) The order gave the trial court discretion to order Newell to submit to the State's mental-health examination, as long as no information gained during the examination would be used in "a manner or for a purpose that contravene[d] [Newell]'s privilege against self-incrimination." (*Id.*) The court further ordered that no information gained during the examination could be used in any criminal proceeding, except on issues raised by Newell in the penalty phase. Finally, the order specified that if Newell refused to cooperate, the trial court had the discretion to preclude him from presenting expert evidence on the issue of his mental condition. (*Id.*)

Ultimately, Newell refused to submit to the examination, and the trial court precluded all mental health evidence. (ROA 112.)

On June 30, 2004, after Petitioner's trial and sentencing, the Arizona Supreme Court issued its opinion in *Phillips*, holding that once a defendant puts his mental health in issue "during the penalty phase of a capital trial," a trial court may order the defendant to submit to a mental examination by the State's expert. 208 Ariz. at 283, 93 P.3d at 483.

1.      Sentencing hearing

Counsel called seven witnesses to present mitigating evidence on Newell's behalf. The witnesses included Newell's mother, stepfather, sister, aunts, and neighbors familiar with Newell's upbringing.

Newell's mother, Kathy, testified that she dropped out of school after eighth grade. (RT 2/23/04, a.m., at 42.)[3] She began using drugs at age 25. (*Id.*)

Kathy testified that Newell never knew his biological father. (*Id.* at 43.) Newell spent much of his early childhood living with his maternal grandmother, Eula. (*Id.* at 43–45.) This was the most stable period in his life. (*Id.* at 44.) Nevertheless, while living at Eula's house, Newell was sexually abused at age eight or nine, when a 12-year-old neighbor attempted to sodomize him. (*Id.* at 50.) Kathy testified to a possible second, later, incident of attempted sexual abuse perpetrated by a babysitter who also attempted to molest Newell's sister. (*Id.* at 51–52.)

When Newell was 15 or 16 months old, Kathy moved with her boyfriend, Ken Offlick, to Ohio. (*Id.* at 43.) Offlick beat her and Newell. They moved to a shelter before returning to Phoenix and moving back in with Eula. (*Id.* at 45.)

When Newell was around eight years old, Kathy married Richard Lincks. Soon thereafter they moved to Las Vegas with Newell and his sister. (*Id.* at 46.) When Lincks, also a drug user, lost his job in Las Vegas he returned to Phoenix alone, leaving Kathy and the children homeless. (*Id.* at 47.) The family spent some time living in a vacant field. (*Id.*)

Kathy and Lincks were both arrested on drug charges in 1998 when Newell was 18. (*Id.* at 48.) Lincks was sentenced to three years for manufacturing methamphetamine while Kathy was placed on probation. (*Id.*) Because of the drug use and their financial problems, Kathy and Richard fought often, sometimes in front of Newell and his sister. (*Id.* at 49.)

Finally, Kathy testified that she remembered a period when Newell engaged in self-harm, cutting and burning himself. (RT 2/23/04, p.m., at 16.)

Newell's stepfather, Richard Lincks, also testified that he and Kathy would get high and fight. (*Id.* at 20–21.) He acknowledged smoking methamphetamine with Newell when Newell was in the seventh grade. (*Id.* at 28–29.) They smoked meth together on several occasions. (*Id.* at 35–36.)

---

[3] "RT" refers to the court reporter's transcript.

Tracy Newell, Newell's older sister, testified while the family was living with Eula, Kathy would "just disappear" for periods. (*Id.* at 44.) After Eula died, the family moved a lot. (*Id.* at 40.) Their parents used drugs together and fought in front of Newell and Tracy. (*Id.* at 46, 48.) Tracy testified that she and Newell were raised in the "drug life" and it was all they ever knew. (*Id.* at 44.)

Mary Lou Trundle, Eula's neighbor, testified that Kathy did not do much parenting. (*Id.* at 55.) Newell spent time at Trundle's house because his mother was not around. (*Id.* at 56.)

Ginger Whitely testified her daughter was Newell's girlfriend when he was 14. (*Id.* at 60.) She allowed Newell and her daughter to live together in a trailer on her property. (*Id.*) Ginger used and manufactured methamphetamine. (*Id.* at 62.)

Kathy's sisters Sherry Osborn and Connie Hendrick testified that Kathy used drugs and was an irresponsible parent. Osborn testified that Newell came to stay with her when he was 12 but she had to ask him to leave after three days because he could not follow the rules. (*Id.* at 75.) Osborn believed that Newell's mother had never set any rules for him to follow. (*Id.* at 76.) Hendrick testified that Newell's mother did not call the police after the incident of alleged sexual abuse by a neighbor boy. (*Id.* at 80–81.) Hendrick also testified that she had heard about Newell cutting and burning himself. (*Id.* at 84.)

Newell's counsel then presented an offer of proof regarding the proposed testimony of Dr. Stewart, who diagnosed Newell with "posttraumatic stress disorder as a result of his physical abuse he suffered as a child and the physical and emotional abandonment, the drug use, and as evidences by his self-mutilation and burning." (*Id.* at 88–89.) Counsel also stated that he believed Dr. Stewart's testimony could provide a connection between Newell's background and the crimes. (*Id.* at 89.)

2.      PCR proceedings

In his PCR petition, Newell alleged that trial counsel performed ineffectively at sentencing by failing to present "substantial mitigation evidence," failing to present expert testimony regarding Newell's mental health and its connection to the crimes, failing to

request an expert on addiction and poly-substance abuse, failing to subpoena certain witnesses to testify at the penalty phase, and being unprepared to challenge the testimony of a probation officer who testified in rebuttal for the State. (Doc. 58-1, Ex. 21.) The PCR court granted an evidentiary hearing on these claims and dismissed the remaining claims in the petition. (ME 3/10/10.)

At the hearing, Newell presented testimony from lead counsel Bruce Peterson and second chair Tim Agan. Peterson testified he took the case over from another attorney early in the proceedings. (RT 3/3/11 at 9–10.) Prior counsel had retained a mitigation specialist and one expert, Dr. Wicks, but not much mitigation work had been done when Peterson took over the case. (*Id.* at 10.) Peterson retained two additional experts, Drs. Lanyon and Stewart. (*Id.*)

Counsel discussed their decision not to permit Newell to be examined by the State's mental health expert. They testified that they were "flying blind" because this was their first trial since *Ring*[4] and there was no direct authority to guide their decision about whether to allow Petitioner to be examined by an independent expert before the guilt phase of trial. (*See* RT 3/3/11 at 11–15, 36–39.) Peterson testified that in addition to seeking guidance by filing a special action, he consulted with colleagues and supervisors about the issue, but there was no "consensus among the defense bar" as to whether counsel should allow Newell to be examined by a State expert. (*Id.* at 13.) He could not say that he made a "strategic decision" in refusing to let Newell be examined, "because we didn't know the rule." (*Id.*) He testified that he did not want Newell to be examined without counsel present.

Newell also called Dr. Edward French, a pharmacologist retained during the PCR proceedings, who testified about the behavioral effects of methamphetamine. Dr. French did not examine Newell but opined that methamphetamine affected Newell's ability to

---

[4] In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that a jury must determine the existence of factors necessary for imposition of the death sentence. Prior to *Ring*, in Arizona the trial judge made the sentencing decision in death penalty cases. *Ring* invalidated the statute in place at the time of Newell's crime and arrest. He was tried and sentenced under the new statutory scheme that provided for jury sentencing.

control his actions at the time of the crimes. (*Id.* at 69, 74.) He also testified that the effects of chronic methamphetamine use can include depression, hallucinations, aggressive behavior, and possible brain damage. (*Id.* at 66.)

Finally, Newell called Dr. Stewart, who performed a pretrial psychological examination of Newell. Dr. Stewart testified that Newell suffered from PTSD caused by a number of events Newell experienced in his childhood, including sexual abuse, his mother's neglect, and witnessing his mother being physically abused. (RT 3/4/11 at 33.) Dr. Stewart also diagnosed Newell with ADHD and cognitive disorder NOS. (*Id.* at 34.) These conditions also affected his executive functioning, causing him to act impulsively and make poor choices. (*Id.* at 48, 60.) Dr. Stewart further explained that Newell's conditions, which were never treated, predisposed him to substance abuse, with Newell using drugs to deal with the symptoms of his disorders. (*Id.* at 48–49.)

In addition to the testimony of Dr. Stewart, Newell presented reports from the experts retained by trial counsel, Drs. Lanyon and Wicks, discussed above, and a declaration by Dr. Karen Froming, a neuropsychologist who examined Newell in October 2008. Dr. Froming highlighted Newell's dysfunctional childhood and traumatic experiences and concluded that Newell's IQ was average but he suffered from attentional and severe memory disorder. (Doc. 59-5, Ex. 42.)

The parties also stipulated to the admission of the neuropsychological report of Dr. Kiran Amin, an expert retained by the State. (RT 6/10/11 at 4.) Dr. Amin found that Newell presented himself as chronically maladjusted and suspicious of others, with difficulty conforming to social norms and accepting responsibility for his actions. (Doc. 58-9, Ex. 31, Exhibit "C.") Dr. Amin found that Newell likely feigned symptoms of neurologic and amnestic disorders and possibly feigned psychotic and affective disorder symptoms. (*Id.*)

The State then called Dr. Steven Pitt, a forensic psychiatrist. (*Id.* at 7.) Dr. Pitt noted Newell's history of drug abuse and diagnosed him with depressive disorder NOS;

personality disorder NOS with antisocial traits; and a "rule out" diagnosis of pedophilia. (*Id.* at 16, 35–39.) Dr. Pitt did not note any cognitive difficulties. (*Id.* at 17.)

Dr. Pitt opined that Newell's drug use and mental conditions were not causally connected to the sexual assault and murder, and that Newell's behavior at the time of the crimes was conscious and purposeful. (*Id.* at 30–35.) After sexually assaulting and strangling Elizabeth, Newell fled after seeing the SRP worker, washed his clothes and shoes, and later attended Elizabeth's funeral, participated in the search for her body, and asked people to concoct an alibi for him. (*Id.* at 35.) These were the behaviors of someone "acutely aware of their conduct." (*Id.*)

Dr. Pitt noted the "huge inconsistency" in Newell's accounts of his drug use at the time of the crimes and expressed skepticism about Newell's claim that just prior to the crimes he had attempted to kill himself with an injection of heroin. (*Id.* at 19, 34.) Dr. Pitt also opined that Newell was malingering with respect to his inability to recall certain details of the crimes. (*Id.* at 35–36.)

The PCR court denied relief. It found that trial counsel's decision not to allow Newell to be examined by the State's expert—thereby forfeiting the opportunity to present expert mental health evidence at sentencing—did not constitute deficient performance because the decision was supported by strategic grounds: counsel's good faith belief that allowing Newell to be interviewed by the State's experts would violate his Fifth and Sixth Amendment rights, and the fact that presenting mental health evidence would have opened the door to unfavorable rebuttal evidence from the State. (ME 1/12/12 at 4.)

The court also found that Newell was not prejudiced by counsel's performance at sentencing because the omitted mental health evidence was "somewhat cumulative" to the evidence presented at trial and was susceptible to impeachment by the State's experts. (*Id.* at 8.) The impeachment evidence "would have affected the weight the jury would have afforded the mental health experts' opinions." (*Id.* at 9.)

3.    Analysis

The PCR court's rejection of these claims was neither contrary to nor an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts. First, the allegation that counsel performed ineffectively in presenting expert evidence is premised on the argument that counsel performed deficiently by not allowing Newell to submit to an examination by the State's expert. As noted, the PCR court found that counsel's decision was supported by strategic considerations meant to protect Newell from the presentation of damaging new information.

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 446 U.S at 690. While trial counsel would not characterize their decision as "strategic," due to their uncertainty about the applicable rules, their testimony during the PCR hearing demonstrated that the decision was informed and rational, based on research and consultation with other defense attorneys. *See Mirzayance*, 556 U.S. at 125–26 (finding no deficient performance where decision to drop insanity defense was not made rashly but reached after counsel carefully weighed their options). Moreover, as the PCR court recognized (ME 1/12/12 at 4), "the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999).

Moreover, the Ninth Circuit has explained that "even where there is a strong basis for a mental defense, an attorney may forego that defense where the attorney's experts would be subject to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion." *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) (citing *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir. 1990)); *see Mickey v. Ayers*, 606 F.3d 1223, 1246 (9th Cir. 2010) (explaining "it is not deficient to refuse to join a battle royale of experts"). As discussed below, the opinions of Newell's experts were ripe for impeachment.

In sum, counsel's performance at sentencing was "well within the range of professionally reasonable judgments." *Van Hook*, 558 U.S. at 12 (quoting *Strickland*, 466

U.S. at 699). In *Van Hook*, defense counsel spoke with the defendant's mother, father, aunt, and a family friend; met with two expert witnesses; reviewed military and medical records; and considered retaining a mitigation specialist. *Id.* at 9–10. Counsel presented mitigating evidence about the defendant's traumatic childhood and his impairment on the day of the crime. *Id.* The Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of the defendant's relatives or the psychiatrist who treated his mother. *Id.* at 11. By this standard, the performance of Newell's counsel was also reasonable.

Even if counsel's performance were deficient, Newell cannot show prejudice. The PCR court cited several grounds for its determination that Newell was not prejudiced by counsel's performance at sentencing. The court found that the omitted mitigating evidence was largely self-reported by Newell, often cumulative, and sometimes inconsistent with other testimony. (ME 1/12/12 at 5–6.) The new mitigation evidence was also impeachable and would have opened the door to damaging rebuttal testimony by the State's experts. (*Id.* at 8–9.)

This ruling does not satisfy the doubly deferential standard that applies to *Strickland* claims under the AEDPA. First, the evidence available through the testimony of lay witnesses, such as details about Newell's dysfunctional family background and history of drug abuse, would have been cumulative to the evidence presented at sentencing through Newell's family members.

Newell alleges that counsel should have called additional lay witnesses, including his ex-girlfriend and a cousin, to detail his dysfunctional family background, particularly the abusive and neglectful behavior of his mother. Newell also alleges that counsel did not adequately prepare the witnesses who did testify. At sentencing, however, counsel presented evidence, including testimony from Newell's mother, detailing the neglect, chaos, and abuse Newell experienced growing up, as well as the drug abuse that was rampant in his family and that dominated his life from the time he first used methamphetamine with his father at age 11. The omitted testimony would have covered

the same ground as the other information counsel offered in mitigation. It would not have "alter[ed] the sentencing profile" presented to the jury. *Strickland*, 466 U.S. at 700; *see Runningeagle v. Ryan*, 825 F.3d 970, 985 (9th Cir. 2016); *Babbitt v. Calderon*, 151 F.3d 1170, 1175 (9th Cir. 1998); *cf. Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017) (finding that the first step of the prejudice analysis was met where the new mitigating evidence "paint[ed] a very different picture of Apelt's character and background than was presented at sentencing").

Next, the evidence available through expert testimony about Newell's mental health and cognitive status was impeachable and would have opened the door to damaging rebuttal evidence, including Dr. Pitt's diagnosis of antisocial personality disorder. Courts have consistently recognized the damaging potential of an antisocial personality diagnosis. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) ("In its best possible light, it is a basket of cobras."); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging harmfulness of antisocial personality diagnosis); *see also Darden v. Wainwright*, 477 U.S. 168, 186–87 (1986) (finding decision not to present mitigating character or mental-state evidence was sound trial strategy because it would have opened the door to damaging rebuttal evidence that the defendant had a sociopathic personality).

Dr. Pitt's testimony would have introduced additional damaging rebuttal evidence because his finding of antisocial personality relied on the details of Newell's 2000 conviction for attempted kidnapping. Regarding that offense, Dr. Pitt testified that Newell asked for a ride from the victim and while she was driving pulled a knife on her, held it to her throat, and made crude sexual comments. (RT 6/10/11 at 42–43.) After driving around for 90 minutes, the victim, who feared Newell would rape her, stopped at a convenience store on the pretext of using the restroom, fled inside, and asked the clerk to call the police. (*Id.* at 43.) Newell drove off in her car. (*Id.*)

According to Dr. Pitt, the offense "underscore[d] [Newell's] predatory nature" and "demonstrated that he's more than capable of making choices to take advantage of others."

(*Id.* at 45.) Dr. Pitt also noted that Newell's disciplinary record in jail contained incidents of manipulation and threats of violence. (*Id.* at 46–48.)

Also, as the PCR court noted, testimony supporting the diagnoses of antisocial personality disorder and rule out pedophilia would have included Dr. Pitt's knowledge of an allegation that as a teenager Newell molested a three-year-old girl. (ME 1/12/12 at 9; *see* RT 6/10/11 at 37.)

In addition to opening the door to damaging rebuttal evidence, the testimony of Newell's experts was susceptible to impeachment by Drs. Amin and Pitt. Dr. Amin stated that Newell likely feigned neurologic and amnesic symptoms. (Doc. 58-9, Ex. 31, Exhibit "C.") Dr. Pitt agreed that Newell malingered memory loss about some details of the crime, as Newell was able to recount other specific details of the crime. (RT 6/10/11 at 16, 36.) Dr. Pitt testified that Newell's behavior in committing the crimes and evading apprehension was goal-driven and not consistent with being under the influence of methamphetamine or having recently attempted suicide with a "speedball." (*Id.* at 23, 33–34.) Such testimony would have reduced the impact of Dr. French's generalizations about the effects of methamphetamine.

Dr. Pitt further testified even if Newell did meet the criteria for PTSD or ADHD, as found by Dr. Stewart, these conditions did not affect his behavior in kidnapping, assaulting, and killing the victim or prevent him from knowing the nature of his acts. (*Id.* at 51–52.) Again, this impeachment evidence would have undermined the opinions of Newell's experts that his executive functioning at the time of the crimes was compromised by cognitive defects and drug use. *See Pinholster*, 563 U.S. at 177–79, 201 (noting the questionable mitigating value of expert testimony diagnosing defendant with bipolar mood disorder and seizure disorders when evidence would invite rebuttal by an expert who would reject the diagnosis of bipolar disorder and offer a diagnosis of antisocial personality disorder).

Finally, Newell had "a significant amount of aggravating circumstances that he would need to overcome." *Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009). He murdered

a child in an especially cruel manner. *Id.* Presenting cumulative evidence or testimony leading to a battle of experts would not have been sufficient overcome these aggravating circumstances.

Accordingly, if the jury had been confronted with additional mitigating evidence, there was not a reasonable probability that it would have returned with a different sentence. *See Belmontes*, 558 U.S. at 20 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003)).

4.    Conclusion

Newell has not met his burden with respect to either prong of *Strickland*. Under AEDPA's doubly deferential standard, *Richter*, 562 U.S. at 105, the PCR court's denial of Newell's claims of ineffective assistance of counsel at sentencing do not satisfy 28 U.S.C. § 2254(d). Claims 1–4 are therefore denied as meritless.

**Claims 6 and 7:**

In Claim 6, Newell alleges that trial counsel performed ineffectively by failing "to ensure crucial portions of the record were preserved and recorded." (Doc. 38 at 110.) In Claim 7, Newell alleges that appellate counsel performed ineffectively by failing to raise the issue of the incomplete record. (*Id.* at 116.) Newell did not raise these claims in state court. He contends that the ineffective assistance of PCR counsel excuses their default. Because *Martinez* applies solely to claims of ineffective assistance of trial counsel, *Davila*, 137 S. Ct. at 2062–63, the Court will address only Claim 6. Claim 7 is barred from federal review.

Newell's original trial counsel moved the court to order the recording of all of the proceedings in his case, including "pretrial hearings, legal arguments, voir dire and jury selection, in-chambers conferences, bench conferences, conference calls, all discussions regarding jury instructions, and all matters during the trial." (ROA 20 at 2.) The court granted the motion. (ROA 23 at 1.)

Newell argues that despite this ruling, his new counsel failed to "ensure the court viewed all of the relevant evidence, including the eight tapes of Newell's third

- 19 -

interrogation," and failed to preserve transcripts provided to the jurors or make a record of what was played to the jury. (Doc. 38 at 112–13.) Newell further alleges that the record does not include transcriptions of bench conferences throughout the trial. (*Id.* at 114–15.)

PCR counsel did not perform ineffectively in failing to raise this claim because the underlying claim of ineffective assistance of trial counsel is clearly meritless. *Sexton*, 679 F.3d at 1157. Newell offers only conclusory allegations that he was prejudiced by an incomplete record. These allegations are insufficient to meet his burden under *Strickland*. *See Green v. Johnson*, 160 F.3d 1029, 1042–43 (5th Cir. 1998) (denying claim of ineffective assistance of counsel based on failure to ensure bench conferences were recorded).

Newell has made no showing that the trial court's purported failure to view the entirety of Newell's recorded interrogation affected the court's decision.[5] Similarly, Newell fails to demonstrate that the unrecorded bench conferences or the missing interview transcripts prevented meaningful appellate review. *See Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989) (finding that the petitioner was not entitled to habeas relief because he had not shown prejudice by the absence of a complete transcript).

The procedural default of Claims 6 and 7 is not excused under *Martinez*. The claims are denied as barred from federal review.

**Claim 9:**

Newell alleges that trial counsel performed ineffectively by failing to "investigate or obtain the probation file upon which the State relied in the aggravation and penalty phase of his trial." (Doc. 38 at 125.) The PCR court denied the claim on the merits. (ME 1/12/12 at 2.)

During the mitigation phase of Newell's sentencing, the trial court precluded the State from presenting rebuttal evidence unless it rebutted evidence that had been presented

---

[5] After the voluntariness hearing, the court indicated that it wanted "to watch these tapes on my own at my own pace." (RT 11/5/03 at 141.) In its ruling finding the confession voluntary, the court stated that it "had listened to the critical portions of the tape again." (ROA 94, ME 11/5/04, at 3.)

to the jury. (RT 2/20/04 at 10.) The State disclosed its intent to present testimony from Newell's former probation officer, James Edwards, to rebut Newell's complaint that he had been unable to get help for his drug addiction. (*Id.* at 7–8.) Edwards would testify that Newell had failed to participate in a drug rehabilitation program recommended by the probation officer.

Newell's counsel argued that the State should not be allowed to rebut its own evidence—namely, the video of Newell's interrogation in which he mentions not being provided with drug treatment, which the State played for the jury during the guilt phase of trial. (*Id.* at 13.) The court disagreed, finding that because the jury had already heard the evidence that Newell was not given drug treatment, Edwards' testimony was "appropriate grist for the rebuttal mill." (*Id.* at 18.) Newell's counsel indicated he had already interviewed Edwards and planned to re-interview him if he was permitted to testify. (*Id.* at 16.)

Prior to closing arguments, Newell's counsel again objected to Edwards' testimony, this time based on late disclosure of a 10-page prescreening report from 2000 prepared by another probation officer. (RT 2/24/04 at 4–5.) Counsel objected that the report was unreliable hearsay, and that he had been given no opportunity to rebut the information it contained, which included responses by Newell denying that he had been sexually abused. (*Id.* at 6, 17.) The court overruled the objection and allowed Edwards to refer to the document in his testimony.

The PCR court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Counsel's performance was not deficient. He objected to the evidence, interviewed Edwards twice (*id.* at 7), and effectively cross-examined Edwards about the contents of the prescreening report, particularly about Newell's denial of sexual abuse (*Id.* at 30–31.)

Even if counsel had performed deficiently with respect to the prescreening report and Edwards' testimony, Newell cannot meet his burden of showing prejudice. He does not indicate what additional steps counsel could have taken if he had become aware of the

prescreening report at an earlier date. There was not a reasonable probability that some alternative course of action by counsel with respect to this evidence would have resulted in a different verdict.

Claim 9 is denied.

**Claim 10:**

Newell alleges that counsel performed ineffectively by failing "to properly investigate and obtain records essential to a complete mitigation presentation." (Doc. 38 at 129.) These materials include Newell's complete school, medical, police, and probation records, and various records concerning Newell's family members, his mother's boyfriend, and Ginger Whitley. (*Id.* at 131.) Newell indicates that he did not raise this claim in state court and contends its default is excused by the ineffective assistance of PCR counsel. (*Id.*)

PCR counsel's failure to raise this allegation was neither deficient nor prejudicial. As discussed above, PCR counsel did raise claims that trial counsel performed ineffectively in their investigation and presentation of mitigating evidence, including the kind of evidence found in the records Newell cites in this claim. There is no reasonable probability that the court would have granted relief if PCR counsel had raised a specific allegation that the information allegedly omitted at sentencing was to be found in documents trial counsel failed to obtain.

The default of Claim 10 is not excused under *Martinez*. Claim 10 is denied as barred from federal review.

**Claim 12:**

Newell alleges that trial counsel performed ineffectively by failing to object to the medical examiner's testimony. (Doc. 38 at 136.) Newell did not raise this claim in state court. He contends its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*) PCR counsel did not perform ineffectively because the underlying claim of ineffective assistance of trial counsel is without merit.

During the guilt phase of trial, Dr. Phillip Keen, the Maricopa County Medical Examiner, testified about the results of an autopsy performed by one of his subordinates.

(RT 2/11/04 at 56–87.) Newell's counsel did not object to the testimony but did raise a hearsay objection to the introduction of two autopsy exhibits. (*Id.* at 60.) The court overruled the objection, but subsequently one of the exhibits was withdrawn. (*Id.* at 61, 88.)

Newell now contends that the testimony was inadmissible hearsay under *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, including *Melendez-Diaz-v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). (*See* Doc. 38 at 133; Doc. 52 at 81–88.) In *Crawford*, the Supreme Court held that the Confrontation Clause permits admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59.

*Crawford* was decided March 8, 2004, almost a month after Dr. Keen's testimony on February 11, 2004. Counsel could not have been ineffective for failing to raise an objection based on a Supreme Court decision that had not been issued. Newell offers no argument that if counsel had objected to Dr. Keen's testimony, the objection would have been sustained. In fact, the trial court's denial of counsel's objection to the autopsy exhibits demonstrates that an objection to Dr. Keen's testimony would have been futile. *See Matylinsky v. Budge,* 577 F.3d 1083, 1094 (9th Cir. 2009) (explaining that failure to object to testimony on hearsay grounds is not ineffective where the objection would have been properly overruled). Moreover, the Arizona Supreme Court has consistently held that a testifying medical examiner may offer an opinion based on an autopsy performed by a non-testifying expert. *See, e.g.*, *State v. Dixon*, 226 Ariz. 545, 553, 250 P.3d 1174, 1182 (2011) ("Our cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he forms his own conclusions.").

Because trial counsel did not perform ineffectively in failing to raise a futile objection to Dr. Keen's testimony, PCR counsel did not perform ineffectively in failing to raise such a claim. *Sexton*, 679 F.3d at 1157. Therefore, the default of Claim 12 is not

excused under *Martinez*. Claim 12 is denied as procedurally defaulted and barred from federal review.

**Claim 24:**

Newell alleges that trial counsel performed ineffectively by failing to "ensure that the jury was properly instructed regarding their sentencing alternatives."[6] (Doc. 38 at 183.) Newell did not raise this claim in state court. He contends its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*) PCR counsel did not perform ineffectively because the underlying claim of ineffective assistance of trial counsel is without merit.

Newell contends, citing *Mills v. Maryland*, 486 U.S. 387 (1986), that the jury instructions in his case "unconstitutionally gave the jury the impression they must unanimously find *all the mitigation* sufficiently substantial to call for lenience before they could return a life verdict." (Doc. 38 at 182.)

The trial court instructed the jury that it must return a life verdict, "If all jurors find mitigation exists, even if the mitigating factors found are different, and all the mitigation they found is sufficiently substantial to call for leniency." (RT 2/23/04, a.m., at 15; *see* RT 2/24/04 at 52.) Trial counsel did not challenge this instruction. (*Id.* at 183.)

Newell's reading of the phrase "all the mitigation" is, at best, strained. The more natural reading, given the language immediately preceding it, is that "all the mitigation" refers to the total weight of the mitigating circumstances, even if individual jurors found different mitigating circumstances had been proved. Therefore, unlike the instructions at issue in *Mills*, the instruction here did not require a unanimous finding as to each mitigating circumstance.

Because the instruction was not objectionable, trial counsel did not perform ineffectively by failing to challenge it. Because the underlying claim of ineffective assistance of trial counsel is without merit, PCR counsel did not perform ineffectively in

_____

[6] As discussed below, Newell also alleges that appellate counsel performed ineffectively by failing to raise the claim. (Doc. 38 at 183.)

failing to raise it and its default is not excused under *Martinez*. *Sexton*, 679 F.3d at 1157. Claim 24 is denied as procedurally defaulted and barred from federal review.

**Claim 28:**

Newell alleges that trial counsel performed ineffectively by failing to ensure the jury was presented with execution impact testimony.[7] (Doc. 38 at 191.) Newell did not raise this claim in state court. He contends its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*) PCR counsel did not perform ineffectively because the underlying claim of ineffective assistance of trial counsel is without merit.

The trial court granted the State's request to preclude evidence of the effect Newell's execution would have on his friends and family. (RT 2/20/04 at 6–7.) Newell's counsel disagreed but conceded that the case law supported the court's ruling. (*Id.* at 3–4.)

Counsel's performance was not ineffective. Arizona court have held that execution impact testimony is not relevant mitigating evidence, *see State v. Chappell*, 225 Ariz. 229, 238, 236 P.3d 1176, 1185 (2010), and the Ninth Circuit has noted that no clearly established federal law requires the admission of execution impact testimony. *Stenson v. Lambert*, 504 F.3d 873, 892 (9th Cir. 2007).

Because the underlying claim of ineffective assistance of trial counsel is without merit, PCR counsel did not perform ineffectively in failing to raise it and its default is not excused under *Martinez*. *Sexton*, 679 F.3d at 1157. Claim 28 is denied as procedurally defaulted and barred from federal review.

**B.    Exhausted Claims**

Newell raised the following claims, in whole or in part, in state court. They were denied on the merits by the Arizona Supreme Court or the PCR court.

**Claim 5:**

Newell alleges that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court admitted his taped confession. He argues that his

---

[7] As discussed below, Newell also alleges that appellate counsel performed ineffectively by failing to raise the claim. (Doc. 38 at 191.)

statements were obtained in violation of *Miranda v. Arizona* and *Edwards v. Arizona*. He also contends that the statements were obtained involuntarily, through force, threats, coercion, and promises. The Arizona Supreme Court denied this claim on direct appeal. *Newell*, 212 Ariz. at 396–400, 132 P.3d at 840–44.

    1.    Background

At about 6:15 p.m. on June 4, 2001, Detectives Kim Seagraves and Roger Marshall of the Maricopa County Sheriff's Office made contact with Newell at the apartment complex where Newell's girlfriend lived. (RT 11/5/03 at 43–44.) They followed Newell as he drove into the parking lot and spoke to him after he exited the vehicle. (*Id.* at 44.) He told the detectives that he had new information to offer about the case, and agreed to follow them, driving his own vehicle, to the police station. (*Id.* at 45.)

Newell was placed in an interview room, where Detectives Seagraves and Marshall began interrogating him at around 8:00 p.m.[8] Detective Seagraves read Newell his *Miranda* rights and he responded that he understood those rights. Seagraves and Newell conversed for two hours without Newell making any inculpatory statements.[9]

At that point the detectives left the room. When they returned, about 15 minutes later, Detective Seagraves told Newell she was "one hundred percent certain" that he had something to do with the victim's death. She listed the evidence they purportedly had against him and told him "the investigation is done, it's over with, it's complete, you're the person that's responsible for her death." Seagraves then stated, "you have a decision right now and the decision you have is to sit there and to deny and to continue to deny it and let us go [on] with our report."

---

[8] Newell had spoken to officers on two prior occasions, most recently on June 2, 2001, when he was interviewed by an MCSO detective. (*See* Doc. 59-6, Ex. 50.) At the end of the interview, before Newell submitted to a "Computer Voice Stress Analyzer" test, the detective read Newell his *Miranda* rights. The police released him after the test.)

[9] The video of this interrogation, which the Court has viewed in its entirety, is recorded on eight CDs: Tape 1 (8:05 p.m. to 10:03 p.m., 6/4/01); Tape 2 (10:02 p.m., 6/4/01 to 12:03 a.m., 6/5/01); Tape 3 (12:00 a.m. to 2:00 a.m.); Tape 4 (1:57 a.m. to 4:13 a.m.); Tape 5 (4:10 a.m. to 6:32 a.m.); Tape 6 (6:31 a.m. to 8:31 a.m.); Tape 7 (8:28 a.m. to 10:30 a.m.); and Tape 8 (10:27 a.m. to 10:42 a.m.). (*See* Doc. 59-6, Ex. 51.)

While Detective Seagraves was speaking, Newell said, "I want to call my lawyer" (the "first invocation"). He continued talking, protesting his innocence. Detective Seagraves, apparently unsure of what Newell had said, asked "Did you just ask for a lawyer, is that what you're asking me for?" Newell responded "No," shaking his head, but then added "I mean, if I'm getting accused right now—if I'm getting charged for it yeah, I want a lawyer" ("second invocation"). Detective Seagraves responded:

> Stop talking, stop talking. I want to tell you something. If you've asked for a lawyer, then I can't ask you anything else. And we are going to go on with our questions but I just don't want it to be confused, I want to understand if you want to talk to me then you need to tell me.

Newell began his response with a phrase in which the words "I" and "willing" are intelligible but then repeated, "If I'm going to go to jail now, I want to talk to my lawyer. That's—there ain't no way" ("third invocation"). He continued talking until Detective Seagraves again asked, "Do you want to talk to me or do you want your lawyer here?" Newell answered, "I want to talk to you." Less than 40 seconds elapsed from the first invocation to Newell's agreement to talk after the third invocation.

At 11:45 p.m., Detective Seagraves left the room and Detective Marshall continued interrogating Newell. Eventually, Newell made incriminating statements to Detective Marshall. At 1:21 a.m., he stated: "I know it's me, I did it, but I can't tell you I remember doing it." Starting at 3:22 a.m., Newell began making further incriminating statements. Over the next 40 minutes he admitted to picking Elizabeth up and setting her between his legs. He admitted that he took her clothes off. He stated that she rubbed against him and he masturbated. He admitted picking her up by her feet, putting her in the water, and setting the green material on her body. He denied hitting, beating, or sexually assaulting her, and stated she was alive, breathing, with her eyes open, when he left her.

Newell was alone in the interrogation room, except for a restroom break, from 4:06 a.m. to 5:23 a.m. He spent much of that time writing a letter to Elizabeth's family. Detective Marshall returned to read the letter. From 5:28 to 6:15 Newell took a cigarette break. After returning to the interrogation room and declining Detective Marshall's offer to bring him

something to eat, Newell was again left alone to write another letter. Marshall returned at 6:34 a.m. and questioning resumed.

At around 7:00 a.m., Newell told Detective Marshall:

> I grabbed the strap, dude, fuck, how hard is it to understand that. I grabbed the fucking strap, picked her up and fucking dropped her in the fucking water. Water splashed, psh, psh. Her eyes were open and bubble, bubbles. Bluh, bluh, bluh. That's when I looked up and there he was, threw the fucking carpet over and fucking ran for my fucking life.

Newell never acknowledged strangling Elizabeth with the purse strings or penetrating her vagina.

At 7:08 a.m., after again offering Newell refreshments, Detective Marshall left Newell alone to work on his letter. He returned at 8:09 to read the letter and ask additional questions. Detective Marshall left the room at 8:30. No further interrogation took place. From 8:47 to 9:02 a.m. Newell visited with his mother in the interrogation room. Newell appeared to fall asleep at around 10:13. He awoke when Detective Marshall arrived to take him to jail at 10:42 a.m. on July 5.

2.      *Miranda* Analysis:

The trial court held a hearing on Newell's motion to suppress the tape. Detectives Seagraves and Marshall testified. With respect to the initial invocation, "I want to call my lawyer," Detective Seagrave testified that she and Newell were "talking over each other" and she heard only the word "lawyer." (RT 11/5/03 at 55–56.) Detective Marshall testified that he did not hear Newell's invocation at all and did not hear the word "lawyer" until Detective Seagrave used it when attempting to clarify Newell's statement. (*Id.* at 87.)

After hearing the testimony, the court found there was no violation of Newell's rights under *Miranda* because Newell never made an unequivocal request for counsel. The court explained:

> As to the first invocation . . . I'm going to accept Detective Seagrave's testimony from my listening of the tape independently, it makes sense that the defendant and she were talking over each other, so it's reasonable that she didn't hear him say, "I want to call my lawyer." And it's reasonable that

she just heard the word "lawyer," and it's also reasonable that she followed up to find out what he was saying.

(*Id.* at 125.)

With respect to the second invocation the court noted that "it's still not clear, because in one sentence he's saying 'no' and he's saying 'yes.' So it's reasonable then to have [Detective Seagrave] continue to ask for clarification." (*Id.* at 126.)

Addressing the third invocation, the court found that "they're still talking over each other . . . and then the only question she ultimately asks, 'Do you want to talk to me or do you want your lawyer here?' And he answered, 'I want to talk to you.'" (*Id.*)

The Arizona Supreme Court held that the trial court did not abuse its discretion in determining that Newell's *Miranda* rights were not violated:

> The entire exchange involving the three supposed requests for counsel occurred within one minute. During this time, Newell and the detective were often speaking simultaneously. As a result, Newell's requests were either not heard or heard in such a way that the detective reasonably found it necessary to ask for clarification. Also, some of the alleged requests were contradictory; therefore, a reasonable officer would not consider them unequivocal. The detective was free to continue her questioning to "clarify whether or not [Newell] actually want[ed] an attorney."
>
> The detective did precisely this. Newell, in response to a clarifying question, stated, "I want to talk to you. I have been down here talking to you guys every time you guys come after me." Once that response was received, further questioning was entirely appropriate.

*Newell*, 212 Ariz. at 398, 132 P.3d at 842 (citing *Davis v. United States,* 512 U.S. 452 (1994)).

When a suspect invokes his Fifth Amendment right to have counsel present during a custodial interrogation, "the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Police may not continue questioning a suspect without counsel present "unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Only an unambiguous

invocation of the right to counsel triggers protection under *Edwards*. An invocation is unambiguous if the accused "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.

Whether a suspect unequivocally invoked his right to counsel is a mixed question of law and fact. What the suspect said and the circumstances under which he said it are questions of fact. Whether what he said constituted an unequivocal request for counsel under the circumstances is a question of law. *See, e.g., Robinson v. Borg*, 918 F.2d 1387, 1390 (9th Cir. 1990).

The state courts found that the detectives did not hear Newell's first invocation. This factual finding is not erroneous. The recording shows that Newell and Detective Seagraves were talking over each other and that Newell's statement, made hurriedly and in a soft voice, was difficult to hear. When Seagraves, who heard only the word "lawyer," asked Newell to clarify whether he was requesting a lawyer Newell first said "No" before adding that if he was getting charged he wanted a lawyer. Because that statement was ambiguous and equivocal, if not contradictory, Detective Seagraves was permitted to clarify Newell's position. The third invocation was also preceded by words suggesting a willingness to talk. As the Arizona Supreme Court found, none of the invocations was unequivocal. *Newell*, 212 Ariz. at 398, 132 P.3d at 842.

Newell argues that *Smith v. Illinois*, 461 U.S. 91 (1984), is dispositive as to his *Miranda* claim. (Doc. 38 at 96.) *Smith* is distinguishable.

When detectives asked Smith whether he understood his right to have a lawyer present, he responded, "Uh, yeah, I'd like to do that." 469 U.S. at 97. Instead of terminating the interrogation, the detective "pressed him again," asking, "Do you wish to talk to me at this time without a lawyer being present?" *Id.* at 93. This time Smith responded, "Yeah and no, uh, I don't know what's what, really." *Id.* Smith then agreed to speak with the detectives. *Id.* The Supreme Court held that the detective's clarifying question was

improper, and Smith's equivocal response could not be used "to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 93, 100.

During Newell's interrogation, by contrast, the clarifying questions asked by Detective Seagraves were prompted by Newell's ambiguous or unclear invocations of his right to counsel. As the *Smith* Court explained, ambiguity can be created by "events preceding the request" or "nuances inherent in the request itself." 469 U.S. at 99–100. The ambiguity in Newell's invocations was caused by the fact that his first request was not audible and his second and third requests were preceded by language inconsistent with a clear intention to cease speaking to the detectives. In contrast to *Smith*, Seagraves' follow up questions were not used to cast retrospective doubt on an earlier, unambiguous invocation, nor were they an attempt to wear Newell down. *Id.* at 98.

This Arizona Supreme Court's denial of Newell's *Miranda* claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

3. Voluntariness Analysis:

"An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment." *United States v. Miller,* 984 F.2d 1028, 1030 (9th Cir. 1993) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)). The question is whether, under the totality of the circumstances, the defendant's will was overborne when he confessed. *Id.* at 1031; *see Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167. To determine whether a confession was voluntary, courts consider length, location, and continuity of the interrogation; the suspect's maturity, education, and physical and mental condition; and whether the suspect was advised of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993).

A claim that a confession was coerced involves mixed questions of law and fact. The ultimate conclusion by a state court that a confession was voluntary constitutes a legal issue that is reviewed under § 2254(d)(1). *See Lambert v. Blodgett*, 393 F.3d 943,

978 (9th Cir. 2004). However, the "factual findings underlying the state court's conclusion . . . are accorded a presumption of correctness." *Id.* at 976; *Miller v. Fenton*, 474 U.S. 104, 117 (1985) (explaining that state court findings regarding the circumstances of an interrogation, the defendant's prior experience with the criminal justice system, and his familiarity with the *Miranda* warnings constitute factual findings entitled to a presumption of correctness on federal habeas review).

Newell alleges that his confession was a result of "force, threats, coercion, and promises." (Doc. 38 at 98.) He argues that his confession was rendered involuntary by the following factors: the length of the interrogation; the detectives' failure to honor his request for an attorney; the fact that he was sleep-deprived and under the influence of methamphetamine; the detectives' appeal to religion; accusations he was a sociopath; promises that his safety in jail would be ensured; the detectives' statements that they were absolutely certain that he was guilty; and the detectives' insistence that Newell was not leaving and needed to tell them what happened.

After the voluntariness hearing, the trial court found that under the "totality of the circumstances, defendant's will was not overcome and the statements were voluntary." (ME 11/5/03 at 3.) The Arizona Supreme Court affirmed. *Newell*, 212 Ariz. at 396–400, 132 P.3d at 840–44.

As the Arizona Supreme Court explained, and the video-tape confirms: "The interrogation here lasted about 14 hours, but not all of that time involved questioning. The detectives gave Newell multiple breaks to smoke and use the restroom. He also spent time alone in the room writing letters and sleeping." *Newell*, 212 Ariz. at 399, 132 P.3d at 843.

Newell's interrogation effectively ended at 8:30 a.m. on June 5. Before that, Newell had spent approximately three hours alone in the interrogation room or taking cigarette and restroom breaks.

While being questioned by Detective Seagraves, Newell asked what would happen to someone accused of these crimes. Detective Seagraves responded that, "if you're worried about your safety in jail, we can make arrangements for that." Newell alleges that

this promise rendered his confession involuntary. The Arizona Supreme Court disagreed, finding that the comments did not "[rise] to the level of a promise that prompted Newell to confess" and that "Newell did not rely upon them when he made his inculpatory statements. Almost immediately after hearing the alleged promises, Newell again denied ever having been in the field with Elizabeth." *Newell*, 212 Ariz. at 44, 132 P.3d at 844.

Newell contends that the detectives' "religious accusations" and "passive-aggressive accusations that [he] was a sociopath" rendered his confessions involuntary. (Doc. 38 at 103.) At points throughout the interrogation, Detective Marshall raised the subject of religion, urging Newell to "get right with God," be truthful, and seek forgiveness. Detective Seagraves and later Detective Marshall also asked Newell if he was the kind of person who would be honest about what he had done, in contrast to a sociopath who would continue to lie without conscience. Detective Marshall further suggested that if Newell would not be honest he might have to tell Newell's ex-girlfriend that he was a sociopath and advise her never to be around him again.

The Arizona Supreme Court found that "[n]o evidence indicates that any religious references caused Newell's will to be overborne." *Newell*, 212 Ariz. at 400, 132 P.3d at 844. The court similarly rejected Newell's argument that Detective Marshall's comments about Newell's ex-girlfriend rendered his confession involuntary:

> Taken in context, however, none of these statements rise to the level of a threat, nor did any cause Newell to make incriminatory statements. Newell asked the detectives to talk to this woman because he felt that "she need[ed] to know" what was going on, and at one point he said that it did not matter what the detective told this woman because she was probably not going to be around anyway. We therefore conclude that these alleged threats did not render Newell's statements involuntary.

*Newell*, 212 Ariz. at 44, 132 P.3d at 844. These decisions are neither contrary to nor an unreasonable application of clearly established law, nor are they based on an unreasonable determination of the facts.

"[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479

U.S. at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). Without some evidence of coercion, mere references to a suspect's religious beliefs do not render a confession involuntary. *See Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010); *Ortiz*, 671 F.3d at 872 ("[I]n the absence of threats or promises, mere psychological appeals to a petitioner's conscience were not enough to overcome his or her will.").

The detectives, primarily Detective Marshall, used only moral and psychological pressure to persuade Newell to confess. Newell cites no clearly established law holding that this type of pressure constitutes "coercive police activity." *Connelly*, 479 U.S. at 167. Detective Marshall played on Newell's feelings for his ex-girlfriend, but those efforts fell short of the type of pressure that overbear a suspect's will. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (suspect confessed after officers told her that failure to cooperate would result in her losing financial aid for, and custody of, her children); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (explaining that it is impermissible to "deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation'"). Here, the detectives never threatened Newell's loved ones or demanded his cooperation as a condition of seeing them again.

Finally, there is no support in the record for Newell's contention that he was "under the mind-altering influence of methamphetamine" during the interrogation. (Doc. 38 at 105.) The only evidence Newell cites is the video showing him scratching himself when he was alone in the interrogation room. (*Id.*, n.5.) Whatever this activity signifies, it does not outweigh the absence of any testimony or other evidence that Newell was, or appeared to be, under the influence when questioned on June 4 and 5. No such evidence is present in Newell's interactions with the detectives, with whom he actively engaged throughout the interrogation. In any event, sleeplessness or drug use only render a confession involuntary if they caused the suspect's will to be overborne. *See Clabourne v. Lewis*, 64 F.3d 1373, 1379 (9th Cir. 1995). Again, the record does not support such a finding. *See United States v. Rodriguez–Rodriguez*, 364 F.3d 1142, 1146 (9th Cir. 2004) (finding waiver of *Miranda* rights voluntary despite heroin withdrawal because suspect was alert

and oriented), *abrogated on other grounds by Young v. Holder,* 697 F.3d 976 (9th Cir. 2012); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (finding that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his *Miranda* rights where police officers testified that they had no knowledge of these alleged impairments and the suspect did not act intoxicated).

In arguing that his confession was not voluntary, Newell relies heavily on the Ninth Circuit's *en banc* decision in *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011). In *Doody*, the 17-year-old suspect, who spoke English as a second language, confessed to his involvement in a multiple murder. The confession occurred during a 12-hour interrogation involving three detectives. The interrogation was preceded by a confusing and misleading recitation of Doody's *Miranda* rights. The trial court denied Doody's motion to suppress, and the Arizona Court of Appeals affirmed. The Ninth Circuit reversed the district court's denial of habeas relief, finding that the state court of appeals did not properly consider the totality of the circumstances that rendered the confession involuntary. These circumstances included:

> Doody's youth, his lack of prior involvement with the criminal justice system, his lack of familiarity with *Miranda* warnings, his non-native status, the length of the interrogation with Doody seated in a straight-back chair for over nine hours without a break, the lack of adequate *Miranda* warnings, the tag team tactics used by the detectives, the number of interrogators, Doody's persistent non-responsiveness, and the previous false confessions.

*Id.* at 1015.

These circumstances are absent or less severe in Newell's case. Newell was 20 years old, a native English speaker, with previous involvement in the criminal justice system. Detective Seagraves properly administered the *Miranda* warning. Newell was not "tag-teamed" by three detectives but made his incriminating statements while speaking with Detective Marshall alone. Unlike Doody, Newell was responsive to the detectives' questions throughout the interrogation. Newell received numerous breaks during the interrogation. Finally, only a little more than five hours had passed when Newell confessed that he "did it."

The totality of the circumstances shows that Newell's will was not overborne. As the Arizona Supreme Court observed, "at no time during the interview did Newell capitulate and say what he thought the detectives wanted to hear" and "persistently refused to admit to sexually assaulting Elizabeth or to tying the purse strap around her neck." *Newell*, 212 Ariz. at 400, 132 P.3d at 844. His confession was not involuntary.

### 4. Conclusion

The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Accordingly, Claim 5 is denied.

**Claim 8:**

Newell alleges that his rights were violated when the trial court allowed the State to present testimony from a probation officer in rebuttal to Newell's mitigation evidence. (Doc. 38 at 118.) This claim consists of three subclaims, only the first of which is exhausted.

In Claim 8(A), Newell alleges that "[t]he Arizona Courts violated clearly-established federal law by allowing the state to present evidence in the penalty phase of Newell's trial that did not rebut any arguments he made." (*Id.* at 119.) Newell's probation officer testified about opportunities Newell was offered to get help for his drug problem. Newell argues that because he did not present evidence of his inability to get help for his drug problem as a mitigating factor, the State was not entitled to present rebuttal evidence that such opportunities had been available.

The trial court ruled that the testimony was admissible to rebut statements Newell made during his videotaped interrogation about being unable to get help for his drug problem. The Arizona Supreme Court found the trial court did not abuse its discretion by allowing the testimony. *Newell*, 212 Ariz. at 404, 132 P.3d at 848. This decision does not entitle Newell to habeas relief.

In finding that the rebuttal testimony was admissible, the Arizona Supreme Court cited state law, including A.R.S. § 13–703(G), which permits a jury to consider any factors

that are offered when considering mitigation, and § 13–703(D), which provides that any evidence admitted during the guilt phase of the trial is admitted for purposes of the sentencing proceeding. *Newell*, 212 Ariz. at 404, 132 P.3d at 848.

A state court's evidentiary errors are not cognizable on federal habeas review without a showing that the errors violated the Constitution. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Walters v. Maas*, 45 F.3d 1355, 1357 (9th Cir. 1995) ("A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.").

Newell does not allege that a specific constitutional right was violated by the testimony rebutting his statements that he was never offered an opportunity for drug treatment. (Doc. 38 at 120–21.) In his reply brief he asserts the testimony rendered his trial fundamentally unfair. (Doc. 52 at 66–67.)

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). The Supreme Court has never held that the admission of irrelevant or prejudicial evidence violates due process. *Id.* ("Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, . . . it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Because there is no clearly established federal law under which the admission of the rebuttal testimony would amount to a constitutional violation, the Arizona Supreme Court's denial of this claim was not an "unreasonable application." *See id.* (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

The same analysis would preclude relief on the remainder of Claim 8.[10] In addition, Claims 8(B) and (C) are procedurally defaulted and barred from federal review.

Newell did not raise these claims in state court. Notwithstanding his arguments to the contrary, the claims' default is not excused by the ineffective assistance of appellate or PCR counsel. As noted, ineffective assistance of PCR counsel excuses only defaulted claims of ineffective assistance of trial counsel. *See Hunton*, 732 F.3d at 1126–27. It does not apply to the allegations in Claim 8.

In addition, before ineffective assistance of appellate counsel may be used as cause to excuse a procedural default, the particular ineffective assistance allegation must first be exhausted in state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986) (explaining that counsel's ineffectiveness in failing to preserve a claim for review in state court can excuse a procedural default only if that ineffectiveness itself constitutes an independent constitutional claim); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).

Newell did not raise allegations of ineffective assistance of appellate counsel in his PCR petition. Therefore, the failure of appellate counsel to raise Claims 8(B) and (C) does not excuse their default.

Claim 8 is denied.

**<u>Claim 14:</u>**

Newell alleges that his "due process rights under the Fifth, Sixth, and Fourteenth Amendments" were violated when the trial court precluded all expert testimony about his

---

[10] In Claim 8(B), Newell alleges that his Confrontation Clause rights were violated when the probation officer was allowed to testify about a prior report prepared by a different officer, in which Newell stated that he had a good relationship with his family, was not addicted to methamphetamine, and had never been sexually abused. (Doc. 38 at 121–23.) In Claim 8(C), Newell alleges that his rights to due process and a fair trial were violated by the late disclosure of the prior report. (*Id.* at 123–25.)

mental health. (Doc. 38 at 139.) The Court discussed the background of this claim above. On direct appeal, Newell argued that the trial court's ruling violated his privilege against self-incrimination. Citing its decision in *Phillips*, 208 Ariz. 280, 93 P.3d 480, the Arizona Supreme Court denied the claim:

> Newell acknowledges that we have previously held that once a defendant puts his mental health in issue, "during the penalty phase of a capital trial," a trial court may order the defendant to submit to a mental examination by the State's expert. As long as the order assures the defendant specific protections, we held that this may be done without running afoul of the defendant's privilege against self-incrimination. We further held that if the defendant refuses to submit to a court-ordered examination, the trial court may, as a sanction, preclude a defendant's mental-health related mitigation evidence at the penalty phase.

> Newell presents no arguments that would compel us to revisit our decision in *Phillips*. Therefore, the superior court did not err when it precluded the testimony of Newell's mental health expert.

*Newell*, 212 Ariz. at 405, 132 P.3d at 849 (citations omitted). This decision is neither contrary to nor an unreasonable application of clearly established federal law.

The Fifth Amendment privilege against self-incrimination applies at the penalty phase of trial. *Estelle v. Smith*, 451 U.S. 454, 465 (1981). However, a defendant may not stand on the Fifth Amendment privilege to preclude the prosecution from using such an evaluation to rebut psychiatric evidence introduced by the defendant himself. *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987). Accordingly, "[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). As the Ninth Circuit has explained, "a defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue." *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) (citing *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987)); *see also White v. Mitchell*, 431 F.3d 517, 536–37 (6th Cir. 2005) (holding that a capital defendant's rights were not violated when the prosecution

used a pretrial competency report to rebut mitigating evidence offered by defendant's expert). Newell's right to avoid self-incrimination was therefore not violated.

Newell also argues that the trial court's ruling violated his right to present "any available mitigation evidence at sentencing." (Doc. 38 at 142.) He cites no authority, however, for the proposition that *Cheever* and *Buchanan* conflict with *Lockett* and *Eddings*, and the Court has found none and the Arizona Supreme Court has rejected the argument.[11]

In *State v. Naranjo*, the Arizona Supreme Court upheld the trial court's decision precluding the defendant from presenting an expert mitigation witness as a sanction for late disclosure. 234 Ariz. 233, 246, 321 P.3d 398, 411 (2014). The court rejected the defendant's argument, citing *Lockett*, that precluding the expert prevented the jury from hearing relevant mitigating evidence. *Naranjo*, 234 Ariz. at 245, 321 P.3d at 410. The court explained that, "Although that general proposition is correct, in exercising the right to present witnesses, a defendant must 'comply with established rules of procedure and evidence.'" *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 411 n.15 (1988).

Claim 14 is denied as meritless.

**<u>Claims 19, 20, and 21:</u>**

Newell alleges that his right to a fair trial was violated by several instances of prosecutorial misconduct. (Doc. 38 at 153.) On direct appeal, Newell raised the allegations in Claim 19(A), challenging comments made during the prosecutor's closing argument vouching for the strength of the State's case. *Newell*, 212 Ariz. at 402-04, 132 P.3d at 846–48. He did not raise the remaining allegations of prosecutorial misconduct, Claim 19(B) though 19(E).[12] In Claim 20, Newell alleges that his due process rights were violated when

---

[11] Under Lockett *v. Ohio,* 438 U.S. 586 (1978), and Eddings *v. Oklahoma,* 455 U.S. 104 (1982), a capital defendant must be allowed to present, and the sentencer must consider, any evidence a defendant proffers as a basis for a sentence less than death.

[12] In Claim 19(B), Newell alleges misconduct based on the State's presentation of the actual ligature to the jury. Claim 19(C) alleges that the State engaged in misconduct when it played an unredacted tape of Petitioner's interrogation. Claim 19(D) alleges the prosecutor engaged in misconduct when he "appealed to vengeance" in his closing argument at the penalty phase. In Claim 19(E), Newell alleges that the Attorney General's

the trial court denied his motion for mistrial based on the prosecutorial misconduct alleged in Claim 19(A). (Doc. 38 at 166.)

During his closing argument, Newell's counsel contended that the State had not met its burden of proof and repeatedly asked why the State had not called certain witnesses. (RT 2/12/04 at 42–43.) In his rebuttal closing argument, the prosecutor responded that "defense counsel said that the defense doesn't have to prove anything, and that's true. But this case had 3,000 pages of police reports. Not every witness was called." (*Id.* at 57.) The Arizona Supreme Court rejected Newell's argument that this constituted improper vouching, explaining that the comments "were not meant to bolster the State's case" but "were an attempt to explain to the jury, in response to statements made in Newell's closing argument, why certain witnesses had not been called to testify." *Newell*, 212 Ariz. at 402, 132 P.3d at 846. The remarks "merely explained to the jury that there were simply too many documents and witnesses for either side to be able to present them all. The prosecutor did not imply that these police reports and witnesses supported the State's case." *Id.*

Also during his rebuttal closing argument, the prosecutor vouched for the superiority of DNA evidence. He stated that "no matter what defense counsel tells you, we all know that DNA is . . . the most powerful investigative tool in law enforcement at this time." (RT 2/12/04 at 59.) When defense counsel objected, the prosecutor commented that defense counsel knew the statement was true. (*Id.*) The court sustained the objection. (*Id.*)

On direct appeal, the Arizona Supreme Court found that the prosecutor's comments improperly vouched for the State's evidence and impugned the integrity of opposing counsel. *Newell*, 212 Ariz. at 403, 132 P.3d at 847. The court determined, however, that the comments did not deprive Newell of a fair trial. *Id.*

The court first noted that the jury was instructed "that anything said in closing arguments was not evidence" and jurors are presumed to follow the court's instructions. *Id.* The court concluded:

Office engaged in misconduct when it failed to disclose to Newell that his appellate lawyer had moved to their capital litigation unit during the PCR proceedings.

> When considered in the context of the entire trial, we agree [with the trial court] that the overwhelming evidence of guilt influenced the jury to convict Newell rather than the prosecutor's statements about the DNA evidence and defense counsel. Moreover, . . . Newell concedes the evidence overwhelmingly establishes his guilt. Therefore, despite the fact that these comments were improper, they were not so prejudicial as to deprive Newell of his right to a fair trial.

*Id.* at 403–04, 132 P.3d at 847–48 (citations omitted).

The rulings of the Arizona Supreme Court were neither contrary to nor an unreasonable application of clearly established federal law. First, the Arizona Supreme Court accurately characterized the prosecutor's comments about the scope of the case and the witnesses not called. The comments were a direct response to the argument made by defense counsel that the State had not met its burden because it failed to call certain witnesses. In that context, as the Arizona Supreme Court explained, the prosecutor was not vouching for his case but rather explaining that the State had made the choice not to call additional witnesses.

The Arizona Supreme Court's rejection of the claim challenging the prosecutor's comments about DNA and opposing counsel does not entitle Newell to habeas relief. First, as the court noted, the trial judge instructed the jury that what the attorneys said in closing argument was not evidence. (RT 2/12/04 at 7.) More significantly, the evidence of Newell's guilt was overwhelming. He confessed to the crime; he was spotted at the crime scene by an eyewitness; and his shoes matched prints at the scene. Given the strength of the evidence of his guilt, beyond any mention of DNA, the prosecutor's comments did not deprive Newell of a fair trial. *See Darden*, 477 U.S. at 182 (finding no due process violation where "[t]he weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges' . . . reduced the likelihood that the jury's decision was influenced by argument") (citation omitted); *see also Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (finding no due process violation where "the evidence of Petitioner's guilt of first-degree murder was very strong"). Accordingly, Claim 19(A) is denied as meritless.

Newell did not raise the remaining allegations in Claim 19 in state court. These unexhausted claims are procedurally defaulted. Because the claims do not allege ineffective assistance of trial counsel, their default is not excused under *Martinez*. *Hunton*, 732 F.3d at 1126–27.

In Claim 20, Newell alleges that his due process rights were violated when the trial court denied his motion for a mistrial based on prosecutorial misconduct. (Doc. 38 at 166.) Because Newell's right to a fair trial was not violated, as discussed above, the Arizona Supreme Court's rejection of this claim does not satisfy 28 U.S.C. § 2254(d). Claim 20 is denied.

In Claim 21, Newell alleges that appellate counsel performed ineffectively by failing to challenge multiple instances of prosecutorial misconduct and the trial court's rulings. (Doc. 38 at 174.) This claim is procedurally defaulted and barred from federal review. *Davila*, 137 S. Ct. at 2062–63 (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

**Claim 22:**

Newell alleges that his equal protection rights were violated when the trial court denied his *Batson* challenge. (Doc. 38 at 176.) The Arizona Supreme Court denied this claim on the merits. *Newell*, 212 Ariz. at 400–02, 132 P.3d at 844–46.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors based solely on their race. *Id.* at 89. During jury selection in Newell's case, prosecutors used a peremptory challenge to strike the only remaining African-American juror, Juror 34.[13] Newell raised a *Batson* challenge.

To justify the strike, the prosecutor cited Juror 34's views on the death penalty. (RT 2/2/04 at 40.) On the juror questionnaire, Juror 34 had answered that she "could not vote to give the death penalty under any circumstances." (*See id.*) During individual voir dire,

---

[13] There was another African-American juror on the panel, but he was dismissed for hardship. The State "would have been glad to have [him]" as a juror. (RT 2//2/04 at 40.)

when questioned by the prosecutor, Juror 34 first indicated that she "could not" vote for the death penalty then stated it was "more likely than not" that she would be unable to do so. (RT 2/27/04 at 68, 69.) Later, after questioning by the defense and the court, she stated that she could consider voting for the death penalty if the court instructed that it needed to be considered. (*Id.* at 70–73.) Based on these answers, the prosecutor conceded that he did not believe he had "grounds to strike her for cause." (*Id.* at 74.) However, he subsequently used one of his peremptory challenges to strike her based on her responses on the questionnaire and during voir dire. (RT 2/2/04 at 40.) He also noted that Juror 34 was a social worker and "we'd like to stay away from social workers if we can." (*Id.*) The court found that the State had provided "race neutral" reasons for striking Juror 34 and denied Newell's *Batson* challenge. (*Id.* at 41.)

Under *Batson*, a defendant's challenge to a peremptory strike requires a three-step analysis. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory strike on the basis of race. *See Rice v. Collins*, 546 U.S. 333, 338 (2006). If the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for the strike. *Id.* The trial court then must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

With respect to *Batson*'s second step, while the prosecutor must offer a "comprehensible reason" for the strike, *id.*, the reason need not be "persuasive, or even plausible," *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). "So long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338; *see Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion).

Under the third *Batson* step, the court is required to evaluate the persuasiveness of the justification to determine whether the prosecutor engaged in intentional discrimination. *Purkett*, 514 U.S. at 768. "The opponent of the strike bears the burden of persuasion regarding racial motivation." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). The court need not agree with the prosecutor's stated nonracial reason—the question is not

whether the reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed. *Hernandez*, 500 U.S. at 365. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

On direct appeal, the Arizona Supreme Court agreed with the trial court that the State satisfied *Batson*'s second step by presenting a race-neutral reason for striking Juror 34 and affirmed the trial court's denial of Newell's *Batson* challenge. *Newell*, 212 Ariz. at 402, 132 P.3d at 846. The court explained:

> The prosecutor's reason for striking the juror, which involved the juror's contradictory responses about whether she could vote to impose the death penalty, satisfied step two of *Batson* because it was facially race-neutral. Moreover, Newell offered no evidence, other than inference, to show that the peremptory strike was a result of purposeful racial discrimination. We find no error in the superior court's determination that the State's peremptory strike did not violate *Batson.*

*Id.* (citations omitted).

On habeas review, a petitioner is entitled to relief on a *Batson* claim only if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338. Thus, this Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. In addition, under § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338–39. Although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341–42. Finally, as the Supreme Court has noted, "[a] trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." *Ayala*, 135 S. Ct. at 2201.

Newell has not rebutted the presumption that the state courts' factual findings are correct. He has not provided sufficient evidence to supercede the trial court's credibility determination. *See Jamerson v. Runnels*, 713 F.3d 1218, 1230 (9th Cir. 2013) (finding state court not unreasonable in determining that the prosecutor's justification for challenging juror was genuine).

Newell notes that "the State had no trouble with vacillation from *death-inclined* jurors." (Doc. 52 at 118) (emphasis added). However, the fact that the prosecutor did not strike "death-inclined" jurors but did strike a juror who initially stated she was unable to vote for the death penalty does not suggest a racial motivation for the strike.

As the trial court found, the stated reason for striking Juror 34 was neither race-based nor pretextual. Based on her responses on the jury questionnaire and during voir dire, the prosecutor had legitimate doubts about her willingness to vote for the death penalty. *See Ayala*, 135 S. Ct. at 2200-01 (finding that prospective juror's perceived inability to impose death penalty was race-neutral reason for using peremptory challenge). Claim 22 is denied.

**Claim 50:**

Newell argues that his conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case. (Doc. 38 at 238.) He raised the claim in his PCR petition. The PCR court denied the petition without addressing the cumulative error claim. (ME 1/12/12).

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Newell cannot meet that burden.

The Ninth Circuit has stated that, "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973)). Assuming for

purposes of Newell's argument that the "cumulative error" doctrine is clearly established federal law, Newell is not entitled to relief.

The Court has addressed the "errors" asserted by Newell and has found that none occurred. Therefore, there are no trial errors to accumulate and no basis for finding that Newell's defense was rendered less persuasive or that his trial was "infected" with unfairness resulting in a due process violation. *See id.* at 927 (citation omitted); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Even if there were error, it would be harmless because the evidence of Newell's guilt was overwhelming and the impact of any error during the penalty phase was minimal in comparison with the strength of the aggravating factors. *Id.* at 928.

Claim 50 is denied.

## C.     Unexhausted and Procedurally Barred Claims

The remaining claims in Newell's petition are procedurally defaulted and barred from federal review.

### Claims 11, 13, 15–18, 23–28, and 31–32:

Claims 11, 15, 17, 23, 25, 27, and 31 allege trial error.[14] Newell failed to raise the claims on direct appeal. He is therefore precluded from relief under Ariz. R. Crim. P. 32.2(a)(3).

---

[14] In Claim 11, Newell alleges that his right to confront witnesses was violated when a medical examiner who did not perform the autopsy testified at trial. (Doc. 38 at 132.) Claim 15 alleges that Newell's right to due process was violated when the trial court "forced counsel into trying a case post-*Ring* before the new rules were clear." (*Id.* at 142.) In Claim 17, Newell alleges that his Eighth Amendment rights were violated when the trial court allowed the ligature to be admitted into evidence. (*Id.* at 148.) In Claim 23, Newell alleges that his rights were violated by a misleading jury instruction. (*Id.* at 179.) Claim 25 alleges that the trial court violated Newell's due process rights by instructing the jury Newell could be sentenced to life with the possibility of parole after only 35 years. (*Id.* at 183–84.) In Claim 27, Newell alleges that his Eighth Amendment rights were violated when the trial court precluded "execution impact testimony." (*Id.* at 187.) In Claim 31, Newell alleges that the application of Arizona's new death penalty statute violated the *Ex Post Facto* Clause. (*Id.* at 197.)

Newell argues that his default of the claims is excused by the ineffective assistance of appellate counsel or, under *Martinez*, by the ineffective assistance of PCR counsel. *Martinez* does not apply, however, because the claims do not allege ineffective assistance of trial counsel. *Hunton*, 732 F.3d at 1126–27.

Nor does the performance of appellate counsel excuse the default. As discussed above, before ineffective assistance of appellate counsel may be used as cause to excuse a procedural default, the ineffective assistance allegation itself must first be exhausted in state court. *Carpenter*, 529 U.S. at 453. In state court, Newell did not raise any claims of appellate ineffectiveness.

Based on this analysis, Claims 11, 15, 17, 23, 25, 27, and 31, are denied as procedurally defaulted and barred from federal review.[15]

In association with these claims, Newell also raises claims of ineffective assistance of appellate counsel. Again, in state court Newell did not raise claims of appellate ineffective assistance, so the claims are defaulted. As previously noted, *Martinez* excuses only claims of ineffective assistance of trial counsel, not appellate counsel, *Davila*, 137 S. Ct. at 2062–63, so Claims 13, 16, 18, 24, 26, and 32 are also procedurally defaulted and barred from federal review.

### Claims 34–49:

Newell raises a series of challenges to the death penalty, Arizona's death penalty statute, and his sentence. He raised these claims in his PCR petition. The PCR court denied

---

[15] The claims are also without merit. Newell is not entitled to relief on Claims 11, 23, and 27, for the reasons set forth in the Court's analysis of Claims 12, 24, and 28. Claim 25 is meritless for the reasons set forth in the Court's order denying a stay. (Doc. 75 at 5). Claim 15, alleging that counsel was forced to go to trial before the post-*Ring* rules were clear, is meritless because Newell's counsel did not perform ineffectively at sentencing. Claim 17 is meritless because admission of the ligature did not raise "the spectre of fundamental fairness such as to violate federal due process of law." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997). Claim 31, alleging an *ex post facto* violation, is meritless because the changes in sentencing caused by *Ring* were procedural and did not place Arizona capital defendants in jeopardy of greater punishment. *State v. Ring*, 204 Ariz. 534, 547, 65 P.3d 915, 928 (2004); *see Dobbert v. Florida*, 432 U.S. 282, 292 (1977).

the claims as precluded under Rule 32.2(a)(1) because they could have been brought on direct appeal. (ME 3/10/10 at 4.)

Newell argues that the default of these claims is excused by the ineffective assistance of PCR counsel—namely, PCR counsel's failure to allege that appellate counsel performed ineffectively in failing to raise the underlying claims. (*See, e.g.*, Doc. 38 at 205–06.) As noted, *Martinez* does not apply to claims of ineffective assistance of appellate counsel.[16] *Davila*, 137 S. Ct. at 2062–63. Claim 34–49 are denied as procedurally defaulted and barred from federal review.

Finally, in Claim 48 Newell alleges that he will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. (Doc. 38 at 227.) This claim is meritless. First, because Newell has not sought clemency, the claim is premature and not ripe for adjudication. More significantly, the claim is not cognizable on federal habeas review. Newell's challenge to state clemency procedures does not constitute an attack on his detention and thus is not a proper ground for habeas relief. *See Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam). Claim 48 is denied.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final

---

[16] Clearly-established federal law precludes relief on Newell's challenges to the constitutionality of the death penalty and Arizona's death penalty scheme. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *Lewis v. Jeffers*, 497 U.S. 764, 774–77 (1990); *Walton v. Arizona*, 497 U.S. 639, 652–56 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987). In addition, Claim 39 is meritless because the victim impact evidence did not include opinions about the crime, the defendant, or the appropriate sentence. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Claim 49 is meritless because, "The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006).

order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 1–4, alleging ineffective assistance of counsel at sentencing, and Claim 5, alleging that Newell's confession violated *Miranda* and was involuntary.

## V.     CONCLUSION

Based on the foregoing,

**IT IS HEREBY ORDERED** that Newell's Petition for Writ of Habeas Corpus (Doc. 38) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on September 26, 2012 (Doc 5) is **VACATED.**

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claims 1–5.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 20th day of March, 2019.

Honorable John J. Tuchi
United States District Judge